**Tab A**
**Excerpts of Deposition of**
**James F. Baskin (1/16/07)**

# COPY

1           IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3             CASE NO.: 05-101 ERIE

4

5   ROBIN NIXON,

6        Plaintiff,

7   vs.

8   NORFOLK SOUTHERN CORPORATION
   and NORFOLK SOUTHERN RAILWAY
   COMPANY, INC.,

9

        Defendant.

10

11

12

13

14                   605 South Ridgewood Avenue
                    Daytona Beach, Florida

15                    January 16, 2007
                    9:30 a.m.- 10:30 a.m.

16

17          DEPOSITION OF JAMES F. BASKIN

18

19      The above-styled cause came on for hearing

20   before me, June C. Miller, Court Reporter and Notary

21   Public, State of Florida at Large, at the time and place

22   indicated above for the purpose of taking testimony.

23

24

25

**SOUTHERN REPORTING COMPANY**
**P.O. Box 2264 . Daytona Beach, FL 32115-2264 . 386-257-3663**

1    Q.    What were your responsibilities as the track

2    supervisor?

3    A.    My job was to assist the division engineer in

4    the ongoing maintenance of the railroad facility.

5    Q.    When you say railroad facility, could you

6    define that?

7    A.    Yes.  I was responsible for the right of way of

8    the tracks.  I was not responsible for the bridges and

9    structures, but the tracks that the trains ran upon.

10    Q.    Were you responsible for the tracks that passed

11    through the city of Erie particularly the tracks between

12    Sassafras Street and, let's say, Liberty Street?

13    A.    I was responsible for the tracks through Erie.

14    Those two particular street names aren't really

15    registering where they would be exactly.

16    Q.    Have you ever been -- you've been in the city

17    of Erie, correct?

18    A.    I have, yes.

19    Q.    Do you recall there being a section near

20    downtown Erie that -- on West 19th Street where the

21    tracks were located and they actually ran through --

22    they actually ran along the middle of West 19th Street

23    on pavement?

24    A.    Yes, sir.

25    Q.    When I say "on pavement," I don't mean the

1     A.   He is not, sir.

2     Q.   Could you tell me what exactly you discussed

3  with Mr. Taft prior to your deposition?

4     A.   Mr. Taft has asked me what my duties were with

5  the Norfolk Southern Railway Company and if I had

6  knowledge of an incident that occurred there.

7     Q.   Is that all that you talked about?

8     A.   Basically, yes, sir, to my recollection.

9     Q.   How long did you meet with Mr. Taft prior to

10  your deposition?

11     A.   Approximately one hour, sir.

12     Q.   Now, getting back to the West 19th Street area

13  that we're talking about, you said that you were

14  responsible for the maintenance of the track right of

15  way?

16     A.   Yes, sir.

17     Q.   Could you explain that in a little more detail

18  what you mean by maintenance.  And I mean not with

19  respect to the rails or ties themselves.  Is there any

20  maintenance that you were responsible for as far as the

21  roadway or the pavement?

22     A.   Actually, in that section of Erie,

23  Pennsylvania, the railroad was -- the ownership was from

24  one end of the tie to the other end of the tie, which is

25  eight foot, six inches.  We were responsible for any

1    defect which occurred in there and, obviously, in the

2    rail or the ties.

3        Of course, the City had utilities which went

4    underneath our tracks and we at times had to work with

5    the City as far as protecting them from train traffic

6    and that type of thing.

7        Q.   Do you recall any individual that you worked

8    with or knew from the City?

9        A.   No.  No specific names.  I know Lou Tullio was

10   mayor at that time and I think I only met him once.

11       Q.   What about the pavement that was between or

12   over the ties?

13       A.   The pavement over the ties, if that were -- the

14   railroad took care of that if there was a problem with,

15   like, a pothole in the pavement or whatever.  If we had

16   to do work on the track we restored that portion.

17       Q.   Who had the responsibility of inspecting -- I'm

18   assuming that you did inspect the right of way

19   occasionally.  Who had that responsibility?

20       A.   Exactly what time frame, sir?

21       Q.   Well, in April of 1997.  That was the time,

22   April 27 was when --

23       A.   Because I had different inspectors and

24   different assistants, so I'm trying -- I honestly can't

25   tell you who the assigned track inspector was at that

1  the safety rule book that applied to children in

2  residential areas such as the West 19th Street area

3  where the tracks were in the roadway of 19th Street?

4      A.  No.  Not that I recall.

5      Q.  During your weekly travels along the tracks in

6  that area, that paved area of West 19th Street, is it

7  your testimony you never saw any children playing along

8  the tracks?

9      A.  I don't recall, sir.  I don't recall seeing any

10  children playing along the tracks.  There was a sidewalk

11  off to the side of that street and there was obviously

12  foot traffic but that's all.

13      Q.  Were you aware that there was a playground

14  located along the south side of West 19th Street in that

15  area?

16      A.  No, sir.  I was not.  I recall cemetery as an

17  open area there, but that's the only open non built-up

18  area I recall.

19      Q.  Were you aware of any safety officer that would

20  have been responsible for the safety along the West 19th

21  Street tracks?

22      A.  Safety officer employed by who, sir?

23      Q.  By Norfolk Western or Southern.

24      A.  Actually, the officers of the company no matter

25  whose responsibility befell them, everyone is

**Tab B**
**Excerpts of Deposition of**
**Steve W. Frye (6/2/06)**

1                IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3

4   ROBIN NIXON,                    )
                                    )
5            Plaintiff,             )
                                    )
6                                   )
    vs.                             ) CIVIL ACTION NO. 05-101 ERIE
7                                   )
                                    )
8                                   )
    NORFOLK SOUTHERN CORPORATION    )
9   and NORFOLK SOUTHERN RAILWAY    )
    COMPANY, INC.                   )
10                                  )
             Defendant.             )
11

12

13                   **DEPOSITION FOR PLAINTIFF**

14

15

16                   ***      ***      ***

17

18          The deposition of **STEVE W. FRYE** was taken in behalf

19   of the Plaintiff before Linda A. Fox, Certified Court Reporter

20   and Notary Public for the State of Kentucky at Large at 400

21   West Market Street, Suite 1800, Louisville, Kentucky on

22   June 2, 2006 at 9:28 a.m.  Said deposition was taken pursuant

23   to Notice for purposes of discovery and for use at trial

24   pursuant to the Pennsylvania Rules of Civil Procedure.

25

| | | |
|---|---|---|
| 10:22:16 | 1 | recorded statement and -- and, naturally, I didn't take notes |
| :20 | 2 | because I had the recorded statement.  I considered that quite |
| 10:22:24 | 3 | a bit better than notes, quite frankly, and I didn't review |
| 10:22:27 | 4 | it.  So I wouldn't differ with it, but I can't verify it one |
| 10:22:27 | 5 | way or the other. |
| 10:22:34 | 6 | **Q.**  Okay.  Do you recall, during your investigation, |
| 10:22:36 | 7 | looking at any area on the north side of the north track that |
| 10:22:45 | 8 | may have caused a hazard for -- for Mr. Nixon's bicycle, in |
| 10:22:54 | 9 | terms of a bump or a hole or some missing asphalt? |
| 10:23:00 | 10 | **A.**  Or perhaps the propensity to hold onto a moving |
| 10:23:00 | 11 | train? |
| 10:23:04 | 12 | **Q.**  No, that wasn't part of my question. |
| 10:23:06 | 13 | **A.**  I know.  I was just bringing that in.  Go ahead. |
| ...:23:11 | 14 | **Q.**  Well, my -- my question was, did you -- did you, in |
| 10:23:13 | 15 | your investigation, did you try to determine if there was |
| 10:23:17 | 16 | anything in the -- on the north side of the track that would |
| 10:23:21 | 17 | have interfered with Mr. Nixon's bicycle traveling in that |
| 10:23:25 | 18 | area? |
| 10:23:29 | 19 | **A.**  I took photographs of the area and the photographs |
| 10:23:32 | 20 | are of that side of the track.  Actually, they're the -- |
| 10:23:38 | 21 | they're that side of the track, they're showing the tracks and |
| 10:23:41 | 22 | they're showing the city street. |
| 10:23:45 | 23 | Mr. Nixon was traveling on a city street, not on |
| 10:23:50 | 24 | railroad property when he was holding onto the side of that |
| ?:52 | 25 | train.  I didn't see anything specifically in the city street |

| | | |
|---|---|---|
| 10:23:58 | 1 | that would caused him to -- to have lost control of his |
| 1:05 | 2 | bicycle; however, I -- I would also say that there was a lot |
| 10:24:10 | 3 | of city street he could have traveled on and I didn't check |
| 10:24:14 | 4 | the whole street, specifically, the street where he should |
| 10:24:18 | 5 | have been traveling rather than where he was, but -- but, no. |
| 10:24:21 | 6 | Q.    Okay.  Well, you said that -- that Mr. Nixon was |
| 10:24:21 | 7 | traveling on the city street and not the right of way? |
| 10:24:33 | 8 | A.    That's correct. |
| 10:24:34 | 9 | Q.    Tell me what the right of way consists of? |
| 10:24:37 | 10 | A.    I don't know.  You'll have to do other investigation |
| 10:24:40 | 11 | on your own in reference to that, simply because I'd tell you |
| 10:24:43 | 12 | if I knew.  But I know this much, that Mr. Nixon was traveling |
| 10:24:50 | 13 | on public property and not railroad property just -- and I |
| 10:24:55 | 14 | can't tell you exactly where it started or stops, but I |
| 10:24:59 | 15 | know -- I know that the railroad is responsible simply for the |
| 10:25:01 | 16 | rails.  And -- and, to my understanding, to the end of the |
| 10:25:06 | 17 | railroad ties. |
| 10:25:08 | 18 | Now, a rail car will -- will exceed that width, and |
| 10:25:14 | 19 | that places him in a city street, on property owned by the |
| 10:25:20 | 20 | City of Erie, Pennsylvania rather than on railroad property, |
| 10:25:23 | 21 | when he was hitchhiking a ride by grabbing onto a moving train |
| 10:25:30 | 22 | while riding his bicycle. |
| 10:25:32 | 23 | Q.    Do you know how long a railroad tie is? |
| 10:25:36 | 24 | A.    It's less than the width of a railroad car.  I can't |
| 5:40 | 25 | give you the specific width of a railroad tie without looking |

| | | |
|---|---|---|
| 10:25:44 | 1 | at it, measuring it and, perhaps, looking at some specs on it. |
| :49 | 2 | Q.  Well, you would agree with me that it would |
| 10:25:50 | 3 | extend -- well, strike that. |
| 10:25:56 | 4 | You -- you would agree with me -- well, let me ask |
| 10:25:59 | 5 | you this, do you know what the distance is rail to rail? |
| 10:26:04 | 6 | A.  Not specifically, it's in the range of |
| 10:26:06 | 7 | four-something-feet. |
| 10:26:08 | 8 | Q.  And you -- would you agree with me that if you -- if |
| 10:26:11 | 9 | you viewed a set of rails, whether they be here on West 9th |
| 10:26:14 | 10 | Street -- or West 19th Street or any railway -- commercial |
| 10:26:21 | 11 | railway, that the railroad ties would -- would extend beyond |
| 10:26:36 | 12 | the outer limits of both tracks? |
| 10:26:36 | 13 | A.  I would.  At -- no.  Well, the outer limits of -- |
| ...26:36 | 14 | you're talking about past the rails on both sides, that's what |
| 10:26:36 | 15 | you're trying -- |
| 10:26:40 | 16 | Q.  Right.  I mean, you have the -- you have the -- the |
| 10:26:40 | 17 | section between the rails and then there's the areas that are |
| 10:26:45 | 18 | outside of that section on -- to both outsides of the rails? |
| 10:26:51 | 19 | A.  Yes, you're correct. |
| 10:26:52 | 20 | Q.  And you don't know how far the railroad tie extends |
| 10:26:52 | 21 | beyond the rail into that outside area, do you? |
| 10:27:00 | 22 | A.  I do, it -- it's going to be something in the range |
| 10:27:09 | 23 | of a foot and a half to two foot, maybe less, maybe a little |
| 10:27:14 | 24 | more. |
| ·7:14 | 25 | Q.  Okay.  Well, you said earlier that you -- that Robin |

10:27:18    1    was on a city street?

7:20    2        A.    Yes, sir.

10:27:22    3        Q.    But you don't actually know where his wheel was when

10:27:26    4    he had the accident, do you?

10:27:30    5        A.    Well, it depends on where you said -- what the exact

10:27:35    6    timing of it is.  Obviously, at one point during the accident,

10:27:41    7    he, himself, was under a rail car on railroad property.

10:27:50    8        Q.    Right.

10:27:51    9        A.    Now, as for riding along beside that rail --

10:27:56    10    railroad car, I'm absolutely certain that prior to his bicycle

10:28:05    11    not rolling along, he was on city property.

10:28:08    12        Q.    Well, tell me what the basis of your certainty is?

10:28:14    13        A.    The rail car itself will extend past the end of the

10:28:17    14    railroad ties.  An arm on a bicycle, reaching from a bicycle,

10:28:23    15    reaching to the railway cars, additionally, gives you a buffer

10:28:27    16    zone in that relation.  But he could not have -- if he were --

10:28:32    17    he would have had to been underneath for a certain number of

10:28:41    18    feet or so, the railway car itself, to have been on railway

10:28:47    19    property, because the railway car, itself, is wider than

10:28:51    20    the -- than the ends of the railroad ties.

10:28:51    21        And, if he's going along on his bicycle -- and I'm

10:28:58    22    not a scientist and I am not somebody who can mathematically

10:28:58    23    tell you -- but common sense folks will tell you if you're

10:28:58    24    reaching out touching something, then you're out further, even

9:07    25    so, than -- than the rail car would be.  And if -- if that

10:29:07  1  were the case, then he was on a city street and not on railway

9:07  2  property when this accident occurred.

10:29:19  3      **Q.**   Well, would it be fair to say that you don't really

10:29:21  4  know what the position of Mr. Nixon's arm was.  The way you

10:29:25  5  described it, you kind of indicated that his was straight out

10:29:29  6  from his body so that that would put another buffer zone in

10:29:33  7  there, but you don't know that for a fact, do you?  You're --

10:29:36  8  you're just making an assumption, correct?

10:29:46  9      **A.**   No, I'm not making an assumption.

10:29:46  10      **Q.**   Well, did you -- did you observe Mr. Nixon as he was

10:29:51  11  grabbing onto the rail car?

10:29:54  12      **A.**   I didn't.

10:29:54  13      **Q.**   Okay.  Isn't it possible that Mr. Nixon could have

10:29:59  14  been next to the rail car but have his arm basically

10:30:05  15  straightforward in front of him and -- and hanging on with his

10:30:09  16  arm going forward rather than sideways?

10:30:13  17      **A.**   Absolutely.  And, at that point, he would have been

10:30:16  18  on a city street.

10:30:18  19      **Q.**   And -- and you're certain that a rail car extends

10:30:23  20  beyond the end of the railway tracks?

10:30:26  21      **A.**   Absolutely, sir.

10:30:29  22      **Q.**   Okay.  But you don't know how much?  And you said

10:30:34  23  earlier that the -- the railroad -- railway tie extended a

10:30:38  24  foot and a half to two or maybe a little more feet beyond the

0:38  25  rail track --

10:30:47  1          MR. TAFT:  Objection.

:40  2      Q.   (BY MR. SOLYMOSI) -- correct?

10:30:40  3          MR. TAFT:  That -- objection.  That was not his

10:30:49  4   testimony.

10:30:49  5      Q.   (BY MR. SOLYMOSI) Well, then why don't you tell me

10:30:52  6   where I'm wrong Mr. -- I'm sorry -- Steve.  That was what I

10:30:56  7   call -- recalled you saying, if I'm wrong --

10:30:57  8          MR. TAFT:  He -- he estimated a foot and a half

10:31:02  9   to two feet, by estimate.  He did not say anything about in

10:31:04  10   excess of two feet, is that correct?

10:31:06  11          MR. SOLYMOSI:  I believe that he said a little

10:31:08  12   bit or a little bit more, Roger.

10:31:09  13          MR. TAFT:  Well, the -- the record will reflect

10:31:11  14   that.

10:31:12  15          MR. SOLYMOSI:  Yeah.  Okay.

10:31:12  16          MR. TAFT:  He -- he's giving you an estimate

10:31:13  17   without a measurement.

10:31:14  18          MR. SOLYMOSI:  I -- I understand that.

10:31:17  19      Q.   (BY MR. SOLYMOSI) Can you give me an estimate of

10:31:19  20   how -- how much fur -- how far a rail car extends beyond the

10:31:22  21   track?

10:31:24  22      A.   I think I'd be going into speculation there.  I'm

10:31:27  23   just trying to give you an overall view of what may have

10:31:32  24   occurred.  I think you can more precisely get the facts

1:33  25   through experts that could -- could do that measuring for you.

| | |
|---|---|
| 10:31:39 | 1 |
| :43 | 2 |
| 10:31:46 | 3 |
| 10:31:52 | 4 |
| 10:31:56 | 5 |
| 10:31:59 | 6 |
| 10:32:04 | 7 |

1  I -- I'm just trying to give you an idea and -- and help you

2  understand what may occurred as a result of what I found

3  through my investigation.  And, basically, my investigation, I

4  don't believe, would be proved wrong but you're welcome to

5  assess those facts yourself.  So I believe -- I believe my

6  investigation will show that young Mr. Nixon was on a city

7  property prior to his fall under the railway car.

8      Q.    Okay.  Well, I was just trying to determine, you

9  know, why you say that you were certain, because you said you

10 were certain, now you say that you'd be speculating on how

11 wide a train is but I -- I understand your position on that

12 now.

13     A.    All right.  I appreciate that.

14     Q.    Were there any other witnesses that you talked to

15 about the accident?

16     A.    Not to my recollection, Mr. Solymosi.

17     Q.    Are you aware of any studies that were conducted,

18 with respect to the safety, along the West 19th Street tracks?

19     A.    I'm not aware of any.

20     Q.    In -- in the course of your job duties, that

21 wouldn't be something that you would encounter anyhow, is that

22 correct?

23     A.    Obviously, not in this case because I'm not aware of

24 any.

25     Q.    Okay.  What -- what safety policies are you aware of

**Tab C
Excerpts of Deposition of
Robert B. Glenn (5/23/06)**

1          IN THE UNITED STATES DISTRICT COURT FOR THE
2               WESTERN DISTRICT OF PENNSYLVANIA

3                        - - - -

ROBIN NIXON,                      )
4                                 )
              Plaintiff,          )
5                                 )
                -vs-              )      CIVIL ACTION
6                                 )      NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION      )
7  and NORFOLK SOUTHERN RAILWAY    )
COMPANY, INC.,                    )
8                                 )
              Defendants.         )
9

10                       - - - -

11           DEPOSITION OF:  ROBERT B. GLENN

12                       - - - -

13

14              DATE:      May 23, 2006
                           Tuesday, 11:30 a.m.

15

16              LOCATION:  Segel & Solymosi
                           818 State Street
                           Erie, PA 16501
17                         814-454-1500

18

19              TAKEN BY:   Plaintiff

20              REPORTED BY:  Toni Rennebeck, RPR
                              Notary Public
21                            NMR Reference No. 052306A

22

23

24              **CERTIFIED COPY**

25

1        document that you carry on board with you at all

2        times?

3  A.   Everybody has one in their possession in their

4        -- that we carry personally.

5  Q.   I see.

6  A.   It's not just on the train.

7  Q.   Okay.  And during the break you had taken a look

8        inside the document and you identified I think

9        on page 90 where the speed limit is indicated --

10  A.   70, sir.

11  Q.   -- 15 miles an hour for that stretch between

12        State and Cranberry --

13  A.   That is correct.

14  Q.   -- on the 19th Street tracks; right?

15               MR. TAFT:  Page 70.

16  A.   Page 70, yeah.

17  BY MR. SOLYMOSI:

18  Q.   Okay.  Are there any other documents that you

19        would have had in your possession at the time

20        with regard to safety protocols for the

21        operation of your train?

22  A.   Dispatcher's bulletin.

23  Q.   Dispatcher's bulletin?  I'm not sure if I have

24        that or not.

25               MR. SOLYMOSI:  Do you know if that's

1  Q.   Was there ever any incident report filed that

2       you're aware of with regard to a person living

3       on the north side of the tracks complaining that

4       someone on the train was shouting obscenities?

5  A.   None that I'm aware of; no, sir.

6  Q.   Were you aware of any signs that were in place

7       regarding children along that stretch from State

8       Street to Cranberry?

9  A.   No, sir.

10 Q.   Prior to the accident had you noted any children

11      in that area riding bikes?

12 A.   None.

13 Q.   Never saw a single child riding a bike while you

14      traversed through that area?

15 A.   No.

16 Q.   Did you ever notice any children in the

17      playground on the south side of the street as

18      you traversed through the area?

19 A.   I don't remember a playground.

20 Q.   I wasn't sure if I asked you that before.

21           You don't recall a playground being

22      --

23 A.   No, I don't.

24 Q.   -- on the south side of the tracks in that area?

25 A.   No.

1  Q.  So is it fair to say then you never took any

2      steps to prevent children from coming into

3      contact with your right-of-way or the train

4      itself while you were going through that

5      neighborhood?

6  A.  No, sir; I didn't observe that.

7  Q.  And, I'm sorry, where were you located on the

8      train?

9  A.  On the -- physically on the lead locomotive.

10 Q.  Okay.  How far back are you able to see?

11 A.  Not very far if we're in a curve.  It depends on

12     if the cars are blocking you or not.

13 Q.  Okay.  How many people were on the train who

14     comprised the train on the day of Robin Nixon's

15     accident?

16 A.  Me and Tim Price.

17 Q.  Just two of you on the train?

18 A.  That is correct.

19 Q.  And you were both in the lead car.  Or lead

20     locomotive.

21 A.  Lead locomotive.

22 Q.  And you did make a written report about the

23     accident; is that correct?

24 A.  Yes, sir.

25 Q.  I'm going to mark this as your Deposition

```
 1        Exhibit 3.

 2                        - - - -

 3          (There was a discussion off the record.)

 4                        - - - -

 5                    (Deposition Exhibit No. 3 marked for

 6        identification.)

 7                        - - - -

 8   BY MR. SOLYMOSI:

 9   Q.    Could you identify Exhibit 3?

10                        - - - -

11          (The witness reviewed the document.)

12                        - - - -

13   A.    Statement of train and engine crews.

14   BY MR. SOLYMOSI:

15   Q.    And is this the document you referred to a

16        minute ago?

17   A.    Did I refer to?

18   Q.    Yes.  I thought you said you wrote out a report

19        or a statement.

20   A.    Oh, yes.  I said that, yes.

21   Q.    Okay.  And that's your signature at the bottom,

22        Robert B. Glenn?

23   A.    Yes, it is.

24   Q.    Okay.  You have marked on here that the speed of

25        the train was 8 miles per hour; correct?
```

1    A.    That's correct.

2    Q.    And how do you know it was 8 miles per hour?

3    A.    That's what I asked the engineer.

4    Q.    So the engineer told you that?

5    A.    Yes, sir.

6    Q.    Did you have any discussions with the City of

7         Erie police after the accident?

8    A.    I imagine I did.

9    Q.    There's an exhibit here that's been previously

10        marked as Morgan Deposition Exhibit 4 and it's a

11        City of Erie police report.

12                   On the second page of the report

13        towards the bottom it does indicate -- third

14        paragraph up --

15                        - - - -

16        (The witness reviewed the document.)

17                        - - - -

18                   (There was a discussion off the

19        record between Mr. Taft and the witness.)

20                        - - - -

21   BY MR. SOLYMOSI:

22   Q.    -- that apparently --

23                   MR. TAFT:  Let him finish looking at

24        it.

25                   MR. SOLYMOSI:  Oh, I'm sorry.

1  A.    Yes.

2  Q.    So can you recall specifically whether or not

3        you were with Mr. Price when the two of you

4        filled these out, or --

5  A.    No, sir.

6  Q.    Okay.  At the time of the accident, or when you

7        were notified of the accident, do you know where

8        your actual location was with respect to the

9        lead locomotive?

10  A.    We were close to Amthor Steel.

11  Q.    That would be --

12  A.    I think it was -- we had just --

13             We were in the neighborhood of --

14             We'd gone passed Ash Street, and we

15        -- if I remember correctly, we had just gone

16        passed the signal Ash Lane right after Ash

17        Street, and --

18  Q.    That's a pretty fair distance then from the

19        accident scene; correct?

20  A.    Yes, sir.

21  Q.    Your statement indicated that the flashers were

22        on, the bells were ringing, and the condition of

23        the crossing was okay.

24             Just to be clear, is it fair to

25        assume that that statement is based on what you

**Tab D
Excerpts of Deposition of
David C. Morgan (5/23/06)**

1

```
1              IN THE UNITED STATES DISTRICT COURT FOR THE
                   WESTERN DISTRICT OF PENNSYLVANIA
2

3                               - - - -

   ROBIN NIXON,                    )
4                                  )
              Plaintiff,           )
5                                  )
                 -vs-              )       CIVIL ACTION
6                                  )       NO. 05-101 ERIE
   NORFOLK SOUTHERN CORPORATION    )
7  and NORFOLK SOUTHERN RAILWAY    )
   COMPANY, INC.,                  )
8                                  )
              Defendants.          )
9

10                              - - - -

11            DEPOSITION OF:  DAVID C. MORGAN

12                              - - - -

13

14            DATE:       May 23, 2006
                          Tuesday, 9:45 a.m.
15

16            LOCATION:   Segel & Solymosi
                          818 State Street
                          Erie, PA 16501
17                        814-454-1500

18

19            TAKEN BY:   Plaintiff

20            REPORTED BY: Toni Rennebeck, RPR
                           Notary Public
21                         NMR Reference No. 052306

22

23
                       CERTIFIED COPY
24

25
```

1    their employment with subsequent name changes

2    since.  I've been an assistant to the

3    trainmaster and assistant trainmaster both in

4    Williamson, West Virginia.

5                I went to Lorain, Ohio as an

6    assistant trainmaster in '76.

7                And then in 1977 I was promoted to

8    trainmaster in Conneaut, Ohio.  And I left there

9    in 1997.

10   Q.    What year was that that you were appointed

11         trainmaster?

12   A.    '77.  1977.

13   Q.    Okay.  I'm sorry to interrupt you.

14   A.    And I believe it was June of 1997 I went to

15         Lexington, Kentucky as trainmaster.

16                And January 2000 I went to my present

17         position as assistant terminal superintendent in

18         Bellevue, Ohio where I'm currently located.

19   Q.    It sounds like a nice long career with one

20         employer so to speak.

21   A.    Yes.

22   Q.    Even though there was a merger that occurred I

23         understand.

24                As far as your civil engineering

25         degree goes, did you have any specialized

1    alcohol.  I probably took some train-the-trainer

2    courses because I've held a lot of classes

3    myself for RT&E employees with regard to

4    operating and safety rules.  And that would

5    basically be the extent.

6  Q.   And that would have been one class?

7  A.   Oh, no.  Probably several classes that was

8    train-the-trainer.  I would get trained and then

9    I would come back to my location and then hold

10    classes for our train and engine personnel.

11  Q.   Okay.  Now, what exactly does the train master

12    do?  What are your duties and --

13  A.   The trainmaster is responsible for the safety

14    and efficient operation of the train movement

15    within the territory that he covers.  He or she

16    covers.

17  Q.   And would it be correct to assume that you were

18    responsible for the safe operation of the train

19    that Robin Nixon had his accident with in 1997?

20  A.   I was their supervisor at the time responsible

21    for their training; that's correct.

22  Q.   Okay.  Well, I thought you said that you were

23    responsible for the safe and efficient operation

24    of the trains that are in your territory.

25  A.   Right.  Well, that's of the personnel.  You

1                    MR. TAFT:  You may answer.

2  A.    That's correct.  Those rules govern the

3        operation of the trains.

4  BY MR. SOLYMOSI:

5  Q.    Okay.  Are there any written rules that you're

6        aware of or policies that would address

7        situations where children are known to be near

8        the railway?

9  A.    Not that I recall, no.

10 Q.    In your training, was that situation ever

11       discussed?  And what I mean is children playing

12       alongside or being in the vicinity of your

13       railway.

14 A.    The only discussion would be trespassers,

15       whether it be adults, whether it be children, we

16       would notify the local police if we observed

17       that activity taking place.

18 Q.    How familiar are you or were you with these --

19                    And when I say --

20                    Maybe to make this simpler, when I

21       say with the tracks in question, I'm going to be

22       referring to the West 19th Street tracks that

23       were in operation at the time of Robin Nixon's

24       accident and the tracks that are in that general

25       location; is that fair?

1   A.   Yeah.  I was based out of Conneaut, as I told

2        you, for 20 years, and that territory was my

3        territory during that time, so I have visited

4        that stretch of track often.

5   Q.   How often?

6   A.   Oh --

7   Q.   I mean, prior to that accident.  Can you guess?

8   A.   I can't even -- honestly I can't guess.  I mean,

9        I --

10  Q.   Would it have been dozens of times?

11  A.   Oh, I'm sure, yes.  Over 20 years, yes.

12  Q.   Okay.  And when you visited, were you on a

13       train, or did you visit while you were in a

14       vehicle or on foot?

15  A.   Both.

16  Q.   Both.  And did you ever observe children playing

17       alongside that railway track on 19th Street?

18  A.   Honestly I can't recall if I did or not because

19       that's a roadway on both sides with traffic and

20       I don't -- honestly I can't recall seeing kids

21       playing in the roadway.

22  Q.   As part of your responsibilities to be

23       responsible for the crew and the operation of

24       that train, would that require you to become

25       familiar with that area in particular?

1      that territory, the physical territory along the

2      West 19th Street tracks in the area that Robin

3      Nixon was injured?

4  A.   Oh, yes.  Like I said, just being there 20 years

5      I better have been familiar with it.

6  Q.   Okay.  How would you characterize that area?

7      Are you familiar with State Street in Erie?

8  A.   The overhead bridge, State, yes.

9  Q.   And I'm talking about the track that would --

10      the portion of the track that would run west

11      from State, westward toward maybe Raspberry

12      Street, if you're familiar with Raspberry

13      Street.

14  A.   Yes.

15  Q.   I think that's fairly close.  Maybe a block or

16      two short of where the paved roadway ended.

17              So for that area, how would you

18      characterize that area in terms of what was

19      there and what activities were going on?

20  A.   Of course, it's right down the middle of 19th

21      Street on -- at least on the north side I

22      remember there's homes.  I don't think there's

23      homes all the way on the south side.

24              But as we go down, or go east or west

25      on 19th Street, you do have vehicular traffic

1         that can also pass on either the north or south

2         side of the tracks because it is a paved road.

3    Q.   Okay.  Is there anything else that you would

4         consider to be significant in that area when you

5         became familiar with it?

6    A.   No, other than it's kind of unique to be going

7         right down the middle of a street.

8    Q.   Well, in fact, doesn't -- at the time of this

9         accident isn't it correct that the railway and

10        the right-of-way shared the roadway?

11                   MR. TAFT:  Object to form.

12                   MR. SOLYMOSI:  Your objection is

13        noted.

14   BY MR. SOLYMOSI:

15   Q.   You can answer the question.

16                   MR. TAFT:  If you're able to answer

17        it.

18                   Let me object to the form of the

19        roadway.

20                   MR. SOLYMOSI:  Well, you can object

21        to it, Roger.

22   BY MR. SOLYMOSI:

23   Q.   But my question is would you agree that the

24        railway shared 19th Street with traffic?

25        Vehicular traffic?

```
 1          tracks?

 2    A.    There is no specific training that I'm aware of

 3          other than the fact that all officers of the

 4          company should report trespassers.

 5    Q.    What do you consider to be a trespasser?

 6    A.    Non-railroad employees on railroad property

 7          without authorization.

 8    Q.    And on that roadway, on 19th Street, what did

 9          you consider to be railroad property?

10    A.    Our right-of-way.  Track structure.

11    Q.    So would that be the area between the two rails?

12    A.    The area from the tie ends to the tie ends.

13    Q.    How long are the ties?  I mean, the tie -- there

14          were no --

15    A.    I don't know.

16    Q.    Well, okay.  I'm sorry, I interrupted you.

17                 When you say the tie ends, you're

18          referring to the railroad ties.

19    A.    That's correct.

20    Q.    They're perpendicular and underneath the steel

21          rails?

22    A.    That's correct.

23    Q.    And you don't know how long they are.

24    A.    I honestly don't.

25    Q.    Okay.  You'd agree with me that there weren't
```

1   Q.   Are you familiar with the term shared roadway

2        with respect to trains?

3   A.   See, the problem is we cross a lot of crossings.

4        Are you saying we share the crossing?  We share

5        the right-of-way with the crossing?

6   Q.   No, I'm talking about a situation where you have

7        perpendicular with the flow -- not perpendicular

8        -- parallel with the flow of the train and the

9        tracks, what I understand that there's a term of

10       art out there in the railway world that there

11       are shared pathways, shared roadways where

12       trains and pedestrians, vehicles, bicycles

13       travel in a parallel direction on the same

14       roadway.

15                You're not familiar with that term or

16       that concept?

17  A.   Actually, no.  I'm saying we have a

18       right-of-way.  Now, once we go through, vehicles

19       can go back and forth, people can go back and

20       forth.  When we are going through, a vehicle can

21       be on the north side and a vehicle can be on the

22       south side and go in the same direction or in

23       the opposite direction, but they aren't sharing

24       the same spot at the same time.

25  Q.   Well, I think that's obvious.  If they are,

1      there's going to be a collision; right?

2   A.  Right.  So, I mean, the term shared roadway, I

3       mean, we have our right-of-way through there

4       that we use, and once we get through, then other

5       people can cross there, yes, if that's what you

6       mean.

7   Q.  You'd agree that when we talk about the roadway,

8       we're talking about the area curb to curb that

9       contains a pathway for vehicles traveling west

10      and when I say vehicles, I mean autos or

11      bicycles --

12  A.  Right.

13  Q.  -- and vehicles and bicycles traveling east

14      adjacent to the tracks that are in the center of

15      the roadway; right?

16  A.  Yeah.

17  Q.  Okay.  And you're telling me that it was

18      possible at the time for vehicular traffic to be

19      on that same roadway at the same time that the

20      train was traveling down the center of the

21      roadway on its right-of-way.  Is that a fair

22      statement?

23  A.  You're going to have to repeat that one again.

24  Q.  You told me earlier that it was possible for

25      vehicles to be traveling on the roadway on West

1      are attracted to watch it and look at it and

2      that kind of stuff.  Maybe you got railroad

3      buffs.

4  Q.  What about with regard to children?  Do you

5      understand that sometimes children are attracted

6      to railways and locomotives and cars?

7  A.  Sure.  Children, adults, yeah.

8  Q.  What kind of training have you had in that

9      regard during all the years you've been with the

10     railroad?

11  A.  Nothing specific, other than, as I told you

12     before, if there's any trespassers, we would

13     notify the local authorities.

14  Q.  Would it be fair to say then that you did

15     nothing in the time that you were a trainmaster

16     to try to prevent such accidents as occurred to

17     Mr. Nixon?

18  A.  That's correct.  That's the first accident of

19     that type that even occurred.

20  Q.  Do you know why the tracks were laid in the

21     middle of 19th Street?

22  A.  I don't know if the tracks were there first and

23     the street was there second or the street was

24     there first and the tracks were there second.  I

25     don't know the history behind it.

1                              -  -  -  -

2                  (The witness reviewed the document.)

3                              -  -  -  -

4                  (Mr. Taft reviewed the document.)

5                              -  -  -  -

6   BY MR. SOLYMOSI:

7   Q.    It states:  Upon speaking to the engineer of the

8         Norfolk and Southern train, Tim Price -- he gave

9         the following information to us:  The train was

10        bound for Buffalo, New York from Conneaut, Ohio.

11        The lead engine -- I'm going to skip the number,

12        the next engine and the third -- he identified

13        the numbers of the train.  He says:  The train

14        was carrying 150 loads (cars) of coal with none

15        empty.  The train was 7,225 feet long weighing

16        18,983 tons traveling 15 miles per hour.

17                  Do you have any idea why there might

18        be a discrepancy between the police report and

19        your report?

20  A.    No.

21  Q.    How were the tracks classified on 19th Street at

22        the time of this accident?

23  A.    The maximum speed limit was 15 miles per hour.

24  Q.    And how is that determined?

25  A.    The engineering department who's responsible for

**Tab E**
**Excerpts of Deposition of**
**Ervin L. Nixon (1/18/07)**

1                    IN THE UNITED STATES DISTRICT COURT

2               FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3
                                    - - -
4
ROBIN NIXON,                          )
5                                     )
                    Plaintiff,        )
6                                     )
            vs.                       )  CIVIL ACTION
7                                     )  No. 05-101 ERIE
                                      )
8   NORFOLK SOUTHERN CORPORATION      )
    and NORFOLK SOUTHERN RAILWAY      )
9   COMPANY, INC.,                    )
                                      )
10                  Defendants.       )

11                                  - - -

12              Deposition of ERVIN LEE NIXON, SR.

13                 Thursday, January 18, 2007

14                                  - - -

15       The deposition of ERVIN LEE NIXON, SR., called
    as a witness by the defendants, pursuant to notice and
16  the Federal Rules of Civil Procedure pertaining to the
    taking of depositions, taken before me, the
17  undersigned, Karen Burkett, a Notary Public in and
    for the Commonwealth of Pennsylvania, at the offices
18  of MacDonald, Illig, Jones & Britton, L.L.P.
    100 State Street, Suite 700, Erie, Pennsylvania
19  16507, commencing at 9:30 o'clock a.m., the day and
    date above set forth.

20
                                    - - -
21              COMPUTER-AIDED TRANSCRIPTION BY
                  MORSE, GANTVERG & HODGE, INC.
22               PITTSBURGH, PENNSYLVANIA
                      412-281-0189
23                                  - - -

24  ORIGINAL

25

1    Q    Do you recall whether your son, Robin,

2  owned or used a bicycle in April of 1997?

3    A    He owned a bicycle.

4    Q    Do you recall what type of bicycle it was?

5    A    No.  It was a bike I bought from

6  Value City.

7    Q    Bicycles, as I understand it, come in many

8  shapes and forms.  Some of them have 12 speeds for

9  racing on roads, others are called mountain bikes with

10  knobby tires to use off the street, others are

11  bicycles that are more traditional in nature.

12    A    It wasn't fancy.

13    Q    Okay.  Just a basic bicycle?

14    A    Yes.

15    Q    Do you have any specific recollection of

16  events that occurred on the date of this accident

17  before you learned of the accident?

18    A    He asked me if he could go visit

19  Chris Houston.

20    Q    Would that request have been sometime

21  during the morning of April 27th, 1997?

22    A    Yes.

23    Q    Again, I am going by information in the

24  police accident report to try to get a sense of time.

25  According to the police accident report, the accident

1    occurred on Sunday at about 12:24 p.m.

2         Do you have a recollection, Mr. Nixon, as

3    to when it was your son, Robin, asked you if he could

4    visit his friend, Chris Houston?

5    A    He had asked me that morning.

6    Q    Okay.  Sometime in the morning?

7    A    Right.

8    Q    Any sense of what time?  And if I push too

9    far on the specifics and you get to a point you don't

10   recall, that is when I want you to let me know you

11   don't recall.

12        Do you have a recollection as to

13   approximately what time that morning you would have

14   had this discussion?

15   A    I can't give an exact time.  I just know it

16   was during the morning.

17   Q    Now, did you know Chris Houston before

18   Robin made this request?

19   A    I've known Chris since he was a little kid.

20   Q    How did you know Chris Houston?

21   A    His stepfather and I grew up together, and

22   I knew his mom casually.

23   Q    Who is Chris' stepfather that you knew

24   growing up?

25   A    Roosevelt Pinkston.

1    Q    And you mentioned that you knew

2    Chris' mother casually.  What is her name?

3    A    I don't know her name.  I just know her

4    from seeing her around.

5    Q    When you say you knew Chris Houston since

6    he was a kid because he was a stepson of your friend,

7    Roosevelt Pinkston, did you know him in a social

8    setting or otherwise, or did you just know of him?

9    A    I knew him from kindergarten in a social

10   setting.  I used to play with him before school every

11   day, push him on a swing just like I did Robin.

12   Q    Okay.  Was Robin a friend of Chris Houston

13   from, say, kindergarten on?

14   A    They were close, yes.

15   Q    Okay.  So this would not have been the

16   first time that Robin may have asked you if he could

17   go see Chris and play with him?

18   A    It wasn't.

19   Q    At the time that Robin made this request,

20   where did Chris Houston reside?

21   A    On 21st Street between Sassafras and Peach.

22   Q    That would be West 21st Street; correct?

23   A    Correct.

24   Q    Do you know whether your son, Robin, had

25   ever visited Chris Houston at his home on

1          The accident occurred on April 27th, 1997.

2    Were these two prior instances where Robin visited

3    Chris on West 21st Street during the year 1997?

4          A     Yes.

5          Q     Do you know if they were the same month?

6          A     No recollection.

7          Q     Okay.  On each of those two prior

8    occasions, did Robin ask for your permission to visit

9    Chris at his house?

10         A     He always asks for my permission.

11         Q     When Robin asked for your permission on

12   April 27th, 1997, did you place any restrictions on

13   what he was allowed to do that day

14         A      He wasn't supposed to go past

15   21st Street.

16         Q     When you say "go past," you mean go north?

17         A     Below.

18         Q     Okay.  And again, so we're clear, when you

19   say "below," in the city of Erie the streets --

20         A     Would be headed north.

21         Q     Headed north.  Because the streets go from

22   high numbers like 21st to the north, to the low

23   numbers along the bay and the lake; is that correct?

24         A     Yes.

25         Q     Do you recall what you specifically told

1  Chris the morning of April 27th, 1997 about not going

2  below or north of West 21st Street?

3       A      I didn't tell Chris anything.

4       Q      I'm sorry.  Do you recall what you

5  specifically told Robin the morning of the accident

6  about not going below or north of West 21st Street?

7       A      Just not to go.

8       Q      And why was that?

9       A      My own personal reasons?  I was afraid of

10  the traffic and the railroad.

11       Q      Have you resided in the city of Erie all or

12  most of your life?

13       A      Most of my life.

14       Q      So you were familiar with the fact that

15  there was a single set of Norfolk Southern tracks that

16  ran east and west through West 19th Street in the city

17  of Erie?

18       A      Very familiar.

19       Q      And you were aware that there was a city

20  street on both sides which there could be traffic --

21       A      Yes.

22       Q      -- or that sort of thing?

23              Why did you think that it might be

24  dangerous for your son, Robin, to go north of

25  21st Street in the vicinity of West 19th Street and

1    the Norfolk Southern tracks?

2        A       Because of traffic and news reports of

3    children being hit by cars and buses.

4        Q       When you had this discussion with Robin on

5    the morning of April 27th, 1997, did you give him any

6    specific reasons as to why you did not want him to go

7    below or north of West 21st Street?

8        A       No, I didn't.

9        Q       You testified a bit earlier that there

10   were two prior occasions in 1997 that you also gave

11   Robin permission to go to Chris Houston's house on

12   21st Street?

13       A       Yes.

14       Q       On both of those occasions -- I will put it

15   this way:  On either of those occasions, did you give

16   any instructions or place any restrictions on Robin in

17   visiting Chris Houston?

18       A       I took him down there and gave him the same

19   instructions, "Don't go below 21st Street."

20       Q       When you say you took him down there, you

21   are referring to Robin, of course?

22       A       Yes.

23       Q       How did you take Robin down to

24   West 21st Street?

25       A       I rode him on his bike.

1        Q       In other words, both of you riding on the

2   bike and, what, him behind?

3        A       No, him on the crossbar.

4        Q       Okay.  When you took your son, Robin, to

5   West 21st Street with you in the bicycle seat and him

6   on the crossbar, did you go down for the purpose of

7   showing him specifically where he was allowed to be,

8   and where he was not allowed to be?

9        A       No, I just took him to Chris's house.

10       Q       When you got him to Chris's house, did you

11  give him instructions that you did not want him to go

12  north or below 21st Street?

13       A       Yes.

14       Q       Did you tell him why it was?

15       A       Yes.

16       Q       What did you tell him?

17       A       I told him there was too much traffic, and

18  I was afraid of him getting hurt.

19       Q       Did you say anything to him at the time

20  about the railroad tracks?

21       A       I showed him where they were, and I told

22  him not to go across them.

23       Q       Did you tell him to stay away from the

24  railroad tracks?

25       A       I thought that was evident when I said,

1   "Don't go that way."

2        Q      You just described the first time that

3   Robin went to Chris's house where you took him down

4   there, showed him the street, and gave him those

5   instructions.

6        A      Yes.

7        Q      The second time that he went to Chris's

8   house, when he asked for your permission again, and

9   you said you gave him the same instructions?

10       A      Yes.

11       Q      "Don't go below 21st Street or north of

12  21st Street"?  Did you go down to Mr. Houston's house

13  again with Robin?

14       A      Yes.

15       Q      So the second time, did you again ride his

16  bicycle down with your son, Robin, on the crossbar?

17       A      No, that time we walked.

18       Q      And that second time when you got down to

19  Chris Houston's house on 21st Street, did you again

20  impress upon Robin, "You are not to go north or below

21  21st Street"?

22       A      Yes.

23       Q      Did you essentially tell him the same thing

24  about traffic and about staying away from the railroad

25  tracks?

1    A    Yes.

2    Q    Directing your attention back to the
3    morning of the accident.  So this would be the third
4    time where Robin asked if he could go to Chris's house
5    am I correct in understanding that you did not go with
6    him this particular occasion?

7    A    You are correct.

8    Q    But before Robin left the house, did you
9    again give him those same instructions, "You are not
10   to go below or north of 21st Street," and he was to
11   stay away from the railroad tracks?

12   A    I just said, "Remember what I told you?"
13   And he said he did.

14   Q    Again, what you had told him was, "Don't go
15   north of 21st Street, and stay away from the railroad
16   tracks"?

17   A    That is correct.

18   Q    And his response is, "I know that.  I
19   remember that"?

20   A    Yes.

21   Q    Mr. Nixon, how did you first learn of your
22   son's accident on April 27th, 1997?

23   A    Telephone call from a surgeon at
24   Saint Vincent.  I think he was an Indian doctor.

25   Q    You don't recall his name at this time?