**Tab F**
**Excerpts of Deposition of**
**Robin I. Nixon (3/24/06)**

1                 IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                              - - -

4    ROBIN NIXON,                            )
                                             )
5                 Plaintiff,                 )
                                             )
6           vs.                              ) No. 05-101ERIE
                                             )
7    NORFOLK SOUTHERN CORPORATION and        )
     NORFOLK SOUTHERN RAILWAY COMPANY,       )
8    INC.,                                   )
                                             )
9                 Defendants.                )

10                             - - -

11                  Deposition of ROBIN NIXON

12                   Friday, March 24, 2006

13                             - - -

14         The deposition of ROBIN NIXON, the plaintiff
     herein, called as a witness by the defendants,
15   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
16   taken before me, the undersigned, Lance E. Hannaford,
     a Notary Public in and for the Commonwealth of
17   Pennsylvania, at the offices of MacDonald Illig Jones
     & Britton, 100 State Street, Suite 700, Erie,
18   Pennsylvania  16507, commencing at 9:35 o'clock a.m.,
     the day and date above set forth.
19
                               - - -
20              COMPUTER-AIDED TRANSCRIPTION BY
                  MORSE, GANTVERG & HODGE, INC.
21                 PITTSBURGH, PENNSYLVANIA
                      412-281-0189
22                             - - -

23

24

25

| | | |
|---|---|---|
| 1 | | ROBIN NIXON |
| 2 | The plaintiff herein, called as a witness by the |
| 3 | defendants, having been first duly sworn, as |
| 4 | hereinafter certified, was deposed and said as |
| 5 | follows: |
| 6 | | EXAMINATION |
| 7 | BY MR. TAFT: |
| 8 | Q | Mr. Nixon, would you state your full name |
| 9 | and home address, please? |
| 10 | A | My name is Robin Ishmael Peter Nixon. |
| 11 | | I live at 3603 Peach Street. |
| 12 | Q | That would be Erie. |
| 13 | | Correct? |
| 14 | A | Erie, PA 16508. |
| 15 | Q | Mr. Nixon, my name is Roger Taft. |
| 16 | | I am representing the defendants in this |
| 17 | case, Norfolk Southern Corporation and Norfolk |
| 18 | Southern Railway Company. |
| 19 | | This, of course, is a lawsuit that you |
| 20 | filed as a result of an accident that occurred on |
| 21 | April 27, 1997 somewhere in the vicinity of West 19th |
| 22 | Street and Sassafras Street. |
| 23 | | You understand that? |
| 24 | A | Yes. |
| 25 | | I do. |

1      A      Yes.

2             MR. SOLYMOSI:  If I may before we start,

3      how do you want to handle any potential

4      objections?

5             MR. TAFT:  Well, the only objections under

6      the federal rules that you ought to raise are

7      objections as to the form of the questions.

8             It will be governed by the Federal Rules of

9      Civil Procedure.

10            MR. SOLYMOSI:  Okay.

11  BY MR. TAFT:

12     Q      Mr. Nixon, what is your age and date of

13  birth?

14     A      My age is 21.

15            Date of birth is 12-03-84.

16     Q      And are you married?

17     A      No.

18            I am not.

19     Q      Ever been married?

20     A      No.

21            I haven't.

22     Q      Do you reside with anyone at 3603 Peach

23  Street in Erie, Pennsylvania?

24     A      I live with my parents.

25     Q      What are their names?

1    Q    And this was after about four or five

2    months of employment?

3    A    Yes.

4    Q    And you haven't held any employment since?

5    A    No.

6         I haven't.

7    Q    Mr. Nixon, let me direct your attention to

8    the time frame of April 1997.

9         I am focusing -- or going to be focusing on

10   the accident that provides the basis for your lawsuit.

11        As of April of 1997, where were you

12   attending school?

13   A    I was attending school at Glenwood

14   Elementary.

15   Q    Do you recall what grade you were in?

16   A    6th.

17   Q    You would have turned 12 on December 3 --

18   yes.  12 on December 3, 1996.

19        Correct?

20   A    Correct.

21   Q    As of April of 1997, where did you reside?

22   A    3603 Peach Street.

23   Q    Same location?

24   A    Yes.

25   Q    How long have you lived at that address?

```
 1     A     Since '95.

 2     Q     Where did you reside before 1995?

 3     A     145 East 22nd Street.

 4     Q     Do you recall how long you lived at the 145

 5 East 22nd Street address?

 6     A     No.

 7           I can't recall exactly.

 8     Q     As of April of 1997, when you were living

 9 at your 3603 Peach Street address, who else was living

10 there?

11     A     Both my parents.

12           My older brother.

13     Q     That would be Ervin Nixon, Jr., correct?

14     A     Correct.

15     Q     Where is Glenwood Elementary School

16 located?

17     A     35th and Peach.

18     Q     Not too far from your house?

19     A     No.

20     Q     Let me direct your attention, now, to April

21 27th, 1997.

22           The date of the accident.

23           I am getting that date from the police

24 accident report.

25           According to that report, the accident
```

1    occurred on a Sunday.

2                    Some time around 12:24 p.m.

3                    Does that sound right to you?

4        A       Yes.

5                    It does.

6        Q       What had you been doing during the morning

7    of Sunday, April 27, 1997 before this accident?

8        A       I met up with a friend.

9                    We were playing basketball.

10       Q       Who was the friend?

11       A       Christopher Houston.

12       Q       How does he spell his last name?

13       A       I am not exactly sure.

14       Q       Sounds like Houston, like Houston, Texas?

15       A       Yes.

16       Q       How did you know Mr. Houston?

17       A       From school.

18       Q       Did he go to Glenwood Elementary as well?

19       A       Yes.

20                   He did.

21       Q       Was he in 6th grade with you?

22       A       Yes.

23                   He was.

24       Q       Was he in the same class?

25       A       No.

```
 1   from the south side of 19th Street, where the

 2   playground was, to the north side of 19th Street?

 3       A      No.

 4              Along 19th Street would be a better way to

 5   say it.

 6       Q      When you say "along".

 7              Going in an east or west direction?

 8       A      East.

                Could I take a break now?

10       Q      Sure.

11              (Recess taken.)

12   BY MR. TAFT:

13       Q      Where we left off, I had asked you what you

14   and Chris Houston did after leaving the playground.

15              You were playing basketball.

16              And you said you went across, I think you

17   said across 19th Street.

18       A      Along 19th Street.

19       Q      Excuse me.

20              I think you told me you were riding east on

21   19th Street?

22       A      Yes.

23       Q      Now, did the two of you go to any Rite-Aid

24   or other type of drug store before the accident?

25       A      I can't recall.
```

```
 1      Q      You do recall riding east on 19th Street?

 2      A      Yes.

 3      Q      Did Chris have his basketball?

 4      A      No.

 5             He didn't.

 6      Q      What happened to his basketball?

 7      A      I can't recall.

 8      Q      Did you tell me earlier that he had a

 9  basketball?

10      A      Yes.

11             He did.

12      Q      And he brought the basketball with him to

13  the playground?

14      A      Yes.

15             He did.

16      Q      But you are saying by the time the two of

17  you left the playground, he no longer had the

18  basketball?

19      A      No.

20             He didn't have it at the time.

21      Q      What happened to it?

22      A      I don't recall what happened to it.

23      Q      Did he lose it?

24      A      He could have left it at the playground.

25             I don't recall.
```

1     Q     So what you recall is the two of you riding

2     east on 19th Street on your bicycles.

3     A     Yes.

4     Q     Do you know the streets Sassafras and

5     Myrtle, where they intersect with West 19th Street?

6     A     Yes.

7           I know of the streets.

8     Q     Had you ever ridden your bicycle on 19th

9     Street before?

10    A     Yes.

11          I have.

12    Q     On what occasions had you ridden on 19th

13    Street before?

14    A     Just to go down to the playground.

15    Q     The same playground?

16    A     Yes.

17    Q     And how many times have you been there

18    riding your bike on West 19th Street prior to April

19    27th, 1997, the date of the accident?

20    A     I think once or twice.

21    Q     At that point in time, 19th Street was a

22    city street that had a single set of railroad tracks

23    running down the middle.

24          Is that correct?

25    A     Yes.

1      Q      And on both sides of the railroad tracks,

2   there was a paved surface for trucks and cars and

3   other vehicles to travel on?

4      A      Yes.

5      Q      It was used as a city street, was it not?

6      A      Yes.

7             It was.

8      Q      And when you and Chris Houston were

9   traveling east on your bicycles on 19th Street, were

10  you on the north side of the tracks, on the lake side,

11  or the south side?

12     A      South side.

13     Q      And again, to be clear on directions, south

14  side would be the side away from the lake?

15     A      It would be the north side then.

16     Q      That is what I want to make sure we are

17  right on our directions.

18     A      Right.  Thank you.

19     Q      So to correct that, you and Chris Houston

20  were riding your bicycles on the north side of the

21  railroad tracks?

22     A      That would be correct.

23     Q      And you were going in an easterly direction

24  toward State Street?

25     A      Yes.

1    Q    Was there a train passing on the tracks as
2  you and Chris were riding your bicycles?
3    A    Yes.
4         There was.
5    Q    At what point in time did you first see the
6  train?
7    A    I don't recall exactly.
8    Q    Okay.
9         Was there a point in time where you grabbed
10 on to the train as it was passing you?
11   A    Yes.
12        There was.
13   Q    How fast was this train traveling, when you
14 grabbed on to it?
15   A    I don't know exactly.
16   Q    Was it going fast or slow?
17   A    It was going kind of fast.
18   Q    But you can't estimate the speed?
19   A    No.
20        I can't.
21   Q    What direction was the train traveling?
22   A    Traveling east.
23   Q    Same direction you were?
24   A    Yes.
25   Q    And you said there was a point in time

29

1    where you grabbed on to the train, as it was passing?

2         A    Yes.

3              I did.

4         Q    And do you remember the types of train cars

5    that were on that train, as it was going by?

6         A    No.

7         Q    You don't recall if they were coal cars or

8    boxcars or some other kind of cars?

9         A    No.

10             I don't exactly.

11        Q    I asked because the records of that train

12   show it was called a coal train.

13             All of the cars in that train were coal

14   hopper cars.

15             You don't recall that?

16        A    No.

17        Q    What did you grab on to on that train, as

18   it was going past you?

19        A    There was a handle on one of the boxcars.

20        Q    Or coal cars.

21        A    Coal cars.

22        Q    We will say cars, if you don't recall what

23   type it was.

24             It was a handle; is that right?

25        A    That's right.

1       Q       In other words, if we were to look at the

2    side of that rail car and we were -- and if we are on

3    the north side of the train, looking at the train as

4    it is going past from right to left, from west to

5    east, there would have been a handle somewhere at the

6    right end or rear end of that rail car.

7       A       Correct.

8       Q       And do you recall if there was anything

9    else besides a handle?

10      A       No.

11              I don't.

12      Q       But this was some kind of handle.

13              Would you describe it?

14      A       No.

15              I can't exactly describe it.

16      Q       Did it appear to be a handle that someone

17   who wanted to climb up on to the car would use to grab

18   on to to climb on to the car?

19      A       I don't know exactly.

20      Q       You don't know what it was used for, but

21   there was a handle there; is that right?

22      A       Yes.

23      Q       And was the handle on the side of the car

24   but toward the rear of the car?

25      A       Yes.

1    Q    It wasn't on the back end of the car, it

2   was on the side of the car at the rear; is that right?

3    A    That's right.

4    Q    Do you recall where you were located on

5   19th Street, when you first grabbed on to that handle

6   of the train moving eastbound?

7    A    No.

8         I do not.

9    Q    Do you understand that if you look at the

10  intersecting streets to 19th Street, and I am saying

11  going west from State, the first intersecting street

12  is Peach Street.

13        Is that correct?

14        From State Street?

15   A    Yes.

16        That's correct.

17   Q    And then if you go one block further west,

18  you are at Sassafras Street.

19        Is that correct?

20   A    That's correct.

21   Q    If you go one block further west, you are

22  at Myrtle Street.

23        Is that correct?

24   A    That's correct.

25   Q    Does that help you at all recall the point

1    where you first grabbed on to the rail car?

2        A    No.

3             It doesn't.

4        Q    How long did you continue to hold on to

5    that moving train?

6             How far did you go?

7        A    I don't remember exactly.

8        Q    Do you remember approximately?

9        A    Approximately one and a half city blocks.

10       Q    One and a half?

11       A    Yes.

12       Q    So let me ask the next question.  Because I

13   am trying to place all of this.

14            We know from the police accident report and

15   perhaps from your own recollection, that the accident,

16   where you were injured, occurred somewhere in the

17   vicinity of Sassafras Street and 19th Street; is that

18   correct?

19       A    That's correct.

20       Q    And one block to the west would be Myrtle

21   Street.

22            Right?

23       A    Correct.

24       Q    So if you were holding on to the train,

25   again, approximately for a block and a half, you would

1    have grabbed on to that train somewhere to the west of

2    Myrtle Street, to the best of your recollection?

3        A    Correct.

4        Q    Now, when you grabbed on to the train, you

5    said that you were holding on to a handle.

6             Is that right?

7        A    That's right.

8        Q    What hand were you using to hold on to the

9    handle?

10       A    My right hand.

11       Q    And you were on your bicycle.

12            Correct?

13       A    Correct.

14       Q    What were you doing with your left hand?

15       A    Holding the handlebars.

16       Q    The left handlebar?

17       A    Left handlebar.

18       Q    So as I understand it, you grabbed on to

19   the handle near the rear of this rail car with your

20   right hand, and you had your left hand on your left

21   handlebar; is that right?

22       A    Correct.

23       Q    I asked you earlier what kind of bicycle

24   you had.

25            You said you couldn't remember for sure.

```
 1                    But I want to try to narrow that down a
 2      little bit.
 3                    How many speeds did the bicycle have?
 4         A      It wasn't a mountain bike.
 5         Q      You have mountain bikes with a gearshift,
 6      right?
 7         A      Right.
 8         Q      You have road racing bikes that have the
 9      real skinny tires and funny looking handlebars that
10      bend down with a lot of gears.
11         A      Yes.
12         Q      It was that kind of bike?
13         A      No.
14                    It would be something of an 18 or 20 inch
15      bike.
16         Q      Basically having a single gear, so to speak?
17         A      Correct.
18         Q      To go faster, you had to pedal faster?
19         A      Correct.
20         Q      You weren't shifting any gears?
21         A      No.
22         Q      And to put the brakes on you reversed the
23      pedals and pressed down?
24         A      No.
25         Q      You had hand brakes?
```

```
1       A       Hand brakes.

2       Q       That helps.

3               As you were being pulled along, holding on

4   to the handle with your right hand, left hand on the

5   left handlebar of your bike, where was Mr. Houston?

6       A       In front of me.

7       Q       Was he riding his bike in front of you?  Or

8   was he also holding on to the train?

9       A       He was also holding on to the train.

10      Q       When did Mr. Houston first grab on to the

11  train?

12      A       Right before me.

13      Q       Now, you were holding on to a handle near

14  the rear of one of these rail cars.

15              Correct?

16      A       Correct.

17      Q       What was Mr. Houston holding on to?

18      A       I am not sure.

19              Because he was two cars ahead of me.

20              So I couldn't exactly see what he was

21  holding on to.

22      Q       He was, to your best recollection, two rail

23  cars farther toward the head end or front end of the

24  train than you were?

25      A       Correct.
```

1    Q    But you could see him holding on to

2  something?

3    A    Correct.

4    Q    Could have been a handle on that car or

5  something else?

6    A    Correct.

7    Q    You don't know?

8    A    I don't know.

9    Q    To your best recollection, when did he

10  first grab on to the train?

11    A    Right before me.

12    Q    Am I correct in understanding that these

13  rail cars, that you and Mr. Houston were holding on

14  to, starting somewhere, to your best recollection, to

15  the west of Myrtle Street, were toward the rear of the

16  train?

17    A    I am not exactly sure.

18    Q    You don't recall one way or the other; is

19  that right?

20    A    Right.

21    Q    At any time, did you see the locomotive of

22  that train go past?

23    A    I am not exactly sure.

24    Q    You do remember seeing the train itself

25  moving past.

1    A    Yes.

2         I do.

3    Q    But you don't recall seeing the locomotives

4    of the train?

5    A    No.

6         I don't recall.

7    Q    At any point in time before you had your

8    accident, did Mr. Houston let go of the train?

9    A    No.

10   Q    So your best recollection is that

11   Mr. Houston was continuing to hold on to this rail car

12   two cars ahead of you.

13        And continued to hold on the entire time up

14   until you fell?

15   A    Correct.

16   Q    Mr. Nixon, before this accident, had your

17   parents ever told you to stay away from moving trains?

18   A    No.

19        They hadn't.

20   Q    They never told you once that you ought to

21   stay away from a moving train?

22   A    No.

23        They hadn't.

24   Q    Did anybody in school ever tell you to stay

25   away from moving trains, they are dangerous?

1    Q    With a single set of railroad tracks

2    running down the middle of West 19th Street?

3    A    Correct.

4    Q    Now, in your earlier testimony, you were

5    stating that to the best of your recollection, you had

6    grabbed on to an eastbound train on these 19th Street

7    tracks, somewhere to the west of Myrtle Street.

8    A    Correct.

9    Q    And you also said that Mr. Houston had

10   grabbed on to the train two cars ahead of you.

11        And both of you were being pulled along by

12   the train.

13   A    Correct.

14   Q    And you also testified that both of you

15   would have been on the north side or the lake side of

16   the train, as it was traveling eastbound.

17   A    Correct.

18   Q    And you further testified that Mr. Nixon

19   continued being pulled along by the train even after

20   you fell, and you had your accident?

21   A    Correct.

22   Q    Now, using this diagram, where,

23   approximately, did you fall off your bicycle?

24        You are putting an X again on the north

25   side of the tracks.

```
 1      A      Correct.

 2      Q      Somewhere in the middle of the intersection

 3   with Sassafras Street?

 4      A      Correct.

 5      Q      Is that the location where you actually

 6   fell to the ground off your bike?

 7      A      I am not exactly sure.

 8      Q      But it was somewhere in that vicinity?

 9      A      Correct.

10      Q      Do you recall why it was you fell off your

11   bike at that location?

12      A      No.

13             I do not.

14      Q      Do you know whether you -- strike that.

15             Do you recall how it was you fell off your

16   bike?

17      A      No.

18             I do not.

19      Q      In other words, all you recall is holding

20   on to this grab iron, I will call it, toward the rear

21   of a -- one of the rail cars.

22             And the next thing you knew, you were down?

23      A      Correct.

24      Q      And you don't know why it was you went

25   down?
```

1    Q    What was it your foot was stuck in, that

2 you couldn't pull it out?

3    A    Between the track and the cement where the

4 wheel goes over.

5    Q    Again, to clarify that, you have the two

6 sets of rails.

7    A    Correct.

8    Q    The tracks where the train was running on.

9         Is that right?

10    A    Yes.

11    Q    And West 19th Street you told me was a city

12 street that traffic, trucks and cars and other

13 vehicles traveled on east and west.

14         Is that right?

15    A    Yes.

16    Q    Was the surface of West 19th Street an

17 asphalt surface?

18    A    Correct.

19    Q    Are you telling me that your foot, your

20 left foot was caught somewhere between the rail on

21 which the train was running and the end of the

22 asphalt?

23    A    To the best of my knowledge, yes.

24    Q    So you were able to move your body, all of

25 your body back outside from under the train.

1     A     To the best of my knowledge.

2           Yes.

3     Q     And then there was asphalt again on the

4     south side against the city street on the south side;

5     is that right?

6     A     Correct.

7     Q     Okay.

8           So when you were telling me that your foot

9     was caught between the rail and the asphalt, was your

10    foot caught on the street side between the edge of the

11    asphalt and the rail, or was it caught on the inside,

12    between the two rails?

13    A     I am not exactly sure where it was caught.

14    Q     It was caught somewhere between the edge of

15    the asphalt and the rail?

16    A     Correct.

17    Q     And then with the train continuing to move,

18    that severed your foot.

19          Is that right?

20    A     Correct.

21    Q     Mr. Nixon, I am going to show you some

22    photographs now.

23          I will ask you some questions about them.

24    They may or may not refresh your recollection about

25    the accident or where it happened.

1               Correct?

2        A      Correct.

3        Q      And by the way, 19th Street, as of April

4    27th, 1997, was a two-way street with both eastbound

5    and westbound traffic?

6        A      Correct.

7        Q      So when you were holding on to that rail

8    car on the north side, you were actually being pulled

9    along on your bicycle against traffic.

10               You were going east while you were in the

11   westbound lane.

12               Correct?

13       A      Correct.

14       Q      I will show you now what has been marked as

15   R. Nixon Deposition Exhibit 4.

16               Does that appear to be a photograph of the

17   conditions as they existed on April 27th, 1997, at the

18   intersection of 19th Street and Sassafras Street?

19       A      I am not sure.

20               Because the train was going over it.

21       Q      So you can't say for sure?

22       A      Correct.

23       Q      Does this appear to be a photograph,

24   though, of the Sassafras Street intersection of 19th

25   Street?

 1      A      Correct.

 2      Q      Showing you now what has been marked R.

 3   Nixon Deposition Exhibit 11.

 4             Is that yet another photograph looking

 5   generally in a northerly direction from somewhere in

 6   the vicinity of the Sassafras Street intersection with

 7   19th Street?

 8      A      Yes.

 9      Q      Is that right?

10      A      Yes.

11      Q      Are you able by looking at any of these

12   photographs, R. Nixon Deposition Exhibit 3 through 11,

13   to locate the point where your foot became stuck

14   between the asphalt -- the end of the asphalt and the

15   rail?

16      A      No.

17             I am not exactly sure.

18      Q      Okay.

19             Are you able to, by looking at any of these

20   photographs, identify the reason why you fell off your

21   bike?

22      A      No.

23             I can't.

24      Q      This question is for Mr. Solymosi, so we

25   clear something up on the record.

**Tab G**
**Excerpts of Deposition of**
**M. Eugene Pandlis (1/12/07)**

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3

4    -----------------------------------------
     ROBIN NIXON,
5
                    Plaintiff,              CIVIL ACTION NO.
6                                             05-101-ERIE
     v.
7
     NORFOLK SOUTHERN CORPORATION
8    and
     NORFOLK SOUTHERN RAILWAY COMPANY, INC.,
9
                    Defendants.
10   -----------------------------------------

11

12

13              DEPOSITION UPON ORAL EXAMINATION
                    OF M. EUGENE PANDLIS,
                 TAKEN ON BEHALF OF THE PLAINTIFF
14

15                   Norfolk, Virginia

16                   January 12, 2007

17

18

19   Appearances:

20        SEGEL & SOLYMOSI
          By:  TIBOR R. SOLYMOSI, ESQUIRE (via telephone)
21             Counsel for the Plaintiff

22        MacDONALD, ILLIG, JONES & BRITTON, LLP
          By:  ROGER H. TAFT, ESQUIRE
23             Counsel for the Defendants

24

25

ADAMS HARRIS REPORTING, INC.
VIRGINIA BEACH, VIRGINIA
(757)631-0458



1   railroad, Norfolk & Western Railroad?

2        A.      No.

3        Q.      Okay.  Now, I'm confused.  Were you

4   employed by both?

5        A.      No, I was employed by Norfolk Southern

6   Corporation and I did work as a claim agent, as agent for

7   Norfolk Southern Railway Company when it -- or Norfolk &

8   Western Railway Company until it was through merger

9   acquisition in 1998 with Norfolk Southern Railway

10  Company, and I've continued to do work for Norfolk

11  Southern Railway Company as agent for Norfolk Southern

12  Corporation.

13       Q.      Okay.  Just so that I understand you then,

14  then you actually were with Norfolk & Western up until

15  the merger with Norfolk and Southern?  Is that correct?

16       A.      No.

17              MR. TAFT:  He testified that he became an

18  employee of Norfolk Southern Corporation in 1983, which

19  is prior to the merger.

20              MR. SOLYMOSI:  Right.

21              MR. TAFT:  Norfolk Southern Corporation, as

22  we've indicated with our discovery responses, is the

23  parent corporation that owns the shares of Norfolk

24  Southern Railway Company.  So he became an employee of

25  Norfolk Southern Corporation in 1983, before the merger.

1                    MR. SOLYMOSI:   Okay.

2

3    BY MR. SOLYMOSI:

4        Q.      Did you have any occasion to be involved at

5    all with the West 19th Street track operations prior to

6    the 1998 merger?

7        A.      To be involved with the operations?

8        Q.      On the West 19th Street tracks.

9        A.      Are you talking about with the movement of

10   trains, cars?  I'm not sure I understand.

11       Q.      In any manner whatsoever were you involved

12   with Norfolk & Western's rail track operations from

13   between 1983 and 1998 while you were an employee of

14   Norfolk Southern Corporation?

15       A.      No.  I did not work in that area.

16       Q.      Okay.  But prior to that, when you were

17   part of Norfolk & Western --

18       A.      Uh-huh.

19       Q.      -- prior to 1983 --

20       A.      Yes.

21       Q.      -- did you have any occasion to be involved

22   with the -- any of the track operations on West 19th

23   Street?

24       A.      No.

25       Q.      In Erie.

1    BY MR. SOLYMOSI:

2        Q.        I'd like to direct your attention to

3    interrogatory three.  The answer that was provided

4    indicated that Norfolk Southern was the owner of tracks

5    and a limited right of way.  What is the limited right of

6    way?  Can you define that for me?

7        A.        The limited right of way is the rails

8    themselves.  And the ties.

9        Q.        So would it encompass the area just from

10   the end of the tie to the other end of the tie,

11   basically?  That's the right of -- the limited right of

12   way you're referring to?

13       A.        Yes.

14       Q.        Okay.  In your answer to number four, you

15   stated that Norfolk Southern effective -- well, I

16   understand at the time of Mr. Nixon's accident Norfolk &

17   Western had operated those tracks, but you said effective

18   September 1, 1998, that Norfolk Southern Railway Company

19   maintained the railroad tracks and the limited right of

20   way.

21            MR. TAFT:  Let me pose an objection, and

22   it's purely for the point of clarification.  First of

23   all, Mr. Pandlis did, as you indicated earlier, sign the

24   affidavit verifying these answers to interrogatories, you

25   know, some based on his knowledge and some based on

1  personal knowledge or on information provided by others

2  that I reasonably believe to be true and correct.

3      Q.    Okay.  Well, before that you did say that

4  they are true and correct based on your personal

5  knowledge or information provided by others.

6          MR. TAFT:  No, no, he didn't.  As a matter

7  of fact --

8          MR. SOLYMOSI:  You believed them to be true

9  and correct.  That's what your affidavit said.  And --

10          MR. TAFT:  Mr. Solymosi, you quoted from

11  his affidavit earlier and he's just quoted again.

12          MR. SOLYMOSI:  Correct.

13          MR. TAFT:  So that's what he said.  This is

14  a proper verification of these answers.

15

16  BY MR. SOLYMOSI:

17      Q.    Okay.  So let's get back to this answer.

18  How is it that you know that Norfolk and Southern Railway

19  maintained the railroad tracks and the limited right of

20  way in September of 1998?

21      A.    Through merger acquisition documents when

22  Norfolk & Western Railway Company was merged into Norfolk

23  Southern Railway Company.

24      Q.    Okay.  And what did you find in those

25  documents to indicate that Norfolk Southern maintained

1  the tracks and limited right of way?

2      A.      I did not see anything in those documents

3  that indicated such.  Those were merger documents

4  strictly addressing the issue of Norfolk & Western

5  Railway Company, now being merged into Norfolk Southern

6  Railway Company.

7      Q.      Well, I'm trying to understand how you knew

8  that Norfolk and Southern maintained that limited right

9  of way.  Are you saying there's nothing in the documents

10  that would have told you that?  How did you arrive at

11  that knowledge?  How did you provide that?  Did you

12  provide that information to Mr. Taft for this answer?

13      A.      The Norfolk & Western Railway Company was

14  the initial owner of the track.  By virtue of the fact

15  that it was merged through acquisition into Norfolk

16  Southern Railway Company would have me to believe to be

17  true that they owned the tracks as of September 1st,

18  1998.

19      Q.      Well, is it generally in the railroad

20  business -- is that how it goes, that whoever is the

21  owner of the track would be responsible to maintain the

22  track and a limited right-of-way area?

23      A.      Generally speaking, the Norfolk and -- the

24  Norfolk Southern Railway Company, if they own the track,

25  they maintain the track as well.

1      Q.      And a limited right of way?

2      A.      True.

3      Q.      Okay.

4      A.      The limited right of way being the rails

5  and the ties.

6      Q.      What about the pavement over the ties?

7      A.      Well, if it is over the ties, the pavement

8  would be part of the railway company's maintenance.

9      Q.      Okay.

10      A.      But only over the ties.

11      Q.      Right.  Well, would you agree with me that

12  Norfolk & Western Railway Company at the time of Mr.

13  Nixon's accident would have maintained that same area?

14  Would that be correct?

15              MR. TAFT:  Object to the form of the

16  question.  When you say, "same area," what do you mean?

17              MR. SOLYMOSI:  The limited right-of-way

18  area we're talking about.

19      A.      I believe to be true that Norfolk & Western

20  Railway Company would have maintained the rails and the

21  ties and the pavement over the ties.

22

23  BY MR. SOLYMOSI:

24      Q.      Okay.  Could you move to number six?

25      A.      Okay.

1   existence prior to Mr. Nixon's accident or after?

2              MR. TAFT:  For the record, Mr. Solymosi,

3   all those documents that Mr. Pandlis just referenced were

4   produced to you pursuant to request number nine of your

5   first set of requests for production.  And all of them

6   are dated -- I'm looking at the response -- prior to

7   April 27, 1997.

8              MR. SOLYMOSI:  Okay.  Thank you.

9

10  BY MR. SOLYMOSI:

11       Q.      When this merger took place, in addition to

12  the employees becoming technically Norfolk Southern

13  employees, you know, that were formerly with Norfolk

14  Western, and the track facilities, were there other

15  facilities of Norfolk Western that were merged into

16  Norfolk Southern?  And I'm going to ask you specifically

17  the following:  The safety department of Norfolk

18  Southern.  Was that the same safety department as Norfolk

19  Western or were there different departments?

20       A.      I think maybe to help simplify things here

21  for you, everything that was in existence on Norfolk &

22  Western Railway Company as of September the 1st became

23  acquired by Norfolk Southern Railway Company, so there,

24  literally speaking, were no changes.

25       Q.      So they just basically just stepped right

1    into the shoes of Norfolk Western with all of the same

2    facilities being in place?

3         A.       Yeah.   Everything that was under the

4    control of Norfolk & Western Railway Company essentially

5    became the property of Norfolk Southern Railway Company,

6    so there weren't really any significant changes of any

7    sort.

8         Q.       Well, did Norfolk & Western have a safety

9    department prior to the merger?

10        A.       Yes.

11        Q.       And was that the same safety department

12   that existed after the merger as far as its location goes

13   and its records?

14        A.       That is correct.

15        Q.       Where is that safety department located?

16        A.       It's headquartered in Roanoke, Virginia.

17        Q.       And who is in charge of the safety

18   department now?

19        A.       I don't know.

20        Q.       Do you know who was in charge of the safety

21   department at the time of Mr. Nixon's accident?

22        A.       No.

23        Q.       When you were answering these

24   interrogatories or providing the information, didn't you

25   go to the safety department to get information?

```
 1    is that your answer or is that Mr. Taft's answer?
 2                 MR. TAFT:  Well, the -- once again, the
 3    answer to interrogatory number one states that --
 4                 MR. SOLYMOSI:  I understand that.
 5                 MR. TAFT:  Well, then when you talk about
 6    whether it's his answer or my answer, refer to the answer
 7    to interrogatory number one.
 8
 9    BY MR. SOLYMOSI:
10         Q.      Did you provide that information for the
11    answer or did Roger provide the information for that
12    answer?
13         A.      The information -- the information I had
14    from the police department report was what I sent to Mr.
15    Taft.  Now, I understood -- it's my understanding that
16    the -- the street is owned and maintained by the City of
17    Erie.  Norfolk & Western Railway Company owned the rails
18    and the ties and the pavement over it.  That's my
19    understanding of the information provided.  The response
20    is the response Mr. Taft put together there.  I did not
21    put that response together.
22         Q.      Okay.
23         A.      But it's based on that understanding.
24         Q.      Your answer to 14.  You had indicated in
25    your answer that Norfolk Southern -- I'm not sure who
```

**Tab H**
**Excerpts of Deposition of**
**Timothy J. Price (5/23/06)**

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
                          -  -  -
 3
   ROBIN NIXON,                      )
 4                                   )
              Plaintiff,             )
 5                                   )
                  -vs-               )      CIVIL ACTION
 6                                   )      NO. 05-101 ERIE
   NORFOLK SOUTHERN CORPORATION      )
 7 and NORFOLK SOUTHERN RAILWAY      )
   COMPANY, INC.,                    )
 8                                   )
              Defendants.            )
 9

10                        -  -  -  -

11          DEPOSITION OF:  TIMOTHY J. PRICE

12                        -  -  -  -

13

14          DATE:     May 23, 2006
                      Tuesday, 12:45 p.m.
15

16          LOCATION:  Segel & Solymosi
                       818 State Street
17                     Erie, PA 16501
                       814-454-1500
18

19          TAKEN BY:  Plaintiff

20          REPORTED BY:   Toni Rennebeck, RPR
                           Notary Public
21                         NMR Reference No. 052306B

22

23

24              CERTIFIED COPY

25
```

1       actual engineer.

2   Q.  Kind of like an apprenticeship program or --

3   A.  Yes.

4   Q.  Okay.  Did you receive a certification?

5   A.  Yes, I did.

6   Q.  And what is that certification?

7   A.  A locomotive engineer.

8   Q.  Do they give you a certificate, or how does that

9       work?

10  A.  We have cards we carry.

11  Q.  Are you familiar with the term physical

12      characteristics of the territory with respect to

13      an engineer?

14  A.  Yes.

15  Q.  Could you explain to me what that means to you?

16  A.  Physical characteristics are the terrain grades,

17      road crossings, signals in relationship to like

18      the territory you're running on.

19  Q.  Would the territory include any other things

20      such as what's maybe adjacent to the railroad

21      tracks in terms of a residential neighborhood or

22      a roadway that's in the same area as the tracks

23      like on West 19th Street?

24  A.  I'm not sure what you mean by roadway.

25  Q.  On West 19th Street the tracks we understand

1       went down the middle of West 19th Street; is

2       that correct?

3   A.  Yes.

4   Q.  And there was pavement between the rails and

5       there was blacktop pavement north and south of

6       the rails all the way to the curbs of West 19th

7       Street.

8   A.  Yes.

9   Q.  So I'm trying to determine where the territory

10      stops and starts so to speak.

11              You have to be familiar with the

12      territory; correct?

13  A.  Yes.

14  Q.  Do you need to be familiar with the territory

15      between the curbs on the north and south side of

16      19th Street?  Would that include the territory?

17  A.  No.  As an engineer my territory in terms of

18      characteristics are the rail, the grade, the

19      signals.  That's what the term physical

20      characteristics falls under.

21  Q.  Okay.  Could you tell me what your

22      responsibilities are as an engineer or what they

23      were as an engineer at the time of this

24      accident?

25  A.  Well, until I was aware that there was even an

1  Q.  Well, let's be specific to West 19th Street.

2  A.  Okay.

3  Q.  You know that there's a paved roadway on roughly

4      the center of which your rails travel.

5  A.  Uh-huh.

6  Q.  Are you aware of what the characteristics of the

7      neighborhood were at the time of Robin Nixon's

8      accident?

9  A.  I'm not sure what you mean by characteristics of

10     the neighborhood.

11 Q.  Well, was it a residential neighborhood?

12     Commercial neighborhood?  Was it out in the

13     boonies where there's just ballast stone and

14     railroad ties?

15            Were you familiar with the

16     surroundings of the area that the train was

17     passing through in that area from State Street

18     to Cranberry Street?

19 A.  Yeah, there were some homes and a couple older

20     buildings that I remember.

21 Q.  Did you ever observe any children in the area?

22 A.  No, not that I can recall.

23 Q.  Did you ever observe anyone on a bicycle in the

24     area?

25 A.  No.

```
 1          at.
 2    Q.    Okay.  You indicated there that the train was
 3          traveling 8 miles per hour; correct?
 4    A.    Correct.
 5    Q.    How do you know that?
 6    A.    By the speed indicator in the lead locomotive.
 7    Q.    Okay.  Do you recall how many speed indicators
 8          there were in the locomotive you were operating
 9          that day?
10    A.    Just one.
11    Q.    And would that have been to your right on the
12          control -- what they call the control panel?
13    A.    It would have been right on the center at the
14          top of the control stand.
15    Q.    Okay.  Would it have been visible to Mr. Glenn,
16          who was on the right-hand side of the cab?
17    A.    No, it would not have.
18    Q.    Okay.  We have marked prior to this deposition
19          during Mr. Morgan's deposition his exhibit 4.
20          It's an Erie police report.
21                  On the second page of the report, the
22          third paragraph up, could you just read that and
23          review it?
24                       -  -  -  -
25          (The witness reviewed the document.)
```

1       But I didn't tell him 15.

2  Q.   Were you and Mr. Glenn the only people on the

3       train that day?

4  A.   Yes.

5  Q.   Did anyone contact you after this lawsuit was

6       filed to get any information from you in order

7       to answer the complaint that was filed in the

8       case?

9  A.   No.  The only person that I've talked to has

10      been Mr. Taft.

11 Q.   Okay.  Did you provide any information to him

12      with regard to the interrogatories that we

13      served upon your employer?

14 A.   No.

15 Q.   Did you provide any information regarding the

16      request for production of documents that we

17      served on your employer?

18 A.   Would you repeat that one more time?

19 Q.   In the discovery process we send out what's

20      called discovery, and we requested that some

21      documents be produced and we specified what we

22      wanted.

23           Did you provide any information in

24      that regard?

25 A.   No, no, no.