1              IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF PENNSYLVANIA
2
                            - - - -
3
ROBIN NIXON,                        )
4                                   )
              Plaintiff,            )
5                                   )
                 -vs-               )      Civil Action
6                                   )      No. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION        )
7  and NORFOLK SOUTHERN RAILWAY      )
COMPANY, INC.                       )
8                                   )
              Defendants.           )
9

10                          - - - -

11            DEPOSITION OF:   ROBERT E. ROCKEY

12                          - - - -

13
                  DATE:    January 9, 2007
14                         Tuesday, 2:40 p.m.

15

                  LOCATION:   Segel & Solymosi
16                            818 State Street
                              Erie, PA 16501
17                            814-454-1500

18
                  TAKEN BY:    Plaintiff
19

20            REPORTED BY:    Toni Rennebeck, RPR
                              Notary Public
21                            NMR Reference No. 010907B

22

23                                        EXHIBIT
                    ORIGINAL                  1
24

25

1        We would load the boats.  We were at Ontario

2        Hydro.

3   Q.   So that was the end of your days as a cross

4        watchman.

5   A.   That's correct.  I did that for three years and

6        then retired.

7   Q.   In the period of time that you worked in the

8        towers, did you ever observe any children

9        playing in the street area of the tracks, in the

10       West 19th Street portion of the tracks where the

11       tracks go down the middle of 19th Street?

12  A.   From time to time you would see children, but

13       not -- you know, it wasn't a regular thing.

14       Most people would not allow their kids to be on

15       tracks to be honest with you, you know.

16  Q.   Well, sure.

17  A.   Any responsible parent wouldn't allow their

18       children to be there.

19  Q.   Of course not.

20  A.   So usually you did not.

21  Q.   Right.  But we all know -- we were kids and our

22       parents didn't always know where you're at;

23       right?

24  A.   Yeah, I guess.

25  Q.   So tell me about what you observed with regard

1          to children on the street or track area of West

2          19th Street.

3    A.    Well, West 19th Street wasn't as heavily

4          populated as the other streets in the area.

5          There was only housing on one side.  You had the

6          cemetery there and you had industry.  When I

7          first started working there it was all industry.

8          There was just a few places where there was just

9          a few houses there.  So it really wasn't -- the

10         kids would -- usually they would be going maybe

11         across the tracks to go somewhere else, but they

12         didn't normally play on 19th Street, you know.

13   Q.    Did you ever see any kids riding their bikes

14         along 19th Street?

15   A.    I'm sure I did, you know.  They probably were

16         riding along, yeah.  Probably, yeah.

17   Q.    Did you ever see them riding along while trains

18         were traversing 19th Street?

19   A.    Normally didn't.  Normally you didn't, you know.

20         People, like I say, people generally stay clear

21         of trains, you know.

22   Q.    You say normally though.  So were there times

23         that maybe you saw someone --

24   A.    Riding a bike?  Sure.

25   Q.    -- a child on a bike maybe closer to the train

1       than they should be?

2  A.   Oh, there were times when I was in the ground

3       crossings and stuff and I'd tell them, you know,

4       this is not --

5              There were signs there, you know.

6  Q.   There were?

7  A.   Yeah, there were signs there.

8  Q.   What did the signs say?

9  A.   That it belonged by Norfolk Southern.  At the

10      center, you know, where the track was itself was

11      belonged by Norfolk Southern, and there were

12      signs telling people that --

13  Q.   Do you know what the sign said?

14  A.   I can't remember now it's been so many years.

15  Q.   You said that you were aware of what was in the

16      area.  Were you aware that there was a

17      playground located on the south side of 19th

18      Street somewhere, a block or two west of Sass?

19  A.   Let me think.  I remember there was something

20      there, but there was never anybody there in that

21      area right there.  I think there was at one time

22      a swing set or something over there.

23  Q.   There was a little playground and a basketball

24      court.

25  A.   Okay.  Yeah.  But I was never in that area right

1  A.    Yeah.

2  Q.    Jim Baskin?

3  A.    Yeah.

4  Q.    Mark Allen?

5  A.    That's correct.

6  Q.    Any others that you can think of?

7  A.    Not really.  Jim Gruey.

8  Q.    Jim Gruey?  How do you spell that?

9  A.    He's deceased now.

10  Q.    Oh, okay.

11  A.    That's about all I can remember.  Yeah, Jim

12        Gruey.  Probably those five.  That's probably

13        it.

14  Q.    How about other cross watchmen?

15  A.    There was a kid behind us by the name of Furman.

16        A guy by the name of Furman from New York.

17  Q.    Do you know where he's at now?

18  A.    Don Gray and Elmer Rundel are both dead now.

19        They're both deceased.  I think pretty much

20        they're all gone now.  I think that guy and

21        myself are about the only ones left.

22  Q.    Did you ever see any kids actually ride their

23        bikes and ride up alongside the train as it was

24        going down the tracks and grab on and get towed

25        by the train?

```
 1   A.   I probably seen everything in the years that
 2        I've been there, and I probably saw that a
 3        couple of times.
 4   Q.   Yeah?
 5   A.   Yeah.  Maybe once or twice I saw kids doing
 6        that.  Yes, I can say that.
 7   Q.   Were you able to do anything about it?
 8   A.   I pulled a kid away from it once; I remember
 9        that.  I think I yelled at a kid that was doing
10        it and he got away from it.
11   Q.   Did you ever report that to any of your
12        supervisors or --
13   A.   Well, they -- I'm sure that they, you know --
14             No, I don't think I ever did, to be
15        honest with you.  Supervision was more, you
16        know, they were -- there wasn't a supervisor in
17        this area for one thing.  It was our job to do
18        that, you know.  You don't have a kid's name or
19        something else, you know, there's nothing you
20        can do about it.  If someone did do something
21        and you got his name or something, then you
22        would report that to a supervisor.
23   Q.   I see.  Do you know or can you remember whether
24        or not anyone ever instructed you to watch for
25        any unsafe activities regarding children along
```

1          the tracks on 19th Street?  Did anybody ever

2          tell you to watch out for that?  Or was it more

3          related to the school crossing safety?

4    A.    Well, I'm sure they did.  I'm sure they did.  I

5          don't recall now, but I'm sure that they did at

6          different points, you know.  Supervision would

7          come around and I'm sure they would -- you know,

8          they would mention this to us.

9    Q.    What would they mention to you?

10   A.    Well, they would mention, you know, make sure

11         that the kids are far enough away from the track

12         and make sure that everything is -- they would

13         make sure that we were doing our job is what it

14         was, you know, and that's what our job consisted

15         of, so I'm sure that they did.  I'll bet every

16         one of those supervisors did.

17              MR. SOLYMOSI:  Okay.  I don't think I

18         have any further questions for you.

19              MR. TAFT:  I have nothing for

20         Mr. Rockey.

21              Mr. Rockey, you have a right, and

22         it's up to you to decide, to review the

23         transcript when it's completed to note any

24         corrections if there are any that need to be

25         made.  You also have a right, if you want, to

1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

ROBIN NIXON,                      )
                                  )
        Plaintiff,                )
                                  )
        -vs-                      )        CIVIL ACTION
                                  )        NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION      )
and NORFOLK SOUTHERN RAILWAY      )
COMPANY, INC.,                    )
                                  )
        Defendants.               )

- - - -

DEPOSITION OF:   ROBERT B. GLENN

- - - -

DATE:        May 23, 2006
             Tuesday, 11:30 a.m.

LOCATION:    Segel & Solymosi
             818 State Street
             Erie, PA 16501
             814-454-1500

TAKEN BY:    Plaintiff

REPORTED BY:    Toni Rennebeck, RPR
                Notary Public
                NMR Reference No. 052306A




EXHIBIT
2

NMR COURT REPORTERS
Gibsonia, PA        724-444-4433

1        observed as you were passing through the

2        intersection?

3   A.   That is correct.

4   Q.   You had no way of knowing whether or not, in

5        fact, the crossing lights and bells and the

6        gates were still operating when you were at

7        Amthor Steel?

8   A.   No, sir; there's no way I could.

9   Q.   Do you know what, if any, safety policy Norfolk

10       Southern had with respect to children being in

11       an area in a repeated manner?

12  A.   None to my knowledge.

13  Q.   And it's fair then you were never given any

14       training in that area?

15  A.   No.

16  Q.   Are there any other locations where you've

17       operated a train where the tracks and

18       residential street were in the same roadway?

19  A.   No.

20  Q.   Are you familiar with the term attractive

21       nuisance?

22  A.   No, sir.

23  Q.   As you traveled along West 19th Street, what was

24       your procedure for horns or whistles on the

25       train?  Did you blow your horn or whistle or

1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
             WESTERN DISTRICT OF PENNSYLVANIA
2
                        -  -  -  -
3
ROBIN NIXON,                        )
4                                   )
          Plaintiff,                )
5                                   )
             -vs-                   )    CIVIL ACTION
6                                   )    NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION        )
7  and NORFOLK SOUTHERN RAILWAY      )
COMPANY, INC.,                      )
8                                   )
          Defendants.               )
9

10                      -  -  -  -

11          DEPOSITION OF:  TIMOTHY J. PRICE

12                      -  -  -  -

13
                    DATE:    May 23, 2006
14                           Tuesday, 12:45 p.m.

15
                 LOCATION:   Segel & Solymosi
16                           818 State Street
                             Erie, PA 16501
17                           814-454-1500

18
                 TAKEN BY:   Plaintiff
19

20            REPORTED BY:   Toni Rennebeck, RPR
                             Notary Public
21                           NMR Reference No. 052306B

22

23              ORIGINAL        EXHIBIT

24                                3

25

NMR COURT REPORTERS
Gibsonia, PA        724-444-4433

1   Q.   Are you aware of any Norfolk Southern safety

2        policy that would apply to children that are

3        repeatedly found in an area adjacent to your

4        railway as you're traveling through the area?

5   A.   No.

6   Q.   So it would be fair to say you were never given

7        any training in that regard?

8   A.   That's correct.

9   Q.   Have you ever operated a train in a similar

10       location where the tracks were on a residential

11       street?

12            MR. TAFT:  Object to form.

13            Go ahead.  You can answer it if

14       you're able to.

15  A.   Repeat that one more time.

16  BY MR. SOLYMOSI:

17  Q.   Are there any other locations on which you

18       operated a train that were similar to the

19       conditions on West 19th Street between State and

20       Cranberry?

21  A.   No.

22  Q.   Are you familiar with the term attractive

23       nuisance?

24  A.   No.

25  Q.   Do you have regular safety meetings?

1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

ROBIN NIXON,                          )
                                      )
          Plaintiff,                  )
                                      )
          -vs-                        )     CIVIL ACTION
                                      )     NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION          )
and NORFOLK SOUTHERN RAILWAY          )
COMPANY, INC.,                        )
                                      )
          Defendants.                 )

- - - -

DEPOSITION OF:   DAVID C. MORGAN

- - - -

DATE:        May 23, 2006
             Tuesday, 9:45 a.m.


LOCATION:    Segel & Solymosi
             818 State Street
             Erie, PA 16501
             814-454-1500


TAKEN BY:    Plaintiff


REPORTED BY: Toni Rennebeck, RPR
             Notary Public
             NMR Reference No. 052306

ORIGINAL

EXHIBIT
4

1    exposed ties on 19th Street at the time of this

2    accident, wouldn't you?

3  A.  That is correct.

4  Q.  Okay.  So how would a trespasser know when he's

5    trespassing onto your property?

6  A.  When he's grabbing onto equipment that's on our

7    right-of-way, definitely he's trespassing.

8  Q.  Well, where would someone be if they were

9    grabbing onto your equipment; particularly

10    someone like Robin Nixon?  You would agree with

11    me that he wasn't between the rails when he

12    grabbed on?

13  A.  He's grabbing onto our property.

14  Q.  I understand that.  My question is when he

15    grabbed on and --

16           You understand that he was riding on

17    his bike?

18  A.  That's what I understand.

19  Q.  And that he had grabbed onto the side of one of

20    the cars.

21  A.  Yes.

22  Q.  And was being pulled along.

23  A.  Yes.

24  Q.  You'd agree with me when he was in the process

25    of doing that, he wasn't between the rails on

1    your right-of-way.

2  A.  That's correct.

3  Q.  He would have had to be somewhere to the north

4      of your north rail.

5  A.  That's correct.

6  Q.  Do you have any idea how far north he was of the

7      north rail?

8  A.  No.

9  Q.  Had you ever in your whole career ever heard of

10     a child or a person grabbing onto a rail car in

11     the manner Robin Nixon did and being towed

12     along?

13 A.  No.

14 Q.  Never heard of that?

15 A.  No.

16 Q.  Would it surprise you that we have many

17     witnesses that lived in that area that are going

18     to testify that it was a daily occurrence on

19     those tracks?

20 A.  That's -- I don't know.  I mean, I'm just

21     telling you what I know.

22 Q.  So that doesn't surprise you though, given that

23     you were there dozens of times to observe the

24     territory and the conditions?

25 A.  Right.  I'm just saying I never observed it.

1      Whether or not someone else did, I can't testify

2      to what they saw or did.

3  Q.   Okay.  And just to make sure I understood your

4      testimony, you said that you did discuss or you

5      did have discussions with crossing watchmen in

6      the years that you were trainmaster for that

7      area, but you never discussed any concerns about

8      children and safety along the tracks with them?

9  A.   That's correct.

10  Q.   Did you ever discuss with anybody concerns with

11     children and their safety when they were in the

12     areas adjacent to the track?

13  A.   Not that I recall.

14  Q.   Wouldn't that be one of your responsibilities as

15     a trainmaster?

16  A.   I'm responsible for the operation of the trains

17     and engines.  If people were laying on the

18     track, I mean, I've had people do that.  But if

19     there was a problem that was brought to me, I

20     would certainly attempt to address it.

21  Q.   I'm going to show you a document.  It says it's

22     a Conrail Transaction.  Norfolk Southern

23     Benefits, Safety, Environmental and Community

24     Benefits Prepared by Norfolk Southern

25     Corporation with a date of February 1998.

```
1          anything to prevent the accident?

2    A.    No.

3    Q.    Why?

4    A.    I just don't believe the railroad could have

5          done anything.  If he would have not trespassed

6          and grabbed our equipment as we went through,

7          then he would have not have gotten hurt.

8    Q.    You said earlier that this was a unique

9          situation with a train running down the center

10         of a city street; correct?

11   A.    Yeah.  As far as I'm aware of during my places

12         I've been on the railroad during my career, yes.

13   Q.    Are there any other places that were similar to

14         this that you've seen outside of Erie with a

15         similar situation?

16   A.    No.

17   Q.    Are you familiar with any safety precautions or

18         things that can be done on what -- I know that

19         Roger is going to object to me referring to it

20         as a shared roadway but --

21              MR. TAFT:  I'm going to continue to

22         object.  Why don't you just call it West 19th

23         Street because it is not a shared roadway and

24         he's testified to that.

25   BY MR. SOLYMOSI:
```

1    Q.    Are you familiar with the term shared roadway

2          with respect to trains?

3    A.    See, the problem is we cross a lot of crossings.

4          Are you saying we share the crossing?  We share

5          the right-of-way with the crossing?

6    Q.    No, I'm talking about a situation where you have

7          perpendicular with the flow -- not perpendicular

8          -- parallel with the flow of the train and the

9          tracks, what I understand that there's a term of

10         art out there in the railway world that there

11         are shared pathways, shared roadways where

12         trains and pedestrians, vehicles, bicycles

13         travel in a parallel direction on the same

14         roadway.

15              You're not familiar with that term or

16         that concept?

17   A.    Actually, no.  I'm saying we have a

18         right-of-way.  Now, once we go through, vehicles

19         can go back and forth, people can go back and

20         forth.  When we are going through, a vehicle can

21         be on the north side and a vehicle can be on the

22         south side and go in the same direction or in

23         the opposite direction, but they aren't sharing

24         the same spot at the same time.

25   Q.    Well, I think that's obvious.  If they are,

```
 1        there's going to be a collision; right?

 2   A.   Right.  So, I mean, the term shared roadway, I

 3        mean, we have our right-of-way through there

 4        that we use, and once we get through, then other

 5        people can cross there, yes, if that's what you

 6        mean.

 7   Q.   You'd agree that when we talk about the roadway,

 8        we're talking about the area curb to curb that

 9        contains a pathway for vehicles traveling west

10        -- and when I say vehicles, I mean autos or

11        bicycles --

12   A.   Right.

13   Q.   -- and vehicles and bicycles traveling east

14        adjacent to the tracks that are in the center of

15        the roadway; right?

16   A.   Yeah.

17   Q.   Okay.  And you're telling me that it was

18        possible at the time for vehicular traffic to be

19        on that same roadway at the same time that the

20        train was traveling down the center of the

21        roadway on its right-of-way.  Is that a fair

22        statement?

23   A.   You're going to have to repeat that one again.

24   Q.   You told me earlier that it was possible for

25        vehicles to be traveling on the roadway on West
```

```
 1          19th Street at the same time a train was

 2          traveling on West 19th Street.

 3     A.   Oh; that is correct, as a train is traveling on

 4          the right-of-way, a vehicle can go beyond the

 5          north side and on the south side.

 6     Q.   Okay.  And you're aware of that being possible

 7          at the time and prior to this accident.

 8     A.   Yes.

 9     Q.   Okay.  But is it fair to say that you're not

10          aware of any safety policies concerning

11          situations such as that where cars or bicycles

12          can travel parallel to the tracks on a roadway

13          that is utilized by both the train and

14          automobiles or bicycles?

15     A.   That's correct.

16     Q.   You're not aware of any safety program or

17          policies or --

18     A.   No.

19     Q.   -- designed criteria for a situation like that?

20     A.   No.

21     Q.   And you're not aware of any studies that the

22          railroad may have undertaken in that regard?

23     A.   That's correct.

24     Q.   Are you aware of any studies that the railroad

25          undertook related to the removal of those
```

```
 1   Q.   Will you admit that this is a dangerous type of

 2        operation when trains run in the center of a

 3        street at low speed?

 4                    MR. TAFT:  Objection to form.  Define

 5        dangerous.

 6   BY MR. SOLYMOSI:

 7   Q.   Well, would you consider the conditions as you

 8        knew them to be on West 19th Street with the --

 9        like we talked about earlier, with the vehicles

10        other than the trains being able to travel

11        alongside the train even when the train was

12        running, including people on bicycles, would you

13        consider that to be a dangerous situation?

14   A.   As long as everyone complied with the law, the

15        railroad, as well as any individuals, then, yes,

16        it is a safe operation.

17   Q.   Do you have any children?

18   A.   Yes, I do.

19   Q.   Do you think that young children are capable of

20        always observing the rules?

21   A.   No.  Just like adults aren't always capable of

22        observing the rules.

23   Q.   Do you think that a child is as capable as an

24        adult when it comes to understanding the dangers

25        alongside a railway?
```

1   A.   Some children are.  My children have been

2        exposed to railroads that they may be more aware

3        of the dangers than other kids, but it is up to

4        the parents to supervise their children.  I

5        mean, that's the way it is.

6   Q.   So do you agree or disagree that that situation

7        was dangerous or not for pedestrians or cars?

8   A.   No.  If everyone obeyed the law, there were no

9        dangers.

10   Q.   And is that why you didn't undertake any efforts

11        to make sure that children would not be near the

12        train while the train was going by?

13   A.   That's correct.

14   Q.   Is it because you assume that if people follow

15        the rules, it wouldn't be dangerous?

16   A.   Well, you have to assume that people will obey

17        the law, just like I have to assume that a train

18        will stop for a stop signal or a car will stop

19        for a stop signal.

20   Q.   Then would it be correct that you don't believe

21        the railroad needs to do anything to try to

22        prevent this type of an accident from happening?

23   A.   I really can't answer that.

24   Q.   Why not?

25   A.   I mean, I -- we --

1    Q.    Do you understand the question?

2    A.    Say that again.

3                MR. SOLYMOSI:  Read it back, Toni.

4                THE WITNESS:  Yeah, read it back to

5          me.

6                          -  -  -  -

7          (The record was read back by the Reporter.)

8                          -  -  -  -

9    A.    Well, the railroad does -- we have Operation

10         Lifesaver programs and we have people that go

11         out to schools, local communities, talk about

12         the dangers of trespassing on railroad property.

13         And I'm sure there was probably something on TV

14         in the area.  There is an educational campaign.

15         And that's a way for the railroad to get

16         information out to the public to say, hey, you

17         know, I mean, obey the law or you could get

18         hurt.

19    BY MR. SOLYMOSI:

20    Q.    So do you know what steps were taken in that

21         regard for this particular area and this

22         particular condition that we've been talking

23         about?

24    A.    Specifically, no.

25    Q.    And you agree you didn't do anything about it.

 1  A.   That's correct.

 2  Q.   Who's in charge of this Operation Lifesaver in

 3       your company?

 4  A.   Operation Lifesaver -- we have a coordinator for

 5       the State of Ohio for all railroads out of

 6       Columbus, and then there's different volunteers

 7       within all the railroads, whether it be Norfolk

 8       Southern CSX that are trained to go out to

 9       schools and trucking companies and so forth and

10       give presentations.

11  Q.   And this is part of that Operation Lifesaver you

12       were talking about?

13  A.   That's correct.

14  Q.   Have you ever been at any presentations for

15       Operation Lifesaver?

16  A.   Yes.

17  Q.   What and where if you can remember?

18  A.   Oh, I've been to a trucking company in Fairview,

19       Ohio -- or Fairview, Pennsylvania.

20  Q.   What trucking company?

21  A.   I do not recall.  I don't even remember it was

22       so many years ago.

23  Q.   Okay.

24  A.   I've been in Conneaut High School driving class.

25  Q.   Driving class?

1  A.  Yeah, driver's ed.

2  Q.  Okay.

3  A.  Maybe I've been in some others, but I just don't

4      recall.

5  Q.  Have you ever been to any that would have

6      addressed the safety issue of kids on bicycles

7      where there's a paved roadway that's adjacent to

8      the tracks?

9  A.  No.

10 Q.  And you've never participated as a presenter in

11     Operation Lifesaver, have you?

12 A.  Yes.

13 Q.  Oh.

14 A.  At the driver's education and at this trucking

15     company.

16 Q.  Oh, okay, I didn't realize that you were

17     actually presenting.

18 A.  Yes.

19 Q.  Okay.  And did you have any written materials or

20     anything that you gave out?

21 A.  Yeah, Operation Lifesaver materials.

22 Q.  That's not something that Norfolk Southern

23     produces?

24 A.  No.

25 Q.  Operation Lifesaver, is it an independent

```
 1        organization?  Do you understand who they are?
 2   A.   It's been a while since I've been involved with
 3        it, but I guess the railroads contribute to this
 4        organization, this Operation Lifesaver,
 5        Incorporated.  And then they do the education,
 6        the training, and so forth.
 7   Q.   Did you ever have any contact with the City of
 8        Erie Police Department in the time that you were
 9        trainmaster prior to this accident?
10   A.   Probably at other crossing accidents.
11   Q.   Other than that, would it be fair to say that
12        you never contacted them to address any concerns
13        there might be with safety and children along
14        the 19th Street tracks?
15   A.   That's correct.
16                          -  -  -  -
17        (There was a discussion off the record.)
18                          -  -  -  -
19   BY MR. SOLYMOSI:
20   Q.   I'm going to mark this as Exhibit 2 to your
21        deposition.  Could you identify that document?
22                          -  -  -  -
23        (The witness reviewed the document.)
24                          -  -  -  -
25   A.   Yes, I can.  It's a report that I completed.
```

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3           - - -

ROBIN NIXON,        )
4             )
   Plaintiff,    )
5           ) CIVIL ACTION
   vs.        ) NO. 05-101 ERIE
6           )
NORFOLK SOUTHERN CORPORATION )
7 and NORFOLK SOUTHERN RAILWAY )
COMPANY, INC.,      )
8           )
   Defendant.    )
9

10         - - -

     Deposition of AUGUST W. WESTPHAL
11
      Thursday, May 17, 2007
12
         - - -
13
    The deposition of AUGUST W. WESTPHAL, called
14 as a witness by the Defendants, pursuant to Notice and
the Federal Rules of Civil Procedure pertaining to the
15 taking of depositions, taken before me, the
undersigned, Deborah L. Endler, a Notary Public in and
16 for the Commonwealth of Pennsylvania, at the offices
of MacDonald, Illig, Jones & Britton, LLP, 100 State
17 Street, Suite 700, Erie, Pennsylvania, 16507,
commencing at 9:40 o'clock a.m., the day and date
18 above set forth.

19         - - -

20    COMPUTER-AIDED TRANSCRIPTION BY
     MORSE, GANTVERG & HODGE, INC.
21     PITTSBURGH, PENNSYLVANIA
       412-281-0189
22
         - - -
23

24       EXHIBIT
        5
25

1  maintenance of the track or the ties per se?

2      A      No, the track, the track and the ties are

3  underneath the cement or the asphalt.

4      Q      I just want to make clear when you are

5  talking about failing to maintain a segment of track,

6  you are not talking about the type of work the

7  maintenance of weigh department does?

8      A      No.

9      Q      Okay.  Is that the same for number 2,

10  number 2 says "Norfolk Southern Railroad was negligent

11  in the maintenance of West 19th Street track located

12  within a residential and industrial area."  What do

13  you mean by that?

14      A      That's correct, they didn't do anything to

15  try to prevent any type of accidents by having any

16  kind of a program to deter the children from playing

17  next to the tracks and where trains are moving along.

18      Q      My understanding from your report is that

19  you and Mr. Guarino agree that what should have

20  happened was the installation of these rumble strips

21  and the painting of signs indicating "DANGER-NO BIKES"

22  between the rails; is that right?

23      A      That's what could have been done.  And

24  that's what was in my report what should have been

25  done.

1    Q    Right.  So when we are referring to items 1

2  and 2, that's what you are referring to?

3    A    No, no, the railroad did absolutely

4  nothing, Mr. Taft.

5    Q    Well, show me, in addition to telling me,

6  that the rumble strips should have been installed and

7  that the signs should have been put between the rails

8  stating "DANGER-NO BIKES," where in your report are

9  you telling me that something else should have been

10  done --

11    A    Down on one of the --

12    Q    -- to maintain the tracks?

13    A    In number 13.

14    Q    Are you on opinion 13?

15    A    Yes.

16    Q    I'm not there yet.  I'm on 1 and 2.

17    A    Well, we are jumping around here.

18         MR. SOLYMOSI:  You just asked him to show

19    you elsewhere in the report.

20         MR. TAFT:  Okay, 13 is installing the

21    rumble strips.

22         MR. SOLYMOSI:  Install and maintain.

23    Q    Right, we talked about those already.

24    A    No, we haven't really talked about them

25  yet.  We just mentioned them and you gave me that

1    exhibit.

2    Q    Okay.  All right.

3    A    And then we jumped to something else.

4    Q    All right.  So we got rumble strips.  And

5    we got signage that should have been put down between

6    the rails; correct?

7    A    Well, in my report it says what could have

8    been done.

9    Q    Yeah.  There is a heading "What Should Have

10   Been Done"?

11   A    Yes.

12   Q    In which you state rumble strips and

13   warnings?

14   A    Yes.

15   Q    That's what you are claiming should have

16   been done?

17   A    But you were talking about opinions 1 and

18   2, and I explained at that time that the railroad did

19   absolutely nothing to prevent kids from running around

20   that track irregardless of the fact that they had

21   crossing watchmen there that seen the kids there.

22   Q    Okay.

23   A    They testified that they seen kids riding

24   on the cars, or grabbing onto the cars.

25   Q    But here is what's confusing to me.  When

1    you are saying we failed to maintain the segment of

2    railroad or we were negligent in maintenance of the

3    West 19th Street track, are you talking about the

4    failure to install rumble strips and the failure to

5    install signs?

6        A    No, I'm talking about the railroad failed

7    to maintain the -- maintain the track between West

8    19th Street in a condition that would have prevented

9    accidents.  That does not -- maintain keeps track of

10   the entire track, not the ties or the ballasts or

11   anything like that.  They didn't maintain any kind of

12   -- they didn't schedule any kind of action by the

13   railroad to prevent kids from playing on the tracks.

14       Q    Such as what?

15       A    What?

16       Q    Such as doing what besides putting these

17   rumble strips in or signs?

18       A    You always jump back to the rumble strips.

19   I'll get to that -- you want to go to that now?

20       Q    No, I don't.  Because I just want to make

21   sure that I understand what you are contending under 1

22   and 2.

23       A    And I explained that.

24       Q    No --

25            MR. SOLYMOSI:  That's been --

1    Q      Not to my understanding.

2           MR. SOLYMOSI:   That's been asked and

3      answered.

4           MR. TAFT:   I don't think it has.

5    Q      What program have you identified in here,

6  besides rumble strips and signs between the tracks

7  that you claim Norfolk Southern should have done to

8  maintain that segment of the railroad?

9    A      To maintain that stretch of the railroad

10 meant in this condition, put it in perspective of the

11 injury to kids or injury to anybody, Norfolk Southern

12 Railroad did absolutely nothing to prevent any kind of

13 accidents on that property by putting up signage or

14 anything, but yet they had crossing watchmen there on

15 certain days that admittedly seen kids catching on and

16 playing around the tracks.  But they did nothing.

17 They did not report them to their superiors.

18         Those people never had any training by

19 Norfolk Southern of what to do when they seen kids out

20 there.  So absolutely, they did absolutely nothing to

21 maintain that track in a safe condition along West

22 19th Street.

23   Q      I guess you mentioned it before, you are

24 saying they should have notified the City Police?

25   A      The standard in the industry, they should

1  have notified their superiors.

2      Q      Then what?

3      A      Then their superiors, the dispatcher or

4  their superiors would notify the police or the

5  railroad police, if they had them, and usually Norfolk

6  Southern had railroad police, and then they would

7  notify the Police Department Erie, Pennsylvania, that

8  there are children playing down along our tracks.

9      Q      And then what?

10     A      We would like to have you come down, see if

11 you can do something about it.  Then it would be the

12 City of Erie responsibility to follow up on that.  And

13 then somebody from the railroad should have followed

14 up, a train master or somebody should have followed up

15 and seen are they doing anything to prevent kids from

16 playing around the tracks and trains when they go

17 through town.

18     Q      Well, are you contending that the police,

19 if they had been notified, should have stationed

20 people there in case some kid like Robin Nixon came

21 along on a Sunday?

22     A      I didn't say that.  You are putting those

23 things --

24             MR. SOLYMOSI:  Roger, I'm going to object.

25       That's been asked and answered.  If you are going

```
 1        to ask it again, you are going to need a Court
 2        Order to get him to answer it again.  It's clear
 3        what he said here.  He said it and it's been
 4        answered.
 5            MR. TAFT:  It's not clear and I'll be happy
 6        to move on.  The transcript will speak for
 7        itself.
 8        Q     Item 4 or opinion 4 says "Norfolk Southern
 9   was negligent in the operation of trackage on West
10   19th Street in a manner that totally disregarded the
11   presence of children who were known to play on or near
12   and near the tracks."  Is that the same as the first
13   three?
14        A     No, this is different.
15        Q     Okay.  What's this?
16        A     "Norfolk Southern Railroad was negligent in
17   the operation of trackage."  Now, the operation would
18   mean a train going down the track and the people
19   assigned to that train, Mr. Price and Mr. Glenn, did
20   absolutely nothing, admitted that they didn't have any
21   responsibility to look on either side or to notify any
22   children or anything.
23            The standard in the industry is to those
24   employees on the train have to be vigilant and alert.
25   Any time they see children playing around the tracks
```

1  or around in the area, they are to notify the train

2  dispatcher and they in turn will notify the City of

3  Erie Police.  It's the standard in the industry.

4      Q     Well, Mr. Westphal, instead of talking

5  about the standard in the industry all the time, what

6  did you see in the materials that you reviewed very

7  carefully that led you to believe that Robin Nixon

8  would have been visible to anyone on that train crew

9  on the Sunday morning, April 27, 1997?

10     A     Well, they went by, they were by already.

11 My understanding they were by that point already.

12     Q     Right.

13     A     They wouldn't have seen him.

14     Q     They wouldn't have seen him at all.  So if

15 they didn't see him, what would that train crew have

16 been able to do to have avoided Mr. Nixon's accident

17 because they never saw him?

18     A     Mr. Taft, it's not just Robin Nixon.  It's

19 all children around in there.  The engineer and

20 conductor, Glenn and Price, did absolutely nothing to

21 warn any, at any time they admitted that they didn't

22 do anything.  Like they were going down there with

23 blinders on, like they didn't even have to look out

24 the window to see where they were at.  It was a total

25 disregard for safety.

1    Q    On the morning of the accident they had

2  already gone through by the time he showed up?

3    A    I answered that already.

4    Q    Okay.  Let's go to number 5.  You opine

5  that "Norfolk Southern Railroad was negligent in the

6  operation of the trackage at West 19th Street by

7  failing to display any signage to warn children of the

8  danger of playing on or near railroad tracks."  Now,

9  are we now to putting of the signs that Mr. Guarino

10  references in his report?

11    A    No, because at the time of this accident

12  they didn't have any signs up there.

13    Q    But is your contention in this opinion that

14  Norfolk Southern should have installed the signs that

15  Mr. Guarino referenced in his report "DANGER-NO BIKES"

16  between the rails?

17    A    Yes, that would have added to it, in my

18  opinion, those signs that Mr. Guarino put big letters,

19  24 inches high and yellow strip across and rumble

20  strips down the side would have been a great deterrent

21  from those children playing on the tracks.

22    Q    But that's the signage that you are

23  referring to in opinion 5?

24    A    No, no, no, no, no, no, you brought that

25  up.

1    Q      You tell me, then, Mr. Westphal, what

2  signage are you referring to in No. 5--

3    A      The railroad company has big signs, they

4  say "No Trespassing," "Keep Away," "Trains Moving."

5  They have a national program that's Operation Life

6  Safer that they go to schools and they teach kids stay

7  away from railroad tracks.  Of course, they didn't

8  participate in that here.  Norfolk Southern didn't

9  participate in that.  I didn't see anything on that.

10    Q      You didn't ask one way or the other, did

11  you?

12    A      It was in the report that I guess Robin

13  Nixon he said that nobody ever come to my school and

14  told us about that.

15    Q      So --

16    A      But to get back to your question, they have

17  signs that say "stay away from the trains" and they

18  could have put up other signs when they knew the

19  children were up and down there.  They could have put

20  up signs up there that had an "X" on them, children on

21  bicycles or something like, stay away from the trains.

22    Q      Mr. Westphal, let's get to a real basic

23  fact, isn't it true that West 19th Street is a public

24  street?

25    A      It's a public street with the Norfolk

1    Southern tracks running right down the middle.

2        Q      Isn't it true that the Norfolk Southern

3    right-of-way runs from end of tie to end of tie on

4    that track line?

5        A      It would depend upon what the negotiation

6    were for installing that track.

7        Q      Well --

8        A      But I agree with you.

9        Q      Yeah, you read the deposition transcripts

10   carefully, and isn't it a fact that the undisputed

11   testimony is that the Norfolk Southern's right-of-way

12   only was from end of tie to end of tie through the

13   middle of 19th Street?

14       A      Yes.

15       Q      And isn't it true because it's undisputed

16   that the rest of 19th Street was a public street owned

17   and maintained by the City of Erie; correct?

18       A      Yes, that would not have prevented them

19   from putting up a sign up there and putting signage up

20   that I mentioned before, but they didn't do it.

21       Q      Signage on someone else's property?

22       A      Put them up on the side or on the telephone

23   pole.  They do that.

24       Q      Wait a minute now.  You are suggesting that

25   Norfolk Southern put big signs up on someone else's

1  property; is that right?

2      A      Well, no, just put up a sign, put up a sign

3  up on a post.

4      Q      Okay, now, keep in mind, Norfolk Southern's

5  property --

6      A      I know what, where you are getting at.

7      Q      So you want Norfolk Southern to post signs

8  on someone else's property?

9      A      Just put them on a telephone post.  They

10  can get permission.  If Norfolk Southern was aware of

11  the fact and wanted to do anything about it, they

12  could go to the City and say would you mind if we put

13  up a sign to protect the children in your city from

14  staying away from our trains.  I don't think Norfolk

15  Southern or the City of Erie would say, oh, no, don't

16  do that, we don't care about our children.

17      Q      Is it your understanding the City of Erie

18  knew nothing about children in the vicinity of these

19  tracks before this accident?

20      A      Well, I don't know really.

21      Q      Okay.

22      A      Norfolk Southern never reported it to them.

23      Q      And so as far as you know, the City had no

24  knowledge of this?

25      A      Norfolk Southern never reported it to them.

1     Q      Okay.

2     A      Because those are the ones, those are the

3  ones get damaged because of the total ignorance of

4  this crew not knowing anything about it.  Hardly

5  anybody knew about it.  It goes back to the lack of

6  training.

7     Q      Let's go to No. 12.  "Norfolk Southern was

8  negligent in that it is clear following my review and

9  research of the operating rules as above outlined,

10  Norfolk Southern Railroad through its employees

11  exhibited a complete disregard for a risk which was

12  clearly known to them."  Is that what you have been

13  testifying to before?

14     A      Yes.

15     Q      Are you contending that on April 27, 1997,

16  the Norfolk Southern crew in that train was aware that

17  Robin Nixon had grabbed onto that train?

18     A      I didn't say that.

19     Q      Well, is that your contention?

20     A      No, no.  They were not -- we went over this

21  before.  But my --

22     Q      Let's go on to --

23     A      Wait a minute.  My contention is that

24  following my review of this, the operating rules, they

25  were totally ignorant of the operating rules and their

1   responsibilities to protect the public, to do anything

2   to protect the public or whether it was Robin Nixon or

3   any other child along there from getting injured on

4   that track.

5        Q    Let's go to No. 13.  "In my opinion the

6   annual cost of $3,500 to install and maintain rumble

7   strips along the area of West 19th Street where the

8   accident occurred would have been a small and

9   reasonable expense compared to the risk presented by

10  Norfolk Southern Railroad to children in the area."

11  Right?

12       A    That's what it says.

13       Q    That's your opinion?

14       A    Yeah.

15       Q    And that ties in with Mr. Guarino's report

16  that you agree with that these rumble strips should

17  have been installed?

18       A    Yes, and I'll point out that the

19  installation, they had three or four, say there was

20  ten crossings in that 1.2 miles there.  If they didn't

21  have any crossing watchmen, it would have cost the

22  railroad company to put in grade crossing protection

23  at all those places a minimum of $12,000 for crossing

24  protection.  And that's $120,000.  That's for one

25  installation and they still have the maintenance.

1          According to Mr. Guarino's recommendations,

2    the $3,500 to install and maintain these rumble strips

3    per year would have been a small amount compared to

4    what they would have had to have done if they really

5    wanted to protect the people.

6        Q     It's your opinion that those rumble strips

7    would have prevented Mr. Nixon's accident?

8        A     They would have been a deterrent for all

9    children, all bicyclists that wanted to do something

10   like that.

11       Q     I'm talking about Mr. Nixon.  You think it

12   would have prevented Mr. Nixon's accident?

13       A     I believe it would have.

14       Q     And 14 says that "It's your further opinion

15   that the conduct of Norfolk Southern Railroad through

16   its employees, engineer Timothy J. Price and conductor

17   Robert B. Glenn above referenced directly and

18   proximally contributed to the serious injury to Robin

19   Nixon on April 27, 1997 on the West 19th Street track

20   at Erie, Pennsylvania."  What conduct are you

21   referring to?

22       A     Of their total disregard for people around

23   the tracks.

24       Q     On the day of the accident or before?

25       A     On any crew, they exhibited that in their

1  instance on April 27th.  But any crew, the railroad

2  company should, the Norfolk Southern Railroad company

3  should have had some responsibilities and training and

4  getting it through the whole procedure as I've

5  explained 7 or 8 times now the whole procedure to keep

6  children away from trains.  They did absolutely

7  nothing.

8    Q    Your contention is not with the way they

9  ran the train that day, your contention is with their

10  failure to follow these rules that you mentioned

11  before and report that there were children in the area

12  on various occasions?

13    A    Well, their whole operation of the train.

14  The train, Mr. Price was operating the engine and that

15  moved the train.  But their total disregard for people

16  around the railroad was a sample, must have been a

17  sample of all their employees.

18    Q    That's your assumption?

19    A    Yes.

20    Q    Do you agree with Mr. Guarino that these

21  rumble strips should have been the same type that were

22  installed on interstate highways?

23    A    I concur with his report.

24    Q    Okay.  And do you agree that the rumble

25  strips that are installed on interstate highways are

1  for the purpose of waking up drowsy drivers?

2      A      Yes, to warn a driver that he is off the

3  road.

4      Q      And --

5      A      And Mr. Guarino had put out a nice thing in

6  his report, if I could find it here, that really, he

7  had a picture in there that showed exactly how the

8  patch strips would have been better, would have been

9  his recommendation.

10          MR. SOLYMOSI:  Here.

11          THE DEPONENT:  Yeah, this is what it is.

12      Q      Would you agree with me that the

13  recommendation Mr. Guarino made, that you concur with,

14  would require those rumble strips to be installed on

15  the City street and not on the railroad right-of-way?

16      A      Well, there would have to be some

17  arrangement made between the City and the railroad,

18  but the actual -- that could be worked out.  I don't

19  think that the City of Erie, Pennsylvania, is going to

20  say no, you can't put that on our street, that might

21  prevent an injury to a child.  But I seriously believe

22  that that could be worked out between the City.  But

23  it would have been an indication that they were doing

24  something to protect children from riding bikes on

25  there.

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                    –  –  –

4    ROBIN NIXON,                        )
                                         )
5            Plaintiff,                  )
                                         )
6        vs.                             )  No. 05–101ERIE
                                         )
7    NORFOLK SOUTHERN CORPORATION and    )
     NORFOLK SOUTHERN RAILWAY COMPANY,   )
8    INC.,                               )
                                         )
9            Defendants.                 )

10                   –  –  –

11          Deposition of ROBIN NIXON

12          Friday, March 24, 2006

13 ─────────────────────── – – – ─────────

14       The deposition of ROBIN NIXON, the plaintiff
     herein, called as a witness by the defendants,
15   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
16   taken before me, the undersigned, Lance E. Hannaford,
     a Notary Public in and for the Commonwealth of
17   Pennsylvania, at the offices of MacDonald Illig Jones
     & Britton, 100 State Street, Suite 700, Erie,
18   Pennsylvania  16507, commencing at 9:35 o'clock a.m.,
     the day and date above set forth.

19                   –  –  –

20       COMPUTER-AIDED TRANSCRIPTION BY
          MORSE, GANTVERG & HODGE, INC.
21          PITTSBURGH, PENNSYLVANIA
               412-281-0189
22                   –  –  –

23

24

25

**EXHIBIT**

_6_

1    A    Hand brakes.

2    Q    That helps.

3         As you were being pulled along, holding on

4    to the handle with your right hand, left hand on the

5    left handlebar of your bike, where was Mr. Houston?

6    A    In front of me.

7    Q    Was he riding his bike in front of you?  Or

8    was he also holding on to the train?

9    A    He was also holding on to the train.

10   Q    When did Mr. Houston first grab on to the

11   train?

12   A    Right before me.

13   Q    Now, you were holding on to a handle near

14   the rear of one of these rail cars.

15        Correct?

16   A    Correct.

17   Q    What was Mr. Houston holding on to?

18   A    I am not sure.

19        Because he was two cars ahead of me.

20        So I couldn't exactly see what he was

21   holding on to.

22   Q    He was, to your best recollection, two rail

23   cars farther toward the head end or front end of the

24   train than you were?

25   A    Correct.

1    Q    But you could see him holding on to
2  something?

3    A    Correct.

4    Q    Could have been a handle on that car or
5  something else?

6    A    Correct.

7    Q    You don't know?

8    A    I don't know.

9    Q    To your best recollection, when did he
10  first grab on to the train?

11    A    Right before me.

12    Q    Am I correct in understanding that these
13  rail cars, that you and Mr. Houston were holding on
14  to, starting somewhere, to your best recollection, to
15  the west of Myrtle Street, were toward the rear of the
16  train?

17    A    I am not exactly sure.

18    Q    You don't recall one way or the other; is
19  that right?

20    A    Right.

21    Q    At any time, did you see the locomotive of
22  that train go past?

23    A    I am not exactly sure.

24    Q    You do remember seeing the train itself
25  moving past.

1    A    Yes.

2         I do.

3    Q    But you don't recall seeing the locomotives

4  of the train?

5    A    No.

6         I don't recall.

7    Q    At any point in time before you had your

8  accident, did Mr. Houston let go of the train?

9    A    No.

10   Q    So your best recollection is that

11 Mr. Houston was continuing to hold on to this rail car

12 two cars ahead of you.

13             And continued to hold on the entire time up

14 until you fell?

15   A    Correct.

16   Q    Mr. Nixon, before this accident, had your

17 parents ever told you to stay away from moving trains?

18   A    No.

19        They hadn't.

20   Q    They never told you once that you ought to

21 stay away from a moving train?

22   A    No.

23        They hadn't.

24   Q    Did anybody in school ever tell you to stay

25 away from moving trains, they are dangerous?

1    A    No.

2         They hadn't.

3    Q    So you didn't know that at all?

4    A    No.

5    Q    Do you recall approximately where it was,

6    when you fell off your bicycle?

7    A    No.

8         I don't.

9    Q    Do you have a recollection today of the

10   accident happening?

11   A    Yes.

12        I do.

13   Q    Do you know whether you fell off your

14   bicycle somewhere in the vicinity of the Sassafras

15   Street intersection?

16   A    Yes.

17        I did.

18   Q    And again, as you best recall it,

19   Mr. Houston was still continuing to be pulled along by

20   the train two cars in front of you, when you fell?

21   A    Yes.

22   Q    Mr. Nixon, I am not saying that art runs in

23   the family.

24   A    It doesn't.

25   Q    Just because your brother attends an art

P.O. Box 39146

North Ridgeville, Ohio 44039

(440) 327-7125 • FAX (440) 327-0362

e-mail: whiteywestphal1@aol.com

A. W. WESTPHAL
President

February 16, 2007

Mr. Tibor Solymosi, Esquire
**SEGAL & SOLYMOSI**
Attorneys at Law
818 State Street
Erie, Pennsylvania 16501

Re:    **Robin Nixon vs. Norfolk Southern Corp.**

Dear Mr. Solymosi:

## BACKGROUND AND EXPERIENCE

I, August W. Westphal, am a railroad safety expert. I have considerable experience (fifty-four years) in the railroad industry. I have performed service as both Freight and Passenger Conductor/brakeman -- Foreman/Switchman both in over the road and Yard/Terminal Operations. Also, I have worked jointly with the representatives of the American Association of Railroads (AAR), Federal Railroad Administration (FRA), National Transportation Safety Board (NTSB), and Rail Labor Organizations (BLE, B of MWE, BRC and UTU) in handling safety activities on the nation's railroads. As a consultant I have participated in 14 cases involving children in railroad accidents. In one of them it involved a child with a bicycle.

## ENGAGEMENT

I was first contacted in this matter by Mr.Tibor Solymosi, Esquire on March 27, 2006 via telephone. This expert was requested to review the facts underlying the incident that occurred on April 27, 1997, conduct any necessary investigation and render opinions regarding the conduct of Norfolk Southern Corporation and its personnel.

## DOCUMENTS

1. Complaint

2. Answers

3. Deposition Testimony of

**EXHIBIT**

7

Westphal
DEP EX. 6

Member: National Association of Railroad Safety Consultants and Investigators

© 99

Mr.Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page two contd

4. Report of Investigation, Dennis Lagan & Associates

5. Defendants Answers to Interrogatories

6. Documents from Defendant Norfolk Southern re: Accident

7. Police Report, Erie PA Police Department

8. Photos, West 19th Street, September 2002

9. Erie, PA Police photos of Accident scene

10. Photos – West 19th Street, March 2006

11. Deposition Testimony of David C. Morgan, NS Trainmaster

12. Deposition Testimony of Timothy J. Price, NS Engineer of train

13. Deposition Testimony of Eugene Pandlis, Manager Claims Litigation

14. Deposition Testimony of James F. Baskin, NS Supervisor of Track

15. Deposition Testimony of Steve W. Frye, NS Claim Agent

16. Deposition Testimony of Robert B. Glenn, Conductor of train

17. Defendant NS Answers to Interrogatories –Second Set

18. Norfolk Southern Railroad Safety and General Conduct Rules

19. Norfolk Southern Operating Rules Effective July 2, 1995

20. Deposition Testimony of Donald R. Cunningham, NS Laborer

21. Deposition Testimony of Robert E. Rockey, NS Route Clerk and Crossing Watchman

22. Deposition Testimony of Harvey H. Stone, President, Stone Consulting and Design Inc.

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page three, contd

    23. Federal Highway Administration, Technical Advisory, Roadway Shoulder
        Rumble Strips

    24. Federal Highway Administration, Synthesis of Shoulder Rumble Strip
        Practices and Policies

    25. Norfolk Southern Six Point Action Plan for Safety of Operations

    26. Expert Opinion of Guarino Enterprises, Rumble Strips near tracks

## FACTS

The train involved in the instant accident April 27, 1997 was a thru Train operating in an
eastbound direction between Conneaut, OH and Buffalo, NY. The lead Unit of the three
Unit power consist was NS 8669 followed by NS 6620 and Trailing Unit NS 8594 the
train is identified as a Unit Coal Train No. Y47L1. The train consist was 150 loads and
00 empties with 7,225 tons traveling at a reported eight (8) miles per hour. The speed of
travel is suspect in that the Engineer had advised the police the train was traveling at 15
MPH at the time of the accident to Robin Nixon.

The Norfolk Southern Train was operated with only a two (2) man crew, the Conductor
and the Engineer. The Conductor was Robert B. Glenn who began his career in May of
1995 in Conneaut, OH. (Glenn P 7 L- 2) Strange as it may seem Mr. Glenn started his
career as a Conductor with just on job training to qualify. Mr. Glenn worked with several
Conductors and there was no certification as to his being qualified. (Glenn P8 L 6-10)
This is very unusual in that generally speaking an employee in train service must have at
least three (3) years experience as a brakeman/switchman prior to being eligible to
qualify as a conductor. Extensive training and rule certification is required. The engineer
was     Timothy J. Price who began his career on the railroad in 1988 served in the
capacity of brakeman/conductor until 1990 when he attended engineer schooling at
McDonough, GA. (Price P -7 L 22-24)

Truly the actual experience and responsibility for operating a railroad train of 150 cars
was lacking. Neither employee on the train seemed to be fully aware of their duties.
Conductor Glenn indicated in response to a question as to who was in charge of the train,
(Glenn P17 L 24-25) that it was a shared responsibility. While messages are generally
addressed "C & E", the Conductor is the employee in charge of the train. The conductor
is to be seated in the lead unit of the train, on a two man crew, and be vigilant and alert to
what is on the left side of the train moving along the track. Conductor Glenn was not alert
and vigilant when he said he observed nothing between State and Cranberry Street

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page four, contd

(Glenn P18 L 11-16) also, was not familiar with the area along the track where children may be sited inasmuch as he stated it was not part of his responsibility. (Glenn P 19 L 3-8) Mr. Glenn indicated his training was ongoing and was specific to the "operation and handling of equipment that we're on" (Glenn P 20 L 7-21) Conductor Glenn further indicated if children were not on the right-of-way and not inhibiting anything to do with our operation, then we were not trained to watch for children. (Glenn P 20 L-22-25 and P 21 L 1-5) Engineer Price was also limited in his knowledge of train operation. Critical to the operation of a train are many characteristics of the territory over which the train will be operated. Direction, terrain, grade, sidings and switch or yard locations and the area surrounding same are critical for a safe and efficient operation of a train. Engineer Price indicated his only concerns were the rail the grade and signals. (Price P8 L 17-19) It is strange to this expert engineer Price indicated he had no policy or training from the carrier NS insofar as watching for children who are repeatedly in the area of the track. (Price P 19 L 1-8) Neither Conductor Glenn or Engineer Price were familiar with or having knowledge of the Norfolk Southern Six Tenets of Safety. While Engineer Price was aware of one (1) speedometer Conductor Glenn was of the opinion there were two (2) speedometers in the locomotive unit. Neither Engineer Price or Conductor Glenn was aware of a children's playground in close proximity to the railroad tracks on west 19th Street in Erie, PA.

## DISCUSSION

Generally speaking the first indication of safety in all Railroad Operating Rules is "**Safety is of the first importance in the discharge of duty**" This mandate is very important to the train crew and all other employees on the railroad. Norfolk Southern Operating Rules **GR-9(a)** requires members of the crew must observe the condition of their train and inspect it at frequent intervals while it is moving. When practical, they will look back at the track frequently to see if damaged by dragging equipment and also at block signals and roadway structures to see if they have been struck by objects protruding from their train. Looking back and watching their train is a very important part of the crew duties. This is especially true since the crew members are all located on the power units of the train.

Observing the passing train is also the important responsibility of the employees who are adjacent to the train operation. In the instant accident to Robin Nixon there were Norfolk Southern Employees in advantageous positions to note the presence of children along the area of West 19th Street in Erie, PA. The use of Crossing Watchmen was in place at three locations along west 19th street and one in particular in the vicinity of the accident to

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page five, contd

Robin Nixon. The Crossing Watchmen were under the direct charge of James F. Baskin
(Taft Answers to Interrogatories Second Set P-4)

It is unfortunate and significant that many of the employees who were in a position to
note children in an area of danger next to moving freight cars were admittedly void of
any required duty insofar as noting children in an area occupied by train traffic. Mr.
Donald E. Cunningham was employed as a Crossing Watchman from 1971 to 1983 and
following that date was a relief person for Crossing Watchmen who were on vacation or
absent for a period of time. Mr. Cunningham indicates he had seen Children in the area
and playing on the sidewalk. (Cunningham P 12 L 24-2) Contrary to looking for children
Mr. Cunningham was taught to watch trains – that was our job. (Cunningham P13 L 23-
1) To Mr. Cunningham's knowledge there were no Supervisors who ever talked to the
Crossing Watchmen about children getting near the tracks and train operations.
(Cunningham P14 L 22-2) In the number of years Mr. Cunningham worked as a Crossing
Watchman he never paid any attention to children close to the tracks. The only reason his
not being concerned being his keeping an eye on the trains. (Cunningham P14 L 3-9) The
three crossings where Watchmen were employed were Cherry Street, Cascade Street and
Cranberry Street (Cunningham P 15 L 12-14) the reason for the Watchmen was due to
there being schools near the crossings. (Cunningham P 15 L 15-17) Mr. Cunningham was
totally unaware of the Norfolk Southern Six Tenets of Safety. (Cunningham P17 L 3-8)
On a different view of the responsibilities of the crossing watchman, Mr. Robert E.
Rockey employed December 1, 1969 as a Route Clerk. (Rockey P 4 L 9) Mr. Rockey was
employed as Extra Crossing Watchman for the period years '83, '84. '85 and '86 and in
'93 came back to crossing watchman.(Rockey P 7 L 9-18) A PUC Order required a
crossing watchman if so many students were to cross the tracks. (Rockey P 8 L 9-12) Our
responsibility was to get the kids across the tracks and see that no one was injured.
(Rockey P 8 L 17-21) In the year 2000 the tracks along West 19th Street were removed
due to a change in operations to Conrail trackage. (Rockey P 9 L 20-24) While Mr.
Rockey was working they would have safety training sessions. (Rockey P 13 L 3-4) The
training was more of a Hazardous Materials (HAZ MAT) training session. If one would
see a car with the HAZ MAT marking and you would see it leaking you would let the
police or railroad know about it quickly (Rockey P13 L 6-16) Training was limited and
very simple. The Watchman would watch another do his job and then catch on quickly. A
basic thing. (Rockey P 14 L 1-17) There were no written instructions for the position of
Crossing Watchman other than a notice in the shanty years ago. Do not know what
happened to them (Rockey P 15 L 25-5 and L 8-10) Mr. Rockey had seen on a couple of
occasions kids on bicycles being towed by the train.(P 17 L 1-6) In one instance Mr.
Rockey pulled a kid away from the train and yelled at another and he stayed away.
(Rockey P 17 L 7-10) There were no Supervisors present to report the incident to. One

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page six, contd

could only attempt to get a name and make a record of it in the event a Supervisor
inquired. (Rockey P 17 L 14-22) Recalls that Supervisors may have come to the area and
indicated what they should do in attempting to be aware of children near the tracks or
trains running thereon. (Rockey P 18 L 4-16) Mr. James L. Baskins who was in charge of
the Crossing Watchmen began his career with N&W Railroad a predecessor to Norfolk
Southern. Mr. Baskins was a Terminal Supervisor for maintenance of way (Track) and
was based in Conneaut, OH. Mr. Baskins personally inspected the track along west 19th
Street on a weekly basis. (Baskins P 11 L 1-4) He clearly understood the job activity of
the crossing watchmen in Erie, PA. (Baskins P 13 L 15-19) The inspections were made
from a High Rail Vehicle which would give him a general look at the trackage and the
area surrounding the track. (Baskins P15 L 8-9) Mr. Baskins was of the opinion the
training of the crossing watchmen was only "on-job-training". To his knowledge there
were no written instructions.(Baskins P17 L 9-13) The only training per se was at
Conneaut, OH held by the Trainmaster and involved union employees. (Baskin P 19 L 7-
19) In Mr. Baskins opinion there was not any concern by N&W or NS for the safety of
children who may be near trains of the carrier. (Baskins P 22 L 11-16) Mr. Baskins could
not recall any signage in the area to alert children of any danger. (Baskins P 22 L 17-20)

In the review of Depositions and/or statements from Norfolk Southern Railroad Officers
employees it is strange and significant they were totally unaware of the Playground area
along the tracks which would be occupied by children. On the other hand, each Officer
and/or employee of the carrier was familiar with the Cemetery located in the area.

The investigation report filed in this matter reflects numerous witnesses from the
populated area who were contacted and they reflected upon the serious situation of
children playing in the area of train tracks. The numerous incidents reported would
indicate there was a serious problem in the area of West 19th Street. It is unconscionable
for the railroad to say they had no notice of children playing in the area. Train Crews and
Officials of the carrier are charged with the responsibility of reporting such sightings to
the train dispatcher and him, to the police of the city. There is no question the railroad
knew or should have known of this serious and dangerous problem.

## WHAT SHOULD HAVE BEEN DONE

Shoulder Rumble Strips (SRS) have been widely tested in many states to reduce
accidents and alert drivers of the edge of the roadway. The Federal; Highway
Administration has assembled data of this nature which includes the testing of bicyclists
who travel on highways, etc. In 2000 the Pennsylvania Transportation Institute relied
upon the project by Elefteriadou et al. to develop new SRS configurations that decrease
the level of vibration experienced by bicyclists while providing an adequate amount of

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page seven, contd

stimulus to alert inattentive or drowsy drivers. Six configurations were tested by 25 intermediate and advanced bicyclists. The researchers recommended the adoption of two new bicycle-tolerable rumble patterns, one for the non-freeway facilities operating near 88 kph (55 mph) and the other for those operating 72 kph (45 mph)

Mr. James A. Guarino of Guarino Enterprises has prepared a report on the cost, application and duration of installing striping, warning signs and rumble strips of a nature similar to and as outlined in the study above referred to. The plan submitted would allow the rumble strips to be placed along the 1.2 miles of track on West 19th Street from Peach Street to Raspberry Street. In my opinion the installation of rumble strips would have prevented children from riding bicycles along the side of the train and avoid injury as was sustained by Mr. Nixon. Also the installation of yellow strips along with signs between the rails indicting DANGER – NO BIKES would be an excellent deterrent. The cost of such installation would be estimated at $7,920.80 This figure, $7,920.80 is the initial cost and when averaged out, the cost per year would be approximately $3,500.00 per year.

In my opinion the installation of the rumble strips would have prevented the condition which existed at West 19th Street in Erie, PA. When riding a bicycle myself I would always seek out a smooth area to ride. Avoiding any rough terrain and/or uneven ground was important. In my opinion any cyclist, young or older, riding along a street would completely avoid any contact with so-called rumble strips. The signage would also alert the rider to a dangerous area.

## OPERATING RULES

### General Rules

Safety is of the first importance in the discharge of duty.
Obedience to the rules is essential to safety.

A. Employees whose duties are prescribed by these rules
   must provide themselves with a copy.

B. Employees must be conversant with and obey the rules
   and special instructions. If in doubt as to their meaning,
   employees must apply to the proper authority for an
   explanation.

GR-9(a) Members of the crew must observe the condition
   of their train and inspect it at frequent intervals while it
   is moving. When practicable, they will look back at the
   track frequently to see if damaged by dragging equipment and

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page eight, contd

also at block signals and roadway structures to see if they have
been struck by protruding from their train.

**GR 27.** Undivided attention to duty is required. While on duty,
employees must not engage in and activity that will interfere
with or distract their attention from their work.

## CONDUCTORS

**581.** Conductors have charge of trains to which they are assigned
and of all employees thereon. They are responsible for safe and
proper management of their trains, for protection and care of
passengers and property, for performance of duty by train employees,
and for observance and enforcement of all rules and instructions.

**593.** Conductors will occupy a window seat in the operating compartment
of the controlling lead unit of moving freight trains unless otherwise
instructed by a division officer.

## ENGINEERS

**600.** Engineers are directly responsible to and must obey the orders of
Division and Terminal Officers. Within shop limits they are under the
direction of shop supervisors. They will obey the instructions of
yardmasters and of their conductors with respect to the general management
of their trains.

## NORFOLK SOUTHERN
## SIX POINT ACTION PLAN
## FOR SAFETY OF OPEATIONS

## STATEMENT OF POLICY
## SAFETY

1. All injuries can be prevented.

2. All exposures can be safeguarded.

3. Prevention of injuries and accidents is the
responsibility of each employee.

Mr. Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page nine, contd

    4. Training is essential for good safety performance.

    5. Safety is a condition of employment.

    6. Safety is good business.

## OPINIONS

1. Norfolk Southern Railroad was negligent in failing to maintain the segment of railroad known as the West 19th street track in a manner to prevent accidents which were known to occur.

2. Norfolk Southern Railroad was negligent in the maintenance of the West 19th street track located within a residential and industry area.

3. Norfolk Southern Railroad was negligent in maintaining the West 19th street track in a condition which would deter children from playing along the tracks.

4. Norfolk Southern Railroad was negligent in the operation of trackage on West 19th Street in a manner that totally disregarded the presence of children who were known to play on and near the tracks.

5. Norfolk Southern Railroad was negligent in the operation of their trackage at West 19th Street by failing to display any signage to warn children of the danger of playing on or near railroad tracks.

6. Norfolk Southern Railroad was negligent in failing to recognize the danger involved in placing a track structure in the middle of a city street and failing to install signage to warn of the danger that was present.

7. Norfolk Southern Railroad was negligent in failing to recognize the danger of placing railroad tracks within a residential and industry area and failing to install a type of rumble strip and warning signage between and along both sides of the track to prevent children from riding bicycles along the edge of the track and/or next to a moving train. The rumble strips would have prevented Robin Nixon's accident.

8. Norfolk Southern Railroad was negligent in failing to properly install and maintain proper warning striping along the street surface to warn children and traffic of there being dangerous railroad track in close proximity.

Mr.Tibor Solymosi, Esquire
Nixon vs. Norfolk Southern
February 16, 2007
Page ten, cont'd

9. Norfolk Southern Railroad was negligent in failing to properly train their employees to watch and direct children away from tracks and have in place and/or initiate accepted methods and procedures to reduce or eliminate accidents which would or should have been known to occur.

10. Norfolk Southern Railroad was negligent in failing to provide a minimum amount of training for Crossing Watchmen in place to guard children in their passing over the tracks in three locations on West 19th Street.

11. Norfolk Southern was negligent in the training and application of the Operating Rules of their employees in the instant train operation.

12. Norfolk Southern was negligent in that it is clear following my review and research of the Operating Rules as above outlined, Norfolk Southern Railroad through its employees exhibited a complete disregard for a risk which was clearly known to them.

13. In my opinion the annual cost of $3,500.00 to install and maintain rumble strips along the area of West 19th Street where the accident occurred would have been a small and reasonable expense compared to the risk presented by Norfolk Southern Railroad to children in the area.

14. It is my further opinion that the conduct of Norfolk Southern Railroad through its employees Engineer Timothy J. Price and Conductor Robert B. Glenn above referenced directly and proximately contributed to the serious injury to Robin Nixon on April 27, 1997 on the West 19th Street track at Erie, Pennsylvania.

My opinions are to a reasonable degree of railroad certainty

I reserve the right to amend this report if and when additional information and/or material facts are furnished the undersigned.

Respectfully,

August W. Westphal, President
T. O. P. of Ohio, Inc.


cc: file

# Transit Operations & Personnel Guidance of Ohio, Inc.

P.O. Box 39146
North Ridgeville, Ohio 44039
(440) 327-7125 • FAX (440) 327-0362
e-mail: whiteywestphal1@aol.com

A. W. WESTPHAL
President

February 16, 2007

Mr. Tibor Solymosi, Esquire
**SEGAL & SOLYMOSI**
Attorneys at Law
818 State Street
Erie, PA 16501

Re:    **Robin Nixon vs. Norfolk Southern**

Dear Mr. Solymosi:

This amendment is concerned with my report this date in the above captioned matter. You will recall I had reserved the right to amend my report in the event additional information or facts were presented to me.

I have now reviewed the Draft Environmental Impact Statement included with F.D. No. 33388 the "Proposed Conrail Acquisition" involving Norfolk Southern and CSX railroads. I would point to the **Pedestrian Safety** as follows:

> The proposed increase in NS trains throughout the residential area of 19th Street and the lack of barriers to prevent public access to the tracks would affect pedestrian safety. For example, 76 residences and 30 industrial/commercial businesses between Peach and Raspberry Streets are located adjacent to the 19th Street line. In addition, eight area schools are located within 1200 feet of the main line.

This language from the Surface Transportation Board stands out inasmuch as the trackage at West 19th Street is directly affected not only in the Merger Proposal but also in the instant accident to Robin Nixon.

Please consider this amendment as a part of my Report dated February 16, 2007

Respectfully,

August W. Westphal, President
T. O. P. of Ohio, Inc

cc: file

EXHIBIT
7
tabbies

Westphal
EX. 7

Member: National Association of Railroad Safety Consultants and Investigators



**GUARINO ENTERPRISES**

10859 Hill Road
Wattsburg, PA 16442
(814) 825-3570

February 12, 2007

Tibor R. Solymosi, Esquire
Segel & Solymosi
818 State Street
Erie, Pennsylvania 16501

RE:    Nixon v. Norfolk Southern Corp., et al.
       Estimate for Striping/Rumble Strips – West 19th Street

Dear Mr. Solymosi:

You have asked me to provide you with an estimate for the costs of installing striping, warning signs and rumble strips on West 19th Street in Erie, Pennsylvania. The work would cover approximately 1.2 miles on West 19th Street from Peach Street to Raspberry Street. The purpose would be to prevent and/or discourage children from riding along the trains and grabbing onto the train in order to be pulled along the roadway.

I have compiled an estimate for the following work which includes all labor, materials and equipment:

1.   Install approximately 2.4 miles of rumble strips approximately 16" to 17" long X 7" wide on 1' centers approximately .5 inches deep, the same type that you would see along shoulders on interstate highways. This would include supplying water to the rumble strip mill machine and sweeping up the milled spoils off the pavement behind the rumble strip machine.  The rumble strip would have been placed parallel to the railroad tracks and approximately 72 ½ inches from the center of the track to the center of the rumble strip. Based upon my measurements of a number of rail cars, an average width of rail car is approximately 128 ½ inches.  A bicycle is approximately 30 inches in width and assuming that a child would be reaching out pretty much straight forward, the center line of the rumble strip should be approximately 72 ½ inches off the center line of the track.

Cost to Install Rumble Strips . . .                     $4,970.00

2.   Install a 3 ½ inch wide yellow stripe just outside of the rumble strips, along with signs between the rails indicating DANGER -- NO BIKES painted in 24 inch high letters, four signs per city block, with the signs alternating so that they are legible for children traveling in both directions.

Cost to Paint Stripes and Signs . . .                   $2,950.80

•Parking Lot Sweeping
•Pavement Marking
•Pavement Sealcoating
•Snowplowing
•Salting
•Asphalt Patching and

**EXHIBIT**
_2_

TOTAL COST FOR RUMBLE STRIPS, STRIPING AND SIGNS $7,920.80

You have also asked me approximately how long the striping and rumble strips would last and provide an estimate as to how often this work would need to be done. Regarding the striping, I believe that would have to be performed on a yearly basis because of the plowing, salt wear and snow conditions.

Regarding the rumble strips, I know that the City has a constant paving renewal program going on yearly. How often blacktop paving surfaces need to be replaced is dependent on a number of factors such as the thickness of the pavement, the type of soil conditions under the pavement, drainage and traffic volume and the type of vehicles that travel on the roadway. Based upon my many years of experience in maintaining blacktop surfaces, I would estimate that the pavement on a City street could be expected to last approximately eight to ten years. I have examined the surface along West 19th Street and found it to be in excellent condition at the present time. Paved streets in the Erie area last conservatively eight to ten (8-10) years on average. Mayers Brothers Construction paved West 19th Street in 2002 after the tracks were removed. There is ample drainage and good crown to the road and good drainage and fall to the spills. The photographs you provided to me of West 19th Street when the tracks were still in place show that there was a good crown in the roadway providing good drainage away from the tracks. Based on these factors, I believe that on 19th Street in this area would last at least eight to ten years.

Taking the initial cost of milling and the yearly maintenance cost of striping, my opinion is that the present yearly cost to install the rumble strips and maintaining the striping over a nine year period would be approximately $3,503.02 per year on average. Regarding what the costs would have been in the seventies, eighties and nineties, it is my opinion that the costs would have been less than current costs and consistent with cost of living at that time.

My opinion is based on my background, experience and training in the field of asphalt patching, preventive maintenance, repairs and safety/directional striping. It is also based upon my examination of the West 19th Street area between Raspberry Street and Peach Street. I have estimated and done this type of work for over 28 years and have based these prices upon what I charge, and what is normally charged for this type of work.

I have never authored or prepared any publications or articles within the preceding ten years nor have I ever testified as an expert at trial or by deposition within the preceding four years. You and I have agreed to an

hourly compensation for my services in this matter at the rate of $25.00 per hour for preparation of this estimate and report. At this point in time, I have spent seven hours in order to prepare this report. I have attached to this report a drawing indicating what the rumble strips, striping and signage would look like as completed, and a copy of my estimate.

I hereby certify that the estimate and this report are in my opinion the fair market value for the work as stated.

With respect to my qualifications, please find attached hereto a Resume indicating my background, training and qualifications.

Sincerely,

James A. Guarino

## RESUME

### Education

Technical Memorial High School – graduate 1967
Gannon College – 1 year (1976-1977)

### Specialized Training

28 years experience – asphalt repair, milling, sealcoating,
striping and power sweeping

### Employment

General Electric welder – 15 years (1971-1986)
Guarino Enterprises – 28 years (1979 to present)

### Seminars

Numerous seminars through Sealmaster (asphalt sealing,
striping, crack filling and repair

### Guarino Enterprises

James A. Guarino
10859 Hill Road
Wattsburg, PA  16442
Phone  (814) 825-3570
Fax  (814) 825-9934

RUMBLE STRIP DIAGRAM



LOCATION DETAIL OF SONIC NAP ALERT PATTERN
SEE NOTE 4

SECTION A—A

DETAILS OF SONIC NAP ALERT PATTERN



## ESTIMATE FOR STRIPING AND
## RUMBLE STRIPS FOR WEST 19TH STREET

**MILLING AND CLEANUP:**

| | |
|---|---|
| Milling 2.4 miles of milled rumble strips: | $3,600.00 |
| Water truck on site: | $ 550.00 |
| Two Tri-axle trucks - 2 hours | $ 260.00 |
| One Athey broom sweeper – 3 hours (cleanup & hauling) | $ 260.00 |
| Traffic Control- 4 flagmen to direct traffic-3 hours to end of job | $ 300.00 |
| **TOTAL (LABOR, EQUIPMENT AND HAULING)** | **$4,970.00** |

**STRIPING:**

| | |
|---|---|
| Layout line at 3 ½" wide in solid line on both outer sides of Rumble strip. Sherwin Williams Highway Traffic yellow Paint (12,672 linear feet x .15 cents /foot) | $1,900.80 |
| Layout DANGER NO BIKES-24" letters between tracks at 4 per block spacing | |
| 42 Stencils in Traffic Yellow paint | $1,050.00 |
| **TOTAL STRIPING** | **$2,950.80** |

| | |
|---|---|
| **TOTAL COST** | **$7,920.80** |

## AVERAGE COST OVER NINE YEARS

| | |
|---|---|
| Year One – Milling and Striping | $ 7,920.80 |
| Years Two through Nine – Striping Only | |
| Eight Times $2,950.80 | $23,606.40 |
| TOTAL COST | $31,527.20 |
| **Divided by Nine years Equals a per year average of:** | **$ 3,503.02** |


**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.



EXHIBIT

tabbies



**EXHIBIT**

11