IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN NIXON, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-101 ERIE |
| | ) | |
| NORFOLK SOUTHERN CORPORATION | ) | |
| and NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, INC., | ) | |
| Defendants | ) | ELECTRONICALLY FILED |

## SUPPLEMENTAL APPENDIX TO MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY, INC.

Defendants NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, INC., by their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Supplemental Appendix to Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc., pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and LR 56.1.B.3 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania.

I hereby certify that this Appendix contains true and correct copies of the following pretrial discovery materials with respect to this case:

I.    <u>Deposition Transcripts</u>

    Tab O   -   Excerpts of Deposition of Robert B. Glenn (5/23/06)

    Tab P   -   Excerpts of Deposition of David C. Morgan (5/23/06)

    Tab Q   -   Excerpts of Deposition of Ervin L. Nixon (1/18/07)

    Tab R   -   Excerpts of Deposition of Robin I. Nixon (3/24/06)

    Tab S   -   Excerpts of Deposition of Timothy J. Price (5/23/06)

    Tab T   -   Excerpts of Deposition of Robert E. Rockey (1/9/07)

    Tab U   -   Excerpts of Deposition of Harvey H. Stone (1/9/07)

II.    <u>Deposition Exhibits</u>

    Tab V   -   H. Stone Deposition Exhibit 5 (1/9/07)

Respectfully submitted,

s/ Roger H. Taft

Roger H. Taft
PA 19983/NY 2876456
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7603
(814) 454-4647 (facsimile)
rtaft@mijb.com

Attorneys for Defendants
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company, Inc.

**Tab O**
**Excerpts of Deposition of**
**Robert B. Glenn (5/23/06)**

1        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA

2

3                    - - - -

ROBIN NIXON,                   )

4                       )
          Plaintiff,         )

5                       )
            -vs-           )     CIVIL ACTION

6                       )     NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION    )

7 and NORFOLK SOUTHERN RAILWAY     )
COMPANY, INC.,               )

8                       )
         Defendants.        )

9

10                    - - - -

11        DEPOSITION OF:  ROBERT B. GLENN

12                    - - - -

13

14              DATE:     May 23, 2006
                      Tuesday, 11:30 a.m.

15

16           LOCATION:    Segel & Solymosi
                      818 State Street

17                       Erie, PA 16501
                      814-454-1500

18

19          TAKEN BY:     Plaintiff

20         REPORTED BY:     Toni Rennebeck, RPR
                      Notary Public

21                       NMR Reference No. 052306A

22

23

24                 **CERTIFIED COPY**

25

1          observed as you were passing through the

2          intersection?

3    A.    That is correct.

4    Q.    You had no way of knowing whether or not, in

5          fact, the crossing lights and bells and the

6          gates were still operating when you were at

7          Amthor Steel?

8    A.    No, sir; there's no way I could.

9    Q.    Do you know what, if any, safety policy Norfolk

10         Southern had with respect to children being in

11         an area in a repeated manner?

12   A.    None to my knowledge.

13   Q.    And it's fair then you were never given any

14         training in that area?

15   A.    No.

16   Q.    Are there any other locations where you've

17         operated a train where the tracks and

18         residential street were in the same roadway?

19   A.    No.

20   Q.    Are you familiar with the term attractive

21         nuisance?

22   A.    No, sir.

23   Q.    As you traveled along West 19th Street, what was

24         your procedure for horns or whistles on the

25         train?  Did you blow your horn or whistle or

**Tab P**
**Excerpts of Deposition of**
**David C. Morgan (5/23/06)**

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF PENNSYLVANIA
2

3                            - - - -

ROBIN NIXON,                        )
4                                   )
              Plaintiff,            )
5                                   )
                   -vs-             )      CIVIL ACTION
6                                   )      NO. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION        )
7  and NORFOLK SOUTHERN RAILWAY     )
COMPANY, INC.,                      )
8                                   )
              Defendants.           )
9

10                           - - - -

11            DEPOSITION OF:  DAVID C. MORGAN

12                           - - - -

13

                   DATE:     May 23, 2006
14                           Tuesday, 9:45 a.m.

15

                   LOCATION: Segel & Solymosi
16                           818 State Street
                             Erie, PA 16501
17                           814-454-1500

18

                   TAKEN BY:  Plaintiff
19

20                 REPORTED BY:  Toni Rennebeck, RPR
                                 Notary Public
21                               NMR Reference No. 052306

22

23

24                      **CERTIFIED COPY**

25

1    their employment with subsequent name changes

2    since.  I've been an assistant to the

3    trainmaster and assistant trainmaster both in

4    Williamson, West Virginia.

5                    I went to Lorain, Ohio as an

6    assistant trainmaster in '76.

7                    And then in 1977 I was promoted to

8    trainmaster in Conneaut, Ohio.  And I left there

9    in 1997.

10    Q.    What year was that that you were appointed

11          trainmaster?

12    A.    '77.  1977.

13    Q.    Okay.  I'm sorry to interrupt you.

14    A.    And I believe it was June of 1997 I went to

15          Lexington, Kentucky as trainmaster.

16                    And January 2000 I went to my present

17          position as assistant terminal superintendent in

18          Bellevue, Ohio where I'm currently located.

19    Q.    It sounds like a nice long career with one

20          employer so to speak.

21    A.    Yes.

22    Q.    Even though there was a merger that occurred I

23          understand.

24                    As far as your civil engineering

25          degree goes, did you have any specialized

1       the roadway prior to this accident on many

2       occasions, did you ever observe whether or not

3       vehicles ever entered what I would call the

4       middle of the track area?

5                   What would you term that area?

6    A. Yeah.  When the train was not going through,

7       vehicles can cross the tracks at locations in

8       that area.

9    Q. Okay.  And when they did that, would it be fair

10      to say that the tires on the vehicle did come in

11      contact with the railroad tracks?

12   A. That's correct.

13   Q. So it was possible that a car could actually

14      ride along with one or two of its tires actually

15      being in contact with the rail for a period of

16      time?

17   A. Sure.

18   Q. Okay.  And getting back to the familiarity with

19      the territory, was there anything else that you

20      noted on your visits that you considered to be

21      significant or a safety issue that you thought

22      should be addressed?

23   A. No.

24   Q. Okay.  And you don't recall ever seeing any

25      children playing alongside the tracks?

1  A.  No, not playing in the street alongside the

2      tracks.  I mean, no.

3  Q.  What about areas not in the street?  North and

4      south of the street?

5  A.  Adjacent -- yes.

6  Q.  What did you observe there?

7  A.  Probably kids just walking.  I'm just not -- I

8      mean, I can't pinpoint any specifics, but

9      people, adults, children.

10 Q.  Okay.  Do you recall ever having in place along

11     those tracks in that area between Raspberry and

12     State Street lookouts?

13 A.  We did have crossing watchmen at different

14     streets.

15 Q.  Tell me about that.

16 A.  I believe it was during school hours.  I mean,

17     during the school year for an eight-hour shift

18     we would have crossing watchmen that would get

19     out on the cross street area, and I can't recall

20     exactly what streets they were to be honest with

21     you, and stop traffic.

22 Q.  Do you have any idea what years this would have

23     been?

24 A.  No, I don't.  I know when I first came there in

25     1977 they were in place.  And I'm not sure if

1        your right-of-way.

2  A.   That's correct.

3  Q.   He would have had to be somewhere to the north

4        of your north rail.

5  A.   That's correct.

6  Q.   Do you have any idea how far north he was of the

7        north rail?

8  A.   No.

9  Q.   Had you ever in your whole career ever heard of

10       a child or a person grabbing onto a rail car in

11       the manner Robin Nixon did and being towed

12       along?

13  A.   No.

14  Q.   Never heard of that?

15  A.   No.

16  Q.   Would it surprise you that we have many

17       witnesses that lived in that area that are going

18       to testify that it was a daily occurrence on

19       those tracks?

20  A.   That's -- I don't know.  I mean, I'm just

21       telling you what I know.

22  Q.   So that doesn't surprise you though, given that

23       you were there dozens of times to observe the

24       territory and the conditions?

25  A.   Right.  I'm just saying I never observed it.

1         Whether or not someone else did, I can't testify

2         to what they saw or did.

3    Q.   Okay.  And just to make sure I understood your

4         testimony, you said that you did discuss or you

5         did have discussions with crossing watchmen in

6         the years that you were trainmaster for that

7         area, but you never discussed any concerns about

8         children and safety along the tracks with them?

9    A.   That's correct.

10   Q.   Did you ever discuss with anybody concerns with

11        children and their safety when they were in the

12        areas adjacent to the track?

13   A.   Not that I recall.

14   Q.   Wouldn't that be one of your responsibilities as

15        a trainmaster?

16   A.   I'm responsible for the operation of the trains

17        and engines.  If people were laying on the

18        track, I mean, I've had people do that.  But if

19        there was a problem that was brought to me, I

20        would certainly attempt to address it.

21   Q.   I'm going to show you a document.  It says it's

22        a Conrail Transaction.  Norfolk Southern

23        Benefits, Safety, Environmental and Community

24        Benefits Prepared by Norfolk Southern

25        Corporation with a date of February 1998.

1           anything to prevent the accident?

2    A.    No.

3    Q.    Why?

4    A.    I just don't believe the railroad could have

5          done anything.  If he would have not trespassed

6          and grabbed our equipment as we went through,

7          then he would have not have gotten hurt.

8    Q.    You said earlier that this was a unique

9          situation with a train running down the center

10          of a city street; correct?

11   A.    Yeah.  As far as I'm aware of during my places

12          I've been on the railroad during my career, yes.

13   Q.    Are there any other places that were similar to

14          this that you've seen outside of Erie with a

15          similar situation?

16   A.    No.

17   Q.    Are you familiar with any safety precautions or

18          things that can be done on what -- I know that

19          Roger is going to object to me referring to it

20          as a shared roadway but --

21                  MR. TAFT:  I'm going to continue to

22          object.  Why don't you just call it West 19th

23          Street because it is not a shared roadway and

24          he's testified to that.

25   BY MR. SOLYMOSI:

1        there's going to be a collision; right?

2   A.   Right.  So, I mean, the term shared roadway, I

3        mean, we have our right-of-way through there

4        that we use, and once we get through, then other

5        people can cross there, yes, if that's what you

6        mean.

7   Q.   You'd agree that when we talk about the roadway,

8        we're talking about the area curb to curb that

9        contains a pathway for vehicles traveling west

10       -- and when I say vehicles, I mean autos or

11       bicycles --

12  A.   Right.

13  Q.   -- and vehicles and bicycles traveling east

14       adjacent to the tracks that are in the center of

15       the roadway; right?

16  A.   Yeah.

17  Q.   Okay.  And you're telling me that it was

18       possible at the time for vehicular traffic to be

19       on that same roadway at the same time that the

20       train was traveling down the center of the

21       roadway on its right-of-way.  Is that a fair

22       statement?

23  A.   You're going to have to repeat that one again.

24  Q.   You told me earlier that it was possible for

25       vehicles to be traveling on the roadway on West

```
 1            19th Street at the same time a train was

 2            traveling on West 19th Street.

 3   A.   Oh; that is correct, as a train is traveling on

 4            the right-of-way, a vehicle can go beyond the

 5            north side and on the south side.

 6   Q.   Okay.  And you're aware of that being possible

 7            at the time and prior to this accident.

 8   A.   Yes.

 9   Q.   Okay.  But is it fair to say that you're not

10            aware of any safety policies concerning

11            situations such as that where cars or bicycles

12            can travel parallel to the tracks on a roadway

13            that is utilized by both the train and

14            automobiles or bicycles?

15   A.   That's correct.

16   Q.   You're not aware of any safety program or

17            policies or --

18   A.   No.

19   Q.   -- designed criteria for a situation like that?

20   A.   No.

21   Q.   And you're not aware of any studies that the

22            railroad may have undertaken in that regard?

23   A.   That's correct.

24   Q.   Are you aware of any studies that the railroad

25            undertook related to the removal of those
```

```
 1   A.   No.

 2   Q.   How often do you look at the six tenets of

 3        safety?

 4   A.   The booklet?  Not very often.

 5   Q.   In here it says that all exposures can be

 6        safeguarded.

 7             Is it your testimony today that you

 8        don't believe that there's anything you could

 9        have done with regard to the safety in

10        preventing children from coming in contact with

11        railway cars on West 19th Street?

12             Is it your position that that

13        exposure cannot be safeguarded for?

14   A.   Maybe if the city just closed off the street and

15        put fences around and put guards around and

16        allowed nobody in, then maybe.  I mean, there's

17        always sometimes exorbitant ways, out-of-the-box

18        ways, but, no, under normal circumstances, no.

19   Q.   Well, you did have in place some crossing

20        watchmen for quite a number of years; isn't that

21        correct?

22   A.   That's correct.

23   Q.   And would you agree with me that during that

24        period of time you're not aware of any child

25        tagging along the railroad train and being
```

1      injured as a result of that?

2   A.   That's correct.

3   Q.   So do you think that your crossing watchmen may

4        have had a positive effect in that regard when

5        they were in place?

6   A.   I don't know.  I didn't really think the

7        crossing watchmen were needed because we had, at

8        least during the time I was there, we had

9        flashers at the crossings, but for some reason

10       they were there.

11  Q.   Is it your position that the railroad has no

12       responsibility for safety between the crossings

13       on the portion of the roadway between the

14       intersections?

15  A.   What do you mean for safety?  I mean, I'm

16       responsible -- we are responsible to make sure

17       that we maintain a safe roadbed and we run safe

18       equipment and our employees are properly

19       trained.

20  Q.   Are you familiar with the term attractive

21       nuisance?

22  A.   I have heard the term in the past.

23  Q.   What do you know about the term?

24  A.   Just that some people allege that just by a

25       railroad being a railroad you have people that

```
 1          are attracted to watch it and look at it and

 2          that kind of stuff.  Maybe you got railroad

 3          buffs.

 4    Q.    What about with regard to children?  Do you

 5          understand that sometimes children are attracted

 6          to railways and locomotives and cars?

 7    A.    Sure.  Children, adults, yeah.

 8    Q.    What kind of training have you had in that

 9          regard during all the years you've been with the

10          railroad?

11    A.    Nothing specific, other than, as I told you

12          before, if there's any trespassers, we would

13          notify the local authorities.

14    Q.    Would it be fair to say then that you did

15          nothing in the time that you were a trainmaster

16          to try to prevent such accidents as occurred to

17          Mr. Nixon?

18    A.    That's correct.  That's the first accident of

19          that type that even occurred.

20    Q.    Do you know why the tracks were laid in the

21          middle of 19th Street?

22    A.    I don't know if the tracks were there first and

23          the street was there second or the street was

24          there first and the tracks were there second.  I

25          don't know the history behind it.
```

```
 1  Q.   Will you admit that this is a dangerous type of
 2       operation when trains run in the center of a
 3       street at low speed?
 4              MR. TAFT:  Objection to form.  Define
 5       dangerous.
 6  BY MR. SOLYMOSI:
 7  Q.   Well, would you consider the conditions as you
 8       knew them to be on West 19th Street with the --
 9       like we talked about earlier, with the vehicles
10       other than the trains being able to travel
11       alongside the train even when the train was
12       running, including people on bicycles, would you
13       consider that to be a dangerous situation?
14  A.   As long as everyone complied with the law, the
15       railroad, as well as any individuals, then, yes,
16       it is a safe operation.
17  Q.   Do you have any children?
18  A.   Yes, I do.
19  Q.   Do you think that young children are capable of
20       always observing the rules?
21  A.   No.  Just like adults aren't always capable of
22       observing the rules.
23  Q.   Do you think that a child is as capable as an
24       adult when it comes to understanding the dangers
25       alongside a railway?
```

```
 1   A.   Some children are.  My children have been

 2        exposed to railroads that they may be more aware

 3        of the dangers than other kids, but it is up to

 4        the parents to supervise their children.  I

 5        mean, that's the way it is.

 6   Q.   So do you agree or disagree that that situation

 7        was dangerous or not for pedestrians or cars?

 8   A.   No.  If everyone obeyed the law, there were no

 9        dangers.

10   Q.   And is that why you didn't undertake any efforts

11        to make sure that children would not be near the

12        train while the train was going by?

13   A.   That's correct.

14   Q.   Is it because you assume that if people follow

15        the rules, it wouldn't be dangerous?

16   A.   Well, you have to assume that people will obey

17        the law, just like I have to assume that a train

18        will stop for a stop signal or a car will stop

19        for a stop signal.

20   Q.   Then would it be correct that you don't believe

21        the railroad needs to do anything to try to

22        prevent this type of an accident from happening?

23   A.   I really can't answer that.

24   Q.   Why not?

25   A.   I mean, I -- we --
```

1    Q.    Do you understand the question?

2    A.    Say that again.

3                     MR. SOLYMOSI:  Read it back, Toni.

4                     THE WITNESS:  Yeah, read it back to

5          me.

6                           -  -  -  -

7          (The record was read back by the Reporter.)

8                           -  -  -  -

9    A.    Well, the railroad does -- we have Operation

10         Lifesaver programs and we have people that go

11         out to schools, local communities, talk about

12         the dangers of trespassing on railroad property.

13         And I'm sure there was probably something on TV

14         in the area.  There is an educational campaign.

15         And that's a way for the railroad to get

16         information out to the public to say, hey, you

17         know, I mean, obey the law or you could get

18         hurt.

19   BY MR. SOLYMOSI:

20   Q.    So do you know what steps were taken in that

21         regard for this particular area and this

22         particular condition that we've been talking

23         about?

24   A.    Specifically, no.

25   Q.    And you agree you didn't do anything about it.

```
 1    A.    That's correct.

 2    Q.    Who's in charge of this Operation Lifesaver in

 3          your company?

 4    A.    Operation Lifesaver -- we have a coordinator for

 5          the State of Ohio for all railroads out of

 6          Columbus, and then there's different volunteers

 7          within all the railroads, whether it be Norfolk

 8          Southern CSX that are trained to go out to

 9          schools and trucking companies and so forth and

10          give presentations.

11    Q.    And this is part of that Operation Lifesaver you

12          were talking about?

13    A.    That's correct.

14    Q.    Have you ever been at any presentations for

15          Operation Lifesaver?

16    A.    Yes.

17    Q.    What and where if you can remember?

18    A.    Oh, I've been to a trucking company in Fairview,

19          Ohio -- or Fairview, Pennsylvania.

20    Q.    What trucking company?

21    A.    I do not recall.  I don't even remember it was

22          so many years ago.

23    Q.    Okay.

24    A.    I've been in Conneaut High School driving class.

25    Q.    Driving class?
```

```
 1   A.   Yeah, driver's ed.

 2   Q.   Okay.

 3   A.   Maybe I've been in some others, but I just don't

 4        recall.

 5   Q.   Have you ever been to any that would have

 6        addressed the safety issue of kids on bicycles

 7        where there's a paved roadway that's adjacent to

 8        the tracks?

 9   A.   No.

10   Q.   And you've never participated as a presenter in

11        Operation Lifesaver, have you?

12   A.   Yes.

13   Q.   Oh.

14   A.   At the driver's education and at this trucking

15        company.

16   Q.   Oh, okay, I didn't realize that you were

17        actually presenting.

18   A.   Yes.

19   Q.   Okay.  And did you have any written materials or

20        anything that you gave out?

21   A.   Yeah, Operation Lifesaver materials.

22   Q.   That's not something that Norfolk Southern

23        produces?

24   A.   No.

25   Q.   Operation Lifesaver, is it an independent
```

 1          organization?  Do you understand who they are?

 2     A.   It's been a while since I've been involved with

 3          it, but I guess the railroads contribute to this

 4          organization, this Operation Lifesaver,

 5          Incorporated.  And then they do the education,

 6          the training, and so forth.

 7     Q.   Did you ever have any contact with the City of

 8          Erie Police Department in the time that you were

 9          trainmaster prior to this accident?

10     A.   Probably at other crossing accidents.

11     Q.   Other than that, would it be fair to say that

12          you never contacted them to address any concerns

13          there might be with safety and children along

14          the 19th Street tracks?

15     A.   That's correct.

16                           - - - -

17          (There was a discussion off the record.)

18                           - - - -

19     BY MR. SOLYMOSI:

20     Q.   I'm going to mark this as Exhibit 2 to your

21          deposition.  Could you identify that document?

22                           - - - -

23          (The witness reviewed the document.)

24                           - - - -

25     A.   Yes, I can.  It's a report that I completed.

**Tab Q**
**Excerpts of Deposition of**
**Ervin L. Nixon (1/18/07)**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                            - - -

 4
     ROBIN NIXON,                      )
 5                                     )
                 Plaintiff,            )
 6                                     )
            vs.                        ) CIVIL ACTION
 7                                     ) No. 05-101 ERIE
                                       )
 8   NORFOLK SOUTHERN CORPORATION      )
     and NORFOLK SOUTHERN RAILWAY      )
 9   COMPANY, INC.,                    )
                                       )
10               Defendants.           )

11                            - - -

12           Deposition of ERVIN LEE NIXON, SR.

13              Thursday, January 18, 2007

14                            - - -

15        The deposition of ERVIN LEE NIXON, SR., called
     as a witness by the defendants, pursuant to notice and
16   the Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
17   undersigned, Karen Burkett, a Notary Public in and
     for the Commonwealth of Pennsylvania, at the offices
18   of MacDonald, Illig, Jones & Britton, L.L.P.
     100 State Street, Suite 700, Erie, Pennsylvania
19   16507, commencing at 9:30 o'clock a.m., the day and
     date above set forth.

20                            - - -

21            COMPUTER-AIDED TRANSCRIPTION BY
               MORSE, GANTVERG & HODGE, INC.
22               PITTSBURGH, PENNSYLVANIA
                    412-281-0189
23                            - - -

24   ORIGINAL

25
```

```
 1              The accident occurred on April 27th, 1997.
 2   Were these two prior instances where Robin visited
 3   Chris on West 21st Street during the year 1997?
 4        A     Yes.
 5        Q     Do you know if they were the same month?
 6        A     No recollection.
 7        Q     Okay.  On each of those two prior
 8   occasions, did Robin ask for your permission to visit
 9   Chris at his house?
10        A     He always asks for my permission.
11        Q     When Robin asked for your permission on
12   April 27th, 1997, did you place any restrictions on
13   what he was allowed to do that day
14        A      He wasn't supposed to go past
15   21st Street.
16        Q     When you say "go past," you mean go north?
17        A     Below.
18        Q     Okay.  And again, so we're clear, when you
19   say "below," in the city of Erie the streets --
20        A     Would be headed north.
21        Q     Headed north.  Because the streets go from
22   high numbers like 21st to the north, to the low
23   numbers along the bay and the lake; is that correct?
24        A     Yes.
25        Q     Do you recall what you specifically told
```

1   Chris the morning of April 27th, 1997 about not going

2   below or north of West 21st Street?

3        A       I didn't tell Chris anything.

4        Q       I'm sorry.  Do you recall what you

5   specifically told Robin the morning of the accident

6   about not going below or north of West 21st Street?

7        A       Just not to go.

8        Q       And why was that?

9        A       My own personal reasons?  I was afraid of

10  the traffic and the railroad.

11       Q       Have you resided in the city of Erie all or

12  most of your life?

13       A       Most of my life.

14       Q       So you were familiar with the fact that

15  there was a single set of Norfolk Southern tracks that

16  ran east and west through West 19th Street in the city

17  of Erie?

18       A       Very familiar.

19       Q       And you were aware that there was a city

20  street on both sides which there could be traffic --

21       A       Yes.

22       Q       -- or that sort of thing?

23               Why did you think that it might be

24  dangerous for your son, Robin, to go north of

25  21st Street in the vicinity of West 19th Street and

1   the Norfolk Southern tracks?

2        A        Because of traffic and news reports of

3   children being hit by cars and buses.

4        Q        When you had this discussion with Robin on

5   the morning of April 27th, 1997, did you give him any

6   specific reasons as to why you did not want him to go

7   below or north of West 21st Street?

8        A        No, I didn't.

9        Q        You testified a bit earlier that there

10  were two prior occasions in 1997 that you also gave

11  Robin permission to go to Chris Houston's house on

12  21st Street?

13       A        Yes.

14       Q        On both of those occasions -- I will put it

15  this way:  On either of those occasions, did you give

16  any instructions or place any restrictions on Robin in

17  visiting Chris Houston?

18       A        I took him down there and gave him the same

19  instructions, "Don't go below 21st Street."

20       Q        When you say you took him down there, you

21  are referring to Robin, of course?

22       A        Yes.

23       Q        How did you take Robin down to

24  West 21st Street?

25       A        I rode him on his bike.

1    Q    In other words, both of you riding on the

2    bike and, what, him behind?

3    A    No, him on the crossbar.

4    Q    Okay.  When you took your son, Robin, to

5    West 21st Street with you in the bicycle seat and him

6    on the crossbar, did you go down for the purpose of

7    showing him specifically where he was allowed to be,

8    and where he was not allowed to be?

9    A    No, I just took him to Chris's house.

10    Q    When you got him to Chris's house, did you

11    give him instructions that you did not want him to go

12    north or below 21st Street?

13    A    Yes.

14    Q    Did you tell him why it was?

15    A    Yes.

16    Q    What did you tell him?

17    A    I told him there was too much traffic, and

18    I was afraid of him getting hurt.

19    Q    Did you say anything to him at the time

20    about the railroad tracks?

21    A    I showed him where they were, and I told

22    him not to go across them.

23    Q    Did you tell him to stay away from the

24    railroad tracks?

25    A    I thought that was evident when I said,

1   "Don't go that way."

2      Q      You just described the first time that

3   Robin went to Chris's house where you took him down

4   there, showed him the street, and gave him those

5   instructions.

6      A      Yes.

7      Q      The second time that he went to Chris's

8   house, when he asked for your permission again, and

9   you said you gave him the same instructions?

10     A      Yes.

11     Q      "Don't go below 21st Street or north of

12  21st Street"?  Did you go down to Mr. Houston's house

13  again with Robin?

14     A      Yes.

15     Q      So the second time, did you again ride his

16  bicycle down with your son, Robin, on the crossbar?

17     A      No, that time we walked.

18     Q      And that second time when you got down to

19  Chris Houston's house on 21st Street, did you again

20  impress upon Robin, "You are not to go north or below

21  21st Street"?

22     A      Yes.

23     Q      Did you essentially tell him the same thing

24  about traffic and about staying away from the railroad

25  tracks?

1       A       Yes.

2       Q       Directing your attention back to the

3  morning of the accident.  So this would be the third

4  time where Robin asked if he could go to Chris's house

5  am I correct in understanding that you did not go with

6  him this particular occasion?

7       A       You are correct.

8       Q       But before Robin left the house, did you

9  again give him those same instructions, "You are not

10 to go below or north of 21st Street," and he was to

11 stay away from the railroad tracks?

12      A       I just said, "Remember what I told you?"

13 And he said he did.

14      Q       Again, what you had told him was, "Don't go

15 north of 21st Street, and stay away from the railroad

16 tracks"?

17      A       That is correct.

18      Q       And his response is, "I know that.  I

19 remember that"?

20      A       Yes.

21      Q       Mr. Nixon, how did you first learn of your

22 son's accident on April 27th, 1997?

23      A       Telephone call from a surgeon at

24 Saint Vincent.  I think he was an Indian doctor.

25      Q       You don't recall his name at this time?

## Errata Sheet

**Deposition Of:** _____          **Date:** _____

| Page # | Line # | Correction: | Reason For Correction: |
|--------|--------|-------------|------------------------|
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |
|        |        |             |                        |

1                          SIGNATURE PAGE

2

3

4

5          Ervin Lee Nixon, Sr.

6              Subscribed and sworn to before me this

7    26    day of February          , 2007

8

9          Notary Public

10

11                         - - -

12

13    COMMONWEALTH OF PENNSYLVANIA
      NOTARIAL SEAL
      Darla J. Carabotta - Notary Public
14    Millcreek Twp.,  Erie County
      MY COMMISSION EXPIRES OCT. 09, 2010

15

16

17

18

19

20

21

22

23

24

25

**Tab R**
**Excerpts of Deposition of**
**Robin L. Nixon (3/24/06)**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                            - - -

 4   ROBIN NIXON,                       )
                                        )
 5              Plaintiff,              )
                                        )
 6         vs.                          ) No. 05-101ERIE
                                        )
 7   NORFOLK SOUTHERN CORPORATION and   )
     NORFOLK SOUTHERN RAILWAY COMPANY,  )
 8   INC.,                              )
                                        )
 9              Defendants.             )

10                            - - -

11              Deposition of ROBIN NIXON

12                 Friday, March 24, 2006

13                            - - -

14        The deposition of ROBIN NIXON, the plaintiff
     herein, called as a witness by the defendants,
15   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
16   taken before me, the undersigned, Lance E. Hannaford,
     a Notary Public in and for the Commonwealth of
17   Pennsylvania, at the offices of MacDonald Illig Jones
     & Britton, 100 State Street, Suite 700, Erie,
18   Pennsylvania  16507, commencing at 9:35 o'clock a.m.,
     the day and date above set forth.
19
                              - - -
20              COMPUTER-AIDED TRANSCRIPTION BY
                  MORSE, GANTVERG & HODGE, INC.
21                  PITTSBURGH, PENNSYLVANIA
                          412-281-0189
22                            - - -

23

24

25
```

1    A    Hand brakes.

2    Q    That helps.

3         As you were being pulled along, holding on

4    to the handle with your right hand, left hand on the

5    left handlebar of your bike, where was Mr. Houston?

6    A    In front of me.

7    Q    Was he riding his bike in front of you?  Or

8    was he also holding on to the train?

9    A    He was also holding on to the train.

10   Q    When did Mr. Houston first grab on to the

11   train?

12   A    Right before me.

13   Q    Now, you were holding on to a handle near

14   the rear of one of these rail cars.

15        Correct?

16   A    Correct.

17   Q    What was Mr. Houston holding on to?

18   A    I am not sure.

19        Because he was two cars ahead of me.

20        So I couldn't exactly see what he was

21   holding on to.

22   Q    He was, to your best recollection, two rail

23   cars farther toward the head end or front end of the

24   train than you were?

25   A    Correct.

**Tab S**
**Excerpts of Deposition of**
**Timothy J. Price (5/23/06)**

1        IN THE UNITED STATES DISTRICT COURT FOR THE
2              WESTERN DISTRICT OF PENNSYLVANIA

3                        - - - -

   ROBIN NIXON,                    )
4                                  )
            Plaintiff,             )
5                                  )
              -vs-                 )      CIVIL ACTION
6                                  )      NO. 05-101 ERIE
   NORFOLK SOUTHERN CORPORATION    )
7  and NORFOLK SOUTHERN RAILWAY    )
   COMPANY, INC.,                  )
8                                  )
            Defendants.            )
9

10                       - - - -

11       DEPOSITION OF:  TIMOTHY J. PRICE

12                       - - - -

13

14              DATE:    May 23, 2006
                         Tuesday, 12:45 p.m.
15

16          LOCATION:    Segel & Solymosi
                         818 State Street
17                       Erie, PA 16501
                         814-454-1500

18

19          TAKEN BY:    Plaintiff

20       REPORTED BY:    Toni Rennebeck, RPR
                         Notary Public
21                       NMR Reference No. 052306B

22

23

24              CERTIFIED COPY

25

1    Q.    Are you aware of any Norfolk Southern safety

2          policy that would apply to children that are

3          repeatedly found in an area adjacent to your

4          railway as you're traveling through the area?

5    A.    No.

6    Q.    So it would be fair to say you were never given

7          any training in that regard?

8    A.    That's correct.

9    Q.    Have you ever operated a train in a similar

10         location where the tracks were on a residential

11         street?

12                    MR. TAFT:   Object to form.

13                    Go ahead.   You can answer it if

14         you're able to.

15   A.    Repeat that one more time.

16   BY MR. SOLYMOSI:

17   Q.    Are there any other locations on which you

18         operated a train that were similar to the

19         conditions on West 19th Street between State and

20         Cranberry?

21   A.    No.

22   Q.    Are you familiar with the term attractive

23         nuisance?

24   A.    No.

25   Q.    Do you have regular safety meetings?

**Tab T**
**Excerpts of Deposition of**
**Robert E. Rockey (1/9/07)**

1           IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2
                        - - - -
3

ROBIN NIXON,                        )
4                                   )
            Plaintiff,              )
5                                   )
                -vs-                )        Civil Action
6                                   )        No. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION        )
7  and NORFOLK SOUTHERN RAILWAY      )
COMPANY, INC.                       )
8                                   )
            Defendants.             )
9

10                      - - - -

11          DEPOSITION OF:  ROBERT E. ROCKEY

12                      - - - -

13

14                  DATE:    January 9, 2007
                             Tuesday, 2:40 p.m.

15

16              LOCATION:    Segel & Solymosi
                             818 State Street
17                           Erie, PA 16501
                             814-454-1500

18

19              TAKEN BY:    Plaintiff

20          REPORTED BY:     Toni Rennebeck, RPR
                             Notary Public
21                           NMR Reference No. 010907B

22

23

24              CERTIFIED COPY

25

1  A.    I don't have any.

2  Q.    You don't have anything?

3  A.    Nothing.  I've been retired for -- I haven't

4        worked that job in several years and I've been

5        retired for a couple also, so I really don't

6        have any paperwork.

7  Q.    That's fine.  Could you tell me when you were

8        first employed by Norfolk Southern?

9  A.    Yes.  December 1st, 1969.  November or December

10       1st, I don't remember.

11 Q.    That's close enough.

12 A.    Okay.

13 Q.    What position were you hired for?

14 A.    I was a route clerk.

15 Q.    A route clerk?  What does that mean?

16 A.    I would route cars from one designation to

17       another.

18 Q.    How long did you perform that job?

19 A.    Until April 1970.

20 Q.    Do you recall what position you moved to after

21       that?

22 A.    I went into the crossings and worked that for a

23       few months, and then worked on B&B, which is

24       called bridge and building.  We worked on the

25       bridges, and carpentry work on the buildings and

1    stuff for a while.  They terminated that job.

2    Then they terminated the route clerk's job also

3    and they computerized it; that's why I left it.

4    And I was the youngest clerk, so then again I

5    was the youngest man on the B&B, and I went back

6    and forth.  I held a position on both rosters,

7    so if work would slow down in one, I would jump

8    into the other one.  I worked that until 1983.

9  Q.  And then what happened in '83?

10 A.  '83 they eliminated the crossing watchmen, all

11   except for the three ground crossings.

12 Q.  When you say they eliminated, do you mean the

13   towers?

14 A.  Yeah.  They put the new motion sensors in and

15   updated all the facilities, so they really

16   didn't need crossing guards or tower people

17   anymore.

18 Q.  And you said that there were three ground

19   locations for cross watchmen?

20 A.  That's correct.

21 Q.  Do you recall where they were located?

22 A.  Yes.  One was at Cherry, one was at Cascade

23   Street, and one was at Raspberry Street.

24 Q.  Did you ever work any of those locations on the

25   ground after 1983?

```
 1  A.   Yes, I did.

 2  Q.   How long did you do that for?

 3  A.   In 1987 -- I worked as an extra man out there

 4       '83, '84, '85 and '86, and I sold real estate at

 5       the same time.

 6  Q.   When you say you worked as an extra man, would

 7       that have been a part-time position?

 8  A.   Yes.  What would happen is I would work the

 9       vacation schedules.  And the guys were pretty

10       good about it.  I was selling real estate and

11       they were making sure I'd get enough time in.

12       So you only had to work once every 120 days to

13       get your insurance.  So one of them would take a

14       vacation day or something so I could pick up the

15       insurance.

16  Q.   So you were really really part-time in '83 to

17       '86.

18  A.   Absolutely.  Yes.

19  Q.   Okay.

20  A.   In '87 I came out on the track department.  Or

21       was it '86?  It's been so long I don't remember.

22  Q.   That's all right.  I'm not going to hold you to

23       it.  Just if you can give me your best

24       recollection.

25  A.   I came out and we worked -- as a matter of fact,
```

1       We would load the boats.  We were at Ontario

2       Hydro.

3   Q.  So that was the end of your days as a cross

4       watchman.

5   A.  That's correct.  I did that for three years and

6       then retired.

7   Q.  In the period of time that you worked in the

8       towers, did you ever observe any children

9       playing in the street area of the tracks, in the

10      West 19th Street portion of the tracks where the

11      tracks go down the middle of 19th Street?

12  A.  From time to time you would see children, but

13      not -- you know, it wasn't a regular thing.

14      Most people would not allow their kids to be on

15      tracks to be honest with you, you know.

16  Q.  Well, sure.

17  A.  Any responsible parent wouldn't allow their

18      children to be there.

19  Q.  Of course not.

20  A.  So usually you did not.

21  Q.  Right.  But we all know -- we were kids and our

22      parents didn't always know where you're at;

23      right?

24  A.  Yeah, I guess.

25  Q.  So tell me about what you observed with regard

1    to children on the street or track area of West

2    19th Street.

3  A.    Well, West 19th Street wasn't as heavily

4    populated as the other streets in the area.

5    There was only housing on one side.  You had the

6    cemetery there and you had industry.  When I

7    first started working there it was all industry.

8    There was just a few places where there was just

9    a few houses there.  So it really wasn't -- the

10   kids would -- usually they would be going maybe

11   across the tracks to go somewhere else, but they

12   didn't normally play on 19th Street, you know.

13 Q.    Did you ever see any kids riding their bikes

14   along 19th Street?

15 A.    I'm sure I did, you know.  They probably were

16   riding along, yeah.  Probably, yeah.

17 Q.    Did you ever see them riding along while trains

18   were traversing 19th Street?

19 A.    Normally didn't.  Normally you didn't, you know.

20   People, like I say, people generally stay clear

21   of trains, you know.

22 Q.    You say normally though.  So were there times

23   that maybe you saw someone --

24 A.    Riding a bike?  Sure.

25 Q.    -- a child on a bike maybe closer to the train

```
 1              than they should be?
 2   A.    Oh, there were times when I was in the ground
 3         crossings and stuff and I'd tell them, you know,
 4         this is not --
 5                   There were signs there, you know.
 6   Q.    There were?
 7   A.    Yeah, there were signs there.
 8   Q.    What did the signs say?
 9   A.    That it belonged by Norfolk Southern.  At the
10         center, you know, where the track was itself was
11         belonged by Norfolk Southern, and there were
12         signs telling people that --
13   Q.    Do you know what the sign said?
14   A.    I can't remember now it's been so many years.
15   Q.    You said that you were aware of what was in the
16         area.  Were you aware that there was a
17         playground located on the south side of 19th
18         Street somewhere, a block or two west of Sass?
19   A.    Let me think.  I remember there was something
20         there, but there was never anybody there in that
21         area right there.  I think there was at one time
22         a swing set or something over there.
23   Q.    There was a little playground and a basketball
24         court.
25   A.    Okay.  Yeah.  But I was never in that area right
```

1    A.    Yeah.

2    Q.    Jim Baskin?

3    A.    Yeah.

4    Q.    Mark Allen?

5    A.    That's correct.

6    Q.    Any others that you can think of?

7    A.    Not really.  Jim Gruey.

8    Q.    Jim Gruey?  How do you spell that?

9    A.    He's deceased now.

10   Q.    Oh, okay.

11   A.    That's about all I can remember.  Yeah, Jim

12         Gruey.  Probably those five.  That's probably

13         it.

14   Q.    How about other cross watchmen?

15   A.    There was a kid behind us by the name of Furman.

16         A guy by the name of Furman from New York.

17   Q.    Do you know where he's at now?

18   A.    Don Gray and Elmer Rundel are both dead now.

19         They're both deceased.  I think pretty much

20         they're all gone now.  I think that guy and

21         myself are about the only ones left.

22   Q.    Did you ever see any kids actually ride their

23         bikes and ride up alongside the train as it was

24         going down the tracks and grab on and get towed

25         by the train?

```
 1   A.   I probably seen everything in the years that
 2        I've been there, and I probably saw that a
 3        couple of times.
 4   Q.   Yeah?
 5   A.   Yeah.  Maybe once or twice I saw kids doing
 6        that.  Yes, I can say that.
 7   Q.   Were you able to do anything about it?
 8   A.   I pulled a kid away from it once; I remember
 9        that.  I think I yelled at a kid that was doing
10        it and he got away from it.
11   Q.   Did you ever report that to any of your
12        supervisors or --
13   A.   Well, they -- I'm sure that they, you know --
14             No, I don't think I ever did, to be
15        honest with you.  Supervision was more, you
16        know, they were -- there wasn't a supervisor in
17        this area for one thing.  It was our job to do
18        that, you know.  You don't have a kid's name or
19        something else, you know, there's nothing you
20        can do about it.  If someone did do something
21        and you got his name or something, then you
22        would report that to a supervisor.
23   Q.   I see.  Do you know or can you remember whether
24        or not anyone ever instructed you to watch for
25        any unsafe activities regarding children along
```

**DEPOSITION OF ROBERT E. ROCKEY**
**ERRATA SHEET**
**JANUARY 9, 2007**

| Page/Line | Change From | Change To | Reason for Change |
|---|---|---|---|
| 5/14 | route clerk | rate clerk | Transcription error |
| 5/15 | designation | destination | Transcription error |
| 11/1-2 | We would load the boats. We were at Ontario Hydro. | We would load the boats for Ontario Hydro. | Transcription error |

In all other respects, I believe that the transcript is true and correct.

_____
Robert E. Rockey

Dated:  March _5_, 2007

**Tab U**
**Excerpts of Deposition of**
**Harvey H. Stone (1/9/07)**

1          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA

2

3                          - - - -

ROBIN NIXON,                        )
4                                   )
              Plaintiff,            )
5                                   )
                   -vs-             )      Civil Action
6                                   )      No. 05-101 ERIE
NORFOLK SOUTHERN CORPORATION        )
7  and NORFOLK SOUTHERN RAILWAY      )
COMPANY, INC.                       )
8                                   )
              Defendants.           )
9

10                         - - - -

11          DEPOSITION OF:  HARVEY H. STONE

12                         - - - -

13

                    DATE:     January 9, 2007
14                            Tuesday, 11:10 a.m.

15

                    LOCATION:  Segel & Solymosi
16                             818 State Street
                               Erie, PA 16501
17                             814-454-1500

18

                    TAKEN BY:   Plaintiff
19

20                  REPORTED BY:  Toni Rennebeck, RPR
                                  Notary Public
21                                NMR Reference No. 010907

22

23

24              CERTIFIED COPY

25

1    to take over the Conrail system.  That was the

2    beginning of the project.  Later on when Norfolk

3    Southern and CSX made their deal to do a joint

4    takeover, then we were there to support Norfolk

5    Southern's issues and again get the support of

6    the community to allow more trains to use the

7    corridor until it could be replaced.

8  Q.  So was that one of the major issues then that in

9    order to have the tracks be --

10    Well, when you say replaced, do you

11    mean taken out or moved?

12  A.  The original proposal was to move the Norfolk

13    Southern operation over to 14th Street, which

14    was the Conrail corridor.

15  Q.  Oh, I see.  I see.  So, I mean, I noticed in

16    your file that there was a lot of talk about the

17    increase in traffic.

18  A.  Yes.

19  Q.  And I wasn't sure if the increase in traffic

20    related to increasing traffic on 19th Street in

21    order to do whatever changes may have to happen

22    on 14th Street.

23  A.  No.

24  Q.  That's not correct?

25  A.  That had to do with adding Conrail service to

1       the Norfolk Southern line.  If Norfolk Southern

2       was successful in achieving the takeover, they

3       would be operating more trains.  They would be

4       operating a bunch of Conrail trains that were

5       formerly operated by Conrail.

6    Q.  On 19th Street?

7    A.  Yes.  And in order to do that they would have

8       increased the traffic on 19th Street.

9    Q.  I guess that's where I think I just confused the

10      record when I inserted that 19th Street.

11              So to make sure I understand you, the

12      concern was that if Norfolk Southern was able to

13      acquire Conrail, that there was going to be an

14      increase in traffic on 19th Street?

15   A.  No.

16   Q.  Okay.  Then why don't you say it again.

17   A.  If Norfolk Southern was going to be able to

18      acquire Conrail, they were proposing to move

19      their operations to the 14th Street corridor,

20      which was owned by Conrail.

21              Later on in the process when it

22      became a joint takeover, CSX and Norfolk

23      Southern did a joint takeover of Conrail, CSX

24      was going to wind up with the 14th Street

25      corridor.  Norfolk Southern still had the 19th

```
 1              major bottleneck on their system.  You could

 2              only travel that 6 miles at 10 miles an hour,

 3              and that was a major issue.  That and the fact

 4              that there were some place between 11 and 19

 5              at-grade crossings in downtown Erie.  So that

 6              was the issue that there were these at-grade

 7              crossings and the slow speed limits.

 8    Q.        Were you ever aware that Norfolk Southern had

 9              cross watchmen located along the West 19th

10              Street tracks prior to Mr. Nixon's accident?

11    A.        Yes.

12    Q.        What did you know about the cross watchmen?

13    A.        Well, there were two different times when that

14              was in place.  Initially there were towers that

15              had watchmen that controlled the traffic on the

16              19th Street corridor.  The rail corridor.  When

17              those towers were taken down, then there were

18              watchmen at several school crossings whenever

19              there was school in session on 19th Street.

20    Q.        That was only when there was school in session?

21    A.        As far as I know that's when they were.

22    Q.        Did you ever have any discussions with anyone

23              from Norfolk Southern about the cross watchmen?

24    A.        No.

25    Q.        Were you aware that there was some type of an
```

1          order signed by I think it was a Pennsylvania

2          state agency -- I think it's decree nisi -- that

3          allowed for some changes or some action along

4          West 19th Street tracks but it provided that the

5          cross watchmen were to remain?  Are you familiar

6          with that?

7    A.    Yes, I'm familiar with that.

8    Q.    What can you tell me about that?

9    A.    That was when those towers were taken down.  The

10         order that I remember was that the towers could

11         be taken down, but the railroad would have to

12         provide watchmen during school hours at three

13         specific crossings.

14   Q.    Do you know any of the circumstances or facts

15         involved in the removal of the cross watchmen

16         from the West 19th Street tracks?

17   A.    No.

18   Q.    You never consulted with Norfolk Southern in

19         that regard?

20   A.    No.

21   Q.    Are you aware of any order or any authority that

22         they gained after that decree that we talked

23         about in order to allow them to remove cross

24         watchmen?

25   A.    No.

```
 1            city for many, many years and we believe the

 2            Norfolk Southern and Conrail merger would result

 3            in an option for removing rail traffic from 19th

 4            Street other than local services to the

 5            industries that require it.

 6                        What is the serious issue that you

 7            were referring to in your letter?

 8   A.       The city had been trying to get the 19th Street

 9            corridor closed for many, many years.  Or get

10            the traffic off 19th Street.  And again it was

11            like a dam across downtown Erie.  And we were

12            trying to push the buttons of the city to get

13            them to support the Norfolk Southern takeover of

14            Conrail.

15                        Mike Veshecco was the director of

16            economic development.  His concern was economic

17            development in the city.

18   Q.       Okay.  Now, the next document was produced by

19            Norfolk Southern, that order nisi that we had

20            mentioned earlier.

21                               - - - -

22               (The witness reviewed the document.)

23                               - - - -

24   BY MR. SOLYMOSI:

25   Q.    Would it be correct that this was the document
```

1          that you were referring to earlier that

2          addressed the removal of the towers and

3          requiring cross watchmen to be in place during

4          school hours?

5    A.    That's correct.

6    Q.    Okay.

7                    MR. SOLYMOSI:  We'll mark that order

8          nisi as Exhibit 5

9                          -  -  -  -

10                   (Deposition Exhibit No. 5 marked for

11         identification.)

12                         -  -  -  -

13   BY MR. SOLYMOSI:

14   Q.    Okay.  I'm going to start to talk to you about

15         some of the documents that I copied from your

16         1997 file that you brought with you today.

17                   The first one we'll mark --

18                   It's a February 26, 1997 Times news

19         article entitled:  Merger could finally derail

20         19th Street tracks.

21                   Do you know why this would have been

22         in your file, Harvey?

23                         -  -  -  -

24         (The witness reviewed the document.)

25                         -  -  -  -

**DEPOSITION OF HARVEY H. STONE**
**ERRATA SHEET**
**JANUARY 9, 2007**

| Page/Line | Change From | Change To | Reason for Change |
|---|---|---|---|
| 58/25 to 59/1 | Yes. There's a copy of that in one of the files. | Yes. I believe there is a copy of that in one of the files. | Correction. I was unable to locate the DEIS in our files. |
| 58/9 | Yeah, I can find it. | I believe I can find it. | Correction. I was unable to locate the DEIS in our files. |
| 67/19 | Yes. | Yes, this is Norfolk Southern's response. | Clarification |

In all other respects, I believe that the transcript is true and correct.

_____
Harvey H. Stone

Dated: February 15, 2007

**Tab V**
**H. Stone Deposition Exhibit 5 (1/9/07)**

PENNSYLVANIA
PUBLIC UTILITY COMMISSION
Harrisburg, PA  17120

Public Meeting held May 2?, 1982

Commissioners Present:

Susan M. Shanaman, Chairman
Michael Johnson
James H. Cawley
Linda C. Taliaferro
Clifford L. Jones

Application of Norfolk and Western Railway
Company for approval of (1) the full auto-                    A-00103847
mation of the existing crossing protection
at the crossings, at-grade, where tracks of
said company cross Cranberry, Raspberry,
Cascade, Elm, Liberty, Poplar, Cherry,
Walnut, Chestnut, Myrtle, Sassafras, Peach,
Ash, Holland, German and Parade Streets,
all in the City of Erie, and (2) the removal
of watchmen who control or override the
existing protection except that on-ground
watchmen will remain at Cranberry, Cascade
and Cherry Street Crossings during school
hours.

                          ORDER NISI

BY THE COMMISSION:

        At a location in the City of Erie, the tracks of Norfolk and
Western Railway Company cross, at-grade, 16 streets.

        In its application filed January 6, 1982, Norfolk and Western
Railway Company seeks Commission approval to alter the warning facilities
at 16 at-grade crossings in the city of Erie. The crossings at Cranberry,
Raspberry, Cascade, Elm, Liberty, Poplar, Cherry, Walnut, Chestnut,
Myrtle, Sassafras and Peach Streets have automatic flashing light
signals activated by DC track circuits. The signals are equipped with
manual override systems which allow the signals to be deactivated if a
train stops before it reaches the crossings. The manual override for
these crossings is performed by a crossing watchman located in towers at
Raspberry, Liberty and Sassafras Streets between the hours of 6:30 a.m.
and 10:30 p.m.

        The crossings at Holland Street and German Street have flashing
light warning signals that are manually controlled, on a 24-hour basis,
by a crossing watchman from a tower located at Holland Street.

DEPOSITION
EXHIBIT
Stone
1-9-07

The warning facilities at Parade Street are flashing light
warning signals with short-arm gates and are operated by a crossing
watchman on a 24-hour basis from a tower located at Parade Street.  This
watchman also manually overrides the automatic flashing light signals
which are located at the Ash Street crossing.

At Cranberry, Cascade and Cherry Streets, a crossing watchman
is located on the ground to provide additional warning to school children.
These watchmen are on duty eight hours per day during the school year
and will not be removed under this application.

According to 1979 Pennsylvania Department of Transportation
Railroad Crossing Logs, the 1977 vehicular traffic counts were as follows:

| STREET NAME | AVERAGE DAILY TRAFFIC |
| --- | --- |
| Cranberry Street | 830 |
| Raspberry Street | 3500 |
| Cascade Street | 1560 |
| Plum Street | 570 |
| Liberty Street | 13390 |
| Poplar Street | 360 |
| Cherry Street | 9050 |
| Walnut Street | 310 |
| Chestnut Street | 1350 |
| Myrtle Street | 730 |
| Sassafras Street | 10920 |
| Peach Street | 10920 |
| Holland Street | 2320 |
| German Street | 730 |
| Parade Street | 15600 |
| Ash Street | 5200 |

The train traffic over these crossings averages approximately
five trains per day in each direction.  There is one local train that
performs switching movements to a lumber company near Cranberry Street
approximately two trips per day.  Furthermore, there are three to four
industries between Peach and Ash Streets that a local train services by
making approximately four round trips per day.

Norfolk and Western Railway Company's Exhibit No. 3, attached
to the application, shows the proposed changes in the crossing warning
devices.  At Cranberry, Raspberry, Cascade, Plum, Liberty, Poplar,
Cherry, Walnut, Chestnut, Myrtle, Sassafras, Peach and Ash Street
crossings, the railroad company proposes to install "motion sensor"
units at each of these crossings.  The installation of the "motion
sensor" units enables the flashing light signals to stop operating if
the train stops before reaching a crossing and will automatically activate
the flashing light signals if the train starts moving towards the crossing.
However, if the train starts backing away from the crossing, the flashing
light signal will remain off and if the train has stopped on the crossing,
the flashing light signal will remain operating.

- 2 -

At Holland, German and Parade Street crossings, "motion sensor" units will be installed for the main tracks and island circuits will be installed for the side tracks. In addition, the carrier proposes to remove three tracks at Holland Street and one track at German Street which are no longer necessary for railroad operations.

The estimated cost of the project is $375,300 for the automation of the crossings and $18,300 for the removal of the watchmen's facilities and the surplus tracks at Holland and German Street. Norfolk and Western Railway Company agrees to bear all costs directly associated with this project including the responsibility for installing and maintaining the proposed crossing warning facilities.

The Norfolk and Western Railway Company avers that the full automation of the 16 at-grade crossings by using modern electronic circuitry will provide a safe, more consistent and more dependable warning to motorists and pedestrians than existing manually controlled warning devices.

The railroad company's Exhibit No. 4 is a copy of a resolution that the City of Erie passed on September 23, 1981 granting Norfolk and Western Railway Company permission, subject to Public Utility Commission approval, to implement the proposed automatic warning facilities as outlined in this application.

We have carefully reviewed the record in this proceeding and are of the opinion that the automation of the warning facilities as specified in the Norfolk and Western Railway Company's application should be installed. The full automation of the warning facilities at the 16 crossings will improve the safety and dependability of the flashing light signals and will eliminate the need for complete reliance on the watchmen's attentiveness to manually control the warning facilities.

Since it appears that the United Transportation Union and the Brotherhood of Maintenance of Way Employees may not have been served with a copy of this application, and due to the urgency of the railroad company to initiate the alteration of the warning facilities, we are of the opinion that an order can be issued Nisi.

The record having been certified to this Commission, we issue this order approving this application pursuant to Section 335(a) of the Public Utility Code, 66 Pa. C.S. §335 and find that the alteration of the crossings is necessary and proper for the service, accommodation, convenience or safety of the public; THEREFORE,

IT IS ORDERED:

1. That the application be and is hereby approved.

2. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to alter the crossings at Cranberry, Raspberry, Cascade, Plum, Liberty, Poplar,

- 3 -

Cherry, Walnut, Chestnut, Myrtle, Sassafras, Peach and Ash Streets by the installation of "motion sensor" units to provide fully automatic warning facilities at each crossing in lieu of the manual override performed by crossing watchmen in towers located at Raspberry, Liberty, Sassafras and Parade Streets, all in accordance with Exhibit 3 attached to the application, which plan is hereby approved and made part hereof.

3. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to alter the crossings at Holland, German and Parade Streets by the installation of "motion sensor" units for the main tracks and island circuits for the side tracks to provide fully automatic warning facilities at each crossing in lieu of the manually controlled warning facilities which are completely dependent upon crossing watchmen located in towers at Holland and Parade Streets, all in accordance with the approved plans.

4. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to alter the crossing at Holland Street by the removal of the rails, ties and other railroad facilities of three middle tracks at said crossing including the relocation of the flashing light signals in accordance with Part VIII of the Manual and Uniform Traffic Control Devices and restore the area of the highway disturbed by the tracks' removal with bituminous concrete or other suitable material conforming with the abutting highway paving, in the City of Erie.

5. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to alter the crossing at German Street by the removal of the rails, ties, and other railroad facilities of a side track including the relocation of the flashing light signals in accordance with Part VIII of the Manual and Uniform Traffic Control Devices and restore the area of highway disturbed by the track removal with bituminous concrete or other suitable material conforming with the abutting highway paving, in the City of Erie.

6. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to provide on-ground crossing watchmen at Cranberry, Cascade and Cherry Streets for an 8-hour period each day on school days during the school year.

7. That Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary to establish and maintain any detours that may be required to accommodate properly highway traffic during the time the railroad-highway crossings are being altered.

8. That any relocation of, changes in or removal of any adjacent structures, equipment or other facilities of any public utility other than Norfolk and Western Railway Company, which may be required as incidental to the alteration of the crossings be made by said public utility at Norfolk and Western Railway Company's expense, and in such manner as will not interfere with the alteration, and such relocated or altered facilities hereinafter be maintained by said public utility.

- 4 -

9. That Norfolk and Western Railway Company pay all compensation for damages, if any due to owners for property taken, injured or destroyed by reason of the alteration in accordance with this order.

10. That Norfolk and Western Railway Company cooperate with City of Erie and Department of Transportation so that during the time work is being performed at said crossings, the vehicular traffic will not be endangered or unnecessarily impeded.

11. That all work necessary to complete the alteration of the crossings be done in a manner satisfactory to this Commission on or before December 31, 1983, that on or before said date, Norfolk and Western Railway Company report to this Commission the date of actual completion of the work.

12. That upon completion of the alteration of the crossings, Norfolk and Western Railway Company, furnish all material and do all work necessary to remove the watchman facilities located at Raspberry, Liberty, Sassafras, Holland and Parade Streets.

13. That upon completion of the alteration of the crossings, Norfolk and Western Railway Company, at its sole cost and expense, furnish all material and do all work necessary thereafter to maintain its facilities at the subject crossings including the fully automatic warning facilities installed in accordance with this order.

14. That upon completion of the alteration of the crossings, City of Erie, at its sole cost and expense, furnish all material and do all work necessary thereafter to maintain the highway approaches to the Holland and Gorman Street crossings for the full graded width thereof, including the paving to points 24 inches beyond each outside rail.

15. That unless exceptions are filed with this Commission within 15 days following date of service thereof, this order at Application Docket No. 00103847 and the provisions herein shall remain in full force and effect.

BY THE COMMISSION,

Jerry Rich
Secretary

(SEAL)

ORDER ADOPTED: May 26, 1982

ORDER ENTERED: JUN 16 1982

- 5 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2007, the foregoing Supplemental Appendix to Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc., was filed electronically with the Clerk of Court using the Electronic Case Filing system. Notice of this filing will be sent to all parties by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(D) of the Federal Rules of Civil Procedure. Parties may access this filing through the Court's ECF system.

s/ Roger H. Taft
Roger H. Taft, Esq.