IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN NIXON,<br>Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-101 ERIE |
| | ) | |
| NORFOLK SOUTHERN CORPORATION | ) | |
| and NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, INC., | ) | |
| Defendants | ) | ELECTRONICALLY FILED |

**APPENDIX TO DEFENDANTS' MOTION TO BAR
JAMES A. GUARINO AS EXPERT WITNESS AND TO EXCLUDE
GUARINO'S TESTIMONY AND OTHER EVIDENCE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN
RAILWAY COMPANY, INC., by their attorneys, MacDonald, Illig, Jones & Britton LLP, file
this Appendix to Defendants' Motion to Bar James R. Guarino as Expert Witness and to Exclude
Guarino's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary
Judgment, pursuant to Rule 702 of the Federal Rules of Evidence.

I hereby certify that this Appendix contains true and correct copies of the transcript of the
deposition of James A. Guarino taken on May 18, 2007, and Guarino Deposition Exhibit Nos. 1
through 7 including his resume, expert report dated February 12, 2007, and supplemental expert
report dated February 23, 2007:

I.      Guarino Deposition Transcript

    Tab A    -    Deposition of James A. Guarino (5/18/07)


II.     Guarino Deposition Exhibits

    Tab B    -    Guarino Deposition Ex. 1 - Notice of Deposition (J. Guarino)

    Tab C    -    Guarino Deposition Ex. 2 - J. Guarino Resume

    Tab D    -    Guarino Deposition Ex. 3 - J. Guarino Expert Report (2/12/07)

    Tab E    -    Guarino Deposition Ex. 4 - J. Guarino Supplemental Expert Report (2/23/07)

    Tab F    -    Guarino Deposition Ex. 5 - J. Guarino Handwritten Diagram (Measurements)

    Tab G    -    Guarino Deposition Ex. 6 - Rumble Strip Diagram

    Tab H    -    Guarino Deposition Ex. 7 - J. Guarino Conceptual Photograph/Drawing (oversized original in possession of Tibor R. Solymosi, Esq., counsel for plaintiff Robin Nixon)


Respectfully submitted,


s/ Roger H. Taft

Roger H. Taft
PA 19983/NY 2876456
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7603
(814) 454-4647 (facsimile)
rtaft@mijb.com

Attorneys for Defendants
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company, Inc.

## Tab A
## Deposition of James A. Guarino (5/18/07)

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2
                      - - -

3
ROBIN NIXON,               )

4                       )

       Plaintiff,      )

5                       ) CIVIL ACTION

       vs.               ) NO. 05-101 ERIE

6                       )

NORFOLK SOUTHERN CORPORATION   )

7 and NORFOLK SOUTHERN RAILWAY    )

COMPANY, INC.,            )

8                       )

       Defendants.     )

9
                      - - -

10
          Deposition of JAMES A. GUARINO

11
            Friday, May 18, 2007

12
                      - - -

13
        The deposition of JAMES A. GUARINO, called

14 as a witness by the Defendants, pursuant to Notice and
the Federal Rules of Civil Procedure pertaining to the

15 taking of depositions, taken before me, the
undersigned, Deborah L. Endler, a Notary Public in and

16 for the Commonwealth of Pennsylvania, at the offices
of MacDonald, Illig, Jones & Britton, LLP, 100 State

17 Street, Suite 700, 'Erie, Pennsylvania, 16507,
commencing at 9:40 o'clock a.m., the day and date

18 above set forth.

19                    - - -

20        COMPUTER-AIDED TRANSCRIPTION BY
         MORSE, GANTVERG & HODGE, INC.

21          PITTSBURGH, PENNSYLVANIA
            412-281-0189

22
                      - - -

23

24

25
ORIGINAL

```
 1  APPEARANCES:

 2       On behalf of the Plaintiff:

 3            Segel & Solymosi:
              Tibor R. Solymosi, Esquire
 4            818 State Street
              Erie, Pennsylvania  16501
 5
         On behalf of the Defendants:
 6
              MacDonald, Illig, Jones & Britton, LLP:
 7            Roger H. Taft, Esquire
              100 State Street, Suite 700
 8            Erie, Pennsylvania  16507

 9                      - - -

10

11                              INDEX

12  EXAMINATION BY:                          PAGE:

13  Mr. Taft                                   3
    Mr. Solymosi                              65
14  Mr. Taft                                  68

15                      - - -

16

17

18

19

20

21

22

23

24

25
```

```
 1                    JAMES A. GUARINO

 2  called as a witness by the Defendants, having been

 3  first duly sworn, as hereinafter certified, was

 4  deposed and said as follows:

 5                    EXAMINATION

 6  BY MR. TAFT:

 7       Q      Mr. Guarino, would you state your full name

 8  and home address?

 9       A      James A. Guarino, 10859 Hill Road,

10  Wattsburg, W-a-t-t-s-b-u-r-g, PA, 16442.

11       Q      And your age and date of birth?

12       A      I'm 58.  October 30th, 1948.

13       Q      Mr. Guarino, we met briefly before we

14  started.  My name is Roger Taft.

15       A      Yes.

16       Q      I'm representing the Defendants in a

17  lawsuit filed by Robin Nixon and you have been

18  identified as an expert witness on behalf of

19  Mr. Nixon.  We are here today so that I can ask

20  questions regarding the expert reports that you have

21  provided --

22       A      Yes.

23       Q      -- in this case.  I am going to try to be

24  as clear as I can with my questions, but if I ask you

25  something that you don't understand or if I ask you
```

```
 1   something you don't hear clearly enough --

 2        A      I will ask you again.

 3        Q      -- please ask me to repeat it and I'll be

 4   happy to do that.

 5        A      All right.

 6        Q      Also, as we proceed with your deposition,

 7   if you want to take a break to get a drink of water or

 8   coffee or use the restrooms or anything else, just let

 9   us know.  We'll be happy to accommodate you.

10        A      All right.

11        Q      Other than if I pose a question, I'd like

12   you to answer the question before we take our break.

13        A      All right.

14        Q      Is that okay?

15        A      That's fine.

16        Q      Finally, before we get further under way,

17   is there any reason that you are aware of why you

18   would not be able to accurately respond to my

19   questions today?

20        A      No.

21        Q      Okay.

22        A      No.

23        Q      Good.  Mr. Guarino, I'm going to start with

24   some questions regarding your business?

25        A      Yes.
```

1      Q      The letterhead of your expert report makes

2   reference to Guarino Enterprises.

3      A      Yes.

4      Q      What is your affiliation with that

5   business?

6      A      Owner operator.  I actually do the work,

7   also.  I bid and I do the work.

8      Q      Is Guarino Enterprises a corporation?

9      A      No, sole proprietor.

10      Q      And you are the sole owner; is that

11   correct?

12      A      Yes.

13      Q      And in summary form, what is the nature of

14   your business?  What type of work do you do?

15      A      Parking lot maintenance.

16      Q      And when you talk about parking lot

17   maintenance, to be --

18      A      Asphalt repair.

19      Q      Wait a minute.  In order for her to be able

20   to get a transcript today, you got to let me --

21      A      Finish.  Go ahead.

22      Q      I know you are anticipating what I'm --

23      A      I won't do that again.

24      Q      -- going to say, but that makes life

25   difficult for the court reporter.

1      A      All right.

2      Q      So my question was would you tell me a

3  little more specifically what jobs or duties are

4  involved in what you referred to as parking lot

5  maintenance?

6      A      Well, we do asphalt repair.  We mill, mill

7  out and repair.  We do crack filling which is hot

8  pour.  We do line striping.  We lay out to print and

9  we do design roadways, you know, we do the line

10  striping on the roadways and stuff and arrows,

11  stencils.  During the winter months we do snow plowing

12  and sidewalk work.

13      Q      When you say sidewalk work, removal of

14  snow?

15      A      Removal of snow from sidewalks.

16      Q      And when you talk about line striping, this

17  would be in parking lots?

18      A      Parking lots, yeah, I've done roadways.

19  I've done boroughs.  I've done walkways.  I've done

20  highway roadways.

21      Q      When you say you have done highway roadway

22  line striping, what does that involve?

23      A      I did one, one was at a Wal-Mart on west

24  side.  I did the lines.  I did the divider lines and

25  the arrows.

```
 1      Q      Okay, on what highway?

 2      A      It would be Asbury.

 3      Q      Asbury Road?

 4      A      Yeah.

 5      Q      Okay.  Did you do that pursuant to a

 6   contract with Wal-Mart or a contract with some other

 7   entity?

 8      A      With McCormick's.

 9      Q      Were you a subcontractor --

10      A      Yes.

11      Q      -- of McCormick?

12      A      Yes.

13      Q      And in order to do the line striping and

14   the turn arrows on Asbury Road for the new Wal-Mart --

15      A      Yes.

16      Q      -- and by the way, was it on Asbury Road?

17      A      Yes.

18      Q      Okay.  Were you provided with any plans and

19   specifications to match up --

20      A      Yes.

21      Q      So you didn't prepare the plans and

22   specifications to do the line striping --

23      A      No.

24      Q      -- or the turn arrows?

25      A      No.
```

```
 1       Q       You were just a subcontractor of
 2  McCormick's to do the actual --
 3       A       Right.
 4       Q       -- painting of the highway surface --
 5       A       Right.
 6       Q       -- or road surface.  Aside from that one
 7  occasion, have you done any other line striping on
 8  public roads or streets?
 9       A       No.
10       Q       Have you done any other directional arrows
11  on public roads or streets other than that one
12  occasion for Wal-Mart?
13       A       Just like I told you, walkways for
14  boroughs.
15       Q       Those would be sidewalks?
16       A       They are the walkways on the roads.  I've
17  done in --
18       Q       Oh, you mean like crosswalks?
19       A       Crosswalks, yes.
20       Q       Okay.  What borough is that?
21       A       Lawrence Park.
22       Q       How often did you do that for Lawrence
23  Park?
24       A       I did it one year.  That was directly
25  through them.
```

```
 1     Q     You contracted through Lawrence Park?

 2     A     Yes.

 3     Q     What year was that approximately?

 4     A     God, I couldn't tell you.

 5     Q     Okay.

 6     A     You know, you are asking for details.  I do

 7  a lot of work.

 8     Q     Was it a long time ago?

 9     A     I couldn't say.  Could be six, could be

10  seven years.  Could be five.

11     Q     Okay.  When did you do the work for

12  Wal-Mart?

13     A     Oh, that was awhile ago, too.

14     Q     Several years ago?

15     A     Yeah.

16     Q     When you did the crosswalks, are you

17  referring to just to putting the lines across the

18  street?

19     A     Yeah, lines and dividers.

20     Q     Are the dividers --

21     A     Hash marks in the middle.

22     Q     You got to let me finish.  What are the

23  dividers?

24     A     They are hash marks.  They are actually

25  like diagonal strips that you run across to more or
```

1  less designate that it is a walkway.

2       Q       In installing the crosswalks for Lawrence

3  Park on that one occasion, did you work off plans or

4  specifications that Lawrence Park provided to you?

5       A       No, it's standard.  It's a standard, you

6  know, width from the transition on the walk to the

7  other transition.

8       Q       Were you repainting something that was

9  there already?

10      A       No.

11      Q       What resource material did you use to get

12  the standard --

13      A       Measure and snap them.  Snap them and

14  stripe them.

15      Q       How did you know where to place --

16      A       There is a transition on the sidewalk.

17      Q       You have to wait til I finish.  Where did

18  you go to determine where you would put your crosswalk

19  and the striping that you referenced?  Was it just by

20  going to the site and determining this is where the

21  crosswalk should be?

22      A       Yes.

23      Q       Okay.  And when you said it was just

24  standard, that's just based on your experience of

25  looking at other crosswalks?

```
 1      A      That's the way they are supposed to be,
 2  transition to transition.
 3      Q      How long has Guarino Enterprises been in
 4  existence?
 5      A      28 years.
 6      Q      How many employees do you have?
 7      A      At the present time there is two in the
 8  office, there is one guy sweeping.  We do parking lot
 9  sweeping at night.  And then there is myself and two
10  other gentlemen.
11      Q      What do the other two do?
12      A      Laborers.
13      Q      I think you told me that as an owner
14  operator, you don't just sit in the office, you are
15  out in the --
16      A      No, I work.
17      Q      Okay.  What is the address of Guarino
18  Enterprises?
19      A      It's at present it's 230 East 21st.  That's
20  where I have my equipment at.  The offices are out at
21  my house.
22      Q      So you keep the equipment at East 21st
23  street address, but the business is run out of your
24  home?
25      A      Right, the reason I do that is because of
```

1   fuel.

2              (THEREUPON, Guarino Deposition Exhibit 1

3        was marked for identification.)

4        Q     I show you, Mr. Guarino, what's been marked

5   as Guarino Exhibit 1 which is a copy of a Notice of

6   Deposition scheduling your deposition before --

7        A     Yes.  That's what, I left it at home.  I

8   forgot it.  I left it on the dining room table.

9        Q     Would you refer to the second page of the

10  deposition notice?  Back one.  There is a list

11  requesting you to bring certain documents and things

12  with you to your deposition, and the first item on

13  that list was your most current curriculum vitae.  And

14  I know as part of your expert report you had provided

15  a one page curriculum vitae; is that right --

16       A     Yes.

17       Q     -- that you marked as a resume.

18       A     Don't have a big one.

19             (THEREUPON, Guarino Deposition Exhibit 2

20       was marked for identification.)

21       Q     I'm going to mark it separately just so we

22  have it.  I show you what's been marked as Guarino

23  Deposition Exhibit 2.  Is that a copy of your most

24  current resume?

25       A     Yes, it is.

1      Q      Now, item two requested that you bring with

2   you today your complete expert witness file with

3   respect to the April 27, 1997 accident, including but

4   not limited to your expert reports dated February

5   12th, 2007 and February 23, 2007 and all drafts

6   thereof and any and all documents and things upon

7   which you relied in arriving at your opinions and/or

8   in preparing your expert reports.

9      A      Yes.

10      Q      Now, you provided, you let me look at a

11   folder this morning before we began.  Does that folder

12   constitute all the materials that you had --

13      A      Yes.

14      Q      -- in your possession regarding your expert

15   witness services in this case?

16      A      Yeah, this is what I compiled.

17      Q      Okay.  At any point in time did you compile

18   any handwritten or other notes in connection with this

19   assignment?

20      A      No, what I normally do, I do yellow pad.  I

21   make scratch pads and I throw them way.  I do that on

22   my estimates.  I don't save them.  Then the final

23   documents, she stores them, puts them in the computer

24   and keeps a hard copy.

25      Q      Okay.  So when did you destroy your yellow

1  pages --

2      A      When I'm done.

3      Q      Let me finish.  When did you destroy your

4  handwritten notes, whether they were on yellow pages

5  or otherwise, in connection with the work that did you

6  as a expert?

7      A      When I compiled this.  When I put my, the

8  finished product together, I throw that stuff away.  I

9  don't keep it.

10     Q      Is there any reason why you didn't keep

11  your notes?

12     A      Because I keep terrible notes.  I just

13  throw them away, you know.  When I'm done figuring, I

14  throw the figures away.  A lot of times I never save

15  the figures or even documents.  I throw them away.  I

16  shred them.  She shreds them and gets rid of them.

17  And then I keep the main copies.  Because we would be

18  inundated with papers, so that's why we do it.

19     Q      How many times have you served as an expert

20  witness?

21     A      This is the first time.

22     Q      Okay.  And I understand that there may be a

23  practice that you have with respect to other work that

24  you do, but is there any special reason in this case

25  as an expert witness that you would have destroyed

1   notes and other materials related to the work that you

2   did?

3       A    No, it's common practice.  It's something

4   that I do.  Any bid that I do, I get rid of it and I

5   keep the main copy.

6       Q    Let's go on to item 3.  Any and all

7   documents and things upon which you relied in arriving

8   at your opinions and/or in preparing your expert

9   reports, if not contained in your expert witness file.

10           Is there anything other than what you

11  brought with you today upon which you relied in

12  arriving at the opinions and conclusions and the two

13  expert reports?

14      A    No, that's everything that's in there.

15      Q    Item 4 requested records of all billings

16  and payments with respect to your expert services

17  including all time records for such services.  Have

18  you submitted any bills?

19      A    No, 'cause the way -- I haven't included

20  the time I'm here.  I haven't even included that,

21  because I didn't know how long I was going to be here.

22      Q    Are you keeping track --

23      A    Oh, yes.

24      Q    -- of the time that you spent --

25      A    Oh, yes.

1    Q    Did you bring those time records?

2    A    No, I didn't.  No, I didn't.

3    Q    You have them back at your office?

4    A    Yes, I do.

5    Q    Would you please provide those to

6  Mr. Solymosi?

7    A    Yes.

8    Q    I'm looking for the time records --

9    A    All right.

10    Q    If you haven't submitted a bill so far --

11    A    Well, I had an initial here, which you

12  have, but I haven't submitted a final bill.

13    Q    I'm looking at the time records that would

14  establish the amount of time you spent in your expert

15  witness services that later will turn into a bill --

16    A    All right.

17    Q    -- or that did turn into a bill?

18    A    All right.

19    Q    You understand?

20    A    I can provide that.

21    Q    Because I don't remember seeing any bills

22  that you submitted.

23    A    No, I didn't.  I didn't submit a final bill

24  because I didn't complete the job yet.

25    Q    Did you submit any preliminary bills?

1    A    No.

2    Q    Well, I'm looking for the records of the

3    time spent --

4    A    All right.

5    Q    -- and will later become a bill or bills,

6    okay?  Understood?

7    A    Yes, sir.

8    Q    I'm going to ask you some questions about

9    your formal education.  According to your resume, you

10   graduated from Technical Memorial High School in 1967;

11   is that correct?

12   A    Yes.

13   Q    And the resume also indicates that you

14   attended Gannon College for one year, 1976 to 1977?

15   A    Yeah, I was pursuing a police career and I

16   thought I needed some credits for that.

17   Q    What was the course of study at Gannon?

18   A    Well, it was criminology and I had to take

19   the basic courses, you know, history, English.

20   Q    Was that the equivalent of a freshman year

21   course of study at --

22   A    I don't know if you could consider it a

23   freshman year.  I was taking courses that would help

24   me towards that.  But, you know, trying to run a

25   family and do that, that's what I thought I could get

1  in, the police department.

2      Q      Do you recall what courses you took during

3  that one year at Gannon?

4      A      God, that's a long time.  That's 30, 30

5  some years ago.  No, I can't.

6      Q      Did you attend a full year?

7      A      No, it was like a partial, like a half a

8  year I think I went.

9      Q      And then dropped out after the first

10  semester?

11      A      Yeah, it just got too hard trying to raise

12  a family and everything, because I was working a

13  full-time job, too.

14      Q      Were you working at General Electric

15  Company?

16      A      Yes.

17      Q      Aside from the partial year at Gannon

18  College, 1976, 1977, have you taken any other college

19  courses?

20      A      No.

21      Q      Do you hold any licenses or certifications

22  other than, for instance, a driver's license?

23      A      No, other than when I was welding at

24  General Electric, but no.

25      Q      You had a welder's certificate?

1       A       Uh-huh.

2       Q       You got to say yes or no.

3       A       Yes.

4       Q       Are you a member of any professional

5   organizations or societies?

6       A       No.

7       Q       I want to ask you some questions about your

8   employment experience.

9       A       Yes.

10      Q       Your resume indicates that you worked at

11  General Electric Company as a welder between 1971 and

12  1986; correct?

13      A       Yes.

14      Q       What did you do between graduation from

15  high school in 1967 and beginning to work at GE?

16      A       I had military time and then I worked at

17  Hammermill.

18      Q       How long did you work at Hammermill?

19      A       I worked -- oh, boy, you are asking me to

20  go way back on stuff.  God, probably three years.  I

21  worked Lord Corporation when I got out of school.

22  That was the initial before I went in the service.

23      Q       How long did you work at Lord Corporation

24  before going into the service?

25      A       God, I think I was there about a year.

1      Q      What kind of job or jobs did you hold at

2    Lord?

3      A      I was a laborer, a laborer's job when I

4    went in.  I worked in the batch plant.  There is like

5    a rubber plant, worked there.

6      Q      What type of assignments did you have as

7    part of your military duty?

8      A      I was in a maintenance unit out of

9    Germany.  We were actually padding trucks and stuff

10   down and the military was moving out of Germany, and

11   we were actually padding vehicles down.  So we had to

12   do maintenance and we had to make sure that they were

13   padded down and purged and fogged.

14     Q      When you say padded down, what do you mean

15   by that?

16     A      Well, they put them on giant pads and they

17   tape the windows, purge them.

18     Q      Moth balls?

19     A      They put them in moth balls, yes.

20     Q      That's what I was going to say.  Did you

21   hold your position at Hammermill paper after the

22   military?

23     A      Yeah, I did.  I came back and I worked it

24   for awhile and, you know, I stayed there for awhile

25   and I just didn't see any place to go, so I applied at

1  General Electric and I got in there on an entry

2  position.

3      Q    When you worked at Hammermill, what

4  positions did you hold?

5      A    I was a laborer again.  I ran a cutter, did

6  packing and I moved skids of paper, you know, sorting

7  skids.

8      Q    You told me a little bit earlier that you

9  then went to General Electric Company from 1971 to

10 1986 --

11     A    Yes.

12     Q    -- is that right?  Were you a welder the

13 entire time at GE?

14     A    The first three months I was a snagger.  I

15 started out snagging steel that had been burned.

16     Q    What's a snagger do?

17     A    It knocks the burrs off the burned

18 products, so that they are ready for assembly.  And

19 then after that I went to weld school.

20     Q    And held a welding position through the

21 rest of your --

22     A    Through the rest of my time there, piece

23 work welding.

24     Q    Again, referring back to your resume, it

25 appears that part way through the time that you were

1    working at GE, you formed your present business

2    Guarino Enterprises?

3          A      I worked GE and for five years I built my

4    business while I was working there.

5          Q      And how did you decide to leave GE and go

6    into your business full-time?

7          A      Monetary.

8          Q      You built the business up enough --

9          A      Yes.

10         Q      -- at that point that it made sense?

11         A      I either made a decision to stay or to go

12    on my own.

13         Q      Aside from running your business, Guarino

14    Enterprises, your sole proprietorship, have you held

15    any other employment since leaving GE in 1986?

16         A      No, that's all I've been doing is working

17    it and building it.

18         Q      You told me a little bit earlier that this

19    case is the first time you have ever served as an

20    expert witness in any type of lawsuit --

21         A      Yes.

22         Q      -- is that correct?  And aside from that,

23    has there ever been a time that you have given a

24    deposition in any type of lawsuit?

25         A      No.

1    Q    Has there ever been a time where you have

2  provided court testimony in any type of lawsuit?

3    A    No.

4    Q    At any time, Mr. Guarino, have you authored

5  or published any types of articles on any types of

6  subject matter?

7    A    No.

8    Q    At any other time have you had involvement

9  in another case dealing with a minor riding a bicycle

10  on a public street who was injured after grabbing onto

11  a moving train?

12    A    What do you mean there?

13    Q    I'll have her repeat it and then if you

14  don't understand it, I'll ask it again.

15         MR. TAFT:  Read it back, please.

16         (Read back.)

17    A    No.

18    Q    In your expert report you state "My opinion

19  is based on my background, experience and training in

20  the field of asphalt patching, preventive maintenance,

21  repairs and safety/directional striping."  Is that an

22  accurate statement of what you consider your areas of

23  expertise to be?

24    A    Yeah, asphalt.  Asphalt marking, I've done

25  that for 28 years.

1    Q    You don't claim, Mr. Guarino, do you, that
2  you are an expert in traffic engineering?

3    A    I don't profess to be an engineer.

4    Q    All right.  You don't profess to be an
5  expert in the design of streets or roads?

6         MR. SOLYMOSI:  Object to the form of the
7         question.  I'd like you to explain what you mean
8         by an expert, Roger.  Do you mean through special
9         training?

10        MR. TAFT:  Yes.

11   Q    Do you profess to be an expert in the
12  design of streets or roadways?

13   A    No, I don't.

14   Q    Do you profess to be an expert in the
15  design of effective warnings?

16   A    No, I'm not an expert in that, but I've
17  applied, I've applied striping.  I've applied asphalt.
18  I've done the work, hands on.

19   Q    You don't profess to be an expert in human
20  factors?

21   A    No, I'm not a psychologist.

22   Q    Let me refer you now to your expert
23  reports.

24        (THEREUPON, Guarino Deposition Exhibit 3
25        was marked for identification.)

1      Q      Let me show you what's been marked as

2  Guarino Deposition Exhibit 3.  Is that a copy of the

3  expert report that you provided in this lawsuit dated

4  February 12, 2007?

5      A      Yes.

6      Q      Let me show you now what's been marked as

7  Guarino Deposition Exhibit 4.

8              (THEREUPON, Guarino Deposition Exhibit 4

9      was marked for identification.)

10     Q      Is that a copy of what you refer to as an

11  amended report in this lawsuit dated February 23,

12  2007?

13     A      Yes.

14     Q      Mr. Guarino, in accordance with the Federal

15  Rules of Civil Procedure, do the two reports that have

16  been marked as Guarino Deposition Exhibits 3 and 4 set

17  forth a complete statement of all of your opinions

18  regarding the costs to install striping, warning signs

19  and rumble strips on West 19th Street in Erie,

20  Pennsylvania, approximately 1.2 miles on West 19th

21  Street from Peach Street to Raspberry Street, the

22  purpose would be to prevent and/or discourage children

23  from riding along trains and gabbing onto the train in

24  order to be pulled along the roadway?

25     A      Yes.

1      Q      And do those reports set forth and identify

2   all of the data or other information that you

3   considered in forming your opinions?

4      A      Yes.

5      Q      And do those reports also contain all

6   exhibits that would be used to support or summarize

7   your opinions in this case?

8      A      Yeah, they are in here.

9      Q      When were you first contacted to serve as

10  an expert witness on behalf of Robin Nixon?

11     A      That was back in February.

12     Q      Of what year?

13     A      2007.

14     Q      Do you have any records of that initial

15  contact?

16     A      No, other than the first visit, that's all.

17     Q      When you say the first visit, what do you

18  mean?

19     A      He wanted me to come up with a deterrent.

20     Q      When you say he, who contacted you in

21  February of 2007?

22     A      Mr. Solymosi.

23     Q      And what did he tell you when he first

24  contacted you?

25     A      He just wanted to have a way to deter the

1   kids from riding bicycles and grabbing onto the

2   trains.

3        Q      Did he suggest to you during that initial

4   call a possible way to deter --

5        A      No.

6        Q      What else did he tell you?

7        A      He just told me to compile a deterrent and

8   to come up with some figures as far as cost and how,

9   you know, how much it would cost and how it would come

10  about.

11       Q      So there was no discussion at all during

12  that call regarding rumble strips?

13       A      There was a discussion about reflectors.

14  There is an embossed reflector that they put on the

15  highways.  He had said something about a stick on,

16  stick on reflectors for these tar and chip roads.  And

17  then they make an above ground rumble strip on the

18  state highways.  And I had suggested to him that cost

19  effective wise, the milled ones would probably be more

20  cost effective to put in and would be a deterrent

21  because of the, you know, the shock factor.

22       Q      So during this initial call, Mr. Solymosi

23  was the one that had suggested above ground rumble

24  strips, and you suggested that if you milled them,

25  that might be more cost effective?

1       A       More cost effective and it would probably

2  do a better job.  But there was a lot of, those items,

3  we had discussed all of them.  But I felt that, and we

4  had talked together that the rumble strips and milled

5  in would probably be the best form to deter that.

6       Q       When you were referring to milled rumble

7  strips, were you referring to the type of rumble

8  strips that appear on interstate highways --

9       A       Yes.

10      Q       -- such as the Pennsylvania Turnpike?

11      A       Yes, Turnpike, I-90.

12      Q       And do you know if those rumble strips are

13  installed pursuant to PennDOT specifications?

14      A       Yeah, I think Donegal, you had the estimate

15  there from Donegal Corporation.  Because I couldn't do

16  them.  I would sub to them.  And they gave a drawing

17  of how they were, the depth and the distance that they

18  were spaced.

19      Q       Is it your understanding that these rumble

20  strips, these milled rumble strips that appear on

21  interstate highways or the Pennsylvania Turnpike, are

22  installed along the berm of the highway for the

23  purpose of waking up, so to speak, a drowsy driver --

24      A       Right.

25      Q       -- who may be headed onto the berm?

1    A    Yes.

2    Q    That's the purpose of those rumble strips?

3    A    Yes.

4    Q    And in your expert report you recommended

5  that the same type of rumble strips that you would see

6  along the shoulders of the interstate highways be

7  installed on West 19th Street?

8    A    Sure, it would wake a kid up from riding

9  along the side of a train trying to grab onto it.

10  Plus it would be, like I said, a deterrent.

11    Q    Because of what you refer to as the shock

12  value?

13    A    Oh, yes.

14    Q    Would you agree with me that that shock

15  value could include causing a bicyclist to lose

16  control of a bicycle?

17    A    I would say that if they had rode on them,

18  if they rode on them initially, which they would

19  probably, they probably wouldn't go near it.

20    Q    They wouldn't go back?

21    A    They wouldn't go back.

22    Q    But maybe the first time they went on them,

23  the shock value --

24    A    Probably without the train.  But I mean, if

25  they knew it was bad prior to that, they probably

1  wouldn't go and ride them and try to grab the train,

2  because it would be even worse.  I think it's ideal

3  deterrent.  That's why I recommended it.

4      Q      In making that recommendation, did you

5  research or look for any type of published studies

6  that showed you that installation of rumble strips of

7  the type used on interstate highways that you are

8  recommending were an effective deterrent to a

9  bicyclist who might grab onto moving trains?  Did you

10  see anything in any publication that supported that

11  proposal?

12      A      I've seen in Pavement Magazine, you know,

13  different articles.  And I might have had an article

14  that I read, you know.  But to specifically say for,

15  you are asking me to say specifically on something

16  like that, I mean, nobody is going to write a specific

17  report.  But there is deterrents for all kinds of

18  things.

19      Q      Would you agree with me then, I think is

20  what you are telling me, that you don't recall seeing

21  a single article directed to the use of rumble strips

22  to deter bicyclists from grabbing onto moving trains,

23  not a single one?

24      A      No, I can't agree with you, because I don't

25  know.

1    Q    Can you recall seeing a single article in

2  which someone recommended the installation of rumble

3  strips on a public street --

4    A    No, but I was --

5    Q    Let me finish.  For the purpose of

6  deterring a bicyclist to grab onto a moving train?

7  Just answer my question first.

8    A    No.

9    Q    Did you review any documents in order to

10  come up with the conclusion that these rumble strips

11  of the type that you see on shoulders on interstate

12  highways should be installed on 19th Street?

13    A    No, I did, I did my own deterrent.  He

14  wanted an estimate.  I gave him an estimate of the

15  deterrent.  That's what I put together.

16    Q    Okay.  In other words, and correct me if

17  I'm wrong, after your discussion with Mr. Solymosi

18  where he raised the idea of rumble strips and you said

19  well, if you mill them, they would be more cost

20  effective, he then said well, go ahead and prepare an

21  estimate of the cost of installing milled rumble

22  strips along West 19th Street?

23    A    Yeah, put something together that you would

24  put together to deter a person from riding a bicycle

25  along the side of a train.  And that's what I did.

1    Q    And that was the first time you have ever

2    done that?

3    A    Yes.

4    Q    The second part of your expert opinion has

5    to do with the cost of installing yellow stripes and

6    signs between the rails that would state "DANGER-NO

7    BIKES"?

8    A    Yes.

9    Q    How did you come up with the idea of

10    installing the yellow stripes and painting "DANGER-NO

11    BIKES" between the rails?

12    A    Well, I figure within the parameters of the

13    rumble strips, you mark it on the outside and then

14    have the stenciling on the inside, that would be a

15    danger area.  So it would give them the parameters

16    within that area.  And where the lines are placed on

17    the outside, you could see them so it would be highly

18    visible.

19    Q    Would any of these signs, "DANGER-NO

20    BIKES," be outside the rails and within the rumble

21    strip area or would all these signs be inside the

22    rails?

23    A    Inside the rails.

24    Q    You state in your expert report that, and

25    I'm referring to page 1, item 1, "The rumble strip

1    would have been placed parallel to the railroad tracks

2    and approximately 72 and one-half inches from the

3    center of the track to the center of the rumble

4    strip," right?

5         A    Yes.

6         Q    And then you go on to say below that,

7    "Based upon my measurements of a number of rail cars,

8    an average width of rail cars is approximately 128 and

9    a half inches.  A bicycle is approximately 30 inches

10   in width and assuming that a child would be reaching

11   out pretty much straight forward, the centerline of

12   the rumble strip should be approximately 72 and a half

13   inches off the centerline of the track."  Is that how

14   you determined --

15        A    The placement.

16        Q    -- the placement of the rumble strips?

17        A    Uh-huh.

18             (THEREUPON, Guarino Deposition Exhibit 5

19        was marked for identification.)

20        Q    Show you, Mr. Guarino, what has been marked

21   as Guarino Deposition Exhibit 5.  Is that a copy of a

22   diagram that you prepared which is also part of your

23   expert report marked as Guarino Deposition Exhibit 3

24   that provides information regarding rail car

25   measurements and other measurements from the

1  centerline of the tracks to come up with this 27 and a

2  half inch --

3      A    Yes.

4      Q    -- figure?  Just want to ask you a little

5  bit more about how you came up with that number.  You

6  state in your report that you measured a number of

7  rail cars and found that an average width of a rail

8  car is approximately 128 and a half inches; correct?

9      A    Yes.

10     Q    How many rail cars did you measure?

11     A    There was like a tanker, cargo car.  I

12  think there was two of them that I measured, tanker,

13  cargo or a flat bed.

14     Q    You measured a tanker and a cargo car?

15     A    Yes.

16     Q    Where did you measure them?

17     A    Directly behind Dana Corporation.

18     Q    Whose cars were they, do you know?

19     A    God, I don't know.

20     Q    Where is Dana Corporation located?

21     A    Right off of, what is it, East 12th Street.

22     Q    When did you do these measurements?

23     A    Prior to compiling my report.  It was

24  during the winter months.  I went out and I actually

25  measured them.

1      Q    Do you have a record of the measurement of

2   the tanker?

3      A    No, I just put it on my scratch pad and

4   then I converted it onto the drawing I had.

5      Q    The scratch pad you threw away?

6      A    Yeah.

7      Q    Do you have a record of the measurement of

8   the cargo car?

9      A    It all was on there.  They were all

10  standard width on there.

11     Q    When you say on there, you mean on the

12  scratch pad you threw away?

13     A    Yes.

14     Q    Well, in your report you say an average

15  width of a rail car is approximately 128 and a half

16  inches.

17     A    It could vary.

18     Q    If that's --

19     A    It could vary.

20     Q    If that's the average, what was the largest

21  of those two cars?

22     A    I think they varied maybe three inches at

23  best.

24     Q    You think the largest car, the tanker or

25  the cargo car, was 131 and a half inches?

```
 1      A      At best.

 2      Q      But you don't have your notes to verify

 3 that?

 4      A      No.

 5      Q      Did you make any determination by research

 6 or otherwise whether there were any other types of

 7 rail cars that utilized the 19th Street tracks that

 8 were wider than 131 and a half inches?

 9      A      No, I didn't.

10      Q      So your conclusion was based on looking at

11 only two cars, a tanker and a cargo car, and then

12 taking an average, even though one of the two of them

13 may have been three inches larger; is that correct?

14      A      That's why I said an average.

15      Q      The answer is yes to my question?

16      A      Yes.

17      Q      So you don't have knowledge then as to the

18 widest type of rail car that would be traveling, would

19 have been traveling along West 19th Street when those

20 tracks were in place?

21      A      No, but I wouldn't think that the railroad

22 would let them be any wider than that, because it's a

23 standard width.

24      Q      Well, how do you know?

25      A      For some of the areas that they go through.
```

1    Q    How do you know what a standard width of a

2    rail car is?  Have you ever worked on the railroad?

3    A    No.

4    Q    Have you ever measured rail cars before?

5    A    No.

6    Q    Have you ever looked at any federal or

7    other regulations that establish a standard width of a

8    rail car?

9    A    No.

10    Q    So you really don't have a basis to assume

11    that they must have been standard, do you?

12    A    No.

13    Q    Now, in your report you also say a bicycle

14    is approximately 30 inches in width.  What did you do

15    to make that determination?

16    A    I just measured a couple bicycles to get a

17    standard width.

18    Q    How many bicycles did you measure?

19    A    Three.

20    Q    Where did you measure them?

21    A    I measured the handle bars, that's what I

22    mean.

23    Q    Whose bikes were they?

24    A    Well, one was mine and then there was my

25    brother's and then there was one of the guys that

1   works for me.

2        Q       What type of bike is your's?

3        A       Mine is a mountain bike.

4        Q       What type of bike is your brother's?

5        A       I think Greg's is a mountain bike, too.

6        Q       And what type of bike is the bike of the

7   other guy at work?

8        A       Just a regular, what do you call it, a

9   sprint bike or a road bike.

10       Q       What were the measurements of your mountain

11  bike, end of handle bar to end of handle bar?

12       A       30 inches.

13       Q       Do you have a record of that?

14       A       Other than just measuring it myself.

15       Q       I know, but do you have a written record of

16  that measurement?

17       A       No.

18       Q       Was that on a scratch paper that you threw

19  away?

20       A       Yeah, yeah.

21       Q       What was the width, and I guess you are

22  measuring handle bars on your brother's mountain bike?

23       A       His were the same, because it was basically

24  on the same designs.

25       Q       Who manufactured your mountain bike?

1     A     God, I don't know.  Might have been a Huff,

2   I don't know for sure.

3     Q     How about your brother, who made his

4   mountain bike?

5     A     I didn't --

6     Q     What was the measurement of the regular

7   road bike, the other guy at work?

8     A     28 inches.

9     Q     Did you go to any bike stores to determine

10  whether any bicycles had any handle bar widths larger

11  than 30 inches?

12    A     No, I didn't.

13    Q     Did you review any magazines or other

14  literature to indicate whether bicycles had handle bar

15  widths greater than 30 inches?

16    A     No, I didn't.

17    Q     You go on to say that also "a child would

18  be reaching out pretty much straight forward."  Would

19  you tell me what you mean by that statement?

20    A     Well, the way I was figuring, you have your

21  hands on the actual bike itself, you know, on the

22  handle bars, and would reach out.  You know, there is

23  grab rails on them, you would reach out for the grab

24  rail.

25    Q     Let's take a look at Guarino Deposition

1    Exhibit 5, at least the top part of that exhibit

2    appears to be a rail car diagram you put there?

3         A    Yes.

4         Q    If I read your writing, you have got grab

5    bars with an arrow toward a grab bar on the side of

6    that car?

7         A    Yes.

8         Q    So you are saying that for purposes of

9    forming your opinion you assumed that a minor riding a

10   bicycle with a 30 inch handle bar would be reaching

11   straight forward above the handle bar to grab onto the

12   grab bar?

13        A    By grabbing up.

14        Q    Did you perform any tests to determine

15   whether that assumption on your part was accurate, and

16   I'm talking about whether someone who would be

17   grabbing onto a moving train would be grabbing

18   directly above a handle bar as opposed to let's say to

19   the outside of a handle bar, to be towed along the

20   train?

21        A    No.

22        Q    Did you observe anyone on a bicycle

23   grabbing onto a moving train to determine whether your

24   conclusion that they grab on straight above the handle

25   bar was correct?

1      A      No.

2      Q      So you just made that assumption?

3      A      Well, I would think that once you grabbed

4    on, the grab bar would be straight ahead of you.

5      Q      That's just what you think --

6      A      Yes.

7      Q      -- without any research or --

8      A      No.

9      Q      -- without any observation; correct?

10     A      Yes.

11     Q      And getting back to Guarino Deposition

12   Exhibit 5, it was those assumptions that you made and

13   those conclusions you drew that resulted in your

14   opinion that the rumble strips, the centerline of the

15   rumble strips should be 72 and a half inches from the

16   centerline of the track; correct?

17     A      Yes.

18     Q      Now, let's just take a look at the diagram

19   and see if I understand how you got to that point.

20            You measured the average rail car as you

21   called it, 128 and a half inches from outside of grab

22   bar to outside of grab bar; correct?

23     A      Uh-huh.

24     Q      Which would make the -- well, would make

25   the centerline of the rail car 64 and a quarter inches

1    to the outside of the grab bar; is that right?

2        A      Yeah.

3        Q      Then how did you come up with your

4    conclusion that the centerline of the rumble strip

5    should be 72 and a quarter inches?

6        A      I figured the center of the rumble strip.

7        Q      That's what I'm saying.  But how did you

8    determine, you can explain it from the diagram here,

9    how you came up with the number 72 and a half inches?

10       A      Well, if you look at the actual width of

11   the rumble strip, I tried to figure, place them in the

12   middle so that they would, you know, be a deterrent, a

13   good deterrent.

14       Q      Well, the rumble strip, as I understand it,

15   is, you said 16 to 17 inches long; right?

16       A      In width, yes.

17       Q      And so half of that rumble strip in width

18   would be let's say 8 and a half inches, correct, if it

19   was a 17 inch rumble strip?

20       A      Yes.

21       Q      Then how did you determine that the

22   centerline of the rumble strip should be 72 and a half

23   inches from the centerline of the tracks?

24       A      That's where I placed it.

25       Q      Why did you place it at that location?

1      A      Tried to be more centered that way.

2      Q      I don't understand what you mean by more

3   centered.

4      A      Well, with the dimension of the rumble

5   strip and trying to figure the width of the grab bar

6   and that, that's how I came up with that.

7      Q      Is it fair to say just by the addition,

8   that if from centerline of track, which is centerline

9   of rail car, to end of grab bar was 64 and a quarter

10   inches -- you agree with me on that?

11      A      Yeah.

12      Q      And if centerline of rumble strip to end of

13   rumble strip was 8 and a half inches, is that right?

14      A      Yeah, 72 and three-quarters.

15      Q      That would be 72 and three-quarter inches,

16   and you had suggested 72 and a half, that's how you

17   came up with it; right?

18      A      Well, I added wrong.

19      Q      No, I'm just trying to determine, which is

20   very close, it's off by a quarter inch, but that's how

21   you got that number?

22      A      That's how I got that number, yeah.  I

23   tried to place the bike in the middle of the rumble

24   strip.

25      Q      Okay.  That's what I get.  But if, for

1    instance, rail cars traveling on 19th Street were

2    wider than 128 and a half inches, if some of them

3    were, and you used the same analysis, you would have

4    to put your rumble strip farther out than 27 and a

5    half inches; correct, to have the bike in the middle

6    of the rumble strip?

7         A      Yeah, but actually the rumble strip -- I

8    put the rumble strip for the center of the bike to

9    travel in the center, but it was wide enough on the

10   side to give them a variance one way or the other.

11   That's why I did it that way.

12        Q      Yeah, but assume for a minute here if your

13   goal was to put the bicycle wheel in the middle of the

14   rumble strip, if the rail car that you measured at 128

15   and a half inches, if another rail car was wider than

16   that that you didn't measure, you would have to have

17   your rumble strip out farther based on that

18   measurement, would you agree with me?

19              MR. SOLYMOSI:  In order to do what?

20        Q      To have the bicycle wheel in the middle of

21   the rumble strip.

22        A      Well, I was just coming up with a deterrent

23   when I did the deterrent.  That's what was my opinion

24   on that.

25        Q      I know, but I'm asking you, because you

 1    told me you tried to locate the rumble strip so the

 2    center of the rumble strip was where the bicycle wheel

 3    would be, if the rail car measurement turned out to be

 4    wider because there are rail cars that you didn't

 5    measure that are wider than 128 and a half inches with

 6    grab bars, if you are going to have the bicycle wheel

 7    in the middle of the rumble strip, you would have to

 8    move the rumble strip farther out from the rail,

 9    correct?

10        A    If you placed it, yeah.

11        Q    Okay.

12             MR. SOLYMOSI:  In order to have it dead

13        center, Roger?  I object to the form of the

14        question.

15             MR. TAFT:  No, the witness is answering the

16        question.  And I told him if he doesn't

17        understand it, I'll be happy to repeat it.

18        A    Well, what it was is it was a deterrent and

19    I was -- when I measured it, I measured it --

20        Q    Based on these numbers that we went over,

21    which I'm now asking about, and I'm just saying that

22    if you are trying to put the bicycle wheel in the

23    middle of the rumble strip, one of your measurements

24    like the width of the rail car is not wide enough,

25    because you didn't measure the widest rail car, then