1    you would have to place the rumble strip farther out

2    than you have it on this diagram and in your report in

3    order to have the bicycle wheel in the middle;

4    correct?

5        A    The whole thing that I did -- yes.

6        Q    Was that a yes.  You can explain your

7    answer.  But was that a yes or a no?

8        A    Well, that's why I measured it like that,

9    to put the bike in the middle of the rumble strip.

10       Q    And if the measurements weren't accurate

11   because a rail car is actually wider than the average

12   rail car you measured, and if you are going to have

13   the bicycle wheel in the middle of a rumble strip when

14   the rail car is wider, doesn't that mean that the

15   rumble strip should be placed farther out from the

16   rail?

17       A    Well --

18       Q    Yes or no.

19            MR. SOLYMOSI:  According to who, Roger?

20            MR. TAFT:  According to the witness.

21            MR. SOLYMOSI:  He has already said that he

22       had a variance in there because of the width of

23       the strip.  He has answered that.

24            MR. TAFT:  I'm going to object to you

25       coaching the witness.

1          MR. SOLYMOSI:  I'm not coaching.  I am

2     repeating what he said.

3          MR. TAFT:  No, you are not.

4          MR. SOLYMOSI:  You can read it back.  He

5     stated it's wide enough to give them a variance.

6          MR. TAFT:  Mr. Solymosi, I am deposing your

7     expert witness.  If you got an objection, raise

8     it, but don't make a speaking objection to coach

9     the witness.

10          THE DEPONENT:  He is not coaching me.  When

11     I was asked to do this, I was just asked to give

12     them a deterrent.  If you put these rumble strips

13     this was more or less to construct something that

14     would keep kids from riding on the tracks.  The

15     placement, the placement of these could be wider,

16     could be shorter, could be narrow.  I was giving y

17     my opinion as to the cars that I measured, the

18     width that they were, and if this deterrent was

19     imposed or in place you could turn around and say

20     the average car is 131 and to get this document,

21     to get this bike in the middle of this, you would

22     have to place it at this.

23     Q     That's what I'm --

24     A     But this was a deterrent.  This was an

25     estimate.  This wasn't written in stone, but this was

1    a deterrent and I put it together that way in an

2    honest, honest opinion, I put this together honestly.

3        Q      I know.

4        A      And I measured and I put it together.

5        Q      I know that.

6        A      And that's why it came out that way.  If it

7    varied a couple inches one way or another, if they did

8    impose this, it would be a deterrent.  I would think

9    it would be a good deterrent.

10       Q      Okay.  That's not my question.

11       A      That's my expert opinion on that.

12       Q      I know that.  I know that.  But I'm not

13   asking that question.  I'm challenging your

14   measurements and your conclusion on the placement,

15   which is in your report.

16              So what I'm saying, Mr. Guarino, and it's a

17   pretty straight forward thing, if your measurements

18   and conclusions that provide the basis for your

19   placement of the rumble strips, 72 and a half inches

20   from centerline to centerline of rumble strip, if

21   those measurements change and if your goal was to put

22   the bicycle wheel in the middle of the rumble strip,

23   the placement of the rumble strip would have to

24   change; correct?

25       A      If you impose these, when you put them in.

```
 1      Q      Yeah.

 2      A      If you put them in -- this was an estimate.

 3      Q      I know that.

 4      A      This was to give a deterrent.

 5      Q      My --

 6      A      This could have varied.  You could have put

 7  these rumble strips further.

 8      Q      I know that.

 9      A      I gave you my drawing as to where this

10  would line up.

11      Q      I know, I'm just asking you questions as

12  to --

13      A      I'm telling you.

14      Q      I'm asking you questions as to how

15  different measurements would have affected the

16  placement --

17             MR. SOLYMOSI:  I think he has acknowledged

18         your points.

19      A      I'm not trying, what I'm trying to say

20  is --

21      Q      Okay.

22      A      -- these aren't written in stone.  I wasn't

23  asked to write this in stone.

24      Q      No.

25      A      I was asked to give a deterrent, an expert.
```

1    Q    Well --

2    A    And I said this would be a great deterrent.

3    Q    Yeah, and in your report you told us

4    exactly where to place them, at 72 and a half inches

5    from center of track and that's just what I was asking

6    you.  Maybe that placement needs to change based on

7    other measurements, that's all.

8    A    Well, yeah, but --

9    Q    That's all.

10    A    We are not even talking about that, we are

11    actually talking about what this was all put together

12    for, as a deterrent, aren't we?

13    Q    No, we are not.  We are talking about your

14    placement, which is what I've been asking you.  Now,

15    let me ask you question.

16        Would you agree with me that if bicycles

17    had handle bars that were wider than 30 inches under

18    your assumptions here, that would also cause an

19    adjustment of the placement of the rumble strip

20    farther out from the 72 and a half inches that you put

21    it?

22    A    I don't think it would really, because --

23    Q    Well, let me give you an assumption --

24        MR. SOLYMOSI:  Are you going to let him

25    answer the question?  You are interrupting him

1          now when he is trying to answer the question.

2          Q       Go ahead.

3          A       What child would actually ride one hand

4    trying to go over a rumble strip?   I rode my bike and

5    I tried to put myself in that position and it's

6    very -- I didn't actually ride a rumble strip, but I

7    mean if you don't have both hands on the wheel.

8          Q       You could fall down?

9          A       Yes, definitely.

10          Q       Would you agree with me that for purposes

11    of how you calculated the measurements, that if the

12    handle bars of a bike were wider than 30 inches, that

13    also would affect the placement of the rumble strip,

14    make it something different than 72 and a half inches?

15          A       Yeah, mine are like maybe, the difference I

16    had in that was two inches.

17          Q       Would you agree with me, also, that if

18    someone grabbing onto a moving train was doing so so

19    that his hand was not directly above the handle bar,

20    but was off at an angle toward the grab iron instead

21    of directly above the handle bar, that also could

22    affect your measurements and the placement of your

23    rumble strip?

24          A       Yeah, I guess it could.

25          Q       In calculating your placement of the rumble

1    strip, did you take into account the fact that rail

2    cars rock as they move along the track?

3        A        They bounce, they have a tendency to

4    bounce.

5        Q        Well, bouncing to me is kind of a forward

6    back.   I was saying rocking, side to side?

7        A        They go side to say yes.

8        Q        So you are aware of that?

9        A        Yes.

10       Q        Did you take the fact that rail cars rock

11   from side to side as they move into your calculations

12   as to the placement of the rumble strips?

13       A        Yeah, but they are not going to sway that

14   much.   The grab bars are still going to be in place.

15   You know, I went down and watched a couple of them,

16   the grab bars are still there, they are not going to

17   vary that much.

18       Q        Well, when you say you watched a couple of

19   them, what did you watch?

20       A        I actually watched them on the tracks.   I

21   went on 19th Street tracks.

22       Q        A moving train?

23       A        Yes.

24       Q        And you are saying you paid particular

25   attention to the grab irons to see if they moved while

1  the train rocked?

2      A      Yeah, to try to get an idea what it was

3  doing for the grab bar.  I tried to see what it would

4  be like to go and reach up and grab for it.

5      Q      You stood by a moving train and tried to

6  reach a grab bar?

7      A      I stood off to the side and watched.

8      Q      How far were you from the moving train?

9      A      Probably about 10 feet, 12 feet.

10      Q      And you were just kind of watching the grab

11  bar as the train went by to see what it would be like?

12      A      Right.

13      Q      And you saw the rocking action?

14      A      (Witness nodded.)

15      Q      Did you measure how far it rocked?

16      A      No.  How would I do that?

17      Q      Well, I don't know.  Good question.

18              (THEREUPON, Guarino Deposition Exhibit 6

19          was marked for identification.)

20      Q      Let me show you what's been marked as

21  Guarino Deposition Exhibit 6.  This is a diagram typed

22  at the top rumble strip diagram.  It's part of your

23  expert report; correct?

24      A      Yes.

25      Q      Where did you get this diagram?

```
 1        A      From Donegal, sent it to me and faxed it

 2   out to me in his estimate.

 3        Q      When you refer to Donegal; correct?

 4        A      Yes.

 5        Q      Donegal Construction Corporation of

 6   Greensburg, Pennsylvania that provided the quotation

 7   for milling the rumble strips that's part of your

 8   amended expert report dated February 23, 2007?

 9        A      Yes.

10        Q      Guarino Deposition Exhibit 4; right?  You

11   are saying that you obtained this from Donegal?

12        A      Yes.

13        Q      And do you know where Donegal got it?

14        A      Donegal installs these.  I called them to

15   find out if they would install, if they would do a job

16   for installing rumble strips.

17        Q      Okay.  Do you know where Donegal obtained

18   this diagram?

19        A      Well, that's probably a standard diagram

20   that they have for state highway.

21        Q      We really can't make it out and maybe we

22   are speculating a little bit in the lower right-hand

23   corner, but maybe that almost looks like a Keystone,

24   PennDOT or something perhaps.

25               Is it your understanding that this diagram
```

1    shows the type of rumble strips that are installed on

2    the interstate highways that you reference such as the

3    Pennsylvania Turnpike?

4        A      Yes.

5        Q      And Donegal does that type of work on those

6    highways?

7        A      Yes, that's why I called them.

8        Q      And as we indicated earlier, those rumble

9    strips are installed at those locations for the

10   purpose of waking up a drowsy driver before he or she

11   goes off the road?

12       A      Yes.

13       Q      Does this rumble strip diagram provide the

14   basis for your statement that the rumble strips should

15   be approximately 16 inches to 17 inches long, 7 inches

16   wide on one foot centers, approximately half an inch

17   deep?

18       A      That's what the diagram, I went off the

19   diagram.  That's what I base it on.

20       Q      I want to ask you some further questions

21   that have to do with the location of the rumble strips

22   and their dimensions.  If the rumble strips were

23   placed where you state they should be placed,

24   centerline of rumble strip would be 72 and a half

25   inches from centerline of track; correct?

1    A    Yes.

2    Q    And length of rumble strip is 17 inches

3  long?

4    A    Yes.

5    Q    So centerline of rumble strip to end of

6  rumble strip would be 8 and a half inches?

7    A    Yes.

8    Q    So if we were to measure the distance on

9  Guarino Deposition Exhibit 5, your handwritten

10  diagram, from centerline of track to end of rumble

11  strip, we would have 64 inches being 72 and a half

12  inches less the 8 and a half inches of the rumble

13  strip; correct?

14    A    No, I'm actually going, the actual center,

15  you are adding the center of the rumble strip.

16    Q    Well, I'll try to rephrase my question to

17  make sure we got it right.

18          Distance from centerline of track to

19  centerline of rumble strip is 72 and a half; correct?

20    A    Right.

21    Q    Length of rumble strip is 17 inches?

22    A    Right.

23    Q    So --

24    A    Oh, if you minus the half.

25    Q    Minus the -- if you minus the 8 and a half

1  inches --

2      A      Yeah, brings you to the inside of the --

3      Q      That gets you to 64 inches?

4      A      Right.

5      Q      Would you, just so we have these numbers

6  written on here, would you mark in, if it's not in

7  there already, well, I guess it is 16 to 17 inches,

8  but would you mark the distance between the edge of

9  the rumble strip to centerline of track at 64 inches?

10     A      Yeah, you are going to be here

11 (indicating).

12     Q      Okay, I'm looking from edge of rumble strip

13 to centerline of track, I think we agreed that was 64

14 inches, because the 72 and a half less 8 and a half?

15     A      This is 64 and a half here.

16     Q      Draw a line from there to there.

17     A      (Indicating).

18     Q      Yeah.  My calculation was 64 being 72 and a

19 half less 8 and a half, being 64.  Do you agree with

20 me on that?

21     A      Yes.

22     Q      Scratch out that half.

23     A      (Indicating).

24     Q      Now, one other question I'd like to ask

25 you, see if you agree with me on this.

1            I want you to assume a fact that the

2    railroad ties that are under the rail and under the

3    pavement are 8 feet 6 inches in length which works out

4    to be 102 inches.  Would you agree with me that if

5    from end of tie to end of tie is 102 inches, distance

6    from centerline of track to end of tie would be 51

7    inches?

8        A      (Witness nodded.)

9        Q      Do you agree with that?

10       A      Yeah.

11       Q      And would you agree with me then that if

12   the distance from centerline to end of tie was 51

13   inches and the distance from the edge of the rumble

14   strip to centerline is 64, that the rumble strips

15   would be located off to the side and not over the end

16   of ties?

17       A      Yeah, but they don't have to be.

18       Q      No, but just answer my question.

19       A      No, it wouldn't.  But they don't have to

20   be.  Actually what you are doing is you want the

21   distance there for the bike, the bike to be in line

22   for the grab bar.

23       Q      I know that.  I know that.

24       A      Ties have nothing to do with it.

25       Q      But I'm just asking the question based on

```
 1    those measurements if end of rumble strip is 64 inches
 2    and end of tie is 51, the rumble strips are located
 3    farther out into West 19th Street --
 4         A    Sure, but the --
 5         Q    Let me finish.  The rumble strips are
 6    located out into West 19th Street and not over the end
 7    of ties, do you agree with that?
 8         A    Yeah, they don't have to be, though.
 9         Q    Okay.  You understand that West 19th Street
10    is a city street?
11         A    Yes.
12         Q    Owned and maintained by the City of Erie?
13         A    Yes.
14         Q    With respect to the signs that you
15    recommended be placed between the rail, "DANGER-NO
16    BIKES", would you agree with me that if a train was
17    over the tracks, those signs would not be visible to
18    someone on 19th Street?
19         A    You can see them prior to that.  I mean
20    that's why you put signs down.  But the trains are
21    high enough, I took that into consideration you can
22    see under them, too.
23         Q    So you are saying even if a train were
24    operating over the track, you think someone on 19th
25    Street would still be able to see --
```

```
1      A     Yeah, you could..

2      Q     -- the sign?

3      A     Because you are going to have spacing

4   between the cars and the cars are sitting higher where

5   you can see under them.  I took that into

6   consideration when I did that.  But the majority of

7   the time, too, is you want to show that it's a danger

8   zone, with the lines and the stencils.

9      Q     Your expert report contained kind of a

10  combination of a photograph, that's it, and some

11  handwritten, something superimposed, let's put it that

12  way.

13     A     Yes.

14           MR. TAFT:  Can we mark this?

15           MR. SOLYMOSI:  Sure.

16           (THEREUPON, Guarino Deposition Exhibit 7

17      was marked for identification.)

18           MR. SOLYMOSI:  It's the only one we have,

19      but --

20           MR. TAFT:  Mark it in the corner.

21           MR. SOLYMOSI:  That's fine.

22     Q     Mr. Guarino, let me show you what's been

23  marked as Guarino Deposition Exhibit No. 7.  Did you

24  prepare this?

25     A     Yeah.
```

```
 1     Q      Okay.  Where did you go to prepare it?

 2     A      I did it out of my office.

 3     Q      How did you prepare it?

 4     A      I sketched it out.  I drew it out.

 5     Q      Where did you get the photograph?

 6     A      I got it from Mr. Solymosi.  I told him I

 7   needed something -- I wanted to actually try to show

 8   what it would look like as a finished product back

 9   then.

10     Q      What does this photograph purport to show?

11   What are we looking at in the photograph?

12     A      To actually try to implement were I put in

13   my deterrent, you know, the proposal and everything.

14   I wanted to kind of show, see how it would work.

15   This, there is no actual measurements there, I was

16   just trying to show what it would look like.

17     Q      The concept?

18     A      Yes.

19     Q      Let me ask my question again because I was

20   not clear.  I see a sign that says Sassafras Street on

21   the photograph.

22     A      Yes.

23     Q      Forget what you added by way of concept,

24   just go to the basic photograph as it was given to

25   you.
```

1      A      Yes.

2      Q      What does the photograph show us?  What are

3   we looking at, what direction, what location?

4      A      What do you mean?  I don't know what you

5   mean as far as direction.

6      Q      Well, are we facing east or west?

7      A      You are heading east.

8      Q      All right.  Are we on 19th Street?

9      A      Yes.

10      Q      And is the cross street that's marked "One

11   Way" Sassafras Street because that's what the sign

12   says?

13      A      Yes.

14      Q      And you then having gotten a photograph put

15   in your concept which was the "DANGER-NO BIKES" sign

16   between the rails; correct?

17      A      Yes.

18      Q      And the rumble strips milled in off to the

19   side of the rails; correct?

20      A      Yes.

21      Q      And then the yellow line?

22      A      Yes.

23      Q      But I think you told me that none of that

24   was measured out or put into scale?

25      A      No, I just --

```
 1              MR. SOLYMOSI:  With respect to this
 2      exhibit?
 3              MR. TAFT:  Yeah, that's what we are talking
 4      about.
 5      A       I just tried to actually show what this
 6      would look like implemented.
 7      Q       Okay.
 8      A       There was no dimensions or anything on
 9      there.  I took a drawing and I says if you did
10      implement that, this is what it would look like.  You
11      know, to look at it.  And you know, they were spaced
12      and everything properly, it would be a deterrent for
13      somebody that would, you know, a child riding on the
14      rail, you know, or riding on the rumble strips.
15      Q       In preparing this exhibit, this photograph
16      and the concept, you did not do any dimensions to
17      place the rumble strips --
18      A       No --
19      Q       Let me finish.  -- 72 and a half inches
20      centerline to centerline; correct?
21      A       No, but there is no way to actually off a
22      drawing -- you know, can I give you an accurate
23      reading off a drawing?  I was just trying to --
24      Q       Concept?
25      A       Concept, yes.
```

1       Q       And I'm just trying to clarify whether it's

2   just a concept or whether it's actual dimensions and

3   measurements.  So if someone were able, for instance,

4   to do actual measurements, if they were in some way

5   from this drawing, to measure 72 and a half inches

6   from centerline of rail to centerline of rumble strip,

7   those rumble strips may or may not be located where

8   you have placed them?

            A       Right, like we talked, this is a concept.

10      Q       Right.

11      A       It's not an accurate.

12      Q       And the same thing as far as the spacing of

13  the rumble strips?

14      A       Yeah, you can see.  I'm not an artist, but

15  I was just trying, like you say, give you a concept.

16  If they would take this and impose it, it would look,

17  that would be like supposedly a finished product with

18  the accurate dimensions.

19      Q       Right.

20      A       That's what I was trying to come up with.

21      Q       Okay, good.  But if you were going to

22  actually show it as you proposed it, you would have to

23  place all the rumble strips by measurement --

24      A       Yeah, but this was just an actual estimate

25  to do this.

1      Q      I understand.

2      A      And this here was an actual to show what it

3   would look like.

4      Q      Yeah, a concept?

5      A      A concept.

6      Q      As opposed to specific measurements?

7      A      Right, if they would implement it, then you

8   could put it into a drawing with dimensions.  But

9   that's just a concept.  I tried to -- I asked him for

10   that because I says why can't we show this on the

11   actual street the way it was back then?  The street

12   today itself is in excellent shape.  So is that,

13   that's in decent shape right there (indicating).

14          MR. TAFT:  Let's take a short break.  I may

15       be finished.

16          (Break taken.)

17          MR. TAFT:  Mr. Guarino, I have no further

18       questions.

19          MR. SOLYMOSI:  Okay.  Just a couple.

20                    EXAMINATION

21   BY MR. SOLYMOSI:

22      Q      During your testimony when Mr. Taft was

23   asking you questions, Jim, you said that you didn't

24   put striping on public roads other than the Asbury

25   one.  Did you put striping in private roadways?

1    A    Yes.

2    Q    Could you tell us what kind of experience

3  you have in doing that?

4    A    Well, I do parking lots.  I do

5  subdivisions.  I do apartments.  I do a lot of private

6  work, too.  I do layouts for people.  I do deterrents

7  for people, you know, they will ask me to put, you

8  know, lines in.  They did ask me to, one in

9  particular, St. Bonafice they had an erosion problem,

10  I built like a swale.  I put in speed bumps for

11  Blessed Sacrament.  I mill and prep those.

12            I number, I do flow lanes where I build my

13  own lanes and I do hatched areas.  I completely did

14  Mercyhurst College.  I designed that, no print.

15  That's all done by me.  I do all that.

16            The asphalt I went to seminars and did

17  things.  So I've done that kind of work, a lot of it.

18  28 years of it.

19    Q    Mr. Taft asked you if you ever read

20  anything, you know, about, that spoke specifically

21  with regard to the idea that, you know, is there

22  anything you read that spoke directly to bikes and

23  bicyclists engaging in the kind of activity that we

24  are trying to prevent here, and you said no, that you

25  hadn't.

1          Do you recall ever reading anything that

2    talked about rumble strips being used as a barrier

3    between vehicular traffic and bicycles?

4          A    Oh, yeah.  I read in Pavement Magazine and

5    there was an article, too, that was published, too.  I

6    read Pavement Magazine every week or every month I get

7    it from them and I read different articles about

8    asphalt flow, everything.  Plus I've been to a couple

9    seminars through Pavement Expo.  And I went through

10   Seal Master.

11         Q    And you were talking about how you came up

12   with the dimensions and the centerlines and stuff, and

13   you had answered that you thought that the strips were

14   wide enough to gave a variance, you know, with respect

15   to when we are talking about centering the bike onto

16   the strip.  Could you explain that a little further

17   what you meant by variance?

18         A    Well, I tried to put it in the center,

19   figuring a person grabbing up, you know, to grab a

20   rail car, I tried to put those in a general area where

21   the, you know, a bike would hit it 8 inches this way

22   or 8 inches that way, irregardless.  It would be more

23   to the outside, but there is 8 inches there that they

24   could play with.  If a kid pulled it in tighter, they

25   would be 8 inches to the inside.  So you had 16 inches

1    either way depending on how they pulled, the width of

2    the handle bars.  I tried to, you know, give a

3    variance and that gave me 17 inches to work with

4    there, so.  That's why I did it that way.

5              MR. SOLYMOSI:  That's all that I have.

6                        EXAMINATION

7    BY MR. TAFT:

8        Q    Mr. Guarino, you did not identify any of

9    these articles that you have some recollection of

10   reading in highway magazine in your expert report;

11   correct?

12       A    No, but I have read numerous.

13       Q    You have copies of any of those?

14       A    I probably would have to go through and dig

15   them out, but yeah.

16       Q    Did you rely upon those articles?

17       A    Yeah, I was trying to get a general idea of

18   what I could do to design this and see how it would

19   come out.

20       Q    Is there some reason if you relied upon

21   those articles that you didn't mention that in your

22   expert report?

23       A    This is the first time I ever did this, and

24   I --

25       Q    How many articles did you rely upon?

1      A      I think there is one in particular that I

2   read.

3      Q      Do you recall the name?

4      A      No, I just --

5      Q      Do you recall when it was published?

6      A      No, I probably could go through and see if

7   I could find it.

8      Q      Well, if you have that article, would you

9   please provide it?

10     A      Yes.

11     Q      Provide it to Mr. Solymosi?

12     A      I will.

13     Q      Because it was my understanding that you

14  had identified everything in your report on which you

15  relied?

16     A      I told you this is the first time I done

17  this.

18     Q      I know that, but that's why I asked you the

19  question earlier if there was something else.

20     A      I was just basing it on, you know, the

21  knowledge I've had 28 years doing this stuff.

22            MR. TAFT:  I have nothing further.

23            MR. SOLYMOSI:  We would to read.

24            MR. TAFT:  Exhibit 7 will not be attached.

25     It will be in the possession of Mr. Solymosi.

1           (THEREUPON, at 11:30 o'clock a.m., the

2      deposition was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        SIGNATURE PAGE

 2

 3

 4        _____
              JAMES A. GUARINO
 5

 6        Subscribed and sworn to before me this

 7

 8
     _____ of _____, 2007.
 9

10

11

12

13        _____
              Notary Public
14

15                        - - -

16

17

18

19
     dle
20

21

22

23

24

25
```

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2   COMMONWEALTH OF PENNSYLVANIA, )
                                   )  SS:
 3   COUNTY OF ALLEGHENY:          )

 4        I, Deborah L. Endler, do hereby certify that
     before me, a Notary Public in and for the Commonwealth
 5   aforesaid, personally appeared JAMES A. GUARINO, who
     then was by me first duly cautioned and sworn to
 6   testify the truth, the whole truth, and nothing but
     the truth in the taking of his oral deposition in the
 7   cause aforesaid; that the testimony then given by him
     as above set forth was by me reduced to stenotypy in
 8   the presence of said witness, and afterwards
     transcribed by means of computer-aided transcription.
 9
          I do further certify that this deposition was
10   taken at the time and place in the foregoing caption
     specified, and was completed without adjournment.
11
          I do further certify that I am not a relative,
12   counsel or attorney of either party, or otherwise
     interested in the event of this action.
13
          IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this  30th  day of
15   _____May_____, 2007.

16

17

18   _____
     Deborah L. Endler, Notary Public
19   In and for the Commonwealth of Pennsylvania
     My commission expires November 2, 2008
20
                         - - -
21

22

23

24

25
```

1                          EXHIBIT INDEX

2

   GUARINO EXHIBITS                                    MARKED
3
   1      Notice of Deposition                          12
4
   2      Resume                                        12
5
   3      2/12/07 Guarino Expert Report                 24
6
   4      2/23/07 Guarino Expert Report                 25
7
   5      Diagram                                       33
8
   6      Rumble strip diagram                          53
9
   7      Large photograph drawing (retained by         60
10            Attorney Solymosi)

11                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C-E-R-T-I-F-I-C-A-T-E

2         I, Deborah L. Endler, a notary public in and
for the Commonwealth of Pennsylvania, do hereby
3    certify that the parties did not waive the signing of
the deposition of James Guarino, and that on
4    May 30, 2007, I submitted the transcript to the
witness for examination by him, by mailing the
5    original signature page and a copy of the deposition
to his attorney, Tibor Solymosi, Esquire, requesting
6    the witness read his copy of the deposition and return
the executed original signature page to me.  A copy of
7    the May 30, 2007 letter is attached to this
certificate.

8
         As of the date set forth below, the original
9    signature page has not been signed and returned to me
and the witness has not given me any reason for his
10   refusal to sign the deposition.

11        Accordingly, pursuant to the Pennsylvania
Rules of Civil Procedure, I have signed the within
12   signature page in the original copy of the deposition
in lieu of the witness doing so.

13
         IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of the office at Pittsburgh,
Pennsylvania on this _1st_ day of _August_,
15   2007.

16   _____
     Deborah L. Endler, Notary Public
17   In and for the Commonwealth of Pennsylvania
     My commission Expires November 2, 2008

18

19

20

21

22

23

24

25

**Tab B**
**Guarino Deposition Ex. 1 - Notice of**
**Deposition (J. Guarino)**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBIN NIXON,                              )
      Plaintiff                   )
                                  )
        v.                    )     CIVIL ACTION NO. 05-101 ERIE
                                  )
NORFOLK SOUTHERN CORPORATION )
and NORFOLK SOUTHERN RAILWAY  )
COMPANY, INC.,                            )
      Defendants                  )

## **NOTICE OF DEPOSITION (J. GUARINO)**


TO:    Tibor R. Solymosi, Esq.
       Segel & Solymosi
       818 State Street
       Erie, PA 16501
       Attorney for Plaintiff Robin Nixon


PLEASE TAKE NOTICE that the deposition upon oral examination of James A. Guarino, Guarino Enterprises, 10859 Hill Road, Wattsburg, Pennsylvania 16442, one of the expert witnesses disclosed by plaintiff Robin Nixon, will be taken by stenographic means, pursuant to Rule 30 of the Federal Rules of Civil Procedure, on Friday, May 18, 2007, commencing at 9:30 a.m., at the Offices of MacDonald, Illig, Jones & Britton LLP, 100 State Street, Suite 700, Erie, Pennsylvania 16507, before Morse, Gantverg & Hodge, Inc., Court Reporters, or some other person duly authorized to administer the oath.



The deponent, James A. Guarino, is directed to bring the following documents and things to his deposition:

(1)   the most current Curriculum Vitae for James A. Guarino;

(2)   Mr. Guarino's complete expert witness file with respect to the April 27, 1997 accident including, but not limited to, Mr. Guarino's expert reports dated February 12, 2007 and February 23, 2007, and all drafts thereof, and any and all documents and things upon which Mr. Guarino relied in arriving at his opinions and/or in preparing his expert reports;

(3)   any and all documents and things upon which Mr. Guarino relied in arriving at his opinions and/or in preparing his expert reports, if not contained in his expert witness file; and

(4)   records of all billings and payments with respect to Mr. Guarino's expert witness services including all time records for such services.

Respectfully submitted,

Roger H. Taft
PA 19983/NY 2876456
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7603
(814) 454-4647 (facsimile)
rtaft@mijb.com

Attorneys for Defendants
    Norfolk Southern Corporation and Norfolk
    Southern Railway Company, Inc.

Dated:   April 10, 2007
cc: Morse, Gantverg & Hodge, Inc., Court Reporters

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Notice of Deposition (J. Guarino) was served upon the following attorney of record for plaintiff Robin Nixon, via First-Class United States Mail addressed as follows, this 10th day of April, 2007:

Tibor R. Solymosi, Esq.
Segel & Solymosi
818 State Street
Erie, PA 16501

_____
Roger H. Taft, Esq.

**Tab C**
**Guarino Deposition Ex. 2 - J. Guarino**
**Resume**

**RESUME**

## Education

Technical Memorial High School – graduate 1967
Gannon College – 1 year (1976-1977)

## Specialized Training

~~28 years experience – asphalt repair, milling, sealcoating,~~
striping and power sweeping

## Employment

General Electric welder – 15 years (1971-1986)
Guarino Enterprises – 28 years (1979 to present)

## Seminars

Numerous seminars through Sealmaster (asphalt sealing,
striping, crack filling and repair

## Guarino Enterprises

James A. Guarino
10859 Hill Road
Wattsburg, PA 16442
Phone (814) 825-3570
Fax (814) 825-9934



PENGAD 800-631-6989

Guarino
DEPOSITION
EXHIBIT
2
5-18-07

**Tab D**
**Guarino Deposition Ex. 3 - J. Guarino**
**Expert Report (2/12/07)**



GUARINO
ENTERPRISES

10350 Hill Road
Wattsburg, PA 16442
(814) 825-8670

February 12, 2007

Tibor R. Solymosi, Esquire
Segel & Solymosi
818 State Street
Erie, Pennsylvania 16501



Guarino
DEPOSITION
EXHIBIT
3

RE:    Nixon v. Norfolk Southern Corp., et al.
       Estimate for Striping/Rumble Strips – West 19th Street

Dear Mr. Solymosi:

You have asked me to provide you with an estimate for the costs of installing striping, warning signs and rumble strips on West 19th Street in Erie, Pennsylvania. The work would cover approximately 1.2 miles on West 19th Street from Peach Street to Raspberry Street. The purpose would be to prevent and/or discourage children from riding along the trains and grabbing onto the train in order to be pulled along the roadway.

I have compiled an estimate for the following work which includes all labor, materials and equipment:

1.    Install approximately 2.4 miles of rumble strips approximately 16" to 17" long X 7" wide on 1' centers approximately .5 inches deep, the same type that you would see along shoulders on interstate highways. This would include supplying water to the rumble strip mill machine and sweeping up the milled spoils off the pavement behind the rumble strip machine. The rumble strip would have been placed parallel to the railroad tracks and approximately 72 ½ inches from the center of the track to the center of the rumble strip. Based upon my measurements of a number of rail cars, an average width of rail car is approximately 128 ½ inches. A bicycle is approximately 30 inches in width and assuming that a child would be reaching out pretty much straight forward, the center line of the rumble strip should be approximately 72 ½ inches off the center line of the track.

Cost to Install Rumble Strips . . .                         $4,970.00

• Parking lot Sweeping
• Pavement Marking
• Pavement Sealcoating
• Snow Plowing
• Sealing
• Asphalt Patching and
  Repair

2.    Install a 3 ½ inch wide yellow stripe just outside of the rumble strips, along with signs between the rails indicating DANGER – NO BIKES painted in 24 inch high letters, four signs per city block, with the signs alternating so that they are legible for children traveling in both directions.

Cost to Paint Stripes and Signs . . .                       $2,950.80

TOTAL COST FOR RUMBLE STRIPS, STRIPING AND SIGNS $7,920.80

You have also asked me approximately how long the striping and rumble strips would last and provide an estimate as to how often this work would need to be done. Regarding the striping, I believe that would have to be performed on a yearly basis because of the plowing, salt wear and snow conditions.

Regarding the rumble strips, I know that the City has a constant paving renewal program going on yearly. How often blacktop paving surfaces need to be replaced is dependent on a number of factors such as the thickness of the pavement, the type of soil conditions under the pavement, drainage and traffic volume and the type of vehicles that travel on the roadway. Based upon my many years of experience in maintaining blacktop surfaces, I would estimate that the pavement on a City street could be expected to last approximately eight to ten years. I have examined the surface along West 19th Street and found it to be in excellent condition at the present time. Paved streets in the Erie area last conservatively eight to ten (8-10) years on average. Mayers Brothers Construction paved West 19th Street in 2002 after the tracks were removed. There is ample drainage and good crown to the road and good drainage and fall to the spills. The photographs you provided to me of West 19th Street when the tracks were still in place show that there was a good crown in the roadway providing good drainage away from the tracks. Based on these factors, I believe that on 19th Street in this area would last at least eight to ten years.

Taking the initial cost of milling and the yearly maintenance cost of striping, my opinion is that the present yearly cost to install the rumble strips and maintaining the striping over a nine year period would be approximately $3,503.02 per year on average. Regarding what the costs would have been in the seventies, eighties and nineties, it is my opinion that the costs would have been less than current costs and consistent with cost of living at that time.

My opinion is based on my background, experience and training in the field of asphalt patching, preventive maintenance, repairs and safety/directional striping. It is also based upon my examination of the West 19th Street area between Raspberry Street and Peach Street. I have estimated and done this type of work for over 28 years and have based these prices upon what I charge, and what is normally charged for this type of work.

I have never authored or prepared any publications or articles within the preceding ten years nor have I ever testified as an expert at trial or by deposition within the preceding four years. You and I have agreed to an

hourly compensation for my services in this matter at the rate of $25.00 per hour for preparation of this estimate and report. At this point in time, I have spent seven hours in order to prepare this report. I have attached to this report a drawing indicating what the rumble strips, striping and signage would look like as completed, and a copy of my estimate.

I hereby certify that the estimate and this report are in my opinion the fair market value for the work as stated.

With respect to my qualifications, please find attached hereto a Resume indicating my background, training and qualifications.

Sincerely,

James A. Guarino

**RESUME**

**Education**

> Technical Memorial High School – graduate 1967
> Gannon College – 1 year (1976-1977)

**Specialized Training**

> 28 years experience – asphalt repair, milling, sealcoating, striping and power sweeping

**Employment**

> General Electric welder – 15 years (1971-1986)
> Guarino Enterprises – 28 years (1979 to present)

**Seminars**

> Numerous seminars through Sealmaster (asphalt sealing, striping, crack filling and repair

**Guarino Enterprises**

> James A. Guarino
> 10859 Hill Road
> Wattsburg, PA  16442
> Phone  (814) 825-3570
> Fax  (814) 825-9934

RUMBLE STRIP DIAGRAM



LOCATION DETAIL OF SONIC NAP ALERT PATTERN
SEE NOTE 4

SECTION A-A

SONIC NA

PLAN
DETAILS OF SONIC NAP ALERT PATTERN

SECTION B-B



## ESTIMATE FOR STRIPING AND
## RUMBLE STRIPS FOR WEST 19TH STREET

**MILLING AND CLEANUP:**

| | |
|---|---|
| Milling 2.4 miles of milled rumble strips: | $3,600.00 |
| Water truck on site: | $ 550.00 |
| Two Tri-axle trucks - 2 hours | $ 260.00 |
| One Athey broom sweeper – 3 hours (cleanup & hauling) | $ 260.00 |
| Traffic Control- 4 flagmen to direct traffic-3 hours to end of job | $ 300.00 |
| TOTAL (LABOR, EQUIPMENT AND HAULING) | **$4,970.00** |

**STRIPING:**

| | |
|---|---|
| Layout line at 3 ½" wide in solid line on both outer sides of Rumble strip. Sherwin Williams Highway Traffic yellow Paint (12,672 linear feet x .15 cents /foot) | $1,900.80 |
| Layout DANGER NO BIKES-24" letters between tracks at 4 per block spacing | |
| 42 Stencils in Traffic Yellow paint | $1,050.00 |
| TOTAL STRIPING | **$2,950.80** |

| | |
|---|---|
| **TOTAL COST** | **$7,920.80** |

## AVERAGE COST OVER NINE YEARS

| | |
|---|---|
| Year One – Milling and Striping | $ 7,920.80 |
| Years Two through Nine – Striping Only | |
| Eight Times $2,950.80 | $23,606.40 |
| TOTAL COST | **$31,527.20** |

| | |
|---|---|
| **Divided by Nine years Equals a per year average of:** | **$ 3,503.02** |

**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

 **Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



START **W 19th St & Peach St**
Erie, PA 16502, US

END **W 19th St & Raspberry St**
Erie, PA 16502, US

**Total Est. Time:**
4 minutes

**Total Est. Distance:**
1.25 miles

| Maneuvers | Distance |
|---|---|
| START **1:** Start out going SOUTHWEST on W 19TH ST toward SASSAFRAS ST. | 1.2 miles |
| END **2:** End at **W 19th St & Raspberry St** Erie, PA 16502, US | |

**Total Est. Time:** 4 minutes     **Total Est. Distance:** 1.25 miles



**Tab E**
**Guarino Deposition Ex. 4 - J. Guarino**
**Supplemental Expert Report (2/23/07)**



**GUARINO ENTERPRISES**

10855 Hill Road
Wattsburg, PA 16442
(814) 825-3570

February 23, 2007

Tibor R. Solymosi, Esquire
Segel & Solymosi
818 State Street
Erie, Pennsylvania 16501

    RE:   Nixon v. Norfolk Southern Corp., et al.
            Estimate for Striping/Rumble Strips – West 19th Street

Dear Mr. Solymosi:

You have asked me to amend my report with regard to subcontractors quotes
I relied on. I did obtain a quote from Donegal Construction that I used in my
estimate. Their quote was $3,600.00 for milling in the rumble strips. A copy
of the quotation is included with this letter.

The only other subcontracting would be for the triaxle dump trucks, which I
did not get specific quotes for. I simply used those figures based on my
knowledge and experience in renting that type of equipment.

If you have any other questions, do not hesitate to call me.

                 Sincerely,

                 James A. Guarino

• Parking lot Sweeping
• Pavement Marking
• Pavement Sealcoating
• Snow Plowing
• Salting
• Asphalt Patching and
  Repair



PENGAD 800-631-6989

Guarino

**DEPOSITION
EXHIBIT**

4



# Donegal Construction Corporation
1235 Marguerite Lake Road
Greensburg, Pennsylvania 15601
Pavement Profilers

(724) 423-7500   Telephone
(724) 423-7501   Fax

- An Equal Opportunity Employer -

TO:   Guarino Enterprises
10859 Hill Road
Erie, Pennsylvania 16442

Letting Date : February 12, 2007
Project :
Location : Erie Co. PA

Attention:  Mr. Jim Guarino

## WE APPRECIATE THE OPPORTUNITY TO PROVIDE YOU THE FOLLOWING QUOTATION:

| ITEM & DESCRIPTION | APPROXIMATE QUANTITY: | UNIT PRICE: | TOTAL: |
|---|---|---|---|
| Milled Bituminous Rumble Strips | 2.4 miles | 1,500 / mile | $3,600.00 |

## SPECIAL CONDITIONS:

Rumble strips are approximately 16" – 17" wide on 1' centers approximately 0.5" deep as you would see along shoulders on interstate highways..

General contractor must supply water direct to the rumble strip mill.

General contractor responsible to sweep milled spoils off the pavement behind the rumble strip machine.

This Quotation must be accepted and returned within 45 days of letting date and is subject to the conditions above and on page 2. This Quotation shall be made an attachment to any ensuing Subcontract and it supersedes any conflicting provisions of the Subcontract.

PURCHASER

Accepted By: _____

Company: _____   TITLE

Date: _____

DONEGAL CONSTRUCTION CORPORATION

By: _____

Don Pfeifer - Vice President

Date: _____

## *General Conditions*

1. This quotation is furnished for convenience only and shall not constitute a binding agreement unless signed by purchaser and approved by Donegal Construction Corporation. It is subject to change only by Donegal Construction Corporation without notice and does not include any items not specifically set forth herein. No work shall begin without the receipt of acceptance of this quotation or a subcontract agreement with the quotation attached.

2. This quotation does not include a bond, special licenses, or special insurances (e.g. Railroad, OCP, Waiver of Subrogation, etc.) nor shall Donegal Construction Corporation accept any backcharges for bonds, insurances, association fees, etc.

3. Donegal Construction Corporation shall not be responsible for delays due to strikes, fires, accidents, labor or material shortage or other causes beyond its control and Donegal Construction Corporation is not responsible for back charges resulting from break downs beyond our control.

4. Donegal Construction Corporation can not guarantee the amount of pavement remaining over base, or prime or patching of base in the event base is exposed in milling operation.

5. Donegal Construction Corporation will not accept any other back charges against its account without prior authorization by an official of this company. All claims for damages shall be presented to Donegal Construction Corporation within forty-eight (48) hours of occurrence.

6. Purchaser agrees to pay Donegal Construction Corporation for the work contained in this quotation within seven (7) days of receipt from owner unless it is daily, hourly, or lump sum hourly quoted work which shall be paid in full within forty-five (45) days from work and is not contingent upon receipt of payment by owner to purchaser. Purchaser agrees that any work performed by Donegal Construction Corporation as part of any claim by Purchaser to owner shall be paid in full by Purchaser to Donegal Construction Corporation within forty-five (45) days of such work and is not contingent upon receipt of payment from owner to purchaser.

7. If an indemnification by Donegal Construction Corp is required, it shall be limited to the actions and / or omissions of Donegal Construction Corporation <u>only</u> and will not include the actions and / or omissions of others.

**Responsibilities of Purchaser or Others:**

A.) All trucking and disposal of milled materials with enough trucks to keep milling machine working continuously

B.) All clean-up, hand work or mini milling around inlets, curbs, manholes, other obstacles, and any temporary patching.

C.) All traffic maintenance, signing, flag persons, etc.

D.) Crushing or screening of milling material & permitting of stockpiles

E.) Traffic maintenance to be set up expeditiously where traffic limitations restrict work hours

F.) All engineering work - layout of LOW, grade, lines, transitions, set up of string-lines, etc.

G.) Removal of traffic control devices and markers

H.) Provide a minimum ten (10) days notice to proceed

I.) Provide a water source located on project

J.) Utility and/or Regulatory Agency Notifications prior to the work performed when necessary.

**Tab F**
**Guarino Deposition Ex. 5 - J. Guarino**
**Handwritten Diagram (Measurements)**



Grasino
DEPOSITION
EXHIBIT
5
PENGAD 800-631-6989

**Tab G
Guarino Deposition Ex. 6 - Rumble
Strip Diagram**

RUMBLE STRIP DIAGRAM



LOCATION DETAIL OF SONIC NAP ALERT PATTERN
SEE NOTE 4

SECTION A-A

PLAN

SECTION B-B

DETAILS OF SONIC NAP ALERT PATTERN

SONIC NA

PENGAD 800-631-6989

DEPOSITION
EXHIBIT

Guarino
6
5-18-07

**Tab H**
**Guarino Deposition Ex. 7 - J. Guarino**
**Conceptual Photograph/Drawing**
**(oversized original in possession of**
**Tibor R. Solymosi, Esq., counsel for**
**plaintiff Robin Nixon)**



## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2007, the foregoing Appendix to Defendants' Motion to Bar James R. Guarino as Expert Witness and to Exclude Guarino's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment was filed electronically with the Clerk of Court using the Electronic Case Filing system. Notice of this filing will be sent to all parties by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(D) of the Federal Rules of Civil Procedure. Parties may access this filing through the Court's ECF system.

s/ Roger H. Taft
Roger H. Taft, Esq.