IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN NIXON,<br>Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-101 ERIE |
| | ) | |
| NORFOLK SOUTHERN CORPORATION | ) | |
| and NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, INC., | ) | |
| Defendants | ) | ELECTRONICALLY FILED |

**APPENDIX TO DEFENDANTS' MOTION TO BAR
AUGUST W. WESTPHAL AS EXPERT WITNESS AND TO EXCLUDE
WESTPHAL'S TESTIMONY AND OTHER EVIDENCE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN

RAILWAY COMPANY, INC., by their attorneys, MacDonald, Illig, Jones & Britton LLP, file

this Appendix to Defendants' Motion to Bar August W. Westphal as Expert Witness and to

Exclude Westphal's Testimony and Other Evidence in Opposition to Defendants' Motion for

Summary Judgment, pursuant to Rule 702 of the Federal Rules of Evidence.

I hereby certify that this Appendix contains true and correct copies of the transcript of the

deposition of August W. Westphal taken on May 17, 2007, and Westphal Deposition Exhibit

Nos. 1 through 11 including his resume, expert report dated February 16, 2007, and supplemental

expert report dated February 16, 2007:

I.   Westphal Deposition Transcript

    Tab A   -   Deposition of August W. Westphal (5/17/07)


II.   Westphal Deposition Exhibits

    Tab B   -   Westphal Deposition Ex. 1 - Notice of Deposition (A. Westphal)

    Tab C   -   Westphal Deposition Ex. 2 - A. Westphal Resume

    Tab D   -   Westphal Deposition Ex. 3 - A. Westphal Published Articles and List of Deposition and Trial Testimony (1997-2007)

    Tab E   -   Westphal Deposition Ex. 4 - A. Westphal Invoice for Services (2/23/07)

    Tab F   -   Westphal Deposition Ex. 5 - A. Westphal Invoice for Services (4/25/06)

    Tab G   -   Westphal Deposition Ex. 6 - A. Westphal Expert Report (2/16/07)

    Tab H   -   Westphal Deposition Ex. 7 - A. Westphal Supplemental Expert Report (2/16/07)

    Tab I   -   Westphal Deposition Ex. 8 - A. Westphal Typewritten Notes

    Tab J   -   Westphal Deposition Ex. 9 - Norfolk Southern Consist for Train Y47-62-26(4/27/97)

    Tab K   -   Westphal Deposition Ex. 10 - J. Guarino Expert Report (2/12/07)

    Tab L   -   Westphal Deposition Ex. 11 - R. Glenn Drawing of Norfolk Southern Locomotive (Glenn Deposition Ex. 4)

Respectfully submitted,


_____s/ Roger H. Taft_____
Roger H. Taft
PA 19983/NY 2876456
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7603
(814) 454-4647 (facsimile)
rtaft@mijb.com

Attorneys for Defendants
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company, Inc.

**Tab A**
**Deposition of August W. Westphal (5/17/07)**

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
                          - - -
 3
    ROBIN NIXON,                   )
 4                                 )
            Plaintiff,             )
 5                                 ) CIVIL ACTION
        vs.                        ) NO. 05-101 ERIE
 6                                 )
    NORFOLK SOUTHERN CORPORATION   )
 7   and NORFOLK SOUTHERN RAILWAY  )
    COMPANY, INC.,                 )
 8                                 )
            Defendant.             )
 9
                          - - -
10
              Deposition of AUGUST W. WESTPHAL
11
                 Thursday, May 17, 2007
12
                          - - -
13
              The deposition of AUGUST W. WESTPHAL, called
14  as a witness by the Defendants, pursuant to Notice and
    the Federal Rules of Civil Procedure pertaining to the
15  taking of depositions, taken before me, the
    undersigned, Deborah L. Endler, a Notary Public in and
16  for the Commonwealth of Pennsylvania, at the offices
    of MacDonald, Illig, Jones & Britton, LLP, 100 State
17  Street, Suite 700, Erie, Pennsylvania, 16507,
    commencing at 9:40 o'clock a.m., the day and date
18  above set forth.

19                        - - -

20          COMPUTER-AIDED TRANSCRIPTION BY
             MORSE, GANTVERG & HODGE, INC.
21             PITTSBURGH, PENNSYLVANIA
                  412-281-0189
22
                          - - -
23

24

25
```

ORIGINAL

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3             Segel & Solymosi:
               Tibor R. Solymosi, Esquire
 4             818 State Street
               Erie, Pennsylvania  16501
 5
          On behalf of the Defendants:
 6
               MacDonald, Illig, Jones & Britton, LLP:
 7             Roger H. Taft, Esquire
               100 State Street, Suite 700
 8             Erie, Pennsylvania  16507

 9                            - - -

10

11                         INDEX

12   EXAMINATION BY:                        PAGE:

13   Mr. Taft                                  3
     Mr. Solymosi                            153
14
                              - - -
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    AUGUST W. WESTPHAL

 2   called as a witness by the Defendants, having been

 3   first duly sworn, as hereinafter certified, was

 4   deposed and said as follows:

 5                         EXAMINATION

 6   BY MR. TAFT:

 7        Q     Would you state your name and home address,

 8   please?

 9        A     August W. Westphal, W-e-s-t-p-h-a-l, 35239

10   Greenwidge Avenue, North Ridgeville, Ohio 44039.

11        Q     And your age and date of birth?

12        A     I'll be 81 in June.  My birthdate is June

13   25, 1926.

14        Q     Mr. Westphal, we met prior to the

15   deposition today.  My name is Roger Taft.  I'm

16   representing the Norfolk Southern Defendants in this

17   lawsuit arising out of the accident involving Robin

18   Nixon, who was injured in the vicinity of Sassafras

19   Street and West 19th Street in Erie, Pennsylvania.

20              I'm assuming you are familiar in your role

21   as an expert witness with this lawsuit; is that

22   correct?

23        A     That's correct.

24        Q     Okay.  And I'm going to be asking you

25   several questions today regarding your expert opinions
```

1    and the bases for those opinions in accordance with

2    the Federal Rules of Civil Procedure.  I will try to

3    make my questions as clear as possible.  But if for

4    any reason the question is unclear or you do not hear

5    it accurately or you simply want me to repeat the

6    question, all you have to do is ask me to do so and

7    I'll be happy to oblige.  Is that agreed?

8         A    I understand.

9         Q    I don't know how long your deposition will

10   go today, but as we proceed if at any point you feel

11   that you want to take a break to use the restrooms,

12   get something to drink or just take a short walk, if

13   you let us know, again, we'll be happy to break from

14   the deposition.

15              The only exception to that would be that if

16   I pose a question, I'd like you to answer the question

17   before we take a break, is that agreed?

18        A    I understand.

19        Q    Mr. Westphal, is there any reason that you

20   are aware of why you cannot answer my questions today

21   as accurately as possible with respect to the subject

22   matter of this lawsuit?

23        A    No, I know of no reason why.

24        Q    I understand from your expert report that

25   you are the president of Transit Operations and

```
 1  Personnel Guidance of Ohio, Inc.?
 2       A     Yes.
 3       Q     And what is the nature of that business?
 4       A     It's a consulting corporation on railroad
 5  safety.
 6       Q     How long has Transit Operations been in
 7  existence?
 8       A     Since 1987.
 9       Q     How many employees does the corporation
10  have?
11       A     Just myself.
12       Q     Have you been the sole employee ever since
13  the corporation was formed in 1987?
14       A     Yes.
15       Q     And what is the business address of Transit
16  Operations?
17       A     35239 Greenwich Avenue, North Ridgeville,
18  Ohio, 44039.  And I have a mailing address of Post
19  Office Box 39146.
20       Q     You operate the business Transit Operations
21  out of your home?
22       A     Yes.
23             (THEREUPON, Westphal Deposition Exhibit 1
24       was marked for identification.)
25       Q     Mr. Westphal, I show you what has been
```

1    marked as Westphal Deposition Exhibit 1, which is a

2    copy of the Notice of Deposition that we served in

3    this case scheduling your deposition for today.  Have

4    you seen that notice before?

5         A    I've seen the first page.  I didn't see the

6    second page.

7         Q    Who provided the Notice of Deposition to

8    you?

9         A    Mr. Solymosi's office.

10        Q    Okay.  I'm going to ask you some questions

11    about the second page.  Before we began the deposition

12    today, you brought with you a manila folder which you

13    identified as your file.  You brought with you a

14    yellow legal type sheet with some handwritten notes on

15    it.  And you also brought with you four three-ring

16    binders that include various materials that were

17    identified in your expert report; is that correct?

18        A    That's correct.

19        Q    With that in mind, I want to go through the

20    items on page 2 of the Notice of Deposition to make

21    sure that everything we requested that you bring with

22    you today you did, in fact, bring.

23        A    I understand.

24        Q    Okay.  First of all, did you bring with you

25    today your most recent curriculum vitae?

1     A     Yes.

2     Q     Is that the same document that you provided

3  with your expert report?

4     A     Yes.

5         (THEREUPON, Westphal Deposition Exhibit 2

6        was marked for identification.)

7     Q     Show you what has been marked as Westphal

8  Deposition Exhibit 2.  Is that a copy of your most

9  recent curriculum vitae?  It says revised January 2006

10  at the bottom.

11     A     Yes, that's correct.

12     Q     You have nothing to add or to update since

13  January 2006?

14     A     No.

15     Q     Let's go back to the Notice of Deposition.

16  Item two requested you to bring your complete expert

17  witness file with respect to the April 27, 1997

18  accident including, but not limited to, your two

19  expert reports dated February 16, 2007 and all drafts

20  thereof, and any and all documents and things upon

21  which you relied in arriving at your opinions and/or

22  in preparing your expert witness reports.

23        Did you bring all items responsive to that

24  request?

25     A     Yes.

1    Q    You did give me the opportunity to review

2    your file and your binders and your handwritten notes

3    before we began.  I did not see any drafts of your

4    expert reports.  Did you prepare any drafts?

5    A    The draft is prepared on a computer and

6    then when I finalize the draft, then I print it out.

7    And this is the result of my report, right here.

8    Q    So what you are saying is as you revised

9    your reports, the revisions would have gone on top of

10   the prior drafts?

11   A    Yes.

12   Q    So all you have at this point are the final

13   reports --

14   A    Yes.

15   Q    -- and no drafts?

16   A    No.

17   Q    Do you recall if you made any revisions to

18   prior drafts in arriving at those final reports?

19   A    Only to the extent of typographical errors

20   and putting page reports on and everything like that.

21   That's all it was.

22   Q    But you didn't make any changes to the

23   substance of those reports after making the initial

24   drafts?

25   A    No.

1    Q    You didn't have any discussions with

2    Mr. Solymosi where he suggested you might add or

3    delete any parts of those drafts?

4              MR. SOLYMOSI:  I'm going to object to that,

5         Roger.  I think that's attorney work product.

6              MR. TAFT:  I think he has to answer to the

7         extent to which he had prior drafts of the report

8         prepared if he did that were later changed.

9              MR. SOLYMOSI:  I don't think he has to

10        answer what discussions he had with me.  I don't

11        believe that's discoverable.

12             MR. TAFT:  I think it is to the extent to

13        which he reached his own conclusions in a prior

14        draft and then modified them later by input from

15        someone else.  I think that's a proper question.

16             MR. SOLYMOSI:  If you want to ask him if I

17        told him what to put in the report, go ahead.

18             MR. TAFT:  Read back my question.

19             (Read back.)

20   A    No.

21   Q    Item three requested any and all documents

22   and things upon which you relied in arriving at your

23   opinions and/or in preparing your expert reports, if

24   not contained in your expert witness file.

25             Is there anything, Mr. Westphal, other than

1    the documents and facts that you set forth in your

2    expert report and the materials that you brought today

3    which match that list of documents that you reviewed

4    upon which you relied in preparing those reports and

5    arriving at your conclusions?

6         A    Nothing else.  Everything that I relied

7    upon for the report is contained in this and the

8    information that I brought with me.

9         Q    Okay.  And when we look at your report

10    which we are going to do a little bit later, and it's

11    got a list of all the materials that you reviewed in

12    arriving at your report, that is a complete list?

13        A    Yes.

14        Q    And everything you brought today matches

15    that list?

16        A    Yes.

17        Q    Item four requested any and all expert

18    reports that you prepared and any and all transcripts

19    of depositions that you gave with respect to lawsuits

20    that you identified in your disclosure letter dated

21    February 16, 2007.  And that was the letter in which

22    you were identifying cases in which you either gave a

23    deposition or trial testimony?

24        A    Yes.  Those were forwarded to you.

25        Q    Yes, I think there were three deposition

1    transcripts.

2        A      Yes.

3        Q      And just to be clear about that,

4    Mr. Westphal, of all the cases on that list that you

5    provided, you are in possession of only three

6    deposition transcripts?

7        A      Yes.

8        Q      What about expert reports that you prepared

9    for use in any of those cases that were listed, do you

10   have any of those?

11       A      If they were, if they haven't been

12   disposed, if the cases have not been settled, I would

13   still have them.  But once they are settled, I don't

14   accumulate that material.

15       Q      I realize that for some reason you only got

16   the first page of this notice of this deposition, you

17   didn't get the second page, but I would request to be

18   consistent with item four on page 2, that you go back

19   to your office or when you return to your office you

20   review your files, and to the extent to which you have

21   copies of any expert reports with respect to cases

22   that were identified on your list, that you make

23   copies of those and get them to Mr. Solymosi in order

24   that he can provide them to me, is that understood?

25       A      If they are available, I will.

1    Q    Understood.

2         (THEREUPON, Westphal Deposition Exhibit 3

3    was marked for identification.)

4    Q    Just so we can be clear, when we refer to

5    this list of cases, I'm going to show you,

6    Mr. Westphal, what's been marked as Westphal

7    Deposition Exhibit 3.  Is that a copy of the list of

8    cases that you provided in conjunction with your

9    expert report that identify all cases in which you

10   were deposed or testified at trial from 1997 to the

11   present?

12   A    That's correct.

13   Q    Okay.  And when I was referring earlier to

14   the list of cases where you said I only have copies of

15   three deposition transcripts, you understood this was

16   the list?

17   A    Yes.

18   Q    And when I ask you to go back and look at

19   expert reports or for the existence of expert reports,

20   if any, and provide them this is the list of those

21   cases as well?

22   A    I understand.

23   Q    Finally, Mr. Westphal, item 5 requested

24   that you bring records of all billings and payments

25   with respect to your expert witness services including

1    time records for those services.  Now, I know in going

2    through your file that you gave me to look at today,

3    you did provide copies of three invoices that I'm

4    going to mark.

5                    (THEREUPON, Westphal Deposition Exhibit 4

6         and 5 were marked for identification.)

7         Q     Mr. Westphal, I'm going to correct what I

8    just said.  Because I believe what I found in your

9    file were only two invoices for services, not three.

10   I'll show you what's been marked as Westphal

11   Deposition Exhibits 4 and 5.

12                   Exhibit 4 is a statement dated February 23,

13   2007 directed to Mr. Solymosi with respect to services

14   performed to and including the end of the month of

15   February 2007, and Westphal Deposition Exhibit 5 is an

16   invoice dated April 25, 2006, for services rendered to

17   the end of April 2006; is that correct?

18        A     That's correct.

19        Q     Other than the invoice that you provided to

20   research your files and provide the copies of

21   depositions at my request, which was separately paid,

22   are Westphal Deposition Exhibits 4 and 5 the only

23   invoices that you've submitted to date with respect to

24   your services in this case?

25        A     That's correct.

1     Q     I note, Mr. Westphal, on those invoices

2    that although you identify the amount of time you

3    spent in providing certain services, you don't

4    indicate the dates on which the services were

5    provided.  Do you have time records that would

6    indicate the dates on which you performed particular

7    services?

8     A     The only record I would have, they would be

9    on the cover of the front page of the document.  Like

10   if deposition X, or research testimony of Timothy J.

11   Price, engineer, one hour, that would be on his, the

12   date that I read that would be on his, it would be on

13   his deposition.

14    Q     Okay.  Thank you.

15    A     And it's my practice to bill my clients at

16   the end of every month for the work that's performed

17   in that month.

18    Q     Okay.  So those two invoices are all work

19   through the end of April but you have not yet

20   submitted a bill for the work this month?

21    A     Yes.

22    Q     Mr. Westphal, I'm going to ask you some

23   questions now about your educational background and

24   I'm going to refer to your curriculum vitae marked as

25   Westphal Deposition Exhibit 2.  What is the extent of

1   your formal education?

2        A     High school.  I graduated in 1944.

3        Q     And the C.V. indicates Fremont, NE High

4   School?

5        A     Yes, Freemont, Nebraska.

6        Q     Did you take any courses in college

7   following your high school graduation?

8        A     No, other than courses -- other than

9   educational seminars that I had during my railroad

10  career.

11       Q     During the course of your employment --

12       A     Yes.

13       Q     -- for the railroad; is that right?

14       A     Yes.

15       Q     Do you hold any licenses or professional

16  certifications of any type?

17       A     No.

18       Q     The C.V. indicates that you began

19  employment with Chicago and Northwestern Railway

20  Company in 1945 and continued that employment to or

21  through December 1960; is that correct?

22       A     That's correct.

23       Q     And would you summarize for me the

24  positions that you held and the type of work you

25  performed during that 15 year period for the Chicago

1   and Northwestern Railway Company?

2       A       I started out as a brakeman in freight

3   service and then qualified for passenger brakeman and

4   passenger baggage man.  After I had three years of

5   service or 72,000 miles of freight service, I took and

6   passed the conductor's examination as a railroad

7   conductor on the Chicago Northwestern.  And then was

8   also qualified as a passenger conductor.

9               I had dual rights as a switchman and served

10  in the capacity as a switchman, helper, and conductor

11  foreman for the railroad during those years.

12      Q       During your employment at the Chicago and

13  Northwestern Railway Company, did you ever work as a

14  locomotive engineer?

15      A       No.

16      Q       Did you ever go to locomotive engineer

17  school?

18      A       No.

19      Q       Have you ever been certified or licensed to

20  be a locomotive engineer?

21      A       No.

22      Q       During your employment by Chicago and

23  Northwestern Railway Company, did you ever work in the

24  maintenance of weigh department?

25      A       No.

1     Q     What is the maintenance of weigh
2  department?

3     A     Maintenance of weigh department is a
4  trackman that includes the bridge and building
5  department.  They maintain the track, see that the
6  ballast is correct.  They are called out at various
7  times for derailments to repair track and to rerail
8  cars and work of that nature.

9     Q     Have you ever been employed in a
10  maintenance of weigh department for any railroad?

11     A     No.

12     Q     During your employment by Chicago and
13  Northwestern Railway Company, did you ever work in its
14  safety department?

15     A     In what?

16     Q     Safety department.

17     A     Well, safety was a part of our railroad --
18  it was always, safety was always involved as a
19  railroad employee.  You went to classes and you passed
20  safety examinations as well as the book of rules.

21     Q     I'll ask the question again, because it was
22  apparently not very clear.

23          During the course of your employment by
24  Chicago and Northwestern Railway Company, did you ever
25  work in the railroad's safety department?

1      A      Not the railroad safety department per se.

2      Q      That's what my question was.  What you are

3    saying is that in doing your work as a brakeman,

4    conductor and otherwise, you took some safety courses?

5      A      Yes, they were mandatory.

6      Q      Through the safety department of the

7    railroad?

8      A      Yes.

9      Q      But you were never assigned to the safety

10   department?

11     A      No.

12     Q      Your C.V. indicates that during the period

13   from December 1960 to May 1965 you held a position

14   that you are calling Nebraska State Representative.

15   Now, was that a position for the Chicago and

16   Northwestern Railway Company or for some other entity?

17     A      No, that was a position that I was elected

18   to in my union as the state legislative

19   representative, representing the men and women that

20   worked on the railroad within the state of Nebraska in

21   the Nebraska unicameral legislature.

22     Q      What union was it?

23     A      It was the Brotherhood of Railroad

24   Trainmen.

25     Q      And was your work in that position paid for

1  by the union?

2      A     Yes.

3      Q     So you were an employee of the Union at

4  that point?

5      A     Yes.

6      Q     The C.V. indicates that between June 1965

7  and February 1981 you were director of the BRT/UTU

8  legislative department in Cleveland, Ohio.  Now, BRT

9  is the Brotherhood of Railroad Trainmen; correct?

10     A     Yes.

11     Q     What is UTU?

12     A     United Transportation Union.

13     Q     Was there an affiliation at that point

14  between those two unions?

15     A     No, the United Transportation Union was

16  formed in 1979, I believe it was, and it was a merger

17  of the Brotherhood of Railroad Trainmen, the

18  Brotherhood of Locomotive Firemen and Enginemen, the

19  Order of Railway Conductors and Brakeman, and the

20  Switchmen's Union of North America.

21     Q     So by the end of the time that you held

22  that position, what was previously the Brotherhood of

23  Railroad Trainmen became the UTU?

24     A     That's correct.

25     Q     And again, that was a position that you

1  held with the union as its employee?

2      A      Yes, that was with the International Union.

3      Q      You go on to show that from March 1981 to

4  September 1986 you were the director of legislative

5  research for the UTU in Washington, D.C.  What did

6  that position involve?

7      A      I was charged with the responsibility of

8  coordinating the efforts of the legislative people

9  that would come into Washington, D.C. to lobby on the

10  Capitol Hill in Washington, D.C. to work directly with

11  the Federal Railroad Administration as the UTU

12  representative, also with the National Transportation

13  Safety Board and the National Transportation Research

14  Board.

15      Q      And again, that was a union position in

16  which you were employed by the UTU?

17      A      That is correct.

18      Q      Did you resign or retire in September 1986

19  to start your current business?

20      A      I accepted my annuity in 1986, October 1st

21  of 1986.

22      Q      And I think you told me in 1987 you formed

23  Transit Operations?

24      A      That's correct.

25      Q      In addition to the employment that you have

1    identified, namely with the Chicago and Northwestern

2    Railway Company, with the BRT and the UTU, and with

3    Transit Operations, your current company and employer,

4    have you held any other employment since May of 1945?

5         A    Yes.

6         Q    What else?

7         A    I'm the national president of the National

8    Association of Retired and Veteran Railway Employees,

9    Incorporated.

10        Q    What does that position involve?

11        A    It's supervising, being the chief executive

12   officer, so to speak, of the only retiree association

13   there is in the industry that watches out for our

14   railroad retirement pension and health and welfare

15   benefits for railroad retirees who are members of the

16   now organization.  It's an elected position.

17        Q    I want to ask you some questions now about

18   Transit Operations which is the way I've been

19   referring to it.  Is that what you are call your

20   company for short?

21        A    I call it TOP, Incorporated or just TOP.

22        Q    Let's refer to it as TOP.  You told me that

23   since forming TOP in 1987 you have been the sole

24   employee; correct?

25        A    That's correct.

1    Q    And tell me again the nature of the
2 services that you provide through TOP?
3    A    We provide consulting services for clients
4 that call us or retain us in railroad safety, railroad
5 operations, the responsibility of railroad employees
6 and the railroads to comply with the federal
7 regulations governing the railroad operations and
8 railroad safety.
9    Q    In terms of your clients or the people who
10 retain you, what percentage of the work that you do is
11 for clients who are presenting claims for personal
12 injuries against railroads?
13    A    I would say they are 90 percent.
14    Q    90?
15    A    90 percent plaintiff cases.
16    Q    What are the other 10 percent?
17    A    Well, the other 10 percent would be
18 defendant cases.
19    Q    Okay.  Well, listen to my question
20 carefully.  I asked the percentage of your cases in
21 which your clients were presenting personal injury
22 claims against railroads, and you said 90 percent;
23 correct?
24    A    Yes.
25    Q    And then I asked you the --

1    A    It could be more than that, Mr. Taft.    I

2  mean.

3    Q    That's what I'm asking.

4    A    I can give you numbers if you want them.

5    Q    Well, give me numbers.

6    A    Okay, out of a hundred cases, it would be

7  97 that would be plaintiff cases, injured people or

8  injured workers that were filing an action against the

9  railroad.  And out of a hundred, three cases were

10  defendant cases where railroads and one trucking

11  company retained my services.

12    Q    Okay.  I'm focusing on railroads now.  So

13  you are saying there were two cases in which railroads

14  retained your services as a defendant?

15    A    Yes.

16    Q    What were those cases?

17    A    The SEPTA, Southeast Pennsylvania Transit

18  Association.

19    Q    What case was that?

20    A    Well, there were two cases.  They were both

21  in the Philadelphia area and they were -- you want

22  what they were?

23    Q    Well, I want to identify what the name of

24  the case was.  Start with that.

25    A    I don't know whether I can give you that

1    right off the top of my head.

2        Q      Is it on the list that we marked as

3    Westphal Deposition Exhibit 3?

4        A      I'd have to see.  I'll just look and see.

5    No.

6        Q      Do you recall the name of that case or

7    those cases?

8        A      Really I don't, Mr. Taft.  The case, one

9    case involved two people that were riding a golf cart

10   type of conveyance from their place of, where they

11   went to work at SEPTA, they were going down into the

12   yard.  They went down into the yard, they crossed a

13   crossing that was occupied almost entirely by a car

14   that was being switched, and when they went around

15   behind the car, and just as they went around behind

16   the car, the car moved back and crushed or demolished

17   the golf cart type thing, and those people were both

18   injured.  And they have since died.

19       Q      This is a long time ago then?

20       A      Yes.

21       Q      Do you have any recollection as to

22   approximately what year?

23       A      No, I wouldn't, unless I look at a full

24   list.

25       Q      Do you have a full list?

1    A    I do.  It's on my computer.

2    Q    Would you provide that to Mr. Solymosi?

3    A    Yes.

4    Q    And that would be a full list of all cases

5    in which you have provided expert or consulting

6    services?

7    A    Yes.  I don't know what that has to do with

8    -- don't make a difference to me.

9    Q    Okay.  If I'm understanding you,

10    Mr. Westphal, there was only one lawsuit, although it

11    involved two plaintiffs in which you represented

12    SEPTA?

13    A    That was the one lawsuit.  Now I've got

14    another one.

15    Q    Okay.

16    A    It was another one where a young lady, a

17    young girl, the kids were riding the back of the SEPTA

18    train as it would go from one station to the other.

19    They would jump on the back of the train and try to

20    ride to the next stop.  And one little girl got on

21    there and she got scared and she fell off and she got

22    killed.

23    Q    So this was a second case you

24    represented --

25    A    Yes.

1    Q    -- or that you were retained by SEPTA?

2    A    Yes.

3    Q    And it is not on the list?

4    A    No.

5    Q    Do you have any recollection as to when

6    that was?

7    A    No, unless -- it will be on that other

8    list.  I can furnish that to you, too.

9    Q    I thought you agreed to give me the other

10   list?

11   A    Yes.  You want me to highlight it or mark

12   it so you can identify it?

13   Q    Well, if it says SEPTA on that --

14   A    By the railroad, yes.

15   Q    Are they identified by court?

16   A    No, I don't go into that detail.

17   Q    Okay.  Are they identified by date?

18   A    No, only to the extent that if -- I don't

19   believe -- I don't believe they are unless I put a

20   date on there.  I just list a date, the cases that

21   I've had and what it was involved.

22   Q    Is the list in chronological order?

23   A    It's from when I first started in February

24   of '97 until right up to date.

25   Q    Okay.  Well, good, so the first case on the

1  list would be the oldest and we can go forward from

2  that --

3      A    Yes.

4      Q    -- correct?

5      A    That's correct.

6      Q    Let me direct your attention to Westphal

7  Deposition Exhibit 3.  You stated earlier that you

8  provided me deposition transcripts for three of these

9  cases, so I'm familiar with what they are about.  But

10  I want to ask you at this time about the others.

11              What was the Stubbs case?

12      A    Stubbs was a case in St. Louis where he got

13  caught up with a hand brake and the hand brake

14  wouldn't release and then they finally find out that

15  it was locked up and frozen and he injured his back.

16      Q    So is the Stubbs case what we would call an

17  FELA case?

18      A    Yes.

19      Q    Meaning a case in which a railroad employee

20  presented a claim for personal injuries that he

21  contends he sustained during the course of his

22  employment?

23      A    Yes.

24      Q    Be kind of the railroad equivalent to a

25  workers' compensation claim?

1      A      Well, I don't know about the equivalent,

2  but your first statement was correct.

3      Q      Okay.  What was the Simmons case?

4      A      Simmons case was Mr. Simmons was riding a

5  tank car down in the yard around the Charlotte, North

6  Carolina area and the hand brake failed and when the

7  cars coupled, why, he was thrown off the car.

8      Q      That also was an FELA case brought by an

9  employee of the railroad?

10     A      Yes.

11     Q      What was the Rose case?

12     A      The Rose case was a case where a man was,

13  got off of a caboose car and there were steel

14  strapping in the roadway, in the walkway and he got

15  his feet tangled up in there and injured his legs and

16  his back.

17     Q      That also was an FELA case by a railroad

18  employee?

19     A      Yes.

20     Q      What was the Lambert case?

21     A      Lambert case was down in the State of Ohio

22  and it involved a conductor there that got injured on

23  a car that was bad ordered in the yard.

24     Q      That's another FELA case; correct?

25     A      Yes.

1      Q      What was the Dixon case?

2      A      Dixon, let me see -- oh, Dixon I believe

3    was down in Tampa, Florida.  He was injured when they

4    jumped off of an engine that was coming around a curve

5    and there was a potential of crashing into a gasoline

6    transport truck that was on the highway crossing.

7      Q      That was a railroad employee that jumped

8    off the train?

9      A      Yes.

10     Q      So that's also an FELA case?

11     A      Yes.

12     Q      What's the Heck case?

13     A      Heck case was in Los Angeles, California.

14   That was, Mr. Heck was a switchman and they were into

15   a service area servicing an industry and when they

16   pulled from the cars that were spotted in the

17   industry, when they were pulled out, a company that

18   was alongside the track had a fork lift truck

19   operation that they were moving steel material

20   in their plant and they come up against a fence and

21   knocked a fence over towards the railroad track

22   reducing the clearance.

23          And the top of the fence had a bar out with

24   barbed wire on it for security and that barbed wire,

25   that bar on that barbed wire snagged Mr. Heck off of

1    the car and threw him down to the ground injuring his

2    back.

3        Q     That also was an FELA --

4        A     Yes.

5        Q     -- by a railroad employee?

6        A     Yes.

7        Q     What's the Bartley case?

8        A     The Bartley case was in, that was a case

9    where a conductor went back, they had a malfunction of

10   the air brake system on a train and Mr. Bartley went

11   back to find out where the air leak was and he fell

12   off of a bridge down into a ravine.

13       Q     Again, that's an FELA case filed by a

14   railroad employee against the railroad?

15       A     Yes.

16       Q     What's the All case?

17       A     The All case is Mr. All was an engineer on

18   the railroad and he was in a train switching

19   operation, why, he got all tangled up in the couplings

20   and the slack action of the train and injured his

21   back.

22       Q     So that's another FELA case by a railroad

23   employee?

24       A     Yes.

25       Q     What's the Beyerle case?

1      A      The Beyerle case was a case where a man was

2   in, working as a conductor in the yard and it was a

3   two man operation and he threw the switch and gave the

4   signal to back up and he walked across behind the cars

5   and the cars come around and severed him in two.

6      Q      Another FELA case by a railroad employee?

7      A      Yes.

8      Q      What was the Jones case?

9      A      The Jones case was a man that was working

10  in an elevator operation down in south Illinois and he

11  was working with a radio and it was a two man

12  operation and when he went back in between the cars,

13  why, the cars, the engineer backed up and coupled him

14  up between the knuckles.

15     Q      Another FELA case by a railroad employee?

16     A      Well, he was not a railroad employee.  He

17  was an employee of the elevator company.

18     Q      Okay.

19     A      So it was not really -- it was not an FELA

20  case.

21     Q      But it was an employee of a different

22  company who suffered injury as a result of a train

23  operation?

24     A      Yes.

25     Q      What was the Merollo case?

1    A    Merollo case was a lady that was going to

2    ride the Metra Railroad Service in the Chicago area

3    and she was walking from her car in a parking lot and

4    walking along the right-of-way or along the station

5    platform when the train come back and something was

6    sticking out from the train or the back part of the

7    engine and clipped Mrs. Merollo in the shoulder and

8    the back of the head.

9    Q    What was the Rymanowicz case?

10    A    The Rymanowicz case was up in Michigan.

11    That was a railroad grade crossing case that the

12    railroad had stopped and blocked the railroad grade

13    crossing and Mr. Rymanowicz ran into the side of the

14    train.

15    Q    Was he driving a vehicle?

16    A    Yes.

17    Q    What was the Springston case?

18    A    The Springston case was a case versus

19    Conrail and that was a man that was driving a pick-up

20    truck and had a boat on top of the car and as he

21    approached, when he approached the crossing, the train

22    was coming and it was a grade crossing accident.

23    Q    What was the Cermak case?

24    A    The Cermak case was a case up in Montana

25    where the railroad had pulled out of the side track

```
 1   and stopped to test the air and they had the crossing

 2   blocked and Ms. Cermak come down and ran into the side

 3   of the train.

 4        Q     Was that a grade crossing case?

 5        A     Yes.

 6        Q     Was she driving a motor vehicle?

 7        A     Yes.

 8        Q     What was the Dillon case?

 9        A     The Dillon case was a case over in Indiana

10   that involved, I think it was Mrs. Dillon, that it was

11   a grade crossing accident is what it was.

12        Q     She driving a motor vehicle?

13        A     Yes.

14        Q     What was the Christmas case?

15        A     The Christmas case was down in Louisiana

16   where a young lad was out crossing the, alongside of

17   the railroad tracks that went down right close to his

18   home and the boy was out there and he fell under the

19   train and cut off one of his legs.

20        Q     Was he a pedestrian at the time?

21        A     Yes.

22        Q     Was he on the railroad right-of-way --

23        A     Yes.

24        Q     -- when he fell under the train?

25        A     Yes, the railroad right-of-way went right
```

1  by his house.

2      Q      Okay.  What was the Cork case?

3      A      The Cork case involved a young lad that was

4  involved with just throwing rocks out across into a

5  lake and one of the rocks didn't go by and everything.

6  And he crossed underneath the train and just as he was

7  doing that, the train moved and cut his legs off.

8      Q      So it was a stopped train that he crawled

9  under and the train began to move?

10      A      Yes.

11      Q      What was the Conner case?

12      A      The Conner case was a man, Mr. Conner was

13  sitting down on the rails in a yard in Salt Lake City,

14  Utah, and they were switching down in that plant and

15  he was sitting there eating a sandwich or having some

16  lunch and, just as he was kind of a transient.  But as

17  he was sitting there, the train crew was shoving cars

18  in there on the track and unbeknown, the men on the

19  train didn't know he was down there and they shoved

20  the train down there.  And it ended up that Mr. Conner

21  lost both of his arms right at the shoulder.

22      Q      He was a pedestrian?

23      A      Yes.

24      Q      Was he on railroad property?

25      A      Yes.

1     Q    What was the Clark case?

2     A    Clark was, I think that was a -- I think

3  that was, that was a railroad grade crossing accident

4  also.  I can't really give you the details on it.

5     Q    Did it involve a motor vehicle?

6     A    Yes.

7     Q    What was the Lindquist case?

8     A    Lindquist case was a case where

9  Mrs. Lindquist stopped for the railroad grade crossing

10  and at the railroad grade crossing the signals were

11  operating, but the railroad had a train crew was

12  sitting right in full view of the crossing and

13  everything, waiting for the train to go by and it was

14  a false indication and Ms. Lindquist went around the

15  car and around the gate and as a passenger train come

16  down and caught her at the crossing.

17     Q    What was the Stark case?

18     A    The Stark case was Alvin Stark was a young

19  lad driving a car and he crossed the track and the

20  train of the Kansas City Southwestern Railroad came

21  through there and the train crew was asleep, in my

22  opinion, I testified to that in court, and they struck

23  the car and shoved it 871 feet down the track.

24     Q    It was a grade crossing case?

25     A    Yes.

1    Q    What was the Stone case?

2    A    The Stone case was a man that was across

3    the track, driving a car, down around, it was east of

4    Charleston, West Virginia and he was struck by an

5    Amtrak train.

6    Q    Was he driving a motor vehicle?

7    A    Yes.

8    Q    So that's a grade crossing case, also?

9    A    Yes.

10    Q    What was the Frank case?

11    A    Andrew Frank was a young lad that was

12    walking along, going across the tracks around the

13    tracks, around in, around Hammond, Indiana and was

14    struck by an E.J. & E. Railroad train.

15    Q    Was he on railroad property?

16    A    Yes.

17    Q    And he was a pedestrian?

18    A    Yes.

19    Q    What was the Givens case?

20    A    The Givens case was Pamela Givens was

21    crossing the Norfolk Southern Railroad tracks and she

22    was going, following a pathway as many children did

23    across the railroad tracks and was struck by a train.

24    Q    So she was a pedestrian on railroad

25    property?

1    A    Yes.

2    Q    What was the Hoang case?

3    A    The Hoang case was a case where a man and

4  his two children were in a car down in Mississippi and

5  they crossed the tracks and CSX train hit them.  It

6  was a crossing accident.

7    Q    Grade crossing accident?

8    A    Yes.

9    Q    He was driving a motor vehicle?

10    A    Yes.

11    Q    What was the Humphrey case?

12    A    The Humphrey case was a case in the Omaha,

13  Nebraska area and that involved two boys that were in

14  a car going across the tracks and the Union Pacific

15  train struck and there was an accident there.

16    Q    Was that a grade crossing case?

17    A    Yes.

18    Q    Involving a motor vehicle?

19    A    Yes.

20    Q    What was the Miotti case?

21    A    Miotti case was a man, Mr. Miotti was

22  shoving in on a, riding a gondola into the Chicago

23  steel plant, steel facility and there was steel

24  sticking out over the, infringing upon the railroad

25  clearance and Mr. Miotti was struck with that and

1   severely injured.

2        Q     Was he a railroad employee?

3        A     He was an employee, Mr. Miotti was an

4   employee of the Union Pacific Railroad.

5        Q     Was that an FELA case?

6        A     Yes.

7        Q     What was the Van Overen case?

8        A     Van Overen case was up in Iowa, Register

9   City, Iowa and it was a real foggy night and the train

10  was coming up around the curve and they threw down

11  fuzee, but the fuzee didn't stay on the crossing and

12  Mr. Van overran into the side of the train.

13       Q     Was that a grade crossing case --

14       A     Yes.

15       Q     -- involving a motor vehicle?

16       A     Yes.

17       Q     What was the Bach case?

18       A     Ms. Bach was a switchman for the Soo Line

19  Railroad and she was involved in a personal injury

20  case and everything and injured her back and her arms

21  and legs as a result of high ballast.  It was an FELA

22  injury case.

23       Q     By a railroad employee?

24       A     Yes.

25       Q     What was the Majors case?

1       A       Mr. Majors was a conductor on a CSX

2   Transportation, commuter train operating in the

3   Maryland and Washington, D.C. area, and the train, the

4   commuter train was going eastbound and the Amtrak

5   train was coming westbound on the same track and the

6   engineer on the Amtrak train thought that if he could

7   get to the switch where he could go off on a siding

8   sooner, why, the other train wouldn't hit him head on.

9               And so it struck the Amtrak train on the

10  second unit at the fuel tank and burned up 32 -- 28

11  people.  So it was a head-on collision.

12      Q       Was that an FELA case by a railroad

13  employee?

14      A       Yes.

15      Q       Is this a complete list, Mr. Westphal, or

16  are there any other cases that ought to be added with

17  respect to lawsuits in which you provided depositions

18  or trial testimony from 1997 to the present?

19      A       No, this would be the complete list in

20  1997.

21      Q       Okay.

22      A       Now, the complete list you will get has,

23  there is over a 100 cases in there.

24      Q       I understand.  Mr. Westphal, in those

25  hundred plus cases that you have been involved with

1  that are going to appear on this list that you have

2  been maintaining, have you ever provided expert

3  witness services with respect to an accident involving

4  a minor riding a bicycle on a public street who

5  grabbed on to a moving train?

6      A    Not to my knowledge.

7      Q    You did state on the first page of your

8  expert report that you participated in 14 cases

9  involving children and railroad accidents and you go

10  on to say "In one of them it involved a child with a

11  bicycle".

12     A    Yes.

13     Q    What was that case?

14     A    I'm just trying to -- oh, it was a

15  Harrington matter over in Pennsylvania.

16     Q    Was Harrington the name of the plaintiff?

17     A    Yes.

18     Q    Who was the defendant?

19     A    I believe that was SEPTA.  I'm not for

20  sure, but -- it isn't on here.  That's a long time

21  ago.

22     Q    It would be on the list?

23     A    It would be on the long list, yes.  But

24  Harrington was the boy's name.

25     Q    And do you recall what court it was in?

1    A    No, not off the top of my head.

2    Q    Do you have a general recollection as to

3  the date of that lawsuit?

4    A    No, not.

5    Q    What do you recall, if anything, about the

6  facts of that case?

7    A    The Harrington boy was riding his bicycle

8  down a path and a road and everything, and then the

9  road was barricaded and he was taking his bicycle and

10  he was crossing the tracks.  And as he crossed the

11  tracks, why this motor car type train struck him and

12  killed him there on the tracks.

13    Q    Was he in the process of crossing the

14  tracks when he was struck by this motorized train?

15    A    Yes.

16    Q    Was he riding the bicycle or walking the

17  bicycle across?

18    A    He was walking it across.

19    Q    And when you say --

20    A    Could I ask a question?

21    Q    No.  I'm not going to answer a question for

22  you.

23    A    Well, no, just for clarification.  Oh, let

24  it go.

25    Q    I'm sorry, if you need me to clarify a

1   question I'm asking you, go right ahead.  Tell me you

2   don't understand a question.

3       A       No, Mr. Taft, I understand the question.

4   But if you are making a matter of record of something

5   like that or something, doesn't make any difference to

6   me.  But some of the questions you ask are so

7   ridiculous, like was he riding a bicycle?  You can't

8   ride a bicycle across traffic, across railroad tracks

9   like that, across a field and things like that.

10      Q       Well, I don't know all the details.

11      A       Okay.

12      Q       All you have to do is answer my questions

13  and it's not a matter whether you think the questions

14  are silly or not.

15      A       No problem.

16      Q       Just answer them.

17      A       No problem.

18      Q       Is that agreed?  You said that he went

19  around a barricade on a road.  Was this an old road

20  that had previously been a crossing over the tracks

21  that was closed off?

22      A       No.  There was a road, he was riding down

23  the road and then there was a barricade on the road.

24  So he couldn't go any further.  So in order to get to

25  another side, to another place where there was a road,

1    he crossed the railroad yards where these tracks were.

2    And as he was going with his bicycle across the

3    tracks, why, the train struck him.

4         Q    That helps me a little bit.  So it was

5    actually in a railroad yard that the accident

6    occurred?

7         A    Yes, it's a main line.

8         Q    Okay, okay.  So he was going across

9    railroad property when he was injured?

10        A    Yes.

11        Q    Did you give a deposition or provide trial

12   testimony in that case?

13        A    Only a report.

14        Q    Given the length of time that's passed and

15   from what you told me earlier, it may be that that

16   report is no longer in existence because the case is

17   closed, but I would ask you to look at your records.

18   And if do you have a copy of the report which you

19   provided in the Harrington case, would you give it to

20   Mr. Solymosi, please?

21        A    Yes.

22        Q    Mr. Westphal, would you agree with me that

23   based on your education and experience you do not

24   contend to be an expert in traffic engineering?

25        A    That's correct.

1    Q    And similarly, you don't contend that you

2  are an expert in street or road design?

3    A    That's correct.

4    Q    And likewise, you don't contend that you

5  are an expert in human factors?

6    A    That's correct.

7    Q    And also, you don't contend that you are an

8  expert in the design and effectiveness of warning

9  signs?

10    A    That is correct.

11         (THEREUPON, Westphal Deposition Exhibit 6

12         was marked for identification.)

13    Q    Let me show you what's been marked as

14  Westphal deposition Exhibit 6.  Is that a copy of your

15  expert report dated February 16, 2007 that you

16  submitted in this lawsuit involving claims by Robin

17  Nixon?

18    A    Yes.  Could I use the restroom?

19    Q    Sure.

20         (Break taken.)

21    Q    Back on the record.  Mr. Westphal, I show

22  you what's been marked as Westphal Deposition Exhibit

23  7?

24         (THEREUPON, Westphal Deposition Exhibit 7

25         was marked for identification.)

1  Q  Is that a copy of your amendment to your

2 expert report dated February 16, 2007?

3  A  Yes.

4  Q  Mr. Westphal, am I correct in understanding

5 that in accordance with the Federal Rules of Civil

6 Procedure, these two reports, your expert report dated

7 February 16, 2007 and your amendment, which is the one

8 page letter, that are marked as Westphal Deposition

9 Exhibits 6 and 7, constitute a complete statement of

10 all your opinions regarding the April 27, 1997

11 accident and the bases and reasons for those opinions?

12  A  Yes, as it, as I put in my original report,

13 my report of February 16th, I always reserve the right

14 to add to the report when additional information or

15 facts have been furnished to me.  So as of now, these

16 are the two reports.

17  Q  Okay.  And those two reports, again, in

18 accordance with the Federal Rules of Civil Procedure,

19 set forth or identify all the data or other

20 information that was considered by you in forming your

21 opinions?

22  A  That's correct.

23  Q  And also, those reports, again, in

24 accordance with the Federal Rules of Civil Procedure

25 identify any exhibits that you intend to use either as

1    a summary of or in support of your opinions?

2        A        Yes, I derived my opinion from a review and

3    research of that material.

4        Q        The material identified in those reports?

5        A        Yes.

6        Q        Mr. Westphal, when were you first contacted

7    to serve as an expert witness --

8        A        I was first --

9        Q        -- in this case?

10        A        I was first contacted on March 27th of

11    2006.

12        Q        You are referring to a document in giving

13    that answer.  Is that a one page document that I made

14    a copy of prior to the deposition today --

15        A        Yes.

16        Q        -- in your file?

17        A        Yes, it's a one page document.

18                (THEREUPON, Westphal Deposition Exhibit 8

19        was marked for identification.)

20        Q        Show you what's been marked as Westphal

21    Deposition Exhibit 8.  First of all, is this a

22    document that you prepared?

23        A        Yes.

24        Q        And you have kept in your expert witness

25    file?

1    A    Yes, I prepare this for each deposition.

2    It just prompts me on the information that's usually

3    generally asked in a deposition so I don't have to

4    search for it.  I've got it handy.

5    Q    Before I get back to the line of questions

6    I was on, Westphal Deposition Exhibit 8 also has a

7    list of cases and courts; correct?

8    A    Yes.

9    Q    It says 16 cases pending, 69 RR-49 FELA,

10    what does that mean?

11    A    16 accidents involving railroads or

12    crossing accidents or people involved or transits

13    getting run over, something like that and railroad

14    accidents, and 49 are FELA.  But I have 16 cases

15    pending.  And this 118 is cases that I've handled.

16    Q    Okay.  So the list that you are going to

17    provide is going to have presumably 118 cases?

18    A    Approximately, yes.

19    Q    That's what that means in the parenthesis?

20    A    Yes.

21    Q    And the 16 cases pending mean you have 16

22    cases open and unresolved?

23    A    That I'm working on, yes.

24    Q    What is the purpose of the cases that you

25    then list beginning with the Camacho case, what are

1  those?

2      A      These are cases that I've, that I have

3  worked on, that I have testified in Federal Court.

4  And these other cases up here, the Camacho case I

5  don't know how that got on there, because that was one

6  of the first cases I was involved in.  So that doesn't

7  -- that was handled in the New York Supreme Court and

8  I testified -- these are all cases that I've testified

9  in the court.

10      Q      I see, okay.  If they are all cases that

11  you testified in court, why aren't they all on the

12  list of cases that we just went over marked as

13  Westphal Deposition Exhibit 3?

14      A      Because some of them were before the last

15  seven years.

16      Q      Well, the Westphal Deposition Exhibit 3 --

17      A      Since --

18      Q      -- you indicated were cases that you were

19  deposed or testified at trial since 1997; correct?

20      A      Yes.

21      Q      I don't see any reference to the Subtle

22  case on your first list.  What was the Subtle case?

23      A      That was in Norfolk, down in Alexandria,

24  Virginia.

25      Q      What did that involve?

1      A      That involved a man that got injured on the

2  tracks while he was switching cars and throwing

3  switches.

4      Q      So it was an FELA case?

5      A      Yes.

6      Q      I don't see any reference to the Woods

7  case?

8      A      The Woods case is still pending in

9  California.

10     Q      Okay, but on your first list in which you

11  were identifying cases in which you gave depositions

12  or testified at trial, I don't see the Woods case.

13     A      Well, it's my error then.

14     Q      What's the Woods case involve?

15     A      The Woods case involves a trailer on flat

16  car operation in Sant Monica, California and Mr. Woods

17  was injured on that when they redesigned the grab

18  irons in the vertical position from a horizontal

19  position and he slipped and fell off of there injuring

20  his back.

21     Q      That's an FELA case?

22     A      Yes, it's under appeal now in the State of

23  California.

24     Q      And you have three cases here that go back

25  prior to 1997 but they are on the list that you have

1    in your files so I'm going to ask you about them.

2    What was the Camacho case?

3         A        Camacho case was in New York City.   It was

4    in the New York Supreme Court which is a trial court

5    and the school in that area of New York City let the

6    children out at noon without any supervision or

7    anything, and they would go down on the commuter

8    platform and grab on to freight cars and try to ride

9    the freight cars from one end to the other.   And the

10   little Camacho boy, he fell off the car and cut off

11   his leg.   His leg was severed.

12        Q        So he was a pedestrian that hopped on a

13   freight car?

14        A        Yes.

15        Q        On railroad property?

16        A        Yes.

17        Q        What was the Marcos case?

18        A        The Marcos case was a case where the switch

19   crew was switching the General Motors plant at

20   Lordstown, Ohio and they were shoving in and the

21   conductor instead of being down on the crossing was in

22   the General Motors plant crossing over to where they

23   were going to go in and the, as they shoved the cars

24   down into the, over into, down towards the plant

25   through the railroad yard, they had to go over a