1    crossing, and Mr. Marcos was on the standing, instead

2    of being on the side of the car, he was standing on

3    the crossover platform above the knuckle, spread eagle

4    and a Freightways Corporation truck was going into the

5    plant and they collided at the crossing and Mr. Marcos

6    just, with his hand he went onto the front of the

7    truck and rolled down into a ditch claiming an

8    accident.

9        Q    This was the case you mentioned earlier

10   involving a trucking company?

11       A    Yes.

12       Q    What was the Clark --

13       A    Now, I want to tell you this, if this comes

14   up, this Marcos versus Freight, that was -- well,

15   Mr. Marcos and the conductor settled with Conrail and

16   General Motors for $250,000 and then they persisted

17   in their design against Freightways Corporation, so.

18       Q    What was the Clark case?

19       A    The Clark case -- I told you that awhile

20   ago.

21       Q    Okay.

22       A    Burlington Northern case, Mr. Clark was

23   injured while handling a hand brake.  That was in that

24   other.

25       Q    Okay.  Well, the case you told me about is

1    identified in the other sheet as Clark versus

2    Cavenaugh.  And you also identify it as a case in

3    which you were deposed or testified in trial since

4    1997.

5        A       Wait a minute.  That's a different.  That's

6    a different case there.  That was a case where they,

7    this Mr. Clark --

8        Q       Make sure we are talking about the same

9    case.  You are referring now to the Clark versus

10   Cavenaugh case on the prior list?

11       A       Yeah.

12       Q       Marked as Westphal Deposition Exhibit 3?

13       A       I'm sorry, there is two Clark cases.

14       Q       Okay.

15       A       The Clark was versus Cavenaugh.  And

16   Cavenaugh was not a railroad per se, it was another

17   group, a company that was involved and he was involved

18   in the railroad accident.  That was down in Alabama.

19       Q       You told me that was a grade crossing case?

20       A       I didn't.  I thought that was the Clark

21   that was in the Burlington Northern case over here.

22       Q       What is the Clark versus Burlington

23   Northern case?

24       A       That's the one I referred to before that

25   had a bad hand brake and the hand brake locked up and

1    they had to finally take it off the car.

2        Q     So that's an FELA case?

3        A     Yes.

4        Q     Back to Westphal Deposition Exhibit 8, I

5    had asked you what your first involvement was in this

6    case or when that occurred, and you referred to this

7    sheet and reference March 27th, 2006; correct?

8        A     Yes.

9        Q     Who contacted you?

10       A     I was contacted by Mr. Tibor Solymosi.

11       Q     What did Mr. Solymosi tell you when he

12   contacted you?

13       A     He told me about the accident and that he

14   was going to send me materials and ask me to review

15   the facts and everything involving the incident that

16   occurred on April 27 and conduct any necessary

17   investigations and render an opinion regarding the

18   conduct Norfolk Southern Corporation and its

19   personnel.

20       Q     What record do you have in your expert file

21   that identifies March 27, 2006 as the initial contact?

22       A     Whenever a client calls me, I always type

23   up a folder and I put on that folder the date, the

24   first contact.  And that's the date and that is always

25   on this folder.

1      Q      On the tab on the folder?

2      A      Yes.

3      Q      So following that initial contact, did

4    Mr. Solymosi then send you written materials to

5    review?

6      A      Yes, this material here (indicating).

7      Q      Referring to the four three-ring binders?

8      A      Yes.

9      Q      Go back if you would, Mr. Westphal, to

10   Westphal Deposition Exhibit 6 which is your expert

11   report, and I'm looking at the bottom of page 1 called

12   documents and there are 26 items identified there?

13     A      Yes.

14     Q      Does that constitute the complete list of

15   documents, photographs and other things that you

16   reviewed in arriving at your expert opinions in this

17   lawsuit?

18     A      Yes.

19     Q      And are all of those items, numbers 1

20   through 26, included in the four three-ring binders?

21     A      Yes.

22     Q      Where did you get the items that are marked

23   in your expert report that are marked as items number

24   23 and 24 being publications of the Federal Highway

25   Administration?

1    A    They were forwarded to me by Mr. Solymosi.

2    Q    And I also note at the bottom of page 6 of

3  your expert report under a heading "What Should Have

4  Been Done," a reference to a project from the

5  Pennsylvania Transportation Institute by Elefteriadou,

6  as best as I can pronounce it,

7  E-l-e-f-t-e-r-i-a-d-o-u, et al; do you see that?

8    A    Yes.

9    Q    I don't see that project or that report

10  listed under the documents in your expert report items

11  1 through 26.

12    A    I believe that report came from the, was

13  included with the group.  And evidently I've

14  overlooked it or something, but -- no, these are the

15  depositions.

16    Q    Well, take your time.  Look through your

17  four three-ring binders and just tell me if you have

18  that study or report that you identify at the bottom

19  of page 6 of your expert report from the Pennsylvania

20  Transportation Institute.

21    A    There is the U.S. Department of

22  Transportation.

23    Q    What's the title of that document you are

24  looking at?

25    A    This is "Synthesis of Shoulder Rumble

1    Strips."

2        Q     That would be item 24 that you identify in

3    your expert report on page 3?

4        A     Federal Highway Administration, synthesis

5    ethics and policies, yes.

6        Q     Okay.  What else do you have in the

7    three-ring binder?  Or rather, I shouldn't ask you

8    that question.  If you would, continue to try to

9    locate this Pennsylvania Transportation Institute

10   report.

11       A     I remember that name that you pronounced

12   there.  I remember that in here.

13       Q     Just so we are clear on the record you have

14   just gone by another item --

15       A     That's a "Synthesis of Shoulder Rumble

16   Strips Practices and Policies."

17       Q     Right, that's item 24; correct?

18       A     Yes.

19       Q     What is the next item in that three-ring

20   binder?

21       A     "Roadway Shoulder Rumble Strips."

22       Q     That's item 23 on your list; correct?

23       A     Yes.

24       Q     Okay.  If you continue to look through

25   there and see if you have this report by Elefteriadou

1   that you reference on page 6 as a basis for your

2   opinion.

3        A     I remember seeing that fellow's name in

4   here.  Here is his name right here in the study of

5   Elefteriadou, "the five proposed bicycle tolerable SRS

6   designs were evaluated by 25 intermediate and advanced

7   bicyclists."

8        Q     What document are you referring to where

9   you find that name?

10       A     This is the "Synthesis of Shoulder Rumble

11  Strip Practices and Policies."

12       Q     I'm looking for a copy of his report, not

13  what somebody else said his report states.  If you

14  have it.

15       A     Seems to me that -- that is here someplace.

16  It had, it had a photograph of --

17             MR. SOLYMOSI:  Roger, what was your

18       question?  I can't recall what the question was.

19             MR. TAFT:  I'm asking him if he has a copy

20       of the Pennsylvania Transportation Institute

21       report by Elefteriadou that he referenced and

22       relied upon at the bottom of page 6 of his

23       report.

24             MR. SOLYMOSI:  His report says --

25             MR. TAFT:  I know what it says.

1          MR. SOLYMOSI:  It doesn't say he relied on

2     it.  The says 2006 Pennsylvania Transportation

3     Institute relied upon a project by that person.

4          MR. TAFT:  Right, he references that report

5     as a basis for his conclusion.  I'm asking him if

6     he has a copy of that report by the Pennsylvania

7     Transportation Institute.

8          MR. SOLYMOSI:  I don't believe he

9     references that report.  He references that

10    document which "Shoulder Strip Rumble Strip"

11    document that's been identified.  And inside that

12    document he will Elefteriadou is referenced.  He

13    never referenced a report by Elefteriadou.

14         MR. TAFT:  The question is very simple,

15    does he have a copy of the report from the

16    Pennsylvania Transportation Institute that he

17    cites at the bottom of page 6?

18    A     I can visualize that report.  I just can't

19    -- because it has a report of the Norfolk Southern,

20    Conrail and CSX engines on the front of the report.

21    Q     Are you saying, Mr. Westphal, that that

22    Pennsylvania Transportation Institute report by

23    Elefteriadou involved railroads?

24    A     No, maybe I'm confused a little bit.

25    Q     If it didn't involve railroads, you

1   wouldn't expect to see locomotive engines on the

2   front; correct?

3       A     Well, there was a report.  So maybe I'm

4   confused about that.  Evidently I don't have the

5   study.

6       Q     Well, that's what I'm asking.

7       A     Unless I just took it here, from this study

8   I took it out of here, I believe.

9       Q     Okay.

10      A     He quotes it in here in the study of

11  Elefteriadou or whatever his name is.

12      Q     Okay.  Well, that's what I'm trying to get

13  at.

14      A     Yeah.

15      Q     So to be clear, you do not have and have

16  never reviewed the original report from the

17  Pennsylvania Transportation Institute involving this

18  project by Elefteriadou?  You have made reference to

19  what someone else said the report contained?

20      A     Well, what I said in my report, the Federal

21  Highway Administration has assembled data of this

22  nature, which includes the testing of bicyclists who

23  travel on highways, et cetera, in 2000, and that's

24  what, in 2000 the Pennsylvania Transit Authority

25  relied upon the project of this man, to develop new

1    rumble strips configurations to decrease the level of

2    vibration experienced by bicyclists.  And that's where

3    I got it out of here.

4         Q    Okay.  So just to be clear, you have never

5    seen or reviewed the report itself from the

6    Pennsylvania Transportation Institute, you merely have

7    referred to what someone else stated the report

8    contains?

9         A    I referred to what was included in the

10   Department of Transportation information assembled.

11        Q    Right.

12        A    That included that material.

13        Q    A blurb, a summary of that report?

14        A    Yes, is what I read, what I read to you.

15   And it goes on to the next page, if you want me to

16   read that.

17        Q    No, I don't want you to read it.

18        A    Okay.

19        Q    But what I do want you to admit, if it's

20   true --

21        A    That's where I got this information.

22        Q    -- you have never seen that man's report

23   yourself?

24        A    No.  I got this information from the DOT

25   report.

1    Q    Okay.  Thank you.  Would you agree with me,

2 Mr. Westphal, that in order to give a valid expert

3 opinion, it's necessary to have complete, have a

4 complete and accurate understanding of the relevant

5 facts of the case?

6    A    Yes.

7    Q    And in your --

8    A    And that's what I do, based on my broad

9 experience in the railroad industry, the material that

10 I've had, while I don't claim to be an expert in

11 certain things because I'm an expert in railroad

12 operations and I claim to be, my background and I've

13 been supported in that.  But I do claim to have

14 expertise in many areas of, because of my experience

15 and you can only get that expertise by having that

16 experience.

17    Q    I wasn't asking you a question about your

18 expertise.

19    A    I understand.

20    Q    I was asking you a question was it

21 necessary to have a complete and accurate

22 understanding of the relevant facts to give a valid

23 opinion?

24    A    And I believe I answered that question.

25    Q    Okay.  And in your expert report beginning

1    at page 3, you set forth in writing what you consider

2    to be an accurate statement of relevant facts to

3    support your expert opinion; correct?

4         A    That's correct.

5         Q    I want to refer you to the first paragraph.

6    You are describing, are you not, the train that was

7    involved in the April 27, 1997 accident with Robin

8    Nixon --

9         A    Yes.

10        Q    -- is that right?  And you are indicating

11   that that was an eastbound Norfolk Southern train?

12        A    That's correct.

13        Q    And then you go on to describe the train

14   and you state that "The train consist was 150 loads,

15   zero empties with 7,225 tons traveling at a reported 8

16   miles per hour"; correct?

17        A    That's correct.

18        Q    Now, in order to get that fact upon which

19   you are basing your opinion, I assume you reviewed the

20   train consist?

21        A    I reviewed the information that was given

22   by the depositions of the engineer and the conductor

23   who are responsible for maintaining those records.

24        Q    Well, did you review the train consist?

25        A    The train consist wouldn't give me that.

1    That would give you what -- the train consist only

2    says what is in the cars or things like that and what

3    is their destination.

4        Q    You don't think the train consist tells you

5    the number of cars and loads?

6        A    The consist is the -- well, I guess you

7    could say yes.  The consist of the train is so many

8    loads or empties.

9        Q    Does the consist give you the weight of the

10   train?

11       A    Yes.

12       Q    Does the consist give you the length of the

13   train?

14       A    Yes, it's on the wheel report.

15       Q    Does the consist give you that?

16       A    It's on the wheel report.  Maybe we got a

17   different interpretation of consist.

18       Q    Well, you have been involved in railroad

19   operations for many years and the concept of a consist

20   is pretty simple.  A consist, as I understand it, you

21   correct me if I'm wrong, is the document that

22   identifies the makeup of a particular train; correct?

23       A    Yes.

24       Q    And isn't it a fact that you reviewed the

25   consist of this train in order to come out with your

1   statement that the train consisted of 150 loads, zero

2   empties and 7,225 tons?

3        A    That information was in the, in the

4   deposition questions asked and answered in the

5   engineer's --

6        Q    Show me.

7        A    I don't mean to argue with you.

8        Q    I'm not arguing, but it's a simple

9   question.

10            MR. SOLYMOSI:  He has answered it, Roger.

11       He has told you he got it out of the deposition.

12            MR. TAFT:  Okay.  I'm asking him to show me

13       who said that, that he cites as a fact for a

14       basis of his opinion.

15       A    There he says on page 12 --

16       Q    Who is he?  I'm asking where you got your

17   fact that "the train consist was 150 loads, zero

18   empties and 7,225 tons"?

19       A    I believe I got it out of the information

20   that was furnished in one of these other statements.

21       Q    When you say "other statements," do you

22   mean depositions or something else?  It was not in a

23   deposition; correct?

24       A    No, not in that one.

25       Q    Whose were you reviewing?

1    A    The conductor.

2    Q    That would be Mr. Glenn, Robert Glenn?

3    A    Yeah, Robert Glenn.

4    Q    Okay, go ahead.

5    A    I believe it was in some of the material

6    that was furnished by yourself.  I just have to go

7    through here and find it.

8    Q    Okay.

9    A    Yes, here it is.  It's on the form 6644

10    from the carrier.

11    Q    What is that?

12    A    It shows the number, the three units, 150

13    loads, no empties, 7,225 tons.

14    Q    Can I see that, please?  Did you ask for,

15    Mr. Westphal, a copy of the train consist itself to

16    review to determine the tonnage and length of the

17    train?

18    A    No, this is a report here that tells you

19    the information.

20    Q    Does it give you information on the length

21    of the train?

22    A    Only that it's 150 loads?

23        (THEREUPON, Westphal Deposition Exhibit 9

24        was marked for identification.)

25    Q    Let me show you what's been marked as

1    Westphal Deposition Exhibit 9.  Have you seen that

2    document before?

3        A    No, it's a wheel report is what it is,

4    train consist.

5        Q    All right.  When you make reference to a

6    wheel report, that's a different way of referring to

7    the train consist?

8        A    Well, in railroad terminology, railroad

9    language, train consist is how many loads, how many

10   empties.  The wheel report indicates how many, what is

11   the consist of the train, what is the, what is the

12   loads, what is contained in the cars, where do they

13   set off, where were they picked up, is there any

14   hazardous material in the car.  That's what a wheel

15   report does.

16       Q    So Westphal Deposition Exhibit 9 is a copy

17   of what you refer to as the wheel report --

18       A    Yes.

19       Q    -- for the train involved in the April 27,

20   1997 accident?

21       A    Yes.

22       Q    Did you request a copy of that to review

23   prior to providing your expert report?

24       A    No.

25       Q    Is this wheel report a document that is

1  generated and published on the day in which the train

2  operates with the number of cars identified on the

3  wheel report?

4      A    In today's technology with computers and

5  e-mails and transmissions, it's been my experience in

6  talking to railroad conductors that they might get the

7  wheel report when they start, they might get just a

8  list of the hazardous material cars.  Sometimes it's

9  generated as they go along and they pick it up.  But

10  they do get the loads and empties and the tonnage of

11  the train when they leave their terminal.  It's

12  important to the engineer.

13      Q    Would you agree with me that this wheel

14  report is the most accurate report of what the train

15  consists of car by car, weight wise, number of cars

16  and length of train?

17      A    That's the purpose of the report, yes.

18      Q    If you refer now to this wheel report or

19  what I was referring to as a consist, it refers, does

20  it not, to 153 cars, comprised of three engines and

21  150, what appear to be coal cars?  Do you understand

22  my question?

23      A    Not really.

24          MR. TAFT:  Read it back and I'll repeat it

25      if you don't.

1          (Read back.)

2     A     I understand your question, but that isn't

3 what the wheel report says.

4     Q     Well, let me point something out to you.

5 Does it not say 153 cars?

6     A     Yes.

7     Q     Does it not identify three engines?

8     A     Yes.

9     Q     And does it not then identify 150 separate

10 cars in addition to the three engines making up the

11 total of 153?

12     A     Well, that isn't the way -- that isn't the

13 way -- in railroad -- I'm not arguing with you, but in

14 railroad terminology, that's not the way it's

15 expressed and railroad people don't do that.  There

16 was 153 cars.  That's 153 loads of coal and then there

17 are three engines.

18     Q     This is Norfolk Southern's document, is it

19 not?

20     A     I know it.

21     Q     And correct me if I'm wrong, but you

22 haven't worked on a railroad or for a railroad since

23 you left the Chicago and Northwestern Railway Company

24 in December of 1960; correct?

25     A     Yes, but I've still been involved in the

 1  industry widely in that area during that period of

 2  time.

 3      Q      You have never worked for Norfolk Southern?

 4      A      No.

 5      Q      Take a look at its business record and its

 6  report, does it not show three engines and 150 coal

 7  cars by number?

 8      A      The report shows 153 loads of coal.  If you

 9  look at the last page, the last car is 153, right

10  there.  The total, the three engines are separated

11  from the total consist.

12      Q      You show me car by car where you have 153

13  loads of coal.

14      A      Mr. Taft, all I'm going by is they are

15  numbered --

16             MR. SOLYMOSI:  You are being argumentative.

17      He has answered your question.  He may not have

18      answered it the way you wanted him to --

19             MR. TAFT:  I'm not getting argumentative --

20             MR. SOLYMOSI:  -- but it is argumentative.

21             MR. TAFT:  It may be argumentative, because

22      he is not reading the report.

23      A      I'll read the report, Mr. Taft.  The first

24  car --

25      Q      You don't have to --

1       A       The first car --

2       Q       You don't have to read it out loud.  Read

3   it to yourself and tell me if it does not identify,

4   car by car, 150 coal cars and three engines added

5   together which make up 153?

6       A       It does not.

7       Q       Then let's both look at it.

8       A       All right.

9       Q       Does it identify three engines on the first

10  page?

11      A       Yes.

12      Q       Does it identify 19 coal cars on the first

13  page?

14      A       Starting with number one?

15      Q       Yes.

16      A       All right.

17      Q       Let's go to page 2.

18      A       There is 19 on the first page.  On page 2--

19      Q       Cars 20 through 51, correct, excuse me, 52?

20      A       Mine only goes to 51.

21      Q       Well, it's cut off at the bottom.  Next

22  page goes cars 53 through 85.

23      A       Mine only goes to 54.  Well, I guess the

24  numbers are not there.

25      Q       Well, you can see that there is something

1    at the top, can you not, Mr. Westphal?

2        A    Yes.

3        Q    And you can see there is something at the

4    bottom that's been cut off?

5        A    Yes.

6        Q    Let's go to the next page.  Does it not

7    begin with number 86?

8        A    Yes.

9        Q    End with 118?

10       A    Yes.

11       Q    Let's go to the next page.  Begins with 119

12   and ends with 150?

13       A    Yes.

14       Q    Does it identify any additional coal cars

15   beyond that 150?

16       A    Yes.

17       Q    Three more?

18       A    Three more, which is 153.

19       Q    So you have three engines?

20       A    No.

21       Q    You have three engines and 153 coal cars?

22       A    No -- you have 153 cars, yeah, that's what

23   I said before and three engines.

24       Q    Okay.  All right.

25       A    That's what I said before.  You didn't put

1    it that way.

2         Q       I apologize.

3         A       Okay.

4         Q       I apologize.   Now, does it also indicate

5    the gross tons?

6         A       Yes.

7         Q       19,376?

8         A       Yes.

9         Q       That's not what's in your report.   You have

10   got 7,225 tons.

11        A       Well, then I stand in error.

12        Q       The consist does indicate 19,376 tons;

13   correct?

14        A       Yes.

15        Q       Does the consist also tell us that the

16   train is 7,818 feet in length?

17        A       Yes.

18        Q       And you would agree with me that 7,818 feet

19   is just about one and a half miles long?

20        A       Yes.   I mark report -- I stand corrected on

21   that.

22        Q       Let's move on to the bottom of that page.

23        A       Of --

24        Q       I'm sorry, of your expert report, page 3.

25   You identify the conductor as Robert Glenn; correct?

1       A       Yes.

2       Q       And you identify the engineer as Timothy

3  Price?

4       A       Are you on the bottom of the page now?

5       Q       Second paragraph of your facts.  Is that

6  who you identify as making up the train crew, namely

7  Robert Glenn as conductor and Timothy Price as

8  engineer?

9       A       Yes.

10      Q       And in the third paragraph you go on to say

11 that the conductor, and that's Mr. Glenn, "is to be

12 seated in the lead unit of the train, on a two man

13 crew, and be vigilant and alert to what is on the left

14 side of the train"?

15      A       Yes.

16      Q       Well, isn't it a fact that it was the

17 engineer, Mr. Price, who was operating this train on

18 the left side when this accident occurred, not

19 Mr. Glenn?

20      A       Not to my knowledge.

21      Q       So your knowledge is that Mr. Glenn, the

22 conductor, who was not operating the train, was seated

23 on the left side of this eastbound train?

24      A       Yes.

25      Q       Okay.  Where did you get that information?

1    A    The train, unless the train was backing up,

2    the engine would be going forward, and the conductor

3    would be sitting on the left-hand side of the engine.

4    Q    We all agree, do we not, we had an

5    eastbound train --

6    A    Yes.

7    Q    -- that was moving?

8    A    Yes.

9    Q    And you are saying that based on the

10   materials you reviewed, you concluded that Mr. Glenn,

11   the conductor, was seated on the left side of the

12   train, which would be on the north side --

13   A    Next to the lake.

14   Q    -- on the lake side --

15   A    Uh-huh.

16   Q    -- is that right?

17   A    Yes.

18   Q    Where did you get that fact?

19   A    Well, it's a fact in the industry that when

20   you have an eastbound train, unless that train is

21   backing up, why, the engineer would be on the

22   left-hand side of the locomotive, the engineer would

23   be on the right-hand side of the locomotive where the

24   controls are.

25   Q    Well, isn't it a fact on this locomotive,

1    the controls were on the left side?

2        A    I didn't get that from anything.

3        Q    Well, didn't you read Mr. Glenn's

4    deposition?

5        A    If I did, I didn't read that.

6        Q    Okay, well, you have got identified as

7    Mr. Glenn's deposition as something you reviewed as a

8    basis for your report; correct?

9        A    Yes.

10        Q    Item 16.  How carefully did you review his

11    deposition?

12        A    Very carefully.

13        Q    Did you review any of the deposition

14    exhibits that went with that deposition?

15        A    If they were not with the exhibit, if the

16    exhibits were not included with the deposition, I

17    didn't read them.

18        Q    Well, did you review any depositions that

19    accompanied the deposition transcripts that you

20    reviewed?

21        A    Did I review any depositions that included

22    the deposition transcripts?

23        Q    I'll start over again.  You have

24    identified, and you have in front of you, some

25    deposition transcripts that you claim you reviewed

1    carefully; correct?

2        A    Yes.

3        Q    And some of those, including Mr. Glenn's

4    transcript, make reference to exhibits?

5        A    Yes.

6        Q    Do you have any deposition exhibits for

7    Mr. Glenn's deposition or for any other deposition?

8        A    Unless they were, if they were not

9    forwarded to me, I don't have them.

10       Q    Well, take a look and tell me if you have

11   any deposition exhibits for his deposition or any

12   other deposition?

13       A    No, they were not in the one for Mr. Glenn.

14       Q    How about the rest of them?

15       A    They were not in the ones for Mr. Price.

16       Q    Keep going.  Check the rest of your

17   transcripts.

18       A    They were not in the ones for Mr. Morgan,

19   or for Mr. Rockey, or for Mr. Frye, or for Mr. Baskin,

20   or for Mr. Cunningham.  You are stating that there

21   were deposition exhibits for each one of them?

22       Q    I'm trying to see if you received and

23   reviewed deposition exhibits for any of the

24   depositions that you claim you looked at carefully.

25       A    Or for Mr. Stone, or for Mr. Pandlis.  No,

1   the exhibits were not furnished.

2       Q       As you read carefully those deposition

3   transcripts, you saw references to deposition

4   exhibits, did you not?

5       A       It's in Mr. Robin Nixon there is about 36

6   exhibits.

7       Q       How about the other ones?

8       A       Let me look and see if we have an exhibit

9   in here.

10      Q       Let's focus on Mr. Glenn.   Are you

11  referring to Mr. Nixon's now?

12      A       Well, this is Mr. Glenn.

13      Q       What I'm saying is you reviewed carefully

14  Mr. Glenn's deposition transcript --

15      A       Let's see what --

16      Q       Didn't you see that there were deposition

17  exhibits that went with the transcripts?

18      A       Yes, Exhibit No. 1 was marked for

19  identification.

20      Q       Well, as you saw that there were deposition

21  exhibits that accompanied the transcript, did you make

22  a request to Mr. Solymosi that he give you those

23  exhibits so you had all the information to consider?

24      A       I did not.

25      Q       You didn't think it was important?

1     A     No, because timetable number 1 is a

2   timetable.  A timetable has little or nothing to do

3   with the accident as it happened.  The book of rules

4   is the one that really --

5     Q     So you decided certain deposition exhibits

6   were important and others weren't?

7     A     No, I didn't say that.

8     Q     You didn't think it was important enough to

9   ask for the deposition exhibits that Mr. Glenn

10  referred to in his deposition in order to get all the

11  information?

12    A     If I thought it was, I would have asked for

13  them, yes.

14    Q     And you didn't?

15    A     No.

16    Q     And you didn't ask for any deposition

17  exhibits?

18    A     No.

19    Q     So you didn't think any of the deposition

20  exhibits were important to your opinion?

21    A     No, I didn't say that.  I just didn't ask

22  for them.

23    Q     Well, if you thought they were important

24  for them, would you have asked?

25    A     What I read into the deposition about the

1  exhibit, the exhibit wouldn't mean really anything --

2       Q     Well --

3       A     -- to them.

4       Q     Well, in Mr. Glenn's deposition, isn't it

5  true that Deposition Exhibit 4 was a diagram of the

6  locomotive that showed where he sat and where

7  Mr. Price sat and where the controls were?

8       A     Well, I know what a diagram of a

9  locomotive, I know that, but --

10      Q     Weren't you interested in knowing what this

11 locomotive was set up to do and where this train crew

12 was located?  Wasn't that important to you?

13      A     Yes.

14      Q     Okay.  Did you request a copy of Deposition

15 Exhibit 4 so you could see the diagram that Mr. Glenn

16 drew showing where he sat and where Mr. Price sat and

17 where the controls were?

18      A     No.

19      Q     Okay.  Even though that was important?

20      A     I don't see where the deposition -- oh,

21 Deposition Exhibit No. 1 was the engineer's report.

22      Q     Well, let's go to page 32 of Mr. Glenn's

23 transcript.  I assume you read that very carefully?

24      A     I was in with Mr. Price.

25      Q     Well, let's take a look at Mr. Glenn's.

1       A       Page 22?

2       Q       No, page 32.

3       A       32.

4       Q       You read this transcript carefully;

5   correct?

6       A       Yes, in my opinion I did.

7       Q       What does Mr. Glenn testify to at question

8   beginning at line 14 as where the engineer was located

9   compared to him, the conductor?

10      A       "He was on the north side.  I was on the

11  south as far as sitting on the rail."

12      Q       Okay.

13      A       "There are two seats over here.  I was

14  sitting over here and he is sitting there."

15      Q       Now, Mr. Price was the engineer; correct?

16      A       Yes.

17      Q       And so Mr. Glenn was testifying that the

18  engineer was on the north side, the left side and

19  Mr. Glenn, the conductor, was on the right side, or

20  south side; correct?

21      A       "He was on the north side.  I was on the

22  south side as far as sitting on the rail."

23      Q       Right.

24      A       "There are two seats over here."  Well, two

25  seats over here are on -- they are not on the

1    engineer's side.   They are on the conductor's side.

2         Q    Well, isn't it true that Mr. Glenn, the

3    conductor, was seated on the right side or south side

4    of the locomotive, not on the left side or north side

5    as you put in your report?

6         A    The configuration of the locomotive, they

7    must have been backing up, because the -- I didn't see

8    anything where they had a dual control engine.

9         Q    Well, you didn't ask to look at --

10        A    I understand that.

11        Q    -- Exhibit 4 which was the diagram?

12        A    I understand that.

13        Q    So you didn't --

14        A    Did you see Exhibit 4?

15        Q    Mr. Westphal, you are not to ask the

16   attorney the questions.

17        A    I'm sorry.

18        Q    You answer my questions.   But you would

19   agree with me, would you not, that if you had reviewed

20   this transcript carefully, you would have seen that it

21   was the engineer on the left side, Mr. Price, and it

22   was the conductor, Mr. Glenn, on the right side, not

23   the way you have it.   You have it backwards; is that

24   right?

25        A    That's correct.

1    Q    I'll show you because we made reference to

2  it because you didn't ask for it before, a copy of

3  Glenn Deposition Exhibit 4, which shows the controls

4  on the left side where the engineer was seated and it

5  shows the two seats on the right side where the

6  conductor, Mr. Glenn, was seated.

7    A    That is an entirely different -- that is an

8  entirely different thing, an engine makeup that I've

9  ever seen in the industry.

10    Q    Okay.

11    A    And I would question that exhibit.

12    Q    Well, you apparently didn't read his

13  testimony.

14    MR. SOLYMOSI:  Is that a question?

15    MR. TAFT:  No.

16    A    Could I get a copy of that exhibit, please?

17    Q    Sure.  Make it for you after lunch or you

18  want it now?

19    A    Any time.

20    Q    Okay.

21    MR. SOLYMOSI:  Are we going to take a

22    break, soon, Roger?

23    MR. TAFT:  I'm sorry.

24    MR. SOLYMOSI:  I need to eat.

25    MR. TAFT:  Why don't we take a break now

1          and tell me when you would like to resume.

2                    MR. SOLYMOSI:  1:00.

3                    MR. TAFT:  That's fine.

4          Q    Mr. Westphal, I'll make a copy of that

5    exhibit for you.

6          A    Okay, thank you.

7                    (THEREUPON, at 11:50 a.m. a lunch recess

8          was taken.  Resumed at 1:00 p.m.)

9          Q    Back on the record.  Prior to the lunch

10   break, we were reviewing parts of your expert report

11   in connection with your agreement that it is necessary

12   to have complete and accurate understanding of

13   relevant facts in order to give a valid opinion.

14                   And let me refer you now to the bottom of

15   page 4 of your expert report.  This is under the

16   heading "Discussion," last paragraph, you state in the

17   second sentence "In the instant accident to Robin

18   Nixon there were Norfolk Southern employees in

19   advantageous positions to note the presence of

20   children along the area of West 19th Street in Erie,

21   Pennsylvania.  The use of crossing watchmen was in

22   place at three locations along West 19th Street and

23   one in particular in the vicinity accident to Robin

24   Nixon."  That's what you said; correct?

25         A    That's what it states.

1    Q    But that's not true, is it, Mr. Westphal,

2  because when this accident happened there were no

3  crossing watchmen on duty?

4    A    There were crossing watchmen on duty in

5  that area of the -- I didn't say at the time of the

6  accident, did I?

7    Q    Well, you said "and one in particular in

8  the vicinity of the accident to Robin Nixon".

9    A    Yes, in the vicinity of the accident which

10  would have been Sassafras.

11    Q    You think there was --

12    A    If we look --

13    Q    You think there was a crossing watchman on

14  duty at Sassafras Street when this accident occurred?

15    A    Well, we can look at the -- the crossing

16  watchmen were under the jurisdiction -- well,

17  that's --

18    Q    First of all, Mr. Westphal, are you saying

19  that there were crossing watchmen assigned to

20  Sassafras Street?

21    A    Maybe not -- there was crossing, I don't

22  want to get -- I'd have to look and see.  But there

23  were crossing watchmen at different crossings along

24  that street.

25    Q    So you don't think --

1      A      Can I answer you?

2      Q      Sure.

3      A      For the purpose of guarding the crossing

4  for children that were going back and forth to school

5  and going across and when trains were going by.

6      Q      It was on school days, during the school

7  year, during school hours; correct?

8      A      Yes.

9      Q      And in fact, that's what the PUC Order

10  said?

11      A      Yes.

12      Q      And you don't recall then whether one of

13  these three locations was Sassafras Street or not?

14      A      I'd have to look and see.  If you want to,

15  that's where the accident happened.

16      Q      Right.  But are you saying that there was a

17  crossing watchman on duty either at Sassafras Street

18  or someplace else when this accident occurred?

19      A      No, no, I didn't say that.  "In the instant

20  accident to Robin Nixon, there were Norfolk Southern

21  employees in advantageous positions to note the

22  presence of children along the area of West 19th

23  Street in Erie, Pennsylvania."  That's what it says.

24      Q      The instant accident was on September 27 --

25      A      That's correct.

1      Q      -- 1997; correct?

2      A      Correct.

3      Q      So are you saying that on that date there

4  were crossing watchmen in advantageous positions to

5  note the presence of children?

6      A      No, what does it say there?  "In the

7  instant accident to Robin Nixon, there were Norfolk

8  Southern employees in advantageous positions to note

9  the presence of children along the area of West 19th

10  Street in Erie, Pennsylvania.  The use of crossing

11  watchmen was in place at three locations along West

12  19th Street."  And I can go back --

13      Q      Keep going.

14      A      "And one in particular in the vicinity of

15  the accident to Robin Nixon."  Now, in the vicinity,

16  that doesn't mean, could have been Myrtle Street where

17  they got --

18      Q      Okay, but let me clarify something because

19  I have the wrong date.  The instant accident to Robin

20  Nixon occurred on April 27th, 1997; correct?

21      A      Yes.

22      Q      And so are you saying whether it was a

23  Sassafras Street or Myrtle Street or some other

24  street, that in this instant accident on April 27th,

25  1997, there were Norfolk Southern employees working as

1    crossing watchmen, that day?

2        A    I didn't say that day, no.

3        Q    Okay.

4        A    But I said there were crossing watchmen at

5    advantageous positions in the vicinity of the accident

6    which was at Sassafras.  And those crossing watchmen

7    were in advantageous position to note children playing

8    along the tracks or being around the tracks or being

9    around trains if they were going by.

10        Q    But if they were not working that day, they

11    would not have seen Robin Nixon?

12        A    I didn't say that day --

13        Q    Listen to me.  As I interpreted your

14    statement to say that, when you say in the vicinity of

15    the accident to Robin Nixon.  Maybe we have an

16    agreement here.

17            Would you agree with me that if there were

18    no crossing watchmen working on the day of the

19    accident, none of them would have seen Robin Nixon?

20    Would you agree with that?

21        A    Well, I don't like to agree with, but if

22    there weren't any working, they wouldn't notice him.

23    You said, that's a redundant question.

24        Q    Right, would you agree with that if they

25    were not working on the day of the accident, none of

1  them would have seen Robin Nixon?

2      A     I am concerned with the fact that when they

3  were working, they would have been able to see

4  children around there and that's what they should have

5  reported.

6      Q     Listen to my question.  Would you agree

7  with me that if no crossing watchmen were working on

8  April 27, 1997, when this accident occurred, none of

9  them would have seen Robin Nixon?  Can you agree with

10  that?

11     A     That's a fact.

12     Q     Okay.  Second of all, as a fact, would you

13  agree with me that the accident on April 27, 1997

14  occurred on a Sunday?

15     A     Well, we would have to look it up.

16     Q     Well, let's take a look at the police

17  accident report.  You reviewed that, did you not?

18     A     Yes.

19     Q     Because that's on your list.  I'm talking

20  about the City of Erie Police accident report?

21     A     Did the defendant furnish that?

22     Q     I don't know.

23     A     It says in the newspaper, Sunday's

24  accident.

25     Q     You have a copy of the police accident

1    report in one of those three-ring binders; correct?

2        A    Yes.

3        Q    And you would agree with me that April

4    27th, 1997 was a Sunday?

5        A    Yes, it said Sunday's accident.

6        Q    And second of all, you would agree with me

7    that Sunday is not a school day?

8        A    I would say so, yes.

9        Q    So you would agree with me that none of

10   these crossing watchmen that you were referring to in

11   your report would have been on duty and would have

12   seen Robin Nixon on the day of the accident?

13       A    They wouldn't have been on duty, no.

14       Q    And they wouldn't have seen him on the day

15   of the accident?

16       A    If they weren't on duty, they wouldn't have

17   seen him.

18       Q    That's all I'm --

19       A    My position on this is the crossing

20   watchmen that were there were negligent in not

21   informing the police or anybody else that there were

22   children around and try to deter that.  They never

23   notified the dispatcher, they never notified any of

24   their superiors that there were children up and down

25   that street along the trains and getting on the

1    trains.  One of them did, Mr. Rockey, he pointed that

2    out in his deposition.

3        Q      How would that have prevented the accident

4    to Mr. Nixon on Sunday morning, April 27, 1997?

5        A      If the Norfolk Southern Railroad would have

6    had reported to the police department and the police

7    department would have taken action to look out for

8    that, and the railroad would have done this over the

9    months, these kids wouldn't be playing out there.

10   There is many other things it's in my report --

11       Q      I know, but you are suggesting then that if

12   Norfolk Southern had notified the City of Erie Police,

13   they would have stationed policemen somewhere along

14   19th Street on Sunday morning to make sure people like

15   Robin Nixon didn't do this?

16       A      No, that's not the standard -- I'm talking

17   about the standard in the industry.

18       Q      Well, you just said that if the City Police

19   were notified, they would have taken action to prevent

20   it?

21       A      That would have been on many occasions,

22   Mr. Taft, that they could have done that on many

23   occasions, not just on that day.  Many occasions.  And

24   to deter them children from going there.  You

25   shouldn't have to do it all the time.

1    Q    I'm referring to the specific date of the

2 accident, Robin Nixon on a Sunday morning, okay, there

3 were no Norfolk Southern employees working that day as

4 crossing watchmen, you would agree with that, right?

5 Yes or no?

6    A    Yes.

7    Q    But you are saying that if in the past

8 there had been reports of this, the City of Erie

9 Police would have taken action to have prevented Robin

10 Nixon from grabbing onto that train on Sunday morning?

11    A    Any children, not just Robert Nixon, all

12 the children.

13    Q    What would they have done on Sunday morning

14 to have prevented Robin Nixon from grabbing onto that

15 train?

16    A    If they weren't there, they couldn't have

17 done anything.

18    Q    Right.

19    A    But the reason they weren't there is

20 because Norfolk Southern never took any action to

21 notify the police in Erie, Pennsylvania, about it.

22    Q    So if Norfolk Southern had notified the

23 City Police earlier, the police would have stationed

24 people at 19th Street in case Robin Nixon came along?

25    A    No, you are trying to put words in -- the

1    standard in the industry is the same as what you

2    argued about the, you questioned me about the position

3    of the people on the locomotive.  It doesn't make any

4    difference which side they were on.  They were

5    negligent in not ever noticing children on there and

6    never looking sideways.  They never told the

7    dispatcher about children playing along the tracks,

8    which is the standard in the industry.

9         Q      And you think if that had happened --

10        A      And then the dispatcher would have notified

11   the Police Department.  And the Police Department

12   would have took action to go down there, at least

13   station a car down there and keep the kids away from

14   those tracks.  That's the standard in the industry.

15        Q      So you think the standard in the industry

16   is the City Police would have stationed a car or cars

17   along 19th Street indefinitely?

18        A      No, you are taking it out of context.  I

19   didn't say that

20             MR. SOLYMOSI:  I'm going to object here.

21        You have to look at his report as a whole.  You

22        are looking at one part of his report --

23             MR. TAFT:  I'm trying --

24             MR. SOLYMOSI:  -- and you are trying to

25        rope him into saying that he said that they

1   should have been stationed there.  That's not

2   what his report says.

3       MR. TAFT:  I don't understand his report,

4   and that's what I'm trying to get at.

5       MR. SOLYMOSI:  That's your problem if you

6   don't understand it.  It's clearly stated that he

7   is saying that these people that were alongside

8   the tracks never reported the accident.

9       MR. TAFT:  Mr. Solymosi, don't speak for

10  the witness.  This is cross examination of your

11  expert, and I'd appreciate if you want to object,

12  fine.  But don't speak for your witness and coach

13  him.

14      THE DEPONENT:  I don't believe I have to be

15  coached.  I tried to get my point across to you

16  and tell you just exactly what the standard in the

17  industry is, that the train crews look out, they a

18  vigilant and they look out to see if anybody is ar

19  the train.  If they see children around the train,

20  they are supposed to notify the dispatcher by radi

21  The dispatcher notifies the Police Department and

22  fact the railroad police.  They take action.  Whet

23  it's on Sunday, Monday, Tuesday or Wednesday, to

24  deter kids from doing that practice.  And that

25  would have deterred a lot of the accidents that

1          would have happened.  That's the standard in the

2          industry.

3          Q      How do you know it would have deterred

4    Robin Nixon on Sunday morning, April 27, 1997?

5          A      I didn't say that.  I said it would deter

6    the accidents and the kids would have stayed away from

7    the tracks.

8          Q      | Mr. Westphal, in your expert report you

9    make reference to a report by James Guarino having to

10   do with the installation of rumble strips and also the

11   installation of signs between the rails indicating

12   "DANGER-NO BIKES"; is that correct?

13         A      Can you locate it in my report there?

14         Q      Sure, page 7.

15         A      Okay, I have that in front of me.

16         Q      Okay.  Good.

17                (THEREUPON, Westphal Deposition Exhibit 10

18         was marked for identification.)

19         A      Now, Mr. Taft, did you take one sentence

20   out of context or are we going to look at the whole

21   thing now?

22         Q      I don't think I took a sentence out of

23   context.  I asked if you referenced in your report

24   this report of Mr. Guarino.  I think you said "yes, I

25   did".

1      A      What should have been done, that's on page

2   7, of 6, then continues on page 7.

3      Q      Let me show you what's been marked as

4   Westphal Deposition Exhibit 10.   Is that a copy of

5   Mr. Guarino's report dated February 12th, 2007 to

6   which you reference in your report?

7      A      Yes.

8      Q      And as part of your report you are adopting

9   Mr. Guarino's conclusions about installing rumble

10   strips in the fashion he proposes and also installing

11   these "DANGER-NO BIKE" signs in the fashion he

12   proposes?

13      A      I concur in his recommendations to prevent

14   injuries to the people, kids along the 19th Street.

15      Q      I want to ask you some questions now about

16   your opinions which begin on page 9.

17      A      Are we finished with Exhibit 10?

18      Q      Not necessarily, but I'm referring to page

19   9 of your report, referring to your opinions.   If I

20   understand it, you have set forth a total of 14

21   opinions on pages 9 and 10?

22      A      Yes.

23      Q      And all those are based upon the facts as

24   you understood them and the other materials and

25   documents referenced in your expert report?

1        A       Yes.

2        Q       Including the report of Mr. Guarino dated

3   February 12th, 2007; correct?

4        A       Yes.

5        Q       And I've got to follow up on these opinions

6   and in part on some of them I'm following up because I

7   believe you told me earlier that when you were

8   employed by Chicago and Northwestern Railway Company,

9   you never worked in the maintenance of weigh

10  department; correct?

11       A       Not per se.

12       Q       Well, you were assigned to freight and

13  passenger service, were you not?

14       A       Yes.

15       Q       You were not assigned to the maintenance of

16  weigh department to maintain track and ballast and

17  ties, were you?

18       A       When you are a conductor on the railroad,

19  you have a responsibility when a car is derailed, then

20  you have to do maintenance of weigh work with a car to

21  set frogs on it, to get ballasts out of the way, to

22  put ties underneath it.  It's all maintenance of weigh

23  work.  If you don't have a maintenance of weigh person

24  there you have to do it, you have to do it, to rerail

25  a car.

1    Q    How often did you have derailments?

2    A    Well, one time we had one for five days in

3 a row.  We never did get back to our home terminal.

4    Q    You had maintenance of weigh show up before

5 the end of five days, didn't you?

6    A    Yes, to rerail cars.

7    Q    But derailments were not a very frequent

8 occurrence?

9    A    When I first went to work on the railroad

10 1945, they were.  We were on the ground more than we

11 were on the rail.

12    Q    So you say there were more derailments in

13 1945 that kept you from running than there were good

14 rail that let you operate?

15    A    On our Chicago Northwestern Railroad there

16 was in 1945.

17    Q    So you had to do some temporary ballast

18 work on all these?

19    A    Yes, if they didn't show up, we had to

20 rerail the car.

21    Q    But as far as ongoing maintenance of track,

22 rail, ballast and the like, there was work assigned to

23 the maintenance of weigh department?

24    A    That's their department.

25    Q    And you never worked in that department?

1        A        I never said I did.

2        Q        I know.  I know you didn't.  Now, opinion

3    number 1, "Norfolk Southern Railroad was negligent in

4    failing to maintain the segment of railroad known as

5    the West 19th Street track in a manner to prevent

6    accidents which were known to occur."

7                What do you mean in that opinion that

8    Norfolk Southern Railroad was negligent in failing to

9    maintain the segment of railroad known as West 19th

10   Street track?

11       A        The railroad did not provide any type of

12   signage.  They didn't provide any personnel around the

13   track when -- to report or to accept reports for

14   children playing around the tracks.  The crossing

15   watchmen never reported any of that, those children

16   sightings, to their officials so that any type of a

17   program could be established to prevent the children

18   from catching onto the trains or even being around

19   trains.

20       Q        What does that have to do with maintaining

21   the segment of rail?

22       A        Maintaining the segment of railroad, that's

23   what it's about, to keep it in operating condition

24   without injury to traffic or employees or public.

25       Q        Okay.  You are not referring then to

1    maintenance of the track or the ties per se?

2        A       No, the track, the track and the ties are

3    underneath the cement or the asphalt.

4        Q       I just want to make clear when you are

5    talking about failing to maintain a segment of track,

6    you are not talking about the type of work the

7    maintenance of weigh department does?

8        A       No.

9        Q       Okay.  Is that the same for number 2,

10   number 2 says "Norfolk Southern Railroad was negligent

11   in the maintenance of West 19th Street track located

12   within a residential and industrial area."  What do

13   you mean by that?

14       A       That's correct, they didn't do anything to

15   try to prevent any type of accidents by having any

16   kind of a program to deter the children from playing

17   next to the tracks and where trains are moving along.

18       Q       My understanding from your report is that

19   you and Mr. Guarino agree that what should have

20   happened was the installation of these rumble strips

21   and the painting of signs indicating "DANGER-NO BIKES"

22   between the rails; is that right?

23       A       That's what could have been done.  And

24   that's what was in my report what should have been

25   done.

1    Q    Right.  So when we are referring to items 1

2    and 2, that's what you are referring to?

3    A    No, no, the railroad did absolutely

4    nothing, Mr. Taft.

5    Q    Well, show me, in addition to telling me,

6    that the rumble strips should have been installed and

7    that the signs should have been put between the rails

8    stating "DANGER-NO BIKES," where in your report are

9    you telling me that something else should have been

10   done --

11   A    Down on one of the --

12   Q    -- to maintain the tracks?

13   A    In number 13.

14   Q    Are you on opinion 13?

15   A    Yes.

16   Q    I'm not there yet.  I'm on 1 and 2.

17   A    Well, we are jumping around here.

18       MR. SOLYMOSI:  You just asked him to show

19   you elsewhere in the report.

20       MR. TAFT:  Okay, 13 is installing the

21   rumble strips.

22       MR. SOLYMOSI:  Install and maintain.

23   Q    Right, we talked about those already.

24   A    No, we haven't really talked about them

25   yet.  We just mentioned them and you gave me that