1    exhibit.

2        Q      Okay.  All right.

3        A      And then we jumped to something else.

4        Q      All right.  So we got rumble strips.  And

5    we got signage that should have been put down between

6    the rails; correct?

7        A      Well, in my report it says what could have

8    been done.

9        Q      Yeah.  There is a heading "What Should Have

10   Been Done"?

11       A      Yes.

12       Q      In which you state rumble strips and

13   warnings?

14       A      Yes.

15       Q      That's what you are claiming should have

16   been done?

17       A      But you were talking about opinions 1 and

18   2, and I explained at that time that the railroad did

19   absolutely nothing to prevent kids from running around

20   that track irregardless of the fact that they had

21   crossing watchmen there that seen the kids there.

22       Q      Okay.

23       A      They testified that they seen kids riding

24   on the cars, or grabbing onto the cars.

25       Q      But here is what's confusing to me.  When

1   you are saying we failed to maintain the segment of

2   railroad or we were negligent in maintenance of the

3   West 19th Street track, are you talking about the

4   failure to install rumble strips and the failure to

5   install signs?

6       A    No, I'm talking about the railroad failed

7   to maintain the -- maintain the track between West

8   19th Street in a condition that would have prevented

9   accidents.  That does not -- maintain keeps track of

10  the entire track, not the ties or the ballasts or

11  anything like that.  They didn't maintain any kind of

12  -- they didn't schedule any kind of action by the

13  railroad to prevent kids from playing on the tracks.

14      Q    Such as what?

15      A    What?

16      Q    Such as doing what besides putting these

17  rumble strips in or signs?

18      A    You always jump back to the rumble strips.

19  I'll get to that -- you want to go to that now?

20      Q    No, I don't.  Because I just want to make

21  sure that I understand what you are contending under 1

22  and 2.

23      A    And I explained that.

24      Q    No --

25           MR. SOLYMOSI:  That's been --

1       Q       Not to my understanding.

2               MR. SOLYMOSI:  That's been asked and

3       answered.

4               MR. TAFT:  I don't think it has.

5       Q       What program have you identified in here,

6   besides rumble strips and signs between the tracks

7   that you claim Norfolk Southern should have done to

8   maintain that segment of the railroad?

9       A       To maintain that stretch of the railroad

10  meant in this condition, put it in perspective of the

11  injury to kids or injury to anybody, Norfolk Southern

12  Railroad did absolutely nothing to prevent any kind of

13  accidents on that property by putting up signage or

14  anything, but yet they had crossing watchmen there on

15  certain days that admittedly seen kids catching on and

16  playing around the tracks.  But they did nothing.

17  They did not report them to their superiors.

18              Those people never had any training by

19  Norfolk Southern of what to do when they seen kids out

20  there.  So absolutely, they did absolutely nothing to

21  maintain that track in a safe condition along West

22  19th Street.

23      Q       I guess you mentioned it before, you are

24  saying they should have notified the City Police?

25      A       The standard in the industry, they should

1  have notified their superiors.

2      Q      Then what?

3      A      Then their superiors, the dispatcher or

4  their superiors would notify the police or the

5  railroad police, if they had them, and usually Norfolk

6  Southern had railroad police, and then they would

7  notify the Police Department Erie, Pennsylvania, that

8  there are children playing down along our tracks.

9      Q      And then what?

10      A      We would like to have you come down, see if

11  you can do something about it.  Then it would be the

12  City of Erie responsibility to follow up on that.  And

13  then somebody from the railroad should have followed

14  up, a train master or somebody should have followed up

15  and seen are they doing anything to prevent kids from

16  playing around the tracks and trains when they go

17  through town.

18      Q      Well, are you contending that the police,

19  if they had been notified, should have stationed

20  people there in case some kid like Robin Nixon came

21  along on a Sunday?

22      A      I didn't say that.  You are putting those

23  things --

24          MR. SOLYMOSI:  Roger, I'm going to object.

25      That's been asked and answered.  If you are going

1          to ask it again, you are going to need a Court

2          Order to get him to answer it again.  It's clear

3          what he said here.  He said it and it's been

4          answered.

5                    MR. TAFT:  It's not clear and I'll be happy

6          to move on.  The transcript will speak for

7          itself.

8          Q     Item 4 or opinion 4 says "Norfolk Southern

9     was negligent in the operation of trackage on West

10    19th Street in a manner that totally disregarded the

11    presence of children who were known to play on or near

12    and near the tracks."  Is that the same as the first

13    three?

14         A     No, this is different.

15         Q     Okay.  What's this?

16         A     "Norfolk Southern Railroad was negligent in

17    the operation of trackage."  Now, the operation would

18    mean a train going down the track and the people

19    assigned to that train, Mr. Price and Mr. Glenn, did

20    absolutely nothing, admitted that they didn't have any

21    responsibility to look on either side or to notify any

22    children or anything.

23                    The standard in the industry is to those

24    employees on the train have to be vigilant and alert.

25    Any time they see children playing around the tracks

1   or around in the area, they are to notify the train

2   dispatcher and they in turn will notify the City of

3   Erie Police.  It's the standard in the industry.

4        Q     Well, Mr. Westphal, instead of talking

5   about the standard in the industry all the time, what

6   did you see in the materials that you reviewed very

7   carefully that led you to believe that Robin Nixon

8   would have been visible to anyone on that train crew

9   on the Sunday morning, April 27, 1997?

10       A     Well, they went by, they were by already.

11  My understanding they were by that point already.

12       Q     Right.

13       A     They wouldn't have seen him.

14       Q     They wouldn't have seen him at all.  So if

15  they didn't see him, what would that train crew have

16  been able to do to have avoided Mr. Nixon's accident

17  because they never saw him?

18       A     Mr. Taft, it's not just Robin Nixon.  It's

19  all children around in there.  The engineer and

20  conductor, Glenn and Price, did absolutely nothing to

21  warn any, at any time they admitted that they didn't

22  do anything.  Like they were going down there with

23  blinders on, like they didn't even have to look out

24  the window to see where they were at.  It was a total

25  disregard for safety.

1    Q    On the morning of the accident they had

2    already gone through by the time he showed up?

3    A    I answered that already.

4    Q    Okay.  Let's go to number 5.  You opine

5    that "Norfolk Southern Railroad was negligent in the

6    operation of the trackage at West 19th Street by

7    failing to display any signage to warn children of the

8    danger of playing on or near railroad tracks."  Now,

9    are we now to putting of the signs that Mr. Guarino

10   references in his report?

11   A    No, because at the time of this accident

12   they didn't have any signs up there.

13   Q    But is your contention in this opinion that

14   Norfolk Southern should have installed the signs that

15   Mr. Guarino referenced in his report "DANGER-NO BIKES"

16   between the rails?

17   A    Yes, that would have added to it, in my

18   opinion, those signs that Mr. Guarino put big letters,

19   24 inches high and yellow strip across and rumble

20   strips down the side would have been a great deterrent

21   from those children playing on the tracks.

22   Q    But that's the signage that you are

23   referring to in opinion 5?

24   A    No, no, no, no, no, no, you brought that

25   up.

1    Q    You tell me, then, Mr. Westphal, what

2    signage are you referring to in No. 5--

3    A    The railroad company has big signs, they

4    say "No Trespassing," "Keep Away," "Trains Moving."

5    They have a national program that's Operation Life

6    Safer that they go to schools and they teach kids stay

7    away from railroad tracks.  Of course, they didn't

8    participate in that here.  Norfolk Southern didn't

9    participate in that.  I didn't see anything on that.

10    Q    You didn't ask one way or the other, did

11    you?

12    A    It was in the report that I guess Robin

13    Nixon he said that nobody ever come to my school and

14    told us about that.

15    Q    So --

16    A    But to get back to your question, they have

17    signs that say "stay away from the trains" and they

18    could have put up other signs when they knew the

19    children were up and down there.  They could have put

20    up signs up there that had an "X" on them, children on

21    bicycles or something like, stay away from the trains.

22    Q    Mr. Westphal, let's get to a real basic

23    fact, isn't it true that West 19th Street is a public

24    street?

25    A    It's a public street with the Norfolk

1  Southern tracks running right down the middle.

2      Q      Isn't it true that the Norfolk Southern

3  right-of-way runs from end of tie to end of tie on

4  that track line?

5      A      It would depend upon what the negotiation

6  were for installing that track.

7      Q      Well --

8      A      But I agree with you.

9      Q      Yeah, you read the deposition transcripts

10  carefully, and isn't it a fact that the undisputed

11  testimony is that the Norfolk Southern's right-of-way

12  only was from end of tie to end of tie through the

13  middle of 19th Street?

14      A      Yes.

15      Q      And isn't it true because it's undisputed

16  that the rest of 19th Street was a public street owned

17  and maintained by the City of Erie; correct?

18      A      Yes, that would not have prevented them

19  from putting up a sign up there and putting signage up

20  that I mentioned before, but they didn't do it.

21      Q      Signage on someone else's property?

22      A      Put them up on the side or on the telephone

23  pole.  They do that.

24      Q      Wait a minute now.  You are suggesting that

25  Norfolk Southern put big signs up on someone else's

1    property; is that right?

2        A    Well, no, just put up a sign, put up a sign

3    up on a post.

4        Q    Okay, now, keep in mind, Norfolk Southern's

5    property --

6        A    I know what, where you are getting at.

7        Q    So you want Norfolk Southern to post signs

8    on someone else's property?

9        A    Just put them on a telephone post.  They

10   can get permission.  If Norfolk Southern was aware of

11   the fact and wanted to do anything about it, they

12   could go to the City and say would you mind if we put

13   up a sign to protect the children in your city from

14   staying away from our trains.  I don't think Norfolk

15   Southern or the City of Erie would say, oh, no, don't

16   do that, we don't care about our children.

17       Q    Is it your understanding the City of Erie

18   knew nothing about children in the vicinity of these

19   tracks before this accident?

20       A    Well, I don't know really.

21       Q    Okay.

22       A    Norfolk Southern never reported it to them.

23       Q    And so as far as you know, the City had no

24   knowledge of this?

25       A    Norfolk Southern never reported it to them.

1       Q       Okay.  So aside from that, you are

2    suggesting that the City of Erie, whether or not

3    Norfolk Southern reported it, City of Erie was not

4    aware that there were children in the vicinity of 19th

5    Street?

6       A       I couldn't agree with that, if it's a good

7    City Police Department.

8       Q       As far as you know, did the City post any

9    signs?

10       A       There were no signs there.

11       Q       Let's go to number 7.  Excuse me, let's go

12    to number 6.  "Norfolk Southern Railroad was negligent

13    in failing to recognize the danger involved in placing

14    a track structure in the middle of a city street and

15    failing to install signage to warn of the danger that

16    was present."  Is that the same as we were discussing?

17       A       The same as we were discussing.  They were

18    totally negligent in that.

19       Q       They should have put signage between the

20    rails and they should have posted something else on

21    someone else's property?

22       A       Well, they could have put signage in the

23    middle as Mr. Guarino recommended.

24       Q       Yeah.

25       A       That would have been a deterrent.  They

1    could have put rumble strips there, but they did

2    nothing.

3          Q       Let's go to number 7.  "Norfolk Southern

4    Railroad was negligent in failing to recognize the

5    danger of placing railroad tracks within a residential

6    and industry area and failing to install a type of

7    rumble strip and warning signage between and along

8    both sides of the track to prevent children from

9    riding bicycles along the edge of the track and/or

10   next to a moving train.  The rumble strips would have

11   prevented Robin Nixon's accident."  That's your

12   opinion number 7?

13         A       Yes, and I fully believe that.

14         Q       And that's based on the information in

15   Mr. Guarino's report regarding the rumble strips and

16   the signage between the tracks?

17         A       Yes.

18         Q       Now, you told me earlier, if I'm not

19   mistaken, that you don't contend to be an expert in

20   human factors; correct?

21         A       I'm not an expert in human factors per se,

22   but I do deal with -- I deal with people all the time

23   and I dealt with people when I worked on the railroad.

24   So if we are going to mix apples and oranges there, I

25   do know how -- I do know, realize how another human

1    being acts and responds.

2              MR. SOLYMOSI:  Roger, why don't you define

3         what you mean by an expert in human factors.

4         Q     You don't have any education, Mr. Westphal,

5    in addition to a high school education; correct?

6         A     In what?

7         Q     In anything.

8         A     Yes, I do.

9              MR. SOLYMOSI:  Define education now.

10             MR. TAFT:  Excuse me, I'll ask the

11        questions.  If he wants to ask me to clarify

12        that --

13             MR. SOLYMOSI:  I'm going to object if you

14        have a question that's not clear.

15        Q     Mr. Westphal, you don't have any formal

16   education beyond a high school degree?  You never

17   attended college, you never attended graduate school.

18   You don't have any professional certifications in

19   human factors, in psychology, in warnings or any of

20   those things; correct?

21        A     And I'm not a doctor either.

22        Q     Right.

23        A     But Mr. Taft, I do have the railroad

24   experience that you can get nowhere else than on the

25   railroad.

1    Q    We are now talking about warning signs and

2    effectiveness of warning signs, because you are

3    contending that if this warning sign that Mr. Guarino

4    suggested which says "DANGER-NO BIKES" had been

5    between the rails, this accident wouldn't have

6    happened?

7         A    It would have been a great deterrent.

8         Q    To Robin Nixon?

9         A    To any bicyclist.

10        Q    We are not talking about any bicyclist.  We

11   are talking about Robin Nixon's accident.  It's your

12   contention if that sign "DANGER-NO BIKES" had been put

13   in between the rails, as Mr. Guarino recommended, and

14   you agreed with, Robin Nixon's accident wouldn't have

15   happened?

16            MR. SOLYMOSI:  Object to the

17            characterization you are putting to his

18            testimony.  His testimony in his report was that

19            the signage, along with the rumble strips would

20            have prevented it, Roger.  You are putting words

21            in his mouth.

22        Q    Are you saying that that signage would have

23   deterred the accident?

24        A    Mr. Guarino's report is entirely different

25   than what you are reporting it to be.  You are taking

1    it piece by piece and his is rumble strips and the

2    signage in there.

3        Q    Okay.  But you are saying you think that

4    signage would have made a difference to Mr. Nixon to

5    have prevented his accident?

6            MR. SOLYMOSI:  Is your request just the

7        signage?

8            MR. TAFT:  Yes, we are going to take them

9        one at a time.

10            MR. SOLYMOSI:  Be clear on that.

11        Q    If the signage had been there and no

12    rumble --

13        A    My opinion if the signage had been in there

14    before, long before, why then it would have deterred

15    not only Mr. Nixon, but other children who might be

16    riding along in there.

17        Q    Let's talk about that for a minute.  On the

18    day of the accident, there was a train that was

19    running along the track; correct?

20        A    Yes.

21        Q    How would signs between the rails have

22    deterred Mr. Nixon on the day of the accident if there

23    was a train running over those signs?

24        A    Mr. Taft, the signs don't disappear when

25    the train goes by.  The signs would still be in

1    between the tracks where children would notice them,

2    large 24 inches size letters, "No Bikes," "Danger."

3    Children would recognize that or somebody could point

4    them out to them and they would probably stay away.

5         Q     Do you know whether Mr. Nixon would have

6    seen those signs before the accident?

7         A     If he looked at them, if he was there -- if

8    he was down on that street, anybody would have seen

9    them.   24 inch letters, they are going to look to see

10   yellow letters in between the tracks, they are going

11   to see them.

12        Q     And if it read "DANGER-NO BIKES" between

13   the tracks, do you think Mr. Nixon would have

14   interpreted that, if he even saw it, as don't ride

15   your bike between the tracks?

16        A     I would assume so.

17        Q     Now, let's go to the rumble strips, I think

18   we are getting into those now.   The rumble strips that

19   Mr. Guarino and you are recommending be installed

20   would have been on the outside of the rails on both

21   sides; is that correct?

22        A     Well, first of all, Mr. Guarino's report is

23   the one that recommended the rumble strips.   I concur

24   in that report.

25        Q     Okay.

1      A      I didn't recommend.  He recommended them

2  and I concur in that.  I think it's a very safety

3  conscious program.

4      Q      And that's what I'm trying to ask you about

5  as to why you concur with it.  But these rumble strips

6  would have been on both sides of the rails?

7      A      Yes.

8      Q      On the outside?

9      A      On the outside of the rails, yes.

10      Q      And in his report he states that these

11  strips, these rumble strips would be of the same type

12  as were used, I think he said on interstate highways.

13  Page 1, second paragraph, item 1.  The same type that

14  you would see along shoulders on interstate highways,

15  is that right?

16      A      Yes.

17              MR. SOLYMOSI:  Page one of what, Roger?

18              MR. TAFT:  Mr. Guarino's report.

19      A      "2.4 miles of rumble strips approximately

20  16 inches to 17 inches long and 7 inches wide on one

21  foot centers, approximately five inches deep, the same

22  type that you would see along shoulders of interstate

23  highways," yes.

24      Q      Mr. Westphal, in your review of materials

25  in an effort to come up with your opinions in this

1   case that we have been discussing, and specifically

2   with respect to your opinion on rumble strips, did you

3   locate even one study that suggested that rumble

4   strips should be installed on a public street in order

5   to deter bicyclists from grabbing onto moving trains?

6       A       Repeat that question.

7               (Read back.)

8       A       First of all, I don't understand the last

9   part of your question.  Bicyclists wouldn't grab onto

10  moving trains on a highway because there is no tracks

11  there, there is no trains there.  I don't understand

12  your question, Mr. Taft.

13      Q       Isn't it true that the studies that you

14  reference in your report that you reviewed, which are

15  the two Federal Highway Administration reports, items

16  23 and 24, and also the report that you mention but

17  never read in its entirety from the Pennsylvania

18  Transportation Institute, the project by Elefteriadou,

19  all of those involved rumble strips on interstate

20  highways on the berm, all of them did?

21      A       For cars and for bicyclists, yes.

22      Q       None of them involve railroad tracks, do

23  they?

24      A       No, because they don't have railroad tracks

25  up on the highways.

1      Q      Exactly.

2      A      That's why I don't understand your

3 question.

4      Q      That's what I'm trying to get to, because

5 we are talking about your opinion that in this case

6 rumble strips should have been installed on the City

7 street to prevent people from grabbing onto moving

8 trains, not on an interstate highway to wake up

9 drivers that may doze off, you are recommending that

10 they be installed on West 19th Street, a city street,

11 to deter people from grabbing onto moving trains while

12 riding bicycles?

13      A      That was in Mr. Guarino's report.

14      Q      Right, which you --

15      A      And I concur in that.

16      Q      Have you located one single published study

17 that said that what you and Mr. Guarino are

18 recommending, namely installing rumble strips along a

19 city street, is the way to prevent bicyclists from

20 grabbing onto moving trains?

21      A      Well, the studies that I read here before,

22 and as I outlined in my report, they were on highways

23 and they were rumble strips.

24      Q      Right.

25      A      And they are also in those reports it had

1  about bicycles.  Now, Mr. Guarino's report is

2  recommending that to deter bicyclists or kids from

3  riding bicycles along the trains, the very thing that

4  caused this accident, they would have been able to put

5  this down along the tracks, regardless of any study

6  had ever been made.  They should have done something

7  like this, to at least do something instead of

8  nothing.

9      Q    I guess the answer is no, then, you are not

10  aware of any published study --

11      A    It's just what my answer is what I said.

12      Q    I want to clarify so we don't have a

13  mistake.  You have not found, as far as you know, such

14  a study doesn't exist that recommends the same thing

15  that you and Mr. Guarino are recommending, that rumble

16  strips be installed on a city street to deter

17  bicyclists from grabbing onto moving trains?

18      A    All --

19      Q    Not a single one?

20      A    Only where the -- the only study that was

21  ever made was by Mr. Guarino, and he recommended this

22  and I concur with it.  That they should have, Norfolk

23  Southern should have done something to install rumble

24  strips and put the signage in between the rails to

25  deter children from grabbing onto these tracks --

1   these trains.  They don't have these train tracks any

2   more.

3          Q      This isn't a study, isn't it, it's just a

4   report?

5          A      It's a report and a review -- he studied

6   it.  He studied it, made a report, he didn't pull this

7   out of thin air.  He had to take some serious

8   consideration into this.

9          Q      Looking at his report, which you reviewed,

10  show me what he studied to come up with this

11  conclusion.

12         A      I guess his background in installing rumble

13  strips.

14         Q      Okay.

15         A      And a recommendation.  He certifies that

16  this report is his opinion.

17         Q      Right.  Okay.  Let's go to No. 8.  "Norfolk

18  Southern Railroad was negligent in failing to properly

19  install and maintain proper warning striping along the

20  street surface to warn children and traffic of there

21  being dangerous railroad track in close proximity."

22               What are you talking about "proper warning

23  striping along the street surface"?

24         A      You can put yellow, they put on the

25  highways when they are going to warn people to stay

1    away from a certain place, and they direct the

2    traffic, they put this plastic tape on the highway,

3    it's a yellow reflectorized tape.  Norfolk Southern

4    could have done the same thing here.

5        Q    This is a city street, correct?

6        A    Yes.

7        Q    Okay.  The City didn't do that, did they?

8        A    We are talking about -- I said the Norfolk

9    Southern could have done it.

10       Q    On the City street?

11       A    Right on the edge of their right-of-way.

12       Q    Let's talk about their right-of-way.  You

13   agreed with me, and the record is clear, that the only

14   right-of-way Norfolk Southern had was from end of tie

15   to end of tie --

16       A    That's correct.

17       Q    -- right?  And end of tie to end of tie is

18   8 feet 6 inches?

19       A    That's correct.

20       Q    So you are saying that somewhere between

21   the end of tie to end of tie there should have been

22   striping --

23       A    Yes.

24       Q    -- put in?

25       A    Put it on the end, as a striping for people

1   to stay away from it.

2       Q       Are you aware that the coal cars and other

3   cars that pass over that track extend out beyond end

4   of tie?

5       A       Well, yes, they would.

6       Q       Okay.  So you want the striping to appear

7   in a part of that street that is being covered by a

8   moving train?

9       A       But the coal cars are not always there,

10  Mr. Taft.  The striping would be there all the time as

11  a warning to people, don't go, don't get beyond this

12  stripe.  It wouldn't be there just when a train was

13  going by, it would be there all the time.

14      Q       Let's go to No. 9.  "Norfolk Southern

15  Railroad was negligent in failing to properly train

16  their employees to watch and direct children away from

17  tracks and have in place and/or initiate accepted

18  methods and procedures to reduce or eliminate

19  accidents which would or should have been known to

20  occur."

21              Is that the same thing that you were

22  discussing earlier with respect to, I think it was

23  your first three or four opinions?

24      A       No.

25      Q       Okay.  What is this?

1      A      This one is the Norfolk Southern, as I said

2  before, had engine crews that did nothing whatsoever

3  to warn anybody that there was children around, that

4  they should have seen.  Admitted that they didn't,

5  didn't have to look, which is wrong.

6            And then Norfolk Southern had in place

7  crossing watchmen, whether it was on Monday, Tuesday,

8  Wednesday or school year, they had them there, they

9  could have -- and they seen, admittedly seen children

10  playing along the side of the trains.

11            And one, Mr. Rockey said he seen one

12  grabbing on a bicycle, and they did nothing to report

13  that to their supervisors.  They never reported to the

14  dispatcher, not through the Police Department,

15  nothing, to deter this practice of children around the

16  trains.  Did absolutely nothing.

17      Q      And you --

18      A      No training program whatsoever.

19      Q      And you are saying if that had happened,

20  Robin Nixon's accident would not have occurred, he

21  would have been deterred?

22      A      It could have very well deterred from his

23  accident or any other child.

24      Q      Let's go to No. 10.  "Norfolk Southern

25  Railroad was negligent in failing to provide a minimum

1    amount of training for crossing watchmen in place to

2    guard children in their passing over the tracks in

3    three locations of West 19th Street." What do you

4    mean by that?

5         A    Their testimony here, these people had no

6    training whatsoever. They were brought on on-the-job

7    training. There was a, supposed to be a poster inside

8    the little hut that they had to read, that was their

9    on-the-job training. But they had no training

10   whatsoever, by their own admission, to report any kind

11   of children around the tracks or anything of that

12   nature. The one said, one of the crossing watchman

13   said that he understood his job when the train went

14   through just to see if the train went through.

15        Q    They weren't even working on Sunday when

16   the Nixon accident happened --

17             MR. SOLYMOSI:  Asked and answered.

18        Q    -- is that right?

19        A    We went over that three or four times.

20        Q    You are telling me about days that they are

21   working, and I just want to make clear that we --

22        A    On the morning of this accident involving

23   Robin Nixon, which is the basis for this lawsuit, none

24   of those crossing --

25             MR. SOLYMOSI:  Asked and answered, Roger.

1          Move on.

2                    THE DEPONENT:  Can we go back to No. 10?

3                    MR. SOLYMOSI:  It's been asked and

4          answered.

5                    THE DEPONENT:  I've answered it already.

6                    MR. TAFT:  What's the answer?

7                    MR. SOLYMOSI:  Read in the transcript.

8                    MR. TAFT:  No, if you are going to state

9          something again, new opinion, I want to make sure

10         the record is clear that you agree with me that

11         on Sunday, there were no crossing watchmen

12         working?

13                   MR. SOLYMOSI:  It's been asked and

14         answered, Roger.

15                   THE DEPONENT:  I stated in answer to, when

16         you read No. 10, I went in detail to explain just

17         exactly the lack of ability of Norfolk Southern

18         what they did.  And that's on the record and then

19         you bring in on Sunday.  I didn't mean Sunday.

20         When they were on duty, I said Monday, Tuesday,

21         Wednesday, Thursday, in the summer, or the

22         winter.  Do you remember when I said that?

23         Q     Sure.  Record is clear on that.  But what

24    I'm --

25         A     Let me finish.

1      Q      Go ahead.

2      A      And I went on in detail to show how they

3    did nothing.  They did nothing.  They didn't train

4    them to do anything.  And they were, the only on-job

5    training was a poster on the inside of the hut.

6    That's in their testimony.  They did absolutely

7    nothing.

8            Now, if they had done something, it would

9    have been a deterrent to all the children, not only

10   Robin Nixon.

11     Q      What should they have done?

12     A      They should have reported it to their

13   superiors.

14     Q      Okay.

15     A      They should have had training on what to

16   do, and they never had any training whatsoever.

17     Q      Okay.  All right.  We have gone over that

18   before.  No. 11, "Norfolk Southern was negligent in

19   the training and application of the operating rules of

20   their employees in the instant train operation."  What

21   do you mean by that?

22     A      The conductor -- they didn't have any, they

23   didn't, evidently they didn't have any qualifications

24   on the operating rules of Norfolk Southern because the

25   conductor didn't know whether he was in charge of the

1    train or he was in charge of the train with the

2    engineer.  The conductor didn't have, he said he

3    didn't have any responsibility of looking out the

4    window or anything.  That wasn't his responsibility.

5    He was supposed to look right straight down the track

6    and that is totally untrue.  Any safety officer of the

7    Norfolk Southern would just chastise that person for

8    that statement.

9         Q    Well, that's your interpretation of a

10   deposition testimony, and I understand that's why you

11   are providing your opinions, but you are mistaken,

12   were you not, because the conductor was on the right

13   side of the cab, not the left side?

14        A    Well, I disagree with you on that.  This is

15   wrong and I would challenge that.  If there is any

16   locomotive, if any locomotive operating in the United

17   States today that has one single control stand on the

18   left side of the locomotive, I'll eat your lunch for

19   the next year.

20        Q    So you are disputing what --

21        A    Deposition Exhibit No. 4 from Mr. Glenn is

22   totally false.

23        Q    And Mr. Glenn's testimony is totally false,

24   too?

25        A    This diagram is totally false.

1    Q    And his deposition testimony is consistent

2    with the diagram, is it not?

3    A    Then it would be false.

4    Q    Okay.  You have never seen this locomotive

5    yourself, have you?

6    A    It doesn't -- a locomotive is a locomotive

7    under the Federal Railroad Administration.  They don't

8    have them on this side and on that side.  They all

9    have to be uniform.  Everything in the railroad

10   industry is uniform.  And besides that, it wouldn't

11   make any difference which side they were on, they

12   didn't do anything.

13   Q    I'm not -- at this point I'm just looking

14   at what you are contending as to where they were, and

15   so you are saying Mr. Glenn is wrong in his testimony

16   and his diagram even though you never seen this

17   engine?

18   A    I wouldn't have to see it.

19   Q    Okay.

20   A    This is wrong.

21   Q    Okay.

22   A    It does not comply with the Federal Rules

23   of Regulations pertaining to railroad equipment.

24        MR. TAFT:  Let's mark that as an exhibit.

25        THE DEPONENT:  It's Exhibit No. 4.

1          MR. TAFT:  That's your copy, but let's mark

2     it as Westphal Deposition Exhibit just so there

3     is no dispute over this issue.

4          (THEREUPON, Westphal Deposition Exhibit No.

5     11 was marked for identification.)

6     Q     I'm marking it as Westphal Deposition

7     Exhibit 11 the diagram we have repeatedly referred to

8     as Glenn Deposition Exhibit 4 that you saw for the

9     first time today; correct?

10    A     Yes.

11         MR. SOLYMOSI:  What number is that?

12         MR. TAFT:  That's 11.

13    Q     Let's get back to opinion No. 11, they were

14    "negligent in the training and application of the

15    operating rules of their employees in the instant

16    train operation."  Specifically in what way were they

17    negligent in training these people?

18    A     They didn't comply with the operating

19    rules.

20    Q     Cite me to a rule and tell me why they

21    didn't comply?

22    A     First of all, the general note, "safety is

23    of the first importance in the discharge of duty."

24    They totally ignored the safety part on the railroad.

25         The second one, the general rules, "the

1    employees whose duties are prescribed by these rules

2    must provide themselves with a copy.  Employees whose

3    duties -- "

4         Q     Wait a minute, are you claiming that they

5    did not have a copy of the operating rules?

6         A     They didn't -- they must not have had them

7    because they didn't comply with them.

8         Q     Well, that's your assumption, right?

9         A     They didn't, they said they didn't.

10        Q     They said they didn't have a copy of the

11   rules?

12        A     No, no, they said -- he didn't have to look

13   forward, he didn't have to be vigilant.  So he must

14   not have had edification at all on it.

15        Q     I want to take it slow, Mr. Westphal.  Are

16   you contending these employees violated that rule

17   because they didn't have a copy of the rules?

18        A     Yes, they would.  They violated the rules

19   because if -- the rules said --

20        Q     Right.  Where in the record that you

21   reviewed very carefully is there any indication that

22   they did not have a copy of the rules?

23        A     Well, it's my opinion that they did not

24   have them.

25        Q     It's your speculation?

1    A    Yes.

2    Q    Move on.   Next?

3    A    No, it's my opinion, not my speculation.

4    Q    Well, you didn't see anything to indicate

5 they didn't have a rule?

6    A    It's my opinion.   It's not my speculation.

7    Q    What's the basis of your opinion?

8    A    Because they said they didn't have to look

9 forward and that's one of the cardinal rules, they

10 didn't have to look sideways out and be alert and

11 vigilant.

12    Q    So because you feel they violated a rule

13 means that you have the opinion that they didn't even

14 have the rule book?

15    A    That's correct.

16    Q    Keep going.

17    A    Now, "members of the crew must observe the

18 condition of their train and inspect it at frequent

19 intervals when it is moving.   While practical, they

20 will look back at the track frequently to see if

21 damaged equipment and also blocked signals and roadway

22 structures to see if they have been struck by objects

23 protruding from their train."

24    Q    You claim that they violated that rule?

25    A    Yes.

1    Q    How did the violation of that rule cause

2  Mr. Nixon's accident?

3    A    Because -- I didn't say that.  We are

4  talking about the operating rules.

5    Q    Yeah, but I'm asking when you are claiming

6  that violation of the rules by this crew were a cause

7  of the accident, I think you are saying that, I'm

8  asking you how a violation of a particular rule caused

9  this accident?

10    A    Let's look at that opinion again.  No. 11

11  "Norfolk Southern was negligent in the training and

12  application of the operating rules of their employees

13  in the instant train operation."

14    Q    Are you contending that as a result of

15  that, Mr. Nixon's accident was caused?

16    A    No, no.  I'm talking about the training and

17  the application of the rules to these employees.

18    Q    Okay.

19    A    They were negligent because they didn't --

20  the employees knew nothing about the operating rules.

21    Q    Okay.  Let's go on.  Is that true for all

22  the operating rules you claim are violated?

23    A    Yes.

24    Q    Okay.

25    A    Now, wait.  The ones I'm pointing out.

1      Q      Okay.  Well, keep going.  Point out another

2   one that you claim was violated.

3      A      "Undivided attention to duty is required.

4   While on duty employees must not engage in any

5   activity that will interfere with the, distract their

6   attention from their work."

7      Q      What did you see in the record that led you

8   to conclude they violated that rule?

9      A      Mr. Glenn said he didn't have any

10  responsibility to look sideways.  All he had to do was

11  look straight ahead.

12     Q      Well, this rule has to do with engaging in

13  activities that will interfere with or distract their

14  attention.

15     A      Yeah, yeah.

16     Q      What did you see in the record that

17  suggests that they were being distracted from their

18  work?

19     A      All he said I have to do is look straight

20  ahead.  If he is saying that, he is saying I don't

21  have to look at nothing else, see.

22     Q      And tell me how a violation of that rule

23  caused Mr. Nixon's accident?

24     A      We are talking about the operating rules.

25     Q      How did a violation of that operating rule

1    that you claim occurred cause Mr. Nixon's accident?

2         A    Okay.  We'll go back over it one more time.

3    Had these employees, the engineer and the conductor,

4    in their travels up and down that track on 19th

5    Street --

6         Q    On the day of the accident?

7         A    Any time.

8         Q    No --

9         A    Any time.  Let me answer the question.

10        Q    Okay.

11        A    Any time.  Had they established a practice

12   of noticing children which were out there and

13   notifying the train dispatcher there are kids playing

14   around the train, along the track, and the dispatcher

15   would know about it, then he would come back to the

16   Erie Police and they would do, take, get to their

17   train master, establish some type of a program on the

18   railroad with the police and the employees to keep

19   those kids away from -- you wouldn't have to do it

20   over one or two times, and I think the message would

21   get through to them, along with the signage in the

22   middle of the track.

23        Q    Keep going.

24        A    Now, "conductors are directly responsible

25   to and must obey the orders of division and terminal

1  officers.  They must obey the instructions of station

2  yard masters which are employed.  Conductors must

3  maintain records and compile reports required by the

4  proper authority.  Conductors have charge of trains to

5  which they are assigned all the employees thereon.

6  They are responsible for safe and proper management of

7  their trains for protection and care of passengers and

8  property, for performance of duty by train employees

9  and for observance and enforcement of all rules and

10  instructions."

11          Mr. Glenn didn't even act like he knew that

12  rule was in the book.

13      Q     And you are saying a violation of that rule

14  caused Mr. Nixon's accident?

15      A     I'm saying that was a violation of the

16  operating rules.

17      Q     Are you saying that a violation of that

18  rule caused Mr. Nixon's accident on April?

19      A     Generally over a long period of time, yes.

20      Q     Okay.  What else?

21      A     "Engineers are directly responsible to and

22  must obey the orders of the division terminal officers

23  within shop limits.  They are under the directions of

24  shop supervisors.  They will obey the instructions of

25  yard masters and of their conductor with respect to

1    the general management of their trains.  Engineers are

2    responsible for properly performance and handling of

3    engines, for care of equipment and economical use of

4    fuel and supplies."  They were --

5         Q       Tell me what you saw in the record to

6    indicate that the engineer violated that rule?

7         A       The engineer didn't indicate that he had

8    any responsibility either of looking back along the --

9         Q       And you think that's covered by that rule?

10        A       Yes.

11        Q       Okay.  And how did the violation of that

12   rule, if it happened, cause Mr. Nixon's accident?

13        A       Just generally their whole, total ignorance

14   of the rules in a condition of railroad where it's a

15   dangerous operation.

16        Q       What else?

17        A       And of course, all of the tenants of

18   safety, the six rules.  They didn't, nobody seemed to

19   even know what those were.

20        Q       You got them listed in your report;

21   correct?

22        A       Yes.

23        Q       And how do you contend a violation of those

24   rules caused Mr. Nixon's accident?

25        A       Every rule in that book could contend to

1    safe operation of the railroad.

2          Q      I'm talking about the six point action

3    plan.

4          A      Well, all injuries can be prevented.  They

5    could have prevented the injury to Robin Nixon by

6    doing the things that I pointed out six or seven times

7    already.

8          Q      Mr. Westphal, are you aware that the

9    Norfolk Southern six point action plan involves

10   injuries to railroad employees?

11         A      I don't believe -- I believe it covers

12   everybody.

13         Q      Do you know that for a fact?

14         A      "Each employee of this corporation

15   therefore is held personally accountable for his or

16   her actions on the job."

17         Q      Right.

18         A      It doesn't say except engineers or except

19   conductors, except crossing watchmen.

20         Q      No, what I'm saying is are you aware that

21   those rules that you just cited have to do with safety

22   within the Norfolk Southern group of employees as

23   opposed to safety practices to third parties?

24                MR. SOLYMOSI:  Roger, are you stating that

25         as a fact?  Are you testifying now?

1      A      I answered that.

2      Q      What is your answer?

3      A      It's on the --

4             MR. SOLYMOSI:  He answered it and you keep

5      asking him.  Because you are not happy with his

6      answer --

7             MR. TAFT:  No, I want to know what his

8      answer is.

9             MR. SOLYMOSI:  He said that he believes it

10     applies to everybody.  It's on the record.  It's

11     been asked and answered.

12            MR. TAFT:  Mr. Solymosi, you can object.

13     you can't coach the witness.

14            THE DEPONENT:  He don't have to coach me.

15     I answered your question before, Mr. Taft, and

16     then you try to twist it around some other way.

17     Q      No.  You are saying, Mr. Westphal, it's

18     your understanding that six point action plan for

19     safety of operations addresses safety with respect to

20     third parties, not just with respect to Norfolk

21     Southern employees?

22     A      I didn't say that.

23     Q      What did you say then?

24     A      Let me read it again.  "Responsibility for

25     safety and environmental stewardship cannot be

1    transferred.    Each employee of this corporation

2    therefore is held personally accountable for his or

3    her actions on the job."    And they point out each and

4    every one of them, all six of them.

5         Q       Are those actions on the job actions

6    directed toward other employees of Norfolk Southern or

7    actions directed at third parties outside Norfolk

8    Southern or what don't you know?

9         A       What did I just read here?

10        Q       I heard what you read.

11        A       You don't understand it?

12        Q       No, that's why I'm asking you again.

13        A       You want me to read it again?

14        Q       I want to get your understanding as to

15   whether the intent of that is to apply to third

16   parties, to prevent injuries to third parties or

17   whether the six tenants of safety is directed toward

18   preventing injuries among Norfolk Southern employees,

19   if you know?

20        A       The statement of policy speaks for itself.

21        Q       And how do you interpret that?

22        A       Do you want me to read it again?

23        Q       No --

24        A       "Responsible for safety and environmental

25   stewardship cannot be transferred.    Each employee of

1    this corporation therefore is held personally

2    accountable for his or her actions on the job."

3         Q    Did you understand my question?

4         A    I did.  Did you understand my answer?

5         Q    No, I don't.

6              MR. SOLYMOSI:  You could have her read it

7         back.  He answered the question a long time ago

8         about whether it applied just to employees of

9         Norfolk Southern.

10             MR. TAFT:  I didn't hear that answer.

11             MR. SOLYMOSI:  You want her to read it

12        back?

13             MR. TAFT:  No, I don't want her to go back

14        and do it.

15        Q    Mr. Westphal --

16        A    I've answered the question before,

17   Mr. Taft.

18             MR. TAFT:  Go all the way back.  All the

19        way back and we will listen.  If it's in there, I

20        will move on.

21             (Read back.)

22        Q    Is it your understanding, Mr. Westphal,

23   that those six points of safety that we are referring

24   set forth an obligation on the part of Norfolk

25   Southern employees that apply to third parties other

1   than, other Norfolk Southern employees?

2                MR. SOLYMOSI:  Applied in what manner,

3       Roger?  Because that's a confusing question.

4       Does it mean that third parties have to apply?

5       Q      Is it your opinion, Mr. Westphal, that

6   those six tenants of safety were put in place so that

7   there would be duties placed upon Norfolk Southern

8   employees with respect to third parties that aren't

9   employees of Norfolk Southern, such as Robin Nixon?

10      A      These -- this is just as self-explanatory

11  as it can be.  "Each employee of the corporation

12  therefore is held personally accountable for his or

13  her actions on the job."  It applies to no one else

14  except the employees on the railroad.

15      Q      Whose safety are those rules directed to?

16      A      For the employees and people around the

17  employees.

18      Q      Well, that's what I'm --

19      A      Passengers, the people, the public.

20      Q      That's all I wanted to hear.  That's your

21  understanding, that the safety that's referenced in

22  there is not just the safety of Norfolk Southern

23  employees, it's your understanding it's the safety of

24  others as well?

25      A      Of the public, yes.

1    Q    Okay.

2    A    Because those are the ones, those are the

3  ones get damaged because of the total ignorance of

4  this crew not knowing anything about it.  Hardly

5  anybody knew about it.  It goes back to the lack of

6  training.

7    Q    Let's go to No. 12.  "Norfolk Southern was

8  negligent in that it is clear following my review and

9  research of the operating rules as above outlined,

10  Norfolk Southern Railroad through its employees

11  exhibited a complete disregard for a risk which was

12  clearly known to them."  Is that what you have been

13  testifying to before?

14    A    Yes.

15    Q    Are you contending that on April 27, 1997,

16  the Norfolk Southern crew in that train was aware that

17  Robin Nixon had grabbed onto that train?

18    A    I didn't say that.

19    Q    Well, is that your contention?

20    A    No, no.  They were not -- we went over this

21  before.  But my --

22    Q    Let's go on to --

23    A    Wait a minute.  My contention is that

24  following my review of this, the operating rules, they

25  were totally ignorant of the operating rules and their

1    responsibilities to protect the public, to do anything

2    to protect the public or whether it was Robin Nixon or

3    any other child along there from getting injured on

4    that track.

5        Q    Let's go to No. 13.  "In my opinion the

6    annual cost of $3,500 to install and maintain rumble

7    strips along the area of West 19th Street where the

8    accident occurred would have been a small and

9    reasonable expense compared to the risk presented by

10   Norfolk Southern Railroad to children in the area."

11   Right?

12       A    That's what it says.

13       Q    That's your opinion?

14       A    Yeah.

15       Q    And that ties in with Mr. Guarino's report

16   that you agree with that these rumble strips should

17   have been installed?

18       A    Yes, and I'll point out that the

19   installation, they had three or four, say there was

20   ten crossings in that 1.2 miles there.  If they didn't

21   have any crossing watchmen, it would have cost the

22   railroad company to put in grade crossing protection

23   at all those places a minimum of $12,000 for crossing

24   protection.  And that's $120,000.  That's for one

25   installation and they still have the maintenance.

1          According to Mr. Guarino's recommendations,

2   the $3,500 to install and maintain these rumble strips

3   per year would have been a small amount compared to

4   what they would have had to have done if they really

5   wanted to protect the people.

6          Q     It's your opinion that those rumble strips

7   would have prevented Mr. Nixon's accident?

8          A     They would have been a deterrent for all

9   children, all bicyclists that wanted to do something

10  like that.

11         Q     I'm talking about Mr. Nixon.  You think it

12  would have prevented Mr. Nixon's accident?

13         A     I believe it would have.

14         Q     And 14 says that "It's your further opinion

15  that the conduct of Norfolk Southern Railroad through

16  its employees, engineer Timothy J. Price and conductor

17  Robert B. Glenn above referenced directly and

18  proximally contributed to the serious injury to Robin

19  Nixon on April 27, 1997 on the West 19th Street track

20  at Erie, Pennsylvania."  What conduct are you

21  referring to?

22         A     Of their total disregard for people around

23  the tracks.

24         Q     On the day of the accident or before?

25         A     On any crew, they exhibited that in their

1    instance on April 27th.  But any crew, the railroad

2    company should, the Norfolk Southern Railroad company

3    should have had some responsibilities and training and

4    getting it through the whole procedure as I've

5    explained 7 or 8 times now the whole procedure to keep

6    children away from trains.  They did absolutely

7    nothing.

8         Q    Your contention is not with the way they

9    ran the train that day, your contention is with their

10   failure to follow these rules that you mentioned

11   before and report that there were children in the area

12   on various occasions?

13        A    Well, their whole operation of the train.

14   The train, Mr. Price was operating the engine and that

15   moved the train.  But their total disregard for people

16   around the railroad was a sample, must have been a

17   sample of all their employees.

18        Q    That's your assumption?

19        A    Yes.

20        Q    Do you agree with Mr. Guarino that these

21   rumble strips should have been the same type that were

22   installed on interstate highways?

23        A    I concur with his report.

24        Q    Okay.  And do you agree that the rumble

25   strips that are installed on interstate highways are

1    for the purpose of waking up drowsy drivers?

2        A      Yes, to warn a driver that he is off the

3    road.

4        Q      And --

5        A      And Mr. Guarino had put out a nice thing in

6    his report, if I could find it here, that really, he

7    had a picture in there that showed exactly how the

8    patch strips would have been better, would have been

9    his recommendation.

10              MR. SOLYMOSI:  Here.

11              THE DEPONENT:  Yeah, this is what it is.

12       Q      Would you agree with me that the

13   recommendation Mr. Guarino made, that you concur with,

14   would require those rumble strips to be installed on

15   the City street and not on the railroad right-of-way?

16       A      Well, there would have to be some

17   arrangement made between the City and the railroad,

18   but the actual -- that could be worked out.  I don't

19   think that the City of Erie, Pennsylvania, is going to

20   say no, you can't put that on our street, that might

21   prevent an injury to a child.  But I seriously believe

22   that that could be worked out between the City.  But

23   it would have been an indication that they were doing

24   something to protect children from riding bikes on

25   there.

1      Q      You do agree with me, then, that the rumble

2   strips would have been on the City property; correct?

3      A      Well, I don't understand what that has to

4   do with it.

5      Q      Just answer my question.  Do you agree with

6   me, Mr. Westphal, that Mr. Guarino's recommendation

7   would have required those rumble strips to be

8   installed on the City street not on the railroad

9   right-of-way?

10      A      Well, partly on the railroad right-of-way

11   and maybe a little on the City street.

12      Q      Show me how you conclude that by his

13   dimensions and his recommendations --

14      A      These parts here would be, maybe this much

15   of it would be on the railroad property.  This much

16   would be on the street.

17      Q      When you say this much, what do you mean?

18      A      Maybe three inches or four inches.

19      Q      You are saying three inches or four inches

20   on the railroad right-of-way and the rest on the City

21   street?

22      A      The railroad right of way you said is

23   between the end of the ties, 8 foot 6 inch ties and

24   you pointed out that it would be, that's the railroad

25   right-of-way.  I am saying maybe this would be maybe

1   three inches on the end of that tie up to where that

2   tie -- the tie runs out, it don't stop at the rail, it

3   goes out beyond the rail.

4       Q       Did you do any measurements of that

5   yourself?

6       A       They are gone.  The tracks are gone.

7       Q       Did you do any analysis of the

8   recommendations by Mr. Guarino as to where these

9   rumble strips should be installed to determine whether

10  they were or were not all on public street owned by

11  the City?

12      A       Mr. Guarino is a professional in his job

13  and everything, and I concur in his recommendation.

14      Q       My question was did you do any analysis to

15  determine whether his recommendation would place the

16  entire rumble strip on a public street owned by the

17  City of Erie rather than having any part of it on the

18  Norfolk Southern right-of-way?

19      A       No, and I don't think it makes that much

20  difference.

21      Q       Okay.  All right.

22      A       Just as long as they are there.

23      Q       Are you aware that the Pennsylvania

24  Transportation Institute study by Elefteriadou and

25  others that you cited in your report concluded that

1    rumble strips of the type that Mr. Guarino and you are

2    recommending should have been installed on West 19th

3    Street were the type that created the most risk of

4    loss of control by a bicyclist?

5        A    I believe I read something in there about

6    it, but I'm not that familiar with it.

7        Q    Because in fact you didn't read that report

8    at all, you never seen that report, you only read an

9    excerpt?

10        A    You have that report.

11        Q    Have you ever seen that report?

12        A    We went over this a long time ago,

13    Mr. Taft. I've never seen it.

14        Q    Right.

15        A    I got the report from the federal

16    government on Department of Transportation.

17        Q    So --

18        A    If you have it, I would like to see it.

19        Q    I'm not going to show it to you at this

20    point if you didn't review it.

21            MR. SOLYMOSI:  He doesn't have to show it

22        to you.

23        Q    Isn't it true, Mr. Westphal, that in your

24    report on page 7 with respect to the installation of

25    rumble strips you are basing that report, at least in