IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN NIXON, | ) | |
|     Plaintiff | ) | |
| | ) | |
|       v. | ) | CIVIL ACTION NO. 05-101 ERIE |
| | ) | |
| NORFOLK SOUTHERN CORPORATION | ) | |
| and NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, INC., | ) | |
|     Defendants | ) | ELECTRONICALLY FILED |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO
BAR AUGUST W. WESTPHAL AS EXPERT WITNESS
AND TO EXCLUDE WESTPHAL'S TESTIMONY
AND OTHER EVIDENCE IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Defendants NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, INC., by their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Brief in Support of Defendants' Motion to Bar August W. Westphal as Expert Witness and to Exclude Westphal's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment:

I.     <u>Question Presented</u>

WHETHER AUGUST W. WESTPHAL SHOULD BE BARRED AS AN EXPERT WITNESS AND HIS TESTIMONY AND OTHER EVIDENCE IN OPPOSITION TO DEFENDANTS'

MOTION FOR SUMMARY JUDGMENT SHOULD BE EXCLUDED UNDER FED.R.EVID. 702?

II.     <u>Statement of Facts</u>

    A.     <u>Background and Relevant Procedural History</u>

This civil action involves a common law negligence claim by plaintiff Robin Nixon (hereinafter "Nixon") against defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. (more properly known as "Norfolk Southern Railway Company") for personal injuries arising out of an accident that occurred on or about April 27, 1997, in the City of Erie, Pennsylvania when Nixon, who then was age 12, grabbed onto a slowly-moving eastbound train while riding his bicycle on a public street that was owned and maintained by the City of Erie, Pennsylvania; lost control of his bicycle; and fell under the train.  (Complaint; Norfolk Southern Concise Statement of Material Facts and Nixon's Response, ¶ 6, 8-9, 11, 13-14, 19, 22-23, 27, 29, 36).

During the course of pretrial discovery, Nixon identified August W. Westphal (hereinafter "Westphal") as an expert witness who would testify for Nixon at trial, and Westphal submitted two expert reports -- an initial expert report and a supplemental expert report, both dated February 16, 2007 -- that included Westphal's resume, his purported expert opinions and the facts and materials upon which he relied in arriving at those opinions.  (Westphal Depo. Ex. 3-4).  On May 17, 2007, counsel for Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. conducted an extensive deposition of Westphal and made a detailed

inquiry into his opinions and the grounds therefor.[1] (Westphal Depo., p. 3-158; Westphal Depo. Ex. 1-11).

On June 26, 2007, Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. filed a Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. (hereinafter "Norfolk Southern Motion for Summary Judgment"), supported by a Concise Statement of Material Facts, an Appendix, two Affidavits and a Brief. (Docket Entries). On July 25, 2007, Nixon filed his opposition to the Norfolk Southern Motion for Summary Judgment which relied, inter alia, upon parts of Westphal's deposition and his expert and supplemental reports dated February 16, 2007. (Plaintiff's Response to Defendants' Concise Statement of Material Facts, ¶ 41, 50-547; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, p. 8-9, 11-12; Appendix to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. "5," "7" and "8").

On August 8, 2007, Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. filed their Reply in support of the Norfolk Southern Motion for Summary Judgment through the following papers:

(1)    Defendants' Reply to Plaintiff's Response to Concise Statement of Material Facts in Support of Motion for Summary Judgment on Behalf of Defendants Norfolk Southern;

(2)    Supplemental Appendix to Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc.; and

---

[1]    The complete transcript of Westphal's deposition on May 17, 2007, and all Westphal deposition exhibits are included in the Appendix to Defendants' Motion to Bar Westphal as Expert Witness and to Exclude Westphal's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment at Tabs A-L.

(3)     Reply Brief in Support of Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc.

(Docket Entries).

On August 13, 2007, Norfolk Southern filed Defendants' Motion to Bar August W. Westphal as Expert Witness and to Exclude Westphal's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Norfolk Southern Motion to Bar Westphal as Expert Witness") with supporting papers. (Docket Entries). This Motion not only seeks to bar Westphal from testifying as an expert witness at trial, but also to exclude his testimony and other evidence in opposition to the Norfolk Southern Motion for Summary Judgment.

B.     Westphal's Qualifications and Purported Expert Opinions

1.     Westphal's Background and Experience

Westphal identifies himself as the President of Transit Operations and Personnel Guidance of Ohio, Inc. (hereinafter "TOP"), a consulting business that has been in existence since 1987. (Westphal Depo., p. 4-5, 21). Westphal is age 81, has been the only employee of TOP since its creation, and operates TOP out of his home. (Westphal Depo., p. 3, 5). More than 97 percent of his TOP clients have been persons who make personal injury claims against railroads, almost all of which involved FELA claims by injured railroad employees or grade crossing accident cases. (Westphal Depo., p. 27-39, 47).

Westphal has only a high school education, graduating in 1944. (Westphal Depo., p. 14-15; Westphal Depo. Ex. 2). He has never taken college courses and does not hold any professional licenses or certifications. (Westphal Depo., p. 15; Westphal Depo. Ex. 2).

After graduating from high school, Westphal was employed by Chicago and Northwestern Railway Company from 1945 to 1960, as a brakeman, baggage man, switchman, helper, conductor and conductor foreman. (Westphal Depo., p. 15-16; Westphal Depo. Ex. 2). Westphal never went to locomotive engineering school and has never been certified or licensed as a locomotive engineer. (Westphal Depo., p. 16). Also, Westphal never worked in the Maintenance of Way Department or the Safety Department at Chicago and Northwestern or any other railroad. (Westphal Depo., p. 16-18). Westphal has not been employed by any railroad since 1960 -- 47 years ago. (Westphal Depo., p. 15-22; Westphal Depo. Ex. 2).

During the period from 1960 to 1986, Westphal was employed by the Brotherhood of Railroad Trainman, later known following some mergers, as the United Transportation Union, initially representing union members who worked for railroads in Nebraska from 1960 to 1965, next representing the union in legislative matters in Cleveland, Ohio from 1965 to 1981, and completing his union career by coordinating lobbying efforts in Washington, DC before he retired in 1986. (Westphal Depo., p. 18-20; Westphal Depo. Ex. 2). Westphal also serves as President of the National Association of Retired and Veteran Railway Employees, Inc. that seeks to protect retirement pensions and health and welfare benefits for railroad retirees. (Westphal Depo., p. 20-21; Westphal Depo. Ex. 2).

Westphal admitted that he is not an expert in traffic engineering, street or roadway design, human factors, or the design and effectiveness of warning signs. (Westphal Depo., p. 43). Furthermore, Westphal admitted that the present case involving Nixon is the first time

that he ever provided services with respect to an accident that involved a minor who was riding a bicycle on a public street and who grabbed onto a moving train. (Westphal Depo., p. 39-40).

2.    Westphal's Opinions

In his expert report dated February 16, 2007, Westphal sets forth 14 "Opinions" with respect to Nixon's April 27, 1997 accident. (Westphal Depo. Ex. 6). These duplicative and overlapping "Opinions" essentially are five in nature as articulated by Nixon in Plaintiff's Response to the Concise Statement of Material Facts in Support of Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. and Plaintiff's Brief in Opposition to Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc. filed on July 25, 2007:

> (1)    children could have been deterred from grabbing onto moving trains while riding their bicycles along West 19th Street through the use of rumble strips adjacent to the tracks;
>
> (2)    children could have been deterred from grabbing onto moving trains while riding their bicycles along West 19th Street through the use of signs painted between the tracks stating, "Danger - No Bikes";
>
> (3)    children could have been deterred from grabbing onto moving trains while riding their bicycles along West 19th Street through the use of warning signs adjacent to the tracks;
>
> (4)    Norfolk Southern did not contact the City of Erie to request permission to place warning signs adjacent to the West 19th Street tracks; and
>
> (5)    Norfolk Southern did not contact the City of Erie to discuss the means of protecting children riding their bicycles adjacent to the West 19th Street tracks.

(Plaintiff's Response to Defendants' Concise Statement of Material Facts, ¶ 50-55; Plaintiff's Brief in Opposition to Norfolk Southern Motion for Summary Judgment, p. 9-12).

a.    Rumble Strips and "Danger - No Bikes" Signs
<u>Between the Rails</u>

Westphal's "opinions" regarding the installation of rumble strips on West 19th Street outside of the Norfolk right-of-way and the painting of "Danger - No Bikes" signs between the rails are based <u>solely</u> on the expert report of James A. Guarino dated February 12, 1997.[2] (Westphal Depo., p. 94-96, 99, 107, 111-112, 114-118; Westphal Depo. Ex. 10). As stated by Westphal during his May 17, 2007 deposition:

> Q    Now, let's go to the rumble strips. I think we are getting into those now. The rumble strips that Mr. Guarino and you are recommending be installed would have been on the outside of the rails on both sides; is that correct?
>
> A    Well, first of all, Mr. Guarino's report is the one that recommended the rumble strips. I concur in that report.
>
> Q    Okay.
>
> A    I didn't recommend. He recommended them and I concur in that. I think it's a very safety conscious program.

(Westphal Depo., p. 116-117). Westphal also testified:

> Q    That's what I'm trying to get to, because we are talking about your opinion that in this case rumble strips should have been installed on the City street to prevent people from grabbing onto moving trains, not on an interstate highway to wake up drivers that may doze off, you are recommending that they be installed on West 19th Street, a city street, to deter people from grabbing onto moving trains while riding bicycles?

---

[2]    Contemporaneously with the filing of the Norfolk Southern Motion to Bar Westphal as Expert Witness, Norfolk Southern Corporation and Norfolk Southern Railway Company filed Defendants' Motion to Bar James A. Guarino as an Expert Witness and to Exclude Guarino's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Norfolk Southern Motion to Bar Guarino as Expert Witness") with supporting papers including a Brief. (Docket Entries).

A      That was in Mr. Guarino's report.

Q      Right, which you --

A      And I concur in that.

(Westphal Depo., p. 119). Westphal further testified:

Q      I want to clarify so we don't have a mistake. You have not found as far as you know, such a study doesn't exist that recommends the same thing that you and Mr. Guarino are recommending, that rumble strips be installed on a city street to deter bicyclists from grabbing onto moving trains?

A      All --

Q      Not a single one?

A      Only where the -- the only study that was ever made was by Mr. Guarino, and he recommended this and I concur with it. That they should have, Norfolk Southern should have done something to install rumble strips and put the signage in between the rails to deter children from grabbing onto these tracks -- these trains. They don't have these train tracks any more.

Q      This isn't a study, isn't it, it's just a report?

A      It's a report and a review -- he studied it. He studied it, made a report, he didn't pull this out of thin air. He had to take some serious consideration into this.

Q      Looking at his report, which you reviewed, show me what he studied to come up with this conclusion.

A      I guess his background in installing rumble strips.

Q      Okay.

A      And a recommendation. He certifies that this report is his opinion.

(Westphal Depo., p. 120-121). Westphal also testified:

Q      Did you do any analysis of the recommendations by Mr. Guarino as to where these rumble strips should be installed to determine whether they were or were not all on public street owned by the City?

> A     Mr. Guarino is a professional in his job and everything, and I concur in his recommendation.

(Westphal Depo., p. 149).

Westphal did not conduct his own study to determine the effectiveness of the rumble strips and "Danger - No Bikes" signs to deter bicyclists from grabbing onto moving trains. Rather, he admitted that, "the only study that was ever made was by Mr. Guarino . . .. [Emphasis added]." (Westphal Depo., p. 120). Furthermore, Westphal admitted that he has never seen or read the Elefteriadeau study referenced at Pages 6 and 7 of his February 16, 2007 expert report. (Westphal Depo., p. 55-60, 149-150).

As noted above, Westphal admitted that he is not an expert in traffic engineering, street or railway design, human factors, or the design and effectiveness of warning signs. (Westphal Depo., p. 43-44). In fact, the particular message that the proposed "Danger - No Bikes" signs between the rails communicated to Westphal was that a person should not ride a bicycle between the tracks rather than the intended message that a person should not ride a bicycle on the city street adjacent to the tracks and grab onto a moving train. (Westphal Depo., p. 116).

b.     Warning Signs Adjacent to the Tracks

Westphal also opines that Norfolk Southern should have installed signs on telephone poles or other locations not on Norfolk Southern's property, stating:

- "No Trespassing"

- "Keep Away"

- "Trains Moving"

- "Stay Away From Trains"

- "an 'X' on them, children on bicycles or something like, stay away from the trains"

(Westphal Depo. p. 108-110). Westphal, however, does not provide any grounds for concluding that those particular signs that he suggested would have been effective warnings to Nixon, who already had ignored his father's directions on three separate occasions, including on the day of the accident, not to go anywhere near the Norfolk Southern tracks, or would have deterred Nixon from grabbing onto the Norfolk Southern train while riding his bicycle. All of this, of course, is consistent with the fact that Westphal admitted he is not an expert in human factors or in the design and effectiveness of warnings. (Westphal Depo. p. 43).

c.    Contact With City of Erie

Finally Westphal opines that Norfolk South Corporation and Norfolk Southern Railway Company should have contacted the City of Erie to request permission to place warning signs adjacent to the West 19th Street tracks and to discuss unidentified, "measures of protecting children riding their bicycles adjacent to the West 19th Street tracks." (Plaintiff's Response to Defendants' Concise Statement of Material Facts, ¶ 53-54; Plaintiff's Brief in Opposition, p. 9-11). Westphal acknowledges that these two opinions involve actions to be taken on property that is not owned or maintained by Norfolk Southern Railway Company -- placing warning signs on property adjacent to the railroad right-of-way and having the City of Erie take the unspecified protective measures regarding bicyclists who ride on a public street owned and maintained by the City. (Westphal Depo., p. 89-92, 108-110).

With respect to the types of warning signs that Westphal claims should have been installed on City of Erie property, the effectiveness, or lack thereof, already has been addressed

in Section II.B.2.b above, and Westphal provided nothing to support the conclusion that the particular signs that he recommended would have deterred Nixon from grabbing onto the Norfolk Southern train while riding his bicycle on April 27, 1997. (Westphal Depo., p. 43).

With respect to the opinion that Norfolk Southern should have contacted the City of Erie about children, "riding their bicycles adjacent to the West 19th Street tracks," Westphal admitted that he did not know if the City of Erie had that information prior to the April 27, 1997 accident, either on its own or from sources other than Norfolk Southern. (Westphal Depo., p. 110-111) In fact, Westphal admitted that the City probably did have that information whether or not Norfolk Southern reported anything to the City:

> Q    Okay. So aside from that, you are suggesting that the City of Erie, whether or not Norfolk Southern reported it, City of Erie was not aware that there were children in the vicinity of 19th Street?
>
> A    I couldn't agree with that, if it's a good City Police Department.

(Westphal Depo,. p. 111).

Westphal also was unable to articulate just what "measures" the City of Erie would have taken to deter Nixon from grabbing onto a Norfolk Southern train on April 27, 1997. (Westphal Depo., p. 89-92). Westphal admitted that he was <u>not</u> suggesting that the City of Erie would have stationed policemen on West 19th Street on April 27, 1997, to make sure that Nixon and others did not grab onto moving trains while riding bicycles. (Westphal Depo., p. 90). Westphal also admitted that he was <u>not</u> suggesting that the City of Erie should have stationed police cars along West 19th Street indefinitely to keep kids on bicycles away from the tracks. (Westphal Depo., p. 92). Finally, Westphal admitted that if the City of Erie Police were not on West 19th Street

when Nixon grabbed onto the moving train, "they couldn't have done anything."  (Westphal Depo., p. 91).[3]


III.    Argument


AUGUST W. WESTPHAL SHOULD BE BARRED AS AN EXPERT WITNESS AND HIS TESTIMONY AND OTHER EVIDENCE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE EXCLUDED UNDER FED.R.EVID. 702.


This Honorable Court should exercise its gatekeeper obligation under Rule 702 of the Federal Rules of Evidence and bar Westphal as an expert witness at trial.  The Court also should exclude Westphal's testimony and other evidence in opposition to the Norfolk Southern Motion for Summary Judgment.  It is clear that Westphal lacks the qualifications to opine that rumble strips, warning signs, and suggested contact with the City of Erie regarding bicyclists riding on West 19th Street would have deterred Nixon from grabbing onto the Norfolk Southern train while riding his bicycle on April 27, 1997.  Furthermore, Westphal has failed to show "good grounds" for his opinions so as to satisfy the reliability requirement of Rule 702.  Finally, Westphal's opinions are irrelevant to the material issues in this civil action and fail to meet the "fit" test.

---

[3]    In fact, Nixon admitted that the Norfolk Southern train crew located in the lead engine of the train never saw him riding his bicycle or that he had grabbed onto a rail car near the rear of the train which was approximately 1 and 1-1/2 miles in length.  (Norfolk Southern Concise Statement of Material Facts and Nixon's Response, ¶ 20, 24-25).

A.     General Standard for Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  Rule 702 was amended, effective December 1, 2000, in recognition of the two key United States Supreme Court decisions governing expert testimony -- Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1127 (1999).  Calhoun v. Yamaha Motor Corp. U.S.A., 50 F.3d 316, 320 (3d Cir. 2003); Fed.R.Evid. 702, Advisory Committee Note, 2000 Amendments.

In Daubert, the United States Supreme Court addressed "scientific" expert testimony and stated that the District Court has an obligation to act as a gatekeeper, ensuring "that all scientific testimony or evidence admitted is not only relevant, but reliable."  Kumho Tire Co., Ltd., 526 U.S. at 139, 147, 119 S. Ct. at 1171, 1174; Daubert, 509 U.S. at 589, 113 S. Ct. at 2795.  In Kumho Tire Co., Ltd., the Supreme Court confirmed that this gatekeeping obligation also applied to expert testimony based on "technical" and "other specialized knowledge."  Kumho Tire Co., Ltd., 526 U.S. at 140, 147; 119 S. Ct. at 1171, 1174; Calhoun, 350 F.3d at 320-321.

The District Court exercises its gatekeeping obligation through Rule 104(a) of the Federal Rules of Evidence which states:

> (a)  **Questions of admissibility generally.**  Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).  In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 104(a); Daubert, 509 U.S. at 592 and n.10, 113 S. Ct. at 2796 and n.10.

The decision whether to admit or exclude expert evidence is reviewed by an abuse of discretion standard.  Kumho Tire Co., Ltd., 526 U.S. at 152, 119 S. Ct. at 1176; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).  Furthermore, the District Court also has broad latitude in deciding how to determine whether the proffered expert's testimony is reliable.  Kumho Tire Co., Ltd., 526 U.S. at 142, 119 S. Ct. at 1171, 1176.  This includes whether to apply any of the specific Daubert factors -- described as not constituting a "definitive checklist or test" -- in any particular case.  Kumho Tire Co., Ltd., 526 U.S. at 149-150, 153, 119 S. Ct. at 1175-1176.

In fulfilling its obligation as gatekeeper with respect to expert evidence, the District Court is not required to hold an in limine hearing.  Oddi v. Ford Motor Co., 234 F.3d 136, 151-155 (3d Cir. 2000), cert. denied, 532 U.S. 921 (2001); Kerrigan v. Maxon Indus., Inc., 223 F. Supp.2d 626, 632-634 (E.D. Pa. 2002).  See also Kumho Tire Co., Ltd., 526 U.S. at 152-155, 119 S. Ct. at 1176-1178 (trial judge properly exercised gatekeeper function based on expert's deposition testimony without holding in limine hearing).  Rather, in exercising its broad discretion in deciding how to decide whether expert testimony is admissible, the court can conclude that there is a sufficient basis for its evidentiary ruling in the expert's curriculum vitae, expert report, deposition testimony and other materials of record.  Oddi, 234 F.3d at 153-154; Kerrigan, 223 F. Supp.2d at 634.

Finally, the burden of establishing the admissibility of expert evidence is on the party who proffers the expert.  Daubert, 509 U.S. at 592 n.10; 113 S. Ct. at 2796 n.10.  In the present case, that burden rests with Nixon.

B.     Third Circuit Court of Appeals Trilogy of Restrictions

The Third Circuit Court of Appeals utilizes a "trilogy" of restrictions in determining whether expert testimony is admissible under Rule 702: (1) qualification; (2) reliability; and (3) fit.  Calhoun, 350 F.3d at 321.  First, the proffered expert must be qualified to express an expert opinion.  This means that he must possess the specialized expertise by knowledge, skills or training with respect to the specific area of his intended testimony.  Calhoun, 350 F.3d at 321; Pineda v. Ford Motor Co., 2006 WL 3337488 at *3 (E.D. Pa. 2006).  Although this requirement is interpreted liberally to include practical experience and/or academic training and credentials, the Third Circuit Court has made clear that its policy is not to qualify every proffered witness as an expert.  See Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998); Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-1056 (3d Cir. 1997); Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114-115 (3d Cir. 1987), cert denied, 484 U.S. 853 (1987).

Second, the testimony of the proffered expert must be reliable.  This means that the expert's opinion must have a reliable basis in the knowledge and experience of the relevant discipline, i.e. that there be "good grounds" for the expert opinion.  Kumho Tire Co., Ltd., 526 U.S. at 149, 119 S. Ct. at 1175; Daubert, 509 U.S. at 589, 113 S. Ct. at 2295; Calhoun, 350 F.3d at 321.  The test is whether the particular opinion is based on "valid reasoning and reliable methodology."  Oddi, 234 F.3d at 146, citing Kannankeril v. Terminex Int'l Inc., 128 F.3d 802,

806 (3d Cir. 1997). To be considered "reliable," an expert's opinion must be grounded on, "reliable principles and methods" as opposed to "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590, 113 S. Ct. at 2795; Calhoun, 350 F.3d at 321; Mause v. Global Household Brands, Inc., 2003 WL 224160000 at *1 (E.D. Pa. 2003). Whether the expert testimony is based upon professional studies or personal experience, the proffered expert must employ, "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd., 526 U.S. at 152, 119 S. Ct. at 1176.

Third, there must be a valid connection between the expert testimony and the material facts of the particular case to satisfy the "fit" requirement. Daubert, 509 U.S. at 591, 113 S. Ct. at 2796; Calhoun, 350 F.3d at 321; Kerrigan, 223 F. Supp.2d at 638-639. This requirement is similar in concept to relevance. Calhoun, 350 F.3d at 321.

C.   Westphal Lacks the Required Qualifications to Serve as an Expert
     Witness

It is absolutely clear, when applying the requirements of Rule 702 of the Federal Rules of Evidence, that Westphal is not qualified by knowledge, skill, experience, training or education, to opine that the installation of rumble strips on West 19th Street, adjacent to the Norfolk Southern tracks, signs stating, "Danger - No Bikes" between the tracks, other warning signs posted on telephone poles adjacent to the tracks, and contact with the City of Erie to obtain permission to post those warning signs and to discuss children riding their bicycles on West 19th Street would have prevented Nixon's April 27, 1997 accident. To the contrary, Westphal admitted not only his own lack of qualifications, but also that his opinions derive for the most

part from Guarino, another unqualified expert witness proffered by Nixon. This lack of qualifications bars Westphal from serving as a witness in this civil action.

Although most of Westphal's opinions deal with suggested warnings and other means to deter Nixon from grabbing onto the Norfolk Southern train while riding his bicycle, Westphal expressly admitted that he is <u>not</u> an expert in traffic engineering, is <u>not</u> an expert in street or roadway design, is <u>not</u> an expert in human factors, and is <u>not</u> an expert in the design and effectiveness of warnings. (Westphal Depo., p. 43-44). Rather, Westphal has only a high school degree, has never taken college courses, and does not hold any professional licenses or certifications. (Westphal Depo., p. 14-15; Westphal Depo. Ex. 2).

Furthermore, Westphal has not worked for any railroad since 1960 -- 47 years ago -- and never worked in either the Maintenance of Way Department or in the Safety Department during his 15 years of employment with Chicago and Northwestern Railway Company between 1945 and 1960. (Westphal Depo., p. 15-22; Westphal Depo. Ex. 2). Westphal further admitted that the present case is the first time that he ever provided services regarding an accident of the same type in which Nixon was involved -- a minor who was injured after grabbing onto a moving train while riding his bicycle on a public street. (Westphal Depo., p. 39-40).

Westphal's total lack of qualifications to opine regarding the installation of rumble strips and "Danger - No Bikes" signs to deter bicyclists from grabbing onto moving trains is underscored by the fact that he merely adopted the conclusions of the other unqualified expert, Guarino, without any study of his own. (Westphal Depo., p. 94-96, 99, 107, 111-112, 114-119, 149; Westphal Depo. Ex. 19). In fact, Westphal claimed that Guarino is the only one who has ever conducted such a study. (Westphal Depo., p. 120). Guarino's grossly deficient opinions

also must be excluded under Rule 702 for the reasons set forth in Defendants' Motion to Bar Guarino as Expert Witness and the supporting brief and other materials.

Specialized knowledge, in and of itself, is insufficient to satisfy the qualification requirement of Rule 702. Rather, the proffered expert must have the requisite education, training or experience with respect to the specific area of his intended expert testimony. See, e.g., Calhoun v. Yamaha Motor Corp. U.S.A., 350 F.3d 316, 322 (3d Cir. 2003) (expert may be generally qualified, but has to have specialized knowledge relating to his area of testimony); Kerrigan v. Maxon Indus., Inc., 223 F. Supp.2d 626, 635-636 (E.D. Pa. 2002) (criteria required to qualify an expert witness' knowledge on subject matter of particular opinion to be offered); Fedor v. Freightliner, Inc., 193 F. Supp.2d 820, 828 (E.D. Pa. 2002) (Rule 702 requires proffered expert may lack qualifications to testify outside his area of expertise).

Based on his own admissions, Westphal does not have the requisite qualifications to opine regarding the design and installation of effective deterrents -- whether they be rumble strips or warning signs -- to prevent a bicyclist, such as Nixon, from grabbing onto a moving train while riding on a public street. As with the proffered expert who was barred in Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-1056 (3d Cir. 1997), Westphal has admitted that he does not have expertise in human factors. Also, as with the proffered expert who was barred in Pineda v. Ford Motor Co., 2006 WL 3337488 at *4 (E.D. Pa. 2006), Guarino admitted that he does not qualify as a warnings expert. Finally, as with the proffered expert who was barred in Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114-115 (3d Cir. 1987), it is clear that Guarino is not qualified to opine regarding rumble strips, warning signs and related striping as a deterrent in the present case based on a total lack of training and experience in the design of those items for this particular use.

In short, Westphal clearly fails the qualification requirements.  Accordingly, he should be barred as an expert witness, and his testimony and other evidence in opposition to the Norfolk Southern Motion for Summary Judgment should be excluded.

D.     Westphal's Opinions Lack the Required Degree of Reliability

It also is clear that Westphal's opinions regarding the installation of rumble strips, the painting of "Danger - No Bikes" signs between the rails, the placement of other warning signs on telephone poles outside of the Norfolk Southern right-of-way, and contacting the City of Erie to get permission to post the warning signs and to discuss unspecified "measures of protecting children riding their bicycles adjacent to the West 19th Street tracks" do not satisfy the reliability requirement of Rule 702.  To the contrary, Westphal, in essence, has mimicked Guarino, another unqualified expert witness whose method is flawed, for some of his opinions and has failed to establish "good grounds"  based on "valid reasoning and reliability methodology" for the rest.

As noted above, Westphal has merely adopted Guarino's opinions, without conducting any study of his own, with respect to his opinion regarding the installation of rumble strips and the painting of "Danger - No Bikes" signs on the pavement between the rails.  (Westphal Depo., p. 94-96, 99, 107, 111-112, 114-119, 149; Westphal Depo. Ex. 19).  According to the Third Circuit Court of Appeals, this is in impermissible support for an expert opinion.  Surace v. Caterpillar, Inc., 111 F. 3d 1039, 1056 (3d Cir. 1997) (barring expert opinion where proffered expert admitted he relied on work of another expert as sole authoritative basis for his conclusions).  Westphal, moreover, admitted that he never saw, much less read, the one study on rumble strips noted in his expert report which, in any event, addressed the use of rumble strips in

an entirely different context -- to wake up drowsy drivers on highways.  (Westphal Depo., p. 55-56, 149-150).

Furthermore, as explained by the Third Circuit Court in Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000), cert. denied, 532 U.S. 921 (2001), in rejecting proffered expert testimony based on untested hypotheticals, "[a]lthough Daubert does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry that [the proffered expert] engaged in.  [Emphasis added]" Courts consistently have held that the gatekeeper obligation under Rule 702 requires the exclusion of purported expert testimony that is based on subjective belief and unsupported speculation rather than on the requisite methodology to ensure reliability.  See Willis v. Besam Automated Entrance Sys., Inc., 2005 WL 2902494 at *6 (E.D. Pa. 2005) (excluded expert used little, if any, methodology beyond his own intuition); Bethea v. Bristol Lodge Corp., 2002 WL 31859434 at *5 (E.D. Pa. 2002) (excluded expert provided no more than "instinctive reaction" and did not base opinions on reliable methodology).  See also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 121 (3d Cir. 2004), cert. denied, 544 U.S. 1018 (2005) (expert testimony based on fundamentally flawed methodology was properly excluded).

Consistent with the fact that Westphal admitted that he is not an expert in human factors or the design and effectiveness of warnings, Westphal provides no grounds whatsoever for his opinion that the installation of "No Trespassing," "Keep Away," "Trains Moving," "Stay Away From Tracks," or other signs that have an "X" on them over the symbol of a child riding a bicycle would have deterred Nixon from grabbing onto the Norfolk Southern train while riding his bicycle on April 27, 1997.  Put another way, Westphal's testimony regarding the posting of these warning signs on telephone poles away for the Norfolk Southern right-of-way must be

rejected because he has failed to establish any causal link between these warning signs and a effective deterrent to a minor, such as Nixon, grabbing onto a moving train riding a bicycle on a public street.  See Mause v. Global Household Brands, Inc., 2003 WL 22416000 at *6 (E.D. Pa. 2003).

Furthermore, Westphal's opinion that Norfolk Southern should have contacted the City of Erie to discuss unspecified "measures of protecting children riding this bicycles adjacent to the West 19th Street tracks" suffers from the same fatal flaws.  Westphal admitted that he did not know if the City of Erie already had information regarding children riding bicycles on West 19th Street before Nixon's April 27, 1997 accident although he thought that the City likely did, whether or not that information came directly from Norfolk Southern.  (Westphal Depo., p. 110-111).  Certainly, that is a logical conclusion, given the undisputed fact that West 19th Street is a public street, owned and maintained by the City of Erie.

Westphal also admitted that he could not articulate the specific "measures" that the City of Erie would have taken to deter Nixon from grabbing onto the Norfolk Southern train on April 27, 1997.  (Westphal Depo., p. 89-92).  He stated, however, that he was not suggesting that the City should have stationed policemen on foot or in cars, along West 19th Street on April 27, 1997, to make sure that Nixon and others did not grab onto moving trains while riding bicycles. (Westphal Depo., p. 89-92).  Westphal then admitted that if the City of Erie police were not on West 19th Street when Nixon grabbed onto the Norfolk Southern train, "they couldn't have done anything" to have prevented the accident.  (Westphal Depo., p. 91).

In essence, Westphal has presented shallow, unsupported, result-oriented opinions that fall far short of satisfying the reliability standard of Rule 702.  As a result, Westphal has not

shown "good grounds" for his opinions, and he should be barred as an expert witness and his testimony and other evidence excluded for that reason as well.

        E.    Westphal's Opinions are Irrelevant to the Material Issues in this Civil Action

Finally, Westphal's opinions are irrelevant to the material issues in this civil action for the reasons set forth in the Norfolk Southern Motion for Summary Judgment and its supporting briefs and other materials.  Westphal admitted that the rumble strips and warning signs that he recommended be installed on, or adjacent to, West 19th Street would be on someone else's property rather than on the Norfolk Southern's right-of-way, and yet Norfolk Southern Corporation and Norfolk Southern Railway Company had no right or obligation to do so. (Westphal Depo., p. 95, 110).

Also, the sole legal basis for Nixon's claim against Norfolk Southern Corporation and Norfolk Southern Railway Company -- Restatement (Second) of Torts, § 339 -- has no application to the facts of this case.  (Norfolk Southern Motion for Summary Judgment, Norfolk Southern Brief, and Norfolk Southern Reply Brief).  Norfolk Southern Corporation and Norfolk Southern Railway Company, therefore, also had no duty to install "Danger - No Bikes" signs between the rails."

Accordingly, Westphal's proffered expert testimony is irrelevant and fails to meet the "fit" test.

IV.    <u>Conclusion</u>

Wherefore, defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc., respectfully request this Honorable Court to bar August W. Westphal from serving as an expert witness at trial and to exclude his testimony and other evidence in opposition to the Motion for Summary Judgment on Behalf of Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company, Inc.

Respectfully submitted,


_____ s/ Roger H. Taft _____
Roger H. Taft
PA 19983/NY 2876456
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7603
(814) 454-4647 (facsimile)
rtaft@mijb.com

Attorneys for Defendants
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company, Inc.

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 13, 2007, the foregoing Brief in Support of Defendants' Motion to Bar August W. Westphal as Expert Witness and to Exclude Westphal's Testimony and Other Evidence in Opposition to Defendants' Motion for Summary Judgment was filed electronically with the Clerk of Court using the Electronic Case Filing system.  Notice of this filing will be sent to all parties by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(D) of the Federal Rules of Civil Procedure.  Parties may access this filing through the Court's ECF system.



                                          Roger H. Taft, Esq.